## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:   Mariner Health Central Inc.<br><br>Chapter 11 Debtor<br>───────────────────<br><br>MARINER HEALTH CENTRAL, INC.,<br>PARKVIEW HOLDING COMPANY GP, LLC,<br>AND PARKVIEW OPERATING COMPANY,<br>LP,<br>Plaintiff,<br><br>vs.<br>PEOPLE OF THE STATE OF CALIFORNIA<br><br>Defendant | Case No.   22-10877<br><br>───────────────────<br><br>Adv. Proc. No. 22 -50420 |

### DECLARATION OF DOUGLAS B. ALLEN IN SUPPORT OF OBJECTION
### TO MOTION OF THE DEBTORS FOR AN ORDER GRANTING INJUNCTIVE RELIEF
### AND ENJOINING PROSECUTION OF THE PSC ACTION

I, Douglas B. Allen, declare as follows:

1. I am an Assistant District Attorney for the County of Santa Cruz California. I have been admitted to practice in California for 40 years, and admitted to the Northern, Eastern and Central Districts of California, the 9th Circuit and the Supreme Court.

1

2. I am a member of multiple ongoing and *ad hoc* task force groups of prosecutors investigating

unlawful conduct in California skilled nursing facilities ("SNFs"). Together with other local

prosecutors and the Attorney General of California, we have been investigating the "Mariner

Group of Companies" ("Mariner"), for unlawful conduct in their skilled nursing operations. The

California Department of Justice first contacted Mariner's skilled nursing operations

management in 2019, pointing out that they appear to be understaffing and failing to comply

with California law mandating report of incidents of elder/dependent abuse and endangerment.

Attached as Exhibit 1(a), is the Reply Declaration of Matt Ripley filed in Alameda County

Superior Court case number RG21095881, describing those efforts. See also the original

Declaration of Matt Ripley in support of the preliminary injunction (without exhibits), Exhibit

1(b).

3. The People have refrained from substantial discovery and even though this case has been

pending for a year and a half, the people have only taken 3 depositions in one day regarding

jurisdiction and as actually related to the enforcement action only defendants have taken

depositions, which were of 3 witnesses. The People do not seek to litigate individual patient

outcomes, but to enforce systemwide compliance with the law through injunctive relief,

however, individual tragic outcomes are exemplary of the results of unlawful policies and

practices of Mariner. See the Supplemental Declaration of Special Agent, Matt Ripley attached

as Exhibit 2. See also Exhibit 3, the Declaration of Marthen Lumingkewas supporting that the

control group of Mariner directs the policies that cause the poor outcomes.

4. The People have already established a chronic failure to comply with discharge notice

requirements. See the Declaration of Joel Samuels, Exhibit 4.

2

5. After failed discussions that took place between January and June 2022, the People again moved for a preliminary injunction. The Notice and Amended Proposed Preliminary Injunction is Exhibit 5.

6. The totality of the People's discovery was to take three depositions in one day regarding the structure of the parent companies and learned that Mariner Health Central Inc. only has offices in California, that an office in Georgia is leased by Mariner Health Central Inc. to serve as an office for the parents only, that there is no office in Texas or Maryland, and that Ken Tabler, Devin Ehrlich with the help of Linda Taetz control all the companies. Although the corporation was legally formed in Delaware, its only offices are in California, specifically Hayward (Tabler depo, p. 27, line 19 to page 28, ln. 6; Taetz Depo p. 30, ln. 10-12; p. 37 ln. 2 to p. 38 ln. 16; in the deposition of Linda Taetz, she explains that Mariner Health Central also has an office in Monrovia, California, where all system admissions, Human Resources and payroll are conducted. The so-called Texas office is the home of Kristy Owen (Taetz depo p. 27 ln. 15). The condensed deposition transcripts are attached as Exhibits 6(a)(b) and (c). At page 17 lines 4-7 of the Owen Depo (Ex. 6[c]), she testified that Mariner has not had any business outside of California since 2010.

7. The description of the genesis of Mariner is set forth in the decision of the New York Supreme Court in *Schron v. Grunstein*, 36 Misc. 3d 1238(A), attached as Exhibit 7, of which Judicial Notice is requested (FRE 201).

8. An exhibit to the depositions Exhibits 6, is an organizational chart of Mariner which came from a declaration of Kristy Owen in the Alameda County Case. It is attached here as Exhibit 8.

**DECLARATION OF DOUGLAS B. ALLEN IN SUPPORT OF OBJECTION**
**TO MOTION OF THE DEBTORS FOR AN ORDER GRANTING INJUNCTIVE RELIEF**
**AND ENJOINING PROSECUTION OF THE PSC ACTION**

9.  Two retained experts of the People have analyzed publicly available records submitted by Mariner to CMS reflecting staffing.  In random sampling by both experts, it appears consistent that Mariner is understaffing below the California minimum staffing required levels approximately 20% of the time.  However, Mariner is required to meet patient needs not merely staff to minimums and expert analysis shows an even worse picture in staffing to meet patient needs.  (See Exhibit 9, the Declaration of Valerie Gray in Support of Plaintiff's Motion for Preliminary Injunction).  Discovery of detailed employee time data is sought by the People to confirm these findings.  This does not take 50 plus depositions or cause the production of thousands of pages of patient charts.  Instead, it only requires the downloading of schedules of electronically stored information.  Attached as Exhibit 10 is a relevant page of testimony of forensic accountant Valerie Gray in a deposition taken August 31, 2022, by Mariner, where she describes the process of obtaining the information as "…just a few clicks…" (lines 4-5).

10.  Attached as Exhibit 11, is the *Order re: Hearing on Demurrer* by the Honorable Brad Seligman.

I declare the foregoing to be true and correct of my own knowledge as to direct observations and as to information I have received, based upon my information and belief, and do so under the penalty of perjury pursuant to 28 USC §1746.  Executed, October 18, 2022, at Santa Cruz, California.

Douglas B. Allen,
Assistant District Attorney

4

# EXHIBIT

# 1(a)

ROB BONTA
Acting Attorney General of California
JENNIFER EULER
Chief Assistant Attorney General
JOEL SAMUELS, STATE BAR NO. 234574
Supervising Deputy Attorney General
  2329 Gateway Oaks Drive, Suite 200
  Sacramento, CA 95833-4252
  Telephone: (916) 621-1839
  Fax: (916) 263-0426
  E-mail: Joel.Samuels@doj.ca.gov

NANCY E. O'MALLEY
District Attorney of Alameda County
LORI SCHNALL, State Bar No. 195556
Deputy District Attorney
  1225 Fallon Street, Suite 900
  Oakland, CA 94612-4208
  Telephone: (510) 272-6222
  E-mail: Lori.Schnall@acgov.org

LORI E. FRUGOLI
District Attorney of Marin
ANDRES PEREZ, State Bar No. 186219
Deputy District Attorney
  3501 Civic Center Drive, Suite 145
  San Rafael, CA 94903-4189
  Telephone: (415) 473-6450
  Fax: (415) 473-3719
  E-mail: Aperez@marincounty.org

Exempt from filing fees pursuant to
Government Code section 6103

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**07/14/2022** at **05:09:40 PM**
By: Suzanne Pesko,
Deputy Clerk

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUG ALLEN, State Bar No. 99239
Assistant District Attorney
  701 Ocean Street, Suite 200
  Santa Cruz, CA. 95060
  Telephone: (831) 454-2930
  Fax: (831) 454-2227
  E-mail:
  Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
  211 West Temple Street, Suite 1000
  Los Angeles, CA 90012
  Telephone: (213) 257-2450
  E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
  The People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>MARINER HEALTH CARE INC., et. al.,<br><br>Defendants. | Case No.: RG21095881<br>Hearing Reservation No. 80810896086<br><br>**REPLY DECLARATION OF MATT RIPLEY,** TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION<br><br>DATE: OCTOBER 14, 2022<br>TIME: 10:30 A.M.<br>DEPT: 23<br>JUDGE: HON. BRAD SELIGMAN<br>TRIAL DATE: NONE SET<br>ACTION FILED: APRIL 8, 2021 |

REPLY DECLARATION OF MATT RIPLEY, TO DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION
(RG21095581)

1   **REPLY DECLARATION OF MATT RIPLEY**

2   I, MATT RIPLEY, declare as follows:

3       1. I am a Special Agent with the State of California Department of Justice ("DOJ") –

4   Division of Medi-Cal Fraud and Elder Abuse ("DMFEA"). I have personal knowledge of the

5   matters set forth in this declaration. I have been actively engaged in the investigation by the

6   California Department of Justice and the District Attorney's Offices of Santa Cruz, Alameda, Los

7   Angeles, and Marin of Mariner's chain of nursing homes.

8       2. As I stated in my previous declaration, I have extensive experience in law enforcement

9   and specifically investigations of California skilled nursing facilities.[1]

10

---

11   [1] In August of 2017, I joined the California Department of Justice, Bureau of Medi-

12   Cal Fraud and Elder Abuse (BMFEA). During my time at DOJ I have investigated Medi-Cal fraud, elder abuse, sexual assaults, and prescription drug diversion cases. Prior to becoming a Special Agent with Department of Justice, I served as a Penal Code 830.1(a), Peace Officer

13   Standards and Training (P.O.S.T.) certified peace officer as a deputy sheriff with the Amador County Sheriff's Department for three years. As such I effectuated arrests, communicated to

14   dispatch in response to police calls, testified in court including as a Penal Code §872(b), qualified peace officer at preliminary hearings. I investigated numerous criminal offenses, including

15   neglect cases, sexual assault cases, theft cases, violent crime cases, narcotics cases, sex offender violation cases, and firearms related cases and as a Deputy Coroner, I conducted no less than

16   thirty (30) death investigations. I was employed as a police officer with the Perry Police Department in Iowa from 2007 to 2012, and the Jackson (California) Police Department, for a

17   little under a year. During this time, I also investigated numerous criminal offenses, including narcotics trafficking and manufacturing cases, robbery cases, sexual assault cases, fraud cases,

18   violent crime cases, and firearms related cases. I was assigned to the Internet Crimes Against Children (I.C.A.C.) task force from 2011 until 2012, and as a Perry Police Officer testified in

19   Iowa courts numerous times. In addition, and in connection with my duties, I have authored no less than fifty (50) search warrants and/or court orders. I attended a P.O.S.T. certified Police

20   Academy in Johnston, Iowa, in 2007, where I received over 540 hours of law enforcement training, to include training in neglect investigation. In February 2013, I received a POST-

21   certified Waiver of Attendance from the State of California POST. In 2018, I attended the Department of Justice Special Agent Orientation Academy where I received over 120 hours of

22   training on criminal investigations, surveillance operations, interview techniques, and search warrant preparation. All totaled I have fourteen years of experience as a P.O.S.T. certified peace

23   officer. Throughout the course of my work as a peace officer I have reviewed many police communications and dispatch reports and am familiar with such reports and their formats. I have

24   been investigating incidents of abuse and neglect at both assisted living and skilled nursing facilities in California on an ongoing basis for five years. With DMFEA I am responsible for

25   investigations from Bakersfield to the Oregon Border and have personally inspected and investigated no less than one hundred skilled nursing facilities. I have been engaged in

26   investigation of the skilled nursing facilities operated by Mariner since 2018, and have spoken to numerous residents, family members and staff. I have reviewed numerous records from Mariner

27   as well as police records from the Hayward Police Department who responded to Parkview Healthcare Center.

28       2

---

3. When investigating skilled nursing facilities (SNFs), it is my practice to determine the number of police calls made over time by the facility. Based upon my training and experience, facilities that are understaffed tend to make excessive numbers of calls to police, because they rely on local law enforcement to address issues of resident conflict, dementia, and elopement, instead of employing sufficient qualified staff to intervene and prevent such issues from escalating to the need for law enforcement intervention. Elderly residents in skilled nursing homes often sufferer from mild dementia and will become agitated and disoriented if not promptly redirected by staff. Thus, failing to have sufficient staff to respond to agitated roommates will predictably result in assault and battery. Failing to have sufficient staff to keep tract of the location of ambulatory residents, allows them to elope without being noticed by staff. Typically, all of these types of problems can be solved by simple redirection if intervention occurs promptly.

4. Secondly, I look at the type of calls and whether they are initiated by staff or residents. It is abnormal for staff to repeatedly need law enforcement intervention. I then look to ascertain if appropriate incidents are being reported properly to the California Department of Public Health (CDPH), and the Ombudsman. If it is sufficiently serious that staff needs to call law enforcement for resolution, it is sufficient to require a report to CDPH and the Ombudsman.

5. In a typical SNF facility I expect occasional police calls. Some law enforcement activity is inevitable. When call logs reflect higher numbers of calls that is evidence of inadequate staffing and delegation of maintenance of resident peace and safety to local enforcement in an effort to shift the financial burden of resident supervision to the local taxpayer.

6. Of the Mariner chain of SNFs I obtained call logs on, Creekside Healthcare Center, in San Pablo, averaged 8.3 per month on an 80-bed facility far more than expected. Vale Healthcare in San Pablo, a 200-bed facility averaged 7.6 calls per month, also far more than expected, and Parkview Healthcare, Hayward, a 121 bed facility, averaged 4.4 calls per month for a total of 79 police calls during an 18-month period.

7. Disturbing about the Parkview calls, is what I said in my first declaration, that for 47 out

3

1   of the 79 police calls, which we selected because they involved violence and missing persons,

2   only 3 were reported to CDPH.  Upon obtaining and reviewing the calls I arranged a meeting on

3   April 11, 2019, with, Mariner management to discuss the reports and inquire as to whether the

4   incidents were, documented, investigated internally and reported to the California Department of

5   Health (CDPH) and the Ombudsman.  In addition to myself and my colleague Special Agent

6   Lottie Bloxsom, present was the President and Chief Compliance Officer of Parkview,[2] Linda

7   Taetz, Yuri Ventanilla the former Director of Nursing and then ongoing nursing consultant and

8   Matthew Clark, of Hooper, Lundy,[3] Counsel for Defendants.

9       8. It was at this meeting where Ms. Taetz and Mr. Clark went over multiple incidents in

10  detail and confirmed that only 3 of the 47 selected incidents involving police intervention for

11  violence and missing persons were reported.  It was during this meeting where Ms. Taetz,

12  admitted multiple incidents were supposed to be cross-reported and were not.  Matt Clark

13  represented to me that he would personally investigate the incidents and did follow up with later

14  communications confirming the lack of reporting.

15      9. Attached to my previous declaration are 911 call logs, which reflect the 911 activity at

16  the Parkview location.  These logs were made available at the meeting to the representatives of

17  Mariner and in addition to that we reviewed tape recordings, body camera footage of the incidents

18  and medical records.  Mr. Clark was informed in detail of the circumstances of the incidents.  He

19  listened to the 911 call from incident represented in report number 2017-50066, where the caller

20  reported that one of the residents was bleeding from a gash on the arm.[4]  We viewed body camera

21  footage on other incidents including one showing that a resident was placed in restraints and

22  taken from the building against her will.  This incident was not reported to CDPH.[5]

23

_____

24      [2] See *Declaration of Linda Taetz in Support of Motion to Quash Service of Summons for Lack of Personal Jurisdiction*, page 3 lines 1-2.

25      [3] A copy of my report is attached as Exhibit "A".

26      [4] A transcript of the 911 call is attached as Exhibit "B", and at page 3, lines 12-13 the caller states that the victim has a "big gash on her arm."

27

28      [5] See Exhibit "C" screen shots from the video.

4

REPLY DECLARATION OF MATT RIPLEY, TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(RG21095581)

1      10. It is upon this thorough process of investigation, which included the Defendants'

2 management and their counsel, that the description of individual incidents was developed and

3 upon which it was jointly concluded that only 3 out of the 47 selected calls were reported to

4 CDPH.

5      11. The call logs are merely an abbreviated authentication of the excessive police calls and

6 the failure of Defendants to report assaults and major incidents. Call logs are entered in the

7 jargon of 911 operators and can require peculiar understanding of such jargon to truly understand

8 the message recorded in the log. For instance, the phrase, "no medical requested" such as in

9 report number 2017-50066, where the two residents assaulted each other with canes, simply

10 means that no ambulance or fire department was requested. It does not mean that no medical

11 treatment was required as a result of the assault. After all the residents are in a medical facility

12 already.[6] In the case of report number 2017-50066, indeed one of the residents did need medical

13 attention and was bleeding.

14      12. I also reviewed additional records regarding incidents reflected in the call logs attached

15 to my previous declaration. The allegations made in Defendants' response that the incidents were

16 misrepresented is not true.

17      13. For example:

18      Call, 2017-08702 [sic, should be 28702] (People's Ex. 2, p. 243; Clark Decl.

19 Ex.A)]: Defendants contest the characterization that the staff were unable to control the

20 resident. Based upon my interviews and video records, on 4/16/2017, a Parkview

21 Healthcare Center, Hayward (PHCH) employee identified by the Hayward Police

22 Department (HPD) as "Reyna" dialed the emergency 911 line (call number 2017-

23 00028702) and not the police administrative line. She stated that the facility needed

24 assistance with a resident (Arthur D.) who was identified by the reporting party as "trying

25 to hit several people" and requested a "5150" for the resident. It should be noted; this was

26 the first of four (4) emergency 911 calls the facility made in regard to this same (Arthur

27

28    [6] See Exhibit B, lines 16-19 at page 3.

5

D.s) behavior where PHCH had lost control of the overall safety of the facility and required

police intervention with the other three emergency 911 calls being: call number 2017-

00038039 on 5/7/17 at 1316 hours, call number 2017-00053377 on 6/27/17 at 1146 hours,

and call number 2018-00014322 on 2/16/18 at 1359 hours.

   In addition, a request for documentation regarding this police incident was responded

to by Matt Clark of Hooper Lundy on behalf of PHCH on 2/27/2019 in which Mr. Clark

stated PHCH was unable to locate any record or documentation of the police incident inside

any of the records located at the facility.   As of the date of this declaration, no SOC 341 or

documentation regarding the incident having occurred has been provided by the

facility.[7]  On April 11, 2019 a copy of the call for service was provided to Linda Taetz and

Matt Clark during the in-person interview.  To date the facility has not provided any

documentation that this incident occurred.

   **2017-50066 (People's Ex. 2, p. 297; Clark Decl. Ex. A);** Defendants characterize

this as a complete "fabrication" as the report does not mention any "gash" and the call notes

state "no medical requested."  As previously explained, "no medical requested" in the call

report only means that no ambulance or paramedics were requested.  The "hospital"

apparently treated the "gash" themselves.  The tape of the 911 call clearly reports a gash.[8]

   On 6/16/2017, the phone call to HPD recorded the caller as describing the incident

as an assault.  The body worn camera (BWC) footage worn by the responding officers

captured contact with former PHCH Administrator Johnson Okere where Okere identifies

one of the victims as having a bodily injury on her arm.

   A request for documentation regarding this police incident made earlier was

responded to by Matt Clark of Hooper Lundy on behalf of PHCH on 2/27/2019 in which

Mr. Clark stated PHCH was unable to locate any record or documentation of the police

---

[7] An SOC 341 (blank copy attached as Exhibit D) is a standard reporting form of
the California Department of Social Services.

[8] Ex.B page 3, line 12-13.

6

1    incident inside any of the records located at the facility,[9] and again as of present no SOC

2    341 or documentation regarding the incident has been provided by the facility.

3    **2017-101215 (People's Ex. 2, p. 217; Clark Decl. Ex. A);** Defense counsel contends

4    that a resident with dementia threw a cup of water at another resident which was

5    mischaracterized as a "fight". What happened was that on 12/3/2017, a subject at PHCH

6    identified by the Hayward Police Department (HPD) as "Harmid" dialed the emergency

7    911 line (call number 2017-101215) and not the police administrative line, stating the

8    facility needed assistance with a resident-on-resident altercation describing it as "2

9    residents hitting each other in the hallway" with one of the residents leaving the

10   building. In addition, a second caller later identified as former PHCH resident council

11   president Steven N. described the incident as "patient attacked another patient" identifying

12   the resident as RL.

13        Again, we had requested documentation regarding this police incident and the

14   response by Matt Clark of Hooper Lundy on behalf of PHCH on 2/27/2019 stated PHCH

15   was unable to locate any record or documentation of the police incident inside any of the

16   records located at the facility. As of this date, no SOC 341 or other documentation

17   regarding the incident has been provided by the facility.

18        **2018-17081 (People's Ex. 2, p. 174; Clark Decl. Ex. A);** On this incident the

19   Defendant's concede that the incident was appropriately referred to the police, but object to

20   the characterization that "a resident was hitting other residents and throwing things at

21   them." The call log does recite that the bipolar resident was "off her medication." This by

22   itself is inexplicable since she was a resident of a skilled nursing facility charged with

23   overseeing her medication. The call log states that she was "throwing things around." The

24   resident was placed on a 5150 hold and removed from the facility in restraints.

25        This incident was discussed during the 4/11/19 interview with Mariner VP Linda

26   Taetz, Matt Clark of Hooper Lundy Bookman, and RN Nurse Consultant, Yuri Ventanilla.

27

28   _____

     [9] See Exhibit "E", email from Matt Clark.

                                                          7

1    In the police report, not the call log, the PCHCH caller, employee "Roshini" stated to

2    responding officers that resident Saron L. was "hitting other patients and throwing items

3    around". At approximately the one (1) minute and fifty (50) second mark, the HPD

4    responding officer's Body Worn Camera (BWC) footage captures a PHCH employee

5    looking directly into the officer's BWC camera stating L. "is right over there hitting other

6    residents."

7        I confronted Ms. Taetz, Mr. Clark and Mr. Ventanilla about the lack of cross

8    reporting and documentation. The only documentation by the facility was an internal

9    "Observation Detail List Report" which again characterized the incident that required

10   removal of resident Sharon L. in restraints under a Welfare and Institutions hold because

11   she was a danger to herself and others, as "throwing water at her roommate." The internal

12   report denied and actual physical altercation claiming that the "water did not touch the other

13   resident". During the 4/11/19, interview, Ms. Taetz, Mr. Clark, and Mr. Ventanilla viewed

14   the BWC, the incident report generated from the call, and acknowledged the outcome of the

15   call where resident Sharon L. was removed from the facility in restraints on a gurney and

16   placed on a mental health hold (W&I §5150).[10]

17       Ventanilla deferred the responsibility to report to the "abuse coordinator"

18   Administrator Johnson Okere. He believed an investigation would take place, yet there was

19   none. Mr. Ventanilla said that Administrator Okere, was responsible for all reporting to be

20   made to the CDPH and the Ombudsman's office, which was not done. Linda Taetz also

21   spoke to what she saw on the BWC footage and the police incident report.[11]

22       Even though resident Sharon L. was forcibly removed from the facility in restraints

23   on a W&I §5150 hold which requires a belief that she poses a danger to herself or others, as

24   of the date of this declaration the facility has failed to produce any reporting documentation

---

[10] See Exhibit B.

[11] Nurse Consultant, Ventanilla stated when a person is removed from a facility on a mental health hold, medical staff would document the incident in the medical record progress notes with an "SBAR". Mr. Ventanilla stated this was done for documentation purposes only notating what interventions were used by the facility but did not result in any cross reporting.

8

regarding this incident.[12] In incident **2018-43723 (People's Ex. 2, p. 169; Clark Decl. Ex. A)**, the same resident was again forcibly restrained and transported from the facility with a W&I :5150 hold, after threatening to light the building on fire with a lighter in her hand, but no reports were created for submitted to CDPH nor the Ombudsman.  No SOC 341 was submitted.

**2018-26225 (People's Ex. 2, p. 127; Clark Decl. Ex. A)**; Defendants deny any reportable incident and that, "A resident was causing a disturbance by "throwing patio furniture around" late at night, resulting in the 911 call from another resident. Nobody was hurt and the resident causing the disturbance went back to sleep a few minutes later." Defendants argue that the incident was not reportable.  However, the call report and further investigation showed that the caller stated, "patient is out of control, throwing patio furniture around".  Additionally, the caller stated "they cannot control him" meaning the resident, Richard L.  During a recorded interview with former resident council president Steven N.[13] Steven N. specifically referenced this incident stating that Richard L. was attempting to force entry through the glass doors of multiple PHCH resident rooms using patio furniture to try and break through the glass doors.  Notwithstanding this, in the 4/11/19 interview with President Linda Taetz, Attorney Matt Clark, and RN Consultant Yuri Ventanilla, I questioned the facilities inability to provide any documentation regarding HPD Incident #2018-00026225.  PHCH had no records for the incident.  When President Taetz learned that PHCH was unable to produce documentation regarding the incident, her response was "oh wow".  As of the date of this declaration, the facility has produced no documentation that this event occurred.

In response to our earlier request for reporting documentation regarding this police incident Matt Clark of Hooper Lundy stated PHCH was unable to locate any record or documentation of the police incident inside any of the records located at the facility.  No

---

[12] The report generated from the interview with Taetz, Clark, and Ventanilla is attached as Exhibit A.
[13] This interview was documented in my investigative report ROI #19.

REPLY DECLARATION OF MATT RIPLEY, TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(RG21095581)

1    SOC 341 or documentation regarding the incident having occurred has been provided by

2    the facility.  Mr. Clark knew of the problems with this resident and dismissed the actions

3    stating, "he often required redirection from staff".  Mr. Clark indicated that, "there is no

4    record of any physical confrontation with other residents."  However, from our

5    investigation, and as shown from the examples above, the Mariner management merely

6    refuses to document violence and thus simply ignores its existence.

7    **2018-48536 (People's Ex. 2, p. 286; Clark Decl. Ex. A):**  Although resident Peter C. was

8    "trying to wrap a phone cord around his neck" and was transported from the facility under a

9    W&I §5150 hold, the incident was not reported to either CDPH nor the Ombudsman and no

10   SOC 341 was prepared.

11       14.  In a similar approach, Defendants' counsel takes issue with the statement that

12   Defendants "had lost track of their residents."  Without reviewing the specific reports, which

13   again are mischaracterized by failing to acknowledge all of the available evidence known well to

14   Defendants, that even in the acknowledged description of events, residents were missing from an

15   hour to as much as three days when the facility did not know of the resident's whereabouts.

16   Regardless of the benign outcomes, loosing multiple residents for an hour or more is an

17   unacceptable reflection of inadequate staffing.  Although sometimes staff were aware of

18   elopements, often they were not for hours and days at a time.

19       I declare under the penalty of perjury, under the laws of the State of California, the

20   foregoing to be true and correct.  Executed this 13th day of July 2022, at Sacramento, California.

21                                                          DocuSigned by:

                                                           *Matt Ripley*
22                        _____      56ED766BAFAE4CF...

                          Matt Ripley
23

24

25

26

27

28                                          10
─────────────────────────────────────────────────────────

# Exhibit A

# Report of Investigation

# Field Report no. 43

**Regarding Investigation of Parkview Healthcare Center**

**June 4, 2019**

*BUREAU OF MEDI-CAL FRAUD AND ELDER ABUSE*                *State of California*
                                                         *DEPARTMENT OF JUSTICE*

# REPORT OF INVESTIGATION

**PAGE: 43-1**

**CASE NAME:** PARKVIEW Healthcare Center                    **MATTER ID:** SF2018102591

### FIELD REPORT NO. 43

| | |
|---|---|
| **Name:** | Yuri Ventanilla – Former Director of Nursing |
| **Facility:** | PARKVIEW Healthcare Center - Hayward |
| **Address:** | 27350 Tampa Ave |
| | Hayward, CA 94544 |
| **Phone:** | 510-783-8150 |

| | |
|---|---|
| **Name:** | Linda Taetz – Vice President of Compliance |
| **Facility:** | Mariner Corporation |
| **Address:** | 27350 Tampa Ave |
| | Hayward, CA 94544 |
| **Phone:** | 510-783-8150 |

| | |
|---|---|
| **Name:** | Matthew Clarke - Attorney |
| **Firm:** | Hooper, Lundy & Bookman PC |
| **Address:** | 575 Market St #2300 |
| | San Francisco, CA 94105 |
| **Phone:** | 415-875-8500 |

| | |
|---|---|
| **Name:** | Johnson OKERE - Administrator |
| **Facility:** | PARKVIEW Healthcare Center - Hayward |
| **Address:** | 27350 Tampa Ave |
| | Hayward, CA 94544 |
| **Phone:** | 510-783-8150 |

| | |
|---|---|
| **Name:** | Aureliano PRIETO – Former Resident / Deceased |
| **DOB:** | 6/13/1937 |
| **Facility:** | PARKVIEW Healthcare Center - Hayward |
| **Address:** | 27350 Tampa Ave |
| | Hayward, CA 94544 |
| **Phone:** | 510-783-8150 |

**PAGE** 43-2
**CASE NAME** PARKVIEW Healthcare Center                    **MATTER ID** SF2018102591

On April 11, 2019, I, Special Agent (SA) Matt Ripley and SA Lottie Bloxsom of the California Department of Justice (CA/DOJ) Bureau of Medi-Cal Fraud and Elder Abuse (BMFEA), conducted a recorded interview with Yuri Ventanilla, former Director of Nursing (DON) and current Nursing Consultant (NC) for PARKVIEW HEALTHCARE CENTER HAYWARD (PHCH). In addition to Ventanilla, Linda Taetz, Vice President (VP) of compliance for Mariner Corporation (MC), and Matthew Clarke, attorney with the law firm Hooper, Lundy & Bookman were present. The following is a summary of the interview:

The first area I covered was Ventanilla's education and background. Ventanilla stated he originally worked in healthcare in the Philippines and had continued his healthcare education in the United States. Ventanilla stated he received his nursing license in 2016, and started with MC in 2016 at Driftwood Healthcare Center Hayward (DHCH). Ventanilla stated his first Director of Nursing (DON) was with PHCH from July 2018 until February 2019. Ventanilla stated he is now a Nursing Consultant with MC. Ventanilla stated he was a nurse in the Philippines in an "acute setting".

The second area covered during the interview was abuse reporting and cross-reporting. The documents referenced during this portion of the interview were the responses to a document request regarding specific internal investigations related to violent police calls from PHCH to the Hayward Police Department. The initial responses to the documentation request provided by Clarke are compared to the HPD evidence and records are broken down in ROI #42.

The first specific incident covered was HPD Incident #2018-00017081 dated February 25, 2018 having occurred at approximately 0924 hours. The caller is listed as "roshini" and during the initial call HPD is informed Saron L███ is a "patient hitting other patients and throwing items around". At approximately the one (1) minute and fifty (50) second mark, the HPD responding officer's Body Worn Camera (BWC) footage captures a PHCH employee looking directly into the officer's BWC camera stating "she is right over there hitting other residents" in reference to L███ and her actions. The response for documentation from PHCH regarding the above incident stated *"Observation Detail List Report regarding incident involving Saron L███ throwing water at resident roommate (no actual physical altercation occurred as the water did not touch the other resident)"*.

I showed everyone the BWC, the incident report generated from the call, and the outcome of the call where L███ was removed from the facility and placed on a mental health hold (5150 W&I). I asked Ventanilla was would the process was for the investigation and he stated the abuse coordinator would be informed of the incident and an investigation would take place. Ventanilla identified the abuse coordinator as the administrator (Administrator Johnson OKERE). Ventanilla stated Administrator (ADM) OKERE would be ultimately responsible for all reporting turned over the CDPH and the Ombudsman's office.

Vice President (VP) Linda Taetz also spoke to what she saw on the BWC footage and the police incident report. VP Taetz stated she would require further information before making a judgement on whether the incident needed to be cross-reported to the Ombudsman's office and the California Department of Public Health (CDPH). I advised Taetz with Link being forcibly removed from the facility by the Hayward Police Department (HPD), she would have to be a danger to herself or others and Taetz agreed L███ throwing "water" would not constituted eminent danger.

Ventanilla stated when a person is removed from a facility on a mental health hold, medical staff would document the incident in the progress notes with an "SBAR". Ventanilla stated this was done for documentation purposes only notating what interventions were used by the facility.

**PAGE 43-3**
**CASE NAME** PARKVIEW  Healthcare Center                    **MATTER ID** SF2018102591

The second incident covered during the interview was HPD Incident #2018-00043723 dated May 22, 2018 at approximately 1839 hours. The caller is listed as "jamie-nurse" and the initial information provided to HPD stated Saron L██ "has a lighter and threatening to light the building on fire...doctor wants to send her to John George. Has lighter now and ref to give it to staff". *The response for documentation from PHCH regarding the above incident indicated the facility had no record of the above incident.*

For this incident, Clarke stated he would conduct his own internal investigation to determine if the matter was handled properly.

It should be noted; both VP Taetz and Matthew Clarke stated the facility is required to "take the patient back" if they are removed for a mental health hold. Clarke stated a facility has the option to refuse to admit a new patient; however, "once they get through the door, you have to let them back in". It should be noted; a review of the Hayward Police Department Call logs to PHCH indicated former resident Victoria G██ was physically removed from the facility on August 7, 2018, at approximately 1850 hours (SEE HPD INC# 2018-00065692). The facility failed to re-admit her after being released from a mental health hold, calling HPD to have her removed from the facility grounds on August 8, 2018, after being released from her mental health hold at 0118 hours less than six (6) hours after being taken away (SEE HPD INC# 2018-00065760).

The third incident covered during the interview was HPD Incident #2018-00043723 dated December 3, 2017, at approximately 0910 hours. The caller is listed as "Harmid" and the initial information provided to HPD dispatch stated "2 residents hitting each other". In addition, a second caller stated "patient attacked another patient". The primary aggressor is identified as Richard L██. The response for documentation from PHCH regarding the above incident stated "Richard L██, he often required redirection from staff, but there is no record of any physical confrontation with other residents".

I inquired as to whether the above stated incident would be a reportable incident to both the Ombudsman's office and CDPH, and VP Taetz stated "by company standards its a reportable incident"

Ventanilla stated there would be an internal investigation based on the evidence presented from the HPD. It should be noted; there was no documentation regarding the incident produced by PHCH.

The fourth incident covered during the interview was HPD Incident #2018-00040462, dated May 11, 2018, at approximately 1357 hours. The caller is Fabiola Garcia (former Social Services Director) who informs HPD Aureliano P██ is "hitting people and acting out". In addition, Garcia informs HPD Dispatch Prieto "hit another resident and is touching the female residents in an inappropriate way". The officer's disposition for the above stated incident reads as the following: "I spoke with director who advised me they no longer needed assistance and were just merely concerned with the patient not calming down. The patient touching staff is directly associated to his dementia, as it is known to increase the sexual urge in people suffering from it. The patient is not believed to be an old man seeking to sexually abuse staff members. This was related to me by the director who had spoken with the patient's doctor. No further assistance needed by Director".

Ventanilla stated he had only limited interaction with P██. Ventanilla stated he had never personally heard ADM OKERE communicate to the police about P██'s behavior. Ventanilla stated he never personally heard ADM OKERE report R██'s behavior to the police.

The fifth incident covered during the interview was HPD Incident #2018-00048536, dated June 8, 2018, at approximately 1025 hours. The caller is identified as "Alani" who informs HPD dispatch the facility is having

**PAGE 43-4**
**CASE NAME** PARKVIEW Healthcare Center                    **MATTER ID** SF2018102591

issues with resident Peter C████ Alani stated during the call to HPD "He (C████) has been intentionally throwing himself on the floor to hurt himself", "He is refusing to get up and will not allow nurses to help him", and "subject also tried to wrap a phone cord around his neck". The response for documentation from PHCH regarding the above incident stated "while there is no record of attempted suicide by Peter O████ the resident has a history of slipping out of his wheelchair and landing on the floor due to UTI. Observation Detail List Report provided concerning incident where Mr. O████was found sitting on floor next to wheelchair". This information provided by PHCH omits and/or contradicts the documented suicide attempt by O████ on the HPD call for service and the recorded phone call placed by the PHCH employee.

I asked Ventanilla about the procedures in place for documenting and reporting suicide attempts. Ventanilla stated suicides require an incident report and the resident's doctor would need to be notified. Again, PHCH provided no detail or information regarding the suicide attempt.

The sixth incident covered during the interview was HPD incident #2018-00000305, dated January 2, 2018, at approximately 0300 hours. The incident report indicated multiple callers, including "Jenn who is charge nurse" who stated "male is on the roof at the back of the facility". In addition, responding HPD officers request fire department assistance to "see if fire can get a ladder up there on a storage shed". During a review of the recorded phone call placed regarding this incident "Jenn who is charge nurse" could be clearly heard stating the subject later identified as Richard L████"is trying to jump". The disposition by the responding HPD officers stated "Subject was 5149 and having an episode. Was trying to escape and caught himself on barbwire. Declined medical". The response for documentation from PHCH regarding the above incident stated "The incident that occurred on 1/2/18 was not reportable. While Richard L████was found to have climbed into the storage area at the back of Parkview's building (not the roof) on 1/2/18, he did not fall and did not sustain any injuries".

For the above incident and evidence, VP Taetz referred to the documentation from HPD and the subsequent reply from the facility as "very interesting". VP Taetz stated "the incident does not sound familiar at all".

The seventh incident covered during the interview was HPD incident #2018-00026225, dated March 28, 2018, at approximately 0146 hours. The incident report indicated the caller to be "shakul", and states "patient is out of control, throwing patio furniture around". Additionally, the caller stated "says they cannot control him [Richard L████]". During a recorded interview with former resident council president Steven Nakamura (SEE ROI #19), he specifically references this incident stating L████was attempting to force entry through the glass doors of multiple PHCH resident rooms using patio furniture to try and break through the glass doors. The response for documentation from PHCH stated the facility has no records for the incident.

When I informed VP Taetz that PHCH provided no documentation regarding the incident, her response was "oh wow".

The eight incident reviewed during the interview was HPD incident #2017-00050066, dated June 16 2017, at approximately 1450 hours. The incident report indicated "two (2) 90 year old patients hit each other with their canes. No medical requested, parties separated now, just requesting pd to document the incident".

For this incident no questions were asked; however, the detail call for service was provided to VP Taetz and Clarke for review as part of their own internal investigation.

The ninth incident reviewed during the interview was HPD incident #2017-00028702, dated April 6, 2017, at approximately 1621 hours. The incident report listed "Riena" as the caller, who reported Arthur D████"is

**PAGE 43-5**
**CASE NAME** PARKVIEW Healthcare Center                    **MATTER ID** SF2018102591

trying to his several people". At approximately 1713 hours, the call log is updated with "The patient is no longer violent and eating his dinner in his room. Staff stated they did not need any further assistance". The response for documentation from PHCH stated the facility has no records for the incident.

For this incident no questions were asked; however, the detail call for service was provided to VP Taetz and Clarke for review as part of their own internal investigation.

The tenth incident reviewed during the interview was HPD incident #2018-43943 dated May 23, 2018, at approximately 1320 hours. The incident report listed "Zeenet-staff" as the reporting party. Zeenet reported a physical confrontation between "the administrator" and a resident. Zeenet stated "he was putting hands on him and hitting him". Zeenet identifies the resident as Nilo F█████ Zeenet stated the Administrator "wants" the police to come to the facility. The response for documentation from PHCH sated the facility has no records for the incident.

I then spoke with Ventanilla regarding his interactions with some of PHCH current and former residents. The first resident I spoke with Ventanilla with was current resident, Stephen M█████████ Ventanilla described M█████ as "quiet and kept to himself". Ventanilla stated he had limited interaction with M█████

I then spoke with Ventanilla about the August 2018 infection control document provided by Clarke where it appeared a large portion of the beds inside PHCH had some sort of "rash". Ventanilla stated one of the residents had a scrape test performed and it tested positive for scabies. Ventanilla stated this was not resident Jose S█████, Ventanilla stated S█████'s positive test "came before my time". Ventanilla stated after the first test came back positive for scabies, the staff of PHCH performed a "skin sweep".

Ventanilla stated ADM OKERE would've been made aware of the infection control issues. Ventanilla stated "we discussed it every morning". Ventanilla stated ADM OKERE would be in charge of cleaning and maintenance of the building as it relates to infection control. Ventanilla stated ADM OKERE would ask the staff what to do about the infection control. Ventanilla stated ADM OKERE was actively engaged with the infection control issues.

Ventanilla stated the scabies was reported to CDPH, and the facility has been working closely with them on the issue. Ventanilla stated reporting has been occurring "weekly" since the outbreak. Clarke stated there has been a person at CDPH that has been "actively monitoring" the situation. Clarke stated CDPH did not find any deficiencies. Clarke stated he would be able to provide the CDPH supervisors name that is overseeing the infection control issue in the near future.

Ventanilla stated he had limited interactions with P█████. Ventanilla stated he would normally see P█████ "sitting in the dining room". Ventanilla stated he had very limited interaction with him due to the fact P█████ is "Spanish-speaking". Ventanilla stated PRIETO's behavior was discussed during the "morning meetings". Ventanilla stated he was never involved in any sexual assault investigations regarding female residents in the past. Ventanilla stated it was his belief P█████'s behavior had "been reported in the past". Ventanilla stated it was his belief P█████'s behavior had been reported to both the police and Ombudsman. Ventanilla stated ADM OKERE was "very well aware of the behavior". Ventanilla stated "the whole management team was very well aware of his behavior".

I asked Ventanilla if he had any involvement with the investigation into the Mia R█████ sexual assault done by P█████. Ventanilla stated he was aware of the incident, but did not have any involvement with the investigation. I then reviewed the internal investigation summary generated by a July 23, 2018, sexual battery

**PAGE 43-6**
**CASE NAME** <u>PARKVIEW  Healthcare Center</u>                    **MATTER ID** <u>SF2018102591</u>

of P█████ by P███████with Ventanilla.  Ventanilla did not provide any medical reason or any reason at all as to why the statements made by the persons involved in the incident should not be believed.  I explained to him that ·I had interviewed all of the residents involved and each and every one of them stated the statements contained in the reporting documents provided by PHCH were falsified.

Ventanilla stated the steps he was aware of that were put in place to "try and correct his [P█████} behavior was closely monitoring and activities to keep him occupied".  Ventanilla stated fifteen (15) minute watches were put in place, but no "one on ones".

I asked Ventanilla if he knew P█████ to have been violent with the female residents of PHCH, and he stated that he only knew P█████ to be violent towards PHCH staff.

I asked Ventanilla if he had ever had any dealings with Nancy R█████ and he stated she was both alert and orientated.  It should be noted; R█████ is the roommate of Desderia D█████ and had witnessed an un-reported sexual battery by P█████ against D█████ (SEE ROI #16).

I asked Ventanilla about his interactions with Jose S█████.  Ventanilla described S█████ as "alert, and orientated".

I asked Ventanilla about resident room changes, and he stated "if there is an altercation between a roommate, it needs to be addressed immediately and room change may be necessary".  Ventanilla stated room changes would also be discussed at "QA" [Quality Assurance] meetings.

Ventanilla stated ADM JOHNSON had "over-ruled" him when it came to admitting a patient in the past.  Ventanilla stated this occured two to three (2 to 3) times.  Ventanilla referenced Jimmy C█████as a patient he would have "rejected".

I asked Ventanilla about resident Christine V█████, and he described her as "alert, orientated, and can make her own decisions.  It should be noted; this directly contradicts the PHCH request to the Social Security Administration (SSA) where V█████s bank accounts were switched at the request of PHCH to the facility's trust fund.

Contacts are recorded to the extent possible and attached to this matter in ProLaw (**attachment 43-1**).

The investigation is ongoing.

Prepared By:_____                    Date:_6/4/19_
              Matthew Ripley, SA

Approved By:_____                    Date:_8/14/19_
              Larry Hyatt, SAS

# Exhibit B

# Transcript of Hayward Police Department Call No. 2017-50066

**Hayward Police Department Call No. 2017-50066**

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

PEOPLE OF THE STATE OF
CALIFORNIA,

               Plaintiff,

                             **CERTIFIED COPY**
vs.                           No. RG21095881

MARINER HEALTH CARE, INC., a
Delaware corporation, et al.,

               Defendants.

_____/

HAYWARD POLICE DEPARTMENT CALL

No. 2017-50066

Transcribed by STACY L. LOZANO, CSR No. 12831

a Certified Shorthand Reporter

for the State of California

Friday, June 24, 2022

---oOo---

## Hayward Police Department Call No. 2017-50066

### Page 2

1  HAYWARD POLICE DEPARTMENT CALL
2  NO. 2017-50066
3  —oOo—
4
5  DISPATCH: Hayward Police Department. May I help
6  you?
7  CALLER: Hi, one of our residents just assaulted
8  another one with a cane, so I need the police to come here
9  to fill out a report.
10  DISPATCH: Okay. Does anyone want anyone
11  arrested?
12  CALLER: Both patients have dementia, so...
13  DISPATCH: Oh, sounds fun.
14  What's the address?
15  CALLER: Okay. 27350 Tampa Avenue in Hayward.
16  DISPATCH: And what rooms are they in?
17  CALLER: Okay. Today's my second day. I'm not
18  sure exactly what rooms they're in, but I can guide you to
19  them.
20  DISPATCH: Okay.
21  CALLER: Okay. I don't have computer access
22  here.
23  DISPATCH: No worries.
24  CALLER: Okay, thank you.
25  DISPATCH: Wait, wait, wait. Hold on.

### Page 3

1  CALLER: Oh, I'm sorry.
2  DISPATCH: Okay. And how old are the patients?
3  CALLER: Um, hold on a second.
4  DISPATCH: You don't have to give me --
5  CALLER: I can't really tell you; I'm sorry.
6  DISPATCH: You don't have to give me an exact
7  age. Just like 70s, 60s, 80s, 90s?
8  CALLER: 80s, 90s.
9  DISPATCH: Okay. Give me one second.
10  Is anyone injured? Does anyone need an ambulance
11  or anything?
12  CALLER: Yes, she is injured. She has a big gash
13  on her arm.
14  DISPATCH: So do you need a fire department,
15  ambulance?
16  CALLER: He's -- um, I don't think so. I don't
17  think so. I think the nurses are doing their
18  interventions. If they feel that, you know, they need
19  more medical attention, then they'll call --
20  DISPATCH: Gotcha.
21  CALLER: -- the ambulance. But I just have to
22  call the police.
23  DISPATCH: Okay.
24  CALLER: Yeah.
25  DISPATCH: And they're separated now, right?

### Page 4

1  CALLER: Yes, they're separated.
2  DISPATCH: Okay. We'll send out the police out
3  there.
4  CALLER: Thank you.
5  DISPATCH: No problem.
6  CALLER: Bye.
7
8  ---oOo---
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2  (Pages 2 to 4)

**Hayward Police Department Call No. 2017-50066**

1                    CERTIFICATE OF REPORTER

2

3          I, STACY L. LOZANO, hereby certify the following:

4

5          That said audio file was taken in shorthand by

6    me, a Certified Shorthand Reporter of the State of

7    California, and was thereafter transcribed into

8    typewriting, and that the foregoing transcript constitutes

9    a full, true and correct report of said proceedings which

10   took place;

11

12         That I am a disinterested person to the said

13   action.

14

15         IN WITNESS WHEREOF, I have hereunto set my hand

16   this 24th day of June, 2022.

17

18         _____

19         STACY L. LOZANO, CSR No. 12831

20                  ---oOo---

21

22

23

24

25

                                                    Page 5

**Hayward Police Department Call No. 2017-50066**

Page 5

1                    CERTIFICATE OF REPORTER

2

3          I, STACY L. LOZANO, hereby certify the following:

4

5          That said audio file was taken in shorthand by

6    me, a Certified Shorthand Reporter of the State of

7    California, and was thereafter transcribed into

8    typewriting, and that the foregoing transcript constitutes

9    a full, true and correct report of said proceedings which

10   took place;

11

12         That I am a disinterested person to the said

13   action.

14

15         IN WITNESS WHEREOF, I have hereunto set my hand

16   this 24th day of June, 2022.

17

18         _____

19                    STACY L. LOZANO, CSR No. 12831

20                         ---oOo---

21

22

23

24

25

Hayward Police Department Call No. 2017-50066

**A**

access 2:21
action 5:13
address 2:14
age 3:7
al 1:9
ALAMEDA 1:3
ambulance 3:10
  3:15,21
arm 3:13
arrested 2:11
assaulted 2:7
attention 3:19
audio 5:5
Avenue 2:15

**B**

big 3:12
Bye 4:6

**C**

California 1:2,5
  1:22 5:7
call 1:16 2:1
  3:19,22
CALLER 2:7,12
  2:15,17,21,24
  3:1,3,5,8,12,16
  3:21,24 4:1,4,6
cane 2:8
CARE 1:9
CERTIFICATE
  5:1
Certified 1:7,21
  5:6
certify 5:3
come 2:8
computer 2:21
constitutes 5:8
COPY 1:7
corporation 1:9
correct 5:9
COUNTY 1:3
COURT 1:2
CSR 1:20 5:19

**D**

day 2:17 5:16
Defendants 1:11
Delaware 1:9
dementia 2:12
department 1:16
  2:1,5 3:14
disinterested
  5:12
DISPATCH 2:5
  2:10,13,16,20
  2:23,25 3:2,4,6
  3:9,14,20,23
  3:25 4:2,5
doing 3:17

**E**

et 1:9
exact 3:6
exactly 2:18

**F**

feel 3:18
file 5:5
fill 2:9
fire 3:14
following 5:3
foregoing 5:8
Friday 1:23
full 5:9
fun 2:13

**G**

gash 3:12
give 3:4,6,9
Gotcha 3:20
guide 2:18

**H**

hand 5:15
Hayward 1:16
  2:1,5,15
HEALTH 1:9
help 2:5
hereunto 5:15
Hi 2:7
hold 2:25 3:3

**I**

injured 3:10,12
interventions
  3:18

**J**

June 1:23 5:16

**K**

know 3:18

**L**

L 1:20 5:3,19
LOZANO 1:20
  5:3,19

**M**

MARINER 1:9
medical 3:19

**N**

need 2:8 3:10,14
  3:18
nurses 3:17

**O**

Oh 2:13 3:1
Okay 2:10,15,17
  2:20,21,24 3:2
  3:9,23 4:2
old 3:2
oOo— 1:24 2:3
  4:8 5:20

**P**

patients 2:12 3:2
PEOPLE 1:5
person 5:12
place 5:10
Plaintiff 1:6
police 1:16 2:1,5
  2:8 3:22 4:2
problem 4:5
proceedings 5:9

**Q**

**R**

really 3:5
report 2:9 5:9
Reporter 1:21
  5:1,6
residents 2:7
RG21095881 1:7
right 3:25
rooms 2:16,18

**S**

second 2:17 3:3
  3:9
send 4:2
separated 3:25
  4:1
set 5:15
shorthand 1:21
  5:5,6
sorry 3:1,5
sounds 2:13
STACY 1:20 5:3
  5:19
State 1:2,5,22
  5:6
SUPERIOR 1:2
sure 2:18

**T**

taken 5:5
Tampa 2:15
tell 3:5
thank 2:24 4:4
think 3:16,17,17
Today's 2:17
transcribed 1:20
  5:7
transcript 5:8
true 5:9
typewriting 5:8

**U**

um 3:3,16

**V**

vs 1:7

**W**

wait 2:25,25,25
want 2:10
We'll 4:2
WHEREOF
  5:15
WITNESS 5:15
worries 2:23

**X**

**Y**

Yeah 3:24

**Z**

**0**

**1**

12831 1:20 5:19

**2**

2017-50066 1:17
  2:2
2022 1:23 5:16
24 1:23
24th 5:16
27350 2:15

**3**

**4**

**5**

**6**

60s 3:7

**7**

70s 3:7

**8**

80s 3:7,8

**9**

90s 3:7,8

# Exhibit C

# Screen Shots of Hayward Police Body Worn Camera Video,

# Department Call No. 2018-17081



# Exhibit D

# State of California Report of Suspected Dependent Adult/Elder Abuse

# SOC 341

State of California – Health and Human Services Agency          California Department of Social Services

# REPORT OF SUSPECTED DEPENDENT ADULT/ELDER ABUSE

| Date Completed |
| --- |

**CONFIDENTIAL REPORT - NOT SUBJECT TO PUBLIC DISCLOSURE**
*TO BE COMPLETED BY REPORTING PARTY. PLEASE PRINT OR TYPE.*
*SEE GENERAL INSTRUCTIONS.*

**A. VICTIM** ☐ Check box if victim consents to disclosure of information
(Ombudsman use only - WIC 15636(a))

| Name (Last Name, First Name) | Age | Date of Birth | SSN |
| --- | --- | --- | --- |
| | | | |

| Gender Identity | Sexual Orientation | Ethnicity | Race |
| --- | --- | --- | --- |
| ☐ Male | ☐ Straight | | |
| ☐ Female | ☐ Gay/Lesbian | | |
| ☐ Transgender | ☐ Bisexual | Language (Check one) | |
| ☐ Other/Nonbinary | ☐ Questioning | ☐ Non-Verbal ☐ English | |
| ☐ Unknown/Not Provided | ☐ Unknown/Not Provided | ☐ Other (Specify) _____ | |

| Address (If facility, include name and notify ombudsman) | City | Zip Code | Telephone |
| --- | --- | --- | --- |
| | | | |
| Present Location (If different from above) | City | Zip Code | Telephone |
| | | | |

☐ Elderly (65+)   ☐ Developmentally Disabled   ☐ Mentally Ill/Disabled   ☐ Lives Alone
☐ Physically Disabled   ☐ Unknown/Other   ☐ Lives with Others

**B. SUSPECTED ABUSER**   Check if ☐ Self-Neglect

Name of Suspected Abuser

| Address | City | Zip Code | Telephone |
| --- | --- | --- | --- |
| | | | |

☐ Care Custodian (Type)_____   ☐ Parent   ☐ Son/Daughter   ☐ Other _____
☐ Health Practitioner (Type)_____   ☐ Spouse   ☐ Other Relation _____

| Gender ☐ Male ☐ Female | Ethnicity | Age | D.O.B |
| --- | --- | --- | --- |
| Height | Weight | Eyes | Hair |

State of California – Health and Human Services Agency        California Department of Social Services

**C. REPORTER'S OBSERVATIONS, BELIEFS, AND STATEMENTS BY VICTIM IF AVAILABLE. DOES ALLEGED PERPETRATOR STILL HAVE ACCESS TO THE VICTIM? DOES THE ALLEGATION INVOLVE A SERIOUS BODILY INJURY (see definition in section "Reporting Responsibilities and Time Frames" within the General Instructions)? PROVIDE ANY KNOWN TIME FRAME (2 days, 1 week, ongoing, etc.). LIST ANY POTENTIAL DANGER FOR INVESTIGATOR (animals, weapons, communicable diseases, etc.) or concerns about the client's mental health.**
☐ CHECK IF MEDICAL, FINANCIAL (ACCOUNT INFORMATION, ETC.), PHOTOGRAPHS, OR OTHER SUPPLEMENTAL INFORMATION IS ATTACHED.

State of California – Health and Human Services Agency          California Department of Social Services

**D. REPORTING PARTY**  Check appropriate box if reporting party waives confidentiality to
☐ All   ☐ All but victim   ☐ All but perpetrator

| Name | Signature | Occupation | Agency/Name of Business |
|---|---|---|---|
| Relation to Victim/How Abuse is Known | Street | City | Zip Code |
| Telephone | E-mail Address | | |

**E. INCIDENT INFORMATION** - Address where incident occurred

Date/Time of Incident(s)

Place of Incident (Check One)
☐ Own Home   ☐ Community Care Facility   ☐ Hospital/Acute Care Hospital
☐ Home of Another   ☐ Nursing Facility/Swing Bed   ☐ Other (Specify)_____

**F. REPORTED TYPES OF ABUSE** (Check All that Apply)

1. Perpetrated by Others (WIC 15610.07 & 15610.63)
a. ☐ Physical (e.g. assault/battery, constraint or deprivation, chemical restraint, over/under medication)
b. ☐ Sexual
c. ☐ Financial
d. ☐ Neglect (including Deprivation of Goods and Services by a Care Custodian)
e. ☐ Abandonment
f. ☐ Isolation
g. ☐ Abduction
h. ☐ Psychological/Mental
i. ☐ Other _____

2. Self-Neglect (WIC 15610.57 (b)(5))
a. ☐ Neglect of Physical Care (e.g. personal hygiene, food, clothing, malnutrition/dehydration)
b. ☐ Self-Neglect of Residence (unsafe environment)
c. ☐ Financial Self-Neglect (e.g. inability to manage one's own personal finances)

Abuse Resulted In (Check All that Apply)
☐ No Physical Injury   ☐ Minor Medical Care   ☐ Hospitalization   ☐ Care Provider Required
☐ Death   ☐ Mental Suffering   ☐ Serious Bodily Injury*   ☐ Other (Specify)_____
☐ Unknown   ☐ Health & Safety Endangered

**G. OTHER PERSON BELIEVED TO HAVE KNOWLEDGE OF ABUSE**
*(Family, significant others, neighbors, medical providers, agencies involved, etc.)*

| Name | Relationship |
|---|---|
| Address | Telephone |
| Name | Relationship |
| Address | Telephone |

SOC 341 (11/18)                                             Page 3 of 9

State of California – Health and Human Services Agency      California Department of Social Services

## H. FAMILY MEMBER OR OTHER PERSON RESPONSIBLE FOR VICTIM'S CARE
*(If known, list contact person)*  If Contact person check ☐

| Name | Relationship |
|------|--------------|

| Address | City | Zip Code | Telephone |
|---------|------|----------|-----------|

## I.  TELEPHONE REPORT MADE TO ☐ APS  ☐ Law Enforcement  ☐ Local Ombudsman
☐ Calif. Dept. of State Hospitals   ☐ Calif. Dept. of Developmental Services

| Name of Official Contacted by Phone | Telephone | Date/Time |
|-------------------------------------|-----------|-----------|

## J.  WRITTEN REPORT  Enter information about the agencies receiving this report.  If the abuse occurred in a LTC facility and resulted in Serious Bodily Injury*, please refer to "Reporting Responsibilities and Time Frames" in the General Instructions.  Do not submit report to California Department of Social Services Adult Programs Division.

| Agency Name | Address or Fax | ☐ Date Mailed | ☐ Date Faxed |
|-------------|----------------|---------------|--------------|
| Agency Name | Address or Fax | ☐ Date Mailed | ☐ Date Faxed |
| Agency Name | Address or Fax | ☐ Date Mailed | ☐ Date Faxed |

## K. RECEIVING AGENCY USE ONLY ☐ Telephone Report  ☐ Written Report

| 1.  Report Received By | Date/Time |
|------------------------|-----------|

2.  Assigned  ☐ Immediate Response  ☐ Ten-Day Response  ☐ No Initial Response (NIR)
☐ Not APS  ☐ Not Ombudsman  ☐ No Ten-Day (NTD)

| Approved By | Assigned To (optional) |
|-------------|------------------------|

3.  Cross-Reported to  ☐ CDPH-Licensing & Cert.;  ☐ CDSS-CCL;  ☐ Local Ombudsman;
☐ Bureau of Medi-Cal Fraud & Elder Abuse;
☐ Calif. Dept. of State Hospitals;  ☐ Law Enforcement;
☐ Professional Licensing Board;  ☐ Calif. Dept. of Developmental Services;
☐ APS;  ☐ Other (Specify) _____
Date of Cross-Report _____

4.  APS/Ombudsman/Law Enforcement Case File Number

State of California – Health and Human Services Agency          California Department of Social Services

## REPORT OF SUSPECTED DEPENDENT ADULT/ELDER ABUSE
## GENERAL INSTRUCTIONS

**PURPOSE OF FORM**
This form, as adopted by the California Department of Social Services (CDSS), is required under Welfare and Institutions Code (WIC) Sections 15630 and 15658(a)(1). This form documents the information given by the reporting party on the suspected incident of abuse or neglect of an elder or dependent adult. **Abuse** means any treatment with resulting physical harm, pain, or mental suffering or the deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering. **Neglect** means the negligent failure of an elder or dependent adult or of any person having the care or custody of an elder or a dependent adult to exercise that degree of self-care or care that a reasonable person in a like position would exercise. **Elder** means any person residing in this state who is 65 years of age or older (WIC Section 15610.27). **Dependent Adult** means any person residing in this state, between the ages of 18 and 64, who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights including, but not limited to, persons who have physical or developmental disabilities or whose physical or mental abilities have diminished because of age (WIC Section 15610.23). Dependent adult includes any person between the ages of 18 and 64 who is admitted as an inpatient to a 24-hour health facility (defined in the Health and Safety Code Sections 1250, 1250.2, and 1250.3).

**COMPLETION OF THE FORM**
1. This form may be used by the receiving agency to record information through a telephone report of suspected dependent adult/elder abuse.
2. If any item of information is unknown, enter "unknown."
3. Item A:  Check box to indicate if the victim waives confidentiality.
4. Item C:  Check box if the reporting party waives confidentiality.  Please note that mandated reporters are required to disclose their names, however, non-mandated reporters may report anonymously.

**REPORTING RESPONSIBILITIES AND TIME FRAMES:**
Any mandated reporter, who in his or her professional capacity, or within the scope of his or her employment, has observed or has knowledge of an incident that reasonably appears to be abuse or neglect, or is told by an elder or dependent adult that he or she has experienced behavior constituting abuse or neglect, or reasonably suspects that abuse or neglect has occurred, shall complete this form for each report of known or suspected instance of abuse (physical abuse, sexual abuse, financial abuse, abduction, neglect (self-neglect), isolation, and abandonment) involving an elder or dependent adult.

**\*Serious bodily injury** means an injury involving extreme physical pain, substantial risk of death, or protracted loss or impairment of function of a bodily member, organ or of mental faculty, or requiring medical intervention, including, but not limited to, hospitalization, surgery, or physical rehabilitation (WIC Section 15610.67).

State of California – Health and Human Services Agency         California Department of Social Services

Reporting shall be completed as follows:

- If the abuse occurred in a Long-Term Care (LTC) facility (as defined in WIC Section 15610.47) and resulted in serious bodily injury, report by telephone to the local law enforcement agency immediately and no later than two (2) hours after observing, obtaining knowledge of, or suspecting physical abuse.  Send the written report to the local law enforcement agency, the local Long-Term Care Ombudsman Program (LTCOP), and the appropriate licensing agency (for long-term health care facilities, the California Department of Public Health; for community care facilities, the California Department of Social Services) within two (2) hours of observing, obtaining knowledge of, or suspecting physical abuse.

- If the abuse occurred in a LTC facility, was physical abuse, but did not result in serious bodily injury, report by telephone to the local law enforcement agency within 24 hours of observing, obtaining knowledge of, or suspecting physical abuse.  Send the written report to the local law enforcement agency, the local LTCOP, and the appropriate licensing agency (for long-term health care facilities, the California Department of Public Health; for community care facilities, the California Department of Social Services) within 24 hours of observing, obtaining knowledge of, or suspecting physical abuse.

- If the abuse occurred in a LTC facility, was physical abuse, did not result in serious bodily injury, and was perpetrated by a resident with a physician's diagnosis of dementia, report by telephone to the local law enforcement agency or the local LTCOP, immediately or as soon as practicably possible.  Follow by sending the written report to the LTCOP or the local law enforcement agency within 24 hours of observing, obtaining knowledge of, or suspecting physical abuse.

- If the abuse occurred in a LTC facility, was abuse other than physical abuse, report by telephone to the LTCOP or the law enforcement agency immediately or as soon as practicably possible.  Follow by sending the written report to the local law enforcement agency or the LTCOP within two working days.

- If the abuse occurred in a state mental hospital or a state developmental center, mandated reporters shall report by telephone or through a confidential Internet reporting tool (established in WIC Section 15658) immediately or as soon as practicably possible and submit the report within two (2) working days of making the telephone report to the responsible agency as identified below:

  - If the abuse occurred in a State Mental Hospital, report to the local law enforcement agency or the California Department of State Hospitals.

  - If the abuse occurred in a State Developmental Center, report to the local law enforcement agency or to the California Department of Developmental Services.

- For all other abuse, mandated reporters shall report by telephone or through a confidential Internet reporting tool to the adult protective services agency or the local law enforcement agency immediately or as soon as practicably possible.  If reported by telephone, a written or an Internet report shall be sent to adult protective services or law enforcement within two working days.

State of California – Health and Human Services Agency          California Department of Social Services

## REPORTING PARTY DEFINITIONS

**Mandated Reporter** (WIC Section 15630 (a)) Any person who has assumed full or intermittent responsibility for care or custody of an elder or dependent adult, whether or not that person receives compensation, including administrators, supervisors, and any licensed staff of a public or private facility that provides care or services for elder or dependent adults, or any elder or dependent adult care custodian, health practitioner, clergy member, or employee of a county adult protective services agency or a local law enforcement agency, is a mandated reporter.

**Care Custodian** (WIC Section 15610.17) means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing are or services for elders or dependent adults, including members of the support staff and maintenance staff: (a) Twenty-four hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code; (b) Clinics; (c) Home health agencies; (d) Agencies providing publicly funded in-home supportive services, nutrition services, or other home and community-based support services; (e) Adult day health care centers and adult day care; (f) Secondary schools that serve 18- to 22-year-old dependent adults and postsecondary educational institutions that serve dependent adults or elders; (g) Independent living centers; (h) Camps; (i) Alzheimer's Disease Day Care Resource Centers; (j) Community care facilities, as defined in Section 1502 of the Health and Safety Code, and residential care facilities for the elderly, as defined in Section 1569.2 of the Health and Safety Code; (k) Respite care facilities; (l) Foster homes; (m) Vocational rehabilitation facilities and work activity centers; (n) Designated area agencies on aging; (o) Regional centers for persons with developmental disabilities; (p) State Department of Social Services and State Department of Health Services licensing divisions; (q) County welfare departments; (r) Offices of patients' rights advocates and clients' rights advocates, including attorneys; (s) The Office of the State Long-Term Care Ombudsman; (t) Offices of public conservators, public guardians, and court investigators; (u) Any protection or advocacy agency or entity that is designated by the Governor to fulfill the requirements and assurances of the following: (1) The federal Developmental Disabilities Assistance and Bill of Rights Act of 2000, contained in Chapter 144 (commencing with Section 15001) of Title 42 of the United States Code, for protection and advocacy of the rights of persons with developmental disabilities; or (2) The Protection and Advocacy for the Mentally Ill Individuals Act of 1986, as amended, contained in Chapter 114 (commencing with Section 10801) of Title 42 of the United States Code, for the protection and advocacy of the rights of persons with mental illness; (v) Humane societies and animal control agencies; (w) Fire departments; (x) Offices of environmental health and building code enforcement; or (y) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults.

**Health Practitioner** (WIC Section 15610.37) means a physician and surgeon, psychiatrist, psychologist, dentist, resident, intern, podiatrist, chiropractor, licensed nurse, dental hygienist, licensed clinical social worker or associate clinical social worker, marriage, family, and child counselor, or any other person who is currently licensed under Division 2 (commencing with Section 500) of the Business and Professions Code, any emergency medical technician I or II, paramedic, or person certified pursuant to Division 2.5 (commencing with Section 1797) of the Health and Safety Code, a psychological assistant registered pursuant to Section 2913 of the Business and Professions Code, a marriage, family, and child counselor trainee, as defined in subdivision (c) of Section 4980.03 of the Business and Professions Code, or an unlicensed marriage, family, and child counselor intern registered under Section 4980.44 of the Business and Professions Code, state or county public health or social service employee who treats an elder or a dependent adult for any condition, or a coroner.

State of California – Health and Human Services Agency          California Department of Social Services

Any officer and/or employee of a financial institution is a mandated reporter of suspected financial abuse and shall report suspected financial abuse of an elder or dependent adult on form SOC 342, "Report of Suspected Dependent Adult/Elder Financial Abuse".

## MULTIPLE REPORTERS
When two or more mandated reporters are jointly knowledgeable of a suspected instance of abuse of a dependent adult or elder, and when there is agreement among them, the telephone report may be made by one member of the group. Also, a single written report may be completed by that member of the group. Any person of that group, who believes the report was not submitted, shall submit the report.

## IDENTITY OF THE REPORTER
The identity of all persons who report under WIC Chapter 11 shall be confidential and disclosed only among APS agencies, local law enforcement agencies, LTCOPs, California State Attorney General Bureau of Medi-Cal Fraud and Elder Abuse, licensing agencies or their counsel, Department of Consumer Affairs Investigators (who investigate elder and dependent adult abuse), the county District Attorney, the Probate Court, and the Public Guardian. Confidentiality may be waived by the reporter or by court order.

## FAILURE TO REPORT
Failure to report by mandated reporters (as defined under "Reporting Party Definitions") any suspected incidents of physical abuse (including sexual abuse), abandonment, isolation, financial abuse, abduction, or neglect (including self-neglect) of an elder or a dependent adult is a misdemeanor, punishable by not more than six months in the county jail, or by a fine of not more than $1,000, or by both imprisonment and fine. Any mandated reporter who willfully fails to report abuse of an elder or a dependent adult, where the abuse results in death or great bodily injury, may be punished by up to one year in the county jail, or by a fine of up to $5,000, or by both imprisonment and fine (WIC Section 15630(h)).

No one, including a supervisor, employer, or lawyer, can excuse a mandated reporter from his or her personal legal duty to report known or suspected abuse. Anyone who attempts to impede or inhibit a mandated reporter from reporting may be prosecuted for a misdemeanor punishable by a fine, imprisonment, or both. Mandated reporters are therefore expected to report any such efforts to law enforcement, as well as any other responsible agency (see Welfare and Institutions Code Section 15630(f) and (h).

Officers or employees of financial institutions are mandated reporters of financial abuse (effective January 1, 2007). These mandated reporters who fail to report financial abuse of an elder or dependent adult are subject to a civil penalty not exceeding $1,000. Individuals who willfully fail to report financial abuse of an elder or dependent adult are subject to a civil penalty not exceeding $5,000. These civil penalties shall be paid by the financial institution, which is the employer of the mandated reporter, to the party bringing the action.

State of California – Health and Human Services Agency          California Department of Social Services

## DISTRIBUTION OF SOC 341 COPIES

Mandated reporter:  After making the telephone report to the appropriate agency or agencies, the reporter shall send the written report to the designated agencies (as defined under "Reporting Responsibilities and Time Frames"); and keep one copy for the reporter's file.

Receiving agency:  Place the original copy in the case file.  Send a copy to a cross-reporting agency, if applicable.

DO NOT SEND A COPY TO THE CALIFORNIA DEPARTMENT OF SOCIAL SERVICES ADULT PROGRAMS DIVISION.

# Exhibit E

# Email from Matthew Clark Sent 2/27/2019

.

**RE: Parkview Records Additional Request**

| | |
|---|---|
| From: | Matthew Clark |
| To: | 'Luke VanderDrift' |
| Cc: | 'Matthew Ripley', 'Linda L. Kingsbury', Matthew I. Lahana |
| Sent: | 2/27/2019 3:25:04 PM |

Luke,

On behalf of Parkview Healthcare Center, I am responding to your follow-up request for specific incident reports concerning Parkview's former and existing residents. After a good faith and reasonable investigation by my client, we have uploaded the incident reports identified as responsive to this <u>Sharefile</u> folder, where you may download the documents directly. These include the following:

1. 3/20/17 at approx. 1732 – Reporting documents concerning staff abuse allegation involving Vernita Weeds
2. 6/16/17 at approx. 1450 – Reporting documents involving matter where a 90-year old patient hit another resident with a cane;
3. 6/28/17 at approx. 1055 – Reporting documents involving matter between resident Pinto Auerliano and Deb Thimbough;
4. 2/25/18 at approx. 0924 – Observation Detail List Report regarding incident involving Sharon Link throwing water at resident roommate (no actual physical altercation occurred as the water did not touch the other resident);
5. 6/8/18 at approx. 1025 – While there is no record of attempted suicide by Peter Chiung, the resident has a history of slipping out of his wheelchair and landing on the floor due to UTI. Observation Detail List Report provided concerning incident where Mr. Chiung was found sitting on floor next to wheelchair;
6. 6/23/18 at unknown time – Reporting documents involving physical altercation between residents, including Mia Pinto; and
7. Written documentation provided to Hayward Police Department, Alameda Long Term Care Ombudsman Program, and CDPH regarding Aureliano Pinto and either sexual assault, sexual assault resulting in injury, or "inappropriate touching" involving Janet Horroth, Mia Pinto, Lisa Zolomm, Candace Henshaw, and Yolanda Borth.

Please note that we are providing the documents in a single PDF file that contains numbered bookmarks (available on the left-hand side menu of the file) corresponding to the document numbers identified above. Additionally, we are still in the process of locating records concerning the incident dated 4/6/17 at approx. 1621 involving a resident on resident altercation, involving Arthur Davis. To the extent we find responsive documents, we will send those to you as soon as possible.

Lastly, there were a number of requests for records concerning incidents that were either not reportable or for which Parkview had no record of such an incident occurring, including:

- Parkview has no records for incidents that allegedly occurred on 12/3/17, 3/28/18, 5/22/18 and 5/23/18. With regard to resident Richard Lopez, he often required redirection from staff, but there is no record of any physical confrontation with other residents.
- The incident that occurred on 1/2/18 was not reportable. While Richard Lopez was found to have climbed into the storage area at the back of Parkview's building (not the roof) on 1/2/18, he did not fall and did not sustain any injuries. Of note, Parkview does not maintain barb wire on its roof.

Once you've had an opportunity to review the documents, please feel free to contact me regarding any questions or concerns you may have. Thank you.

Best,
Matt

1

## PROOF OF SERVICE

2

3

STATE OF CALIFORNIA, COUNTY OF ALAMEDA

4

I, Mary O'Malley, declare that I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 7677 Oakport Street, Suite 650, Oakland, CA 94621.

5

6

On July 14, 2022, I served a copy of the following document:

7

**REPLY DECLARATION OF MATT RIPLEY, TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

8

9

on the following parties, as listed below:

10

Scott J. Kiepen, Esq.                          **Counsel for Defendants:**
11
Matthew Clark, Esq.                            Mariner Health Care, Inc.
HOOPER, LUNDY & BOOKMAN, P.C.                  National Senior Care, Inc.
12
101 Montgomery Street, 11th Floor              Mariner Health Care Management Co.
San Francisco, CA 94104                        Mariner Health Central, Inc.
13
skiepen@health-law.com                         Almaden Operating Company LP
mclark@health-law.com                          Autumn Hills Operating Company LP
14
                                               Creekside Operating Company LP
15
                                               Driftwood Hayward Operating Company LP
Darryl Ross, Esq.                              Driftwood Santa Cruz Operating Company LP
16
Mariner Health Central, Inc.                   Fremont Healthcare Operating Company LP
5440 Trabuco Road                              Fruitvale Long Term Care, LLC
17
Irvine, CA 92620                               Hayward Hills Operating Company LP
daross@marinerhealthcare.com                   Inglewood Operating Company LP
18
                                               Verdugo Vista Operating Company LP
19
                                               Monterey Palms Operating Company LP
                                               Parkview Operating Company LP
20
                                               San Rafael Operating Company LP
                                               Palm Springs Operating Company LP
21
                                               Rehabilitation Center of Santa Monica
22
                                               Operating Company LP
                                               Santa Monica Operating Company LP
23
                                               Skyline San Jose Operating Company LP
                                               Vale Operating Company LP
24
                                               San Marcos Operating Company LP

25

26

27

28

1       **By Electronic Service**: A copy of the document listed above was transmitted via electronic service to the persons at the e-mail addresses listed above.

2

3       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

4

5       Executed on July 14, 2022, in Oakland, California.

6

7       Mary O'Malley

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

PROOF OF SERVICE - REPLY DECLARATION OF MATT RIPLEY, TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

RG21095881

# EXHIBIT
# 1(b)

1   ROB BONTA
Acting Attorney General of California
2   JENNIFER EULER
Chief Assistant Attorney General
3   LUKE VANDERDRIFT, State Bar No. 248235
Deputy Attorney General
4    2329 Gateway Oaks Drive, Suite 200
Sacramento, CA 95833-4252
5    Telephone: (916) 621-1839
Fax: (916) 263-0426
6    E-mail: Luke.VanderDrift@doj.ca.gov

7   NANCY E. O'MALLEY
District Attorney of Alameda County
8   LORI SCHNALL, State Bar No. 195556
Deputy District Attorney
9    1225 Fallon Street, Suite 900
Oakland, CA 94612-4208
10    Telephone: (510) 272-6222
E-mail: Lori.Schnall@acgov.org

12   LORI E. FRUGOLI
District Attorney of Marin
13   ANDRES PEREZ, State Bar No. 186219
Deputy District Attorney
14    3501 Civic Center Drive, Suite 145
San Rafael, CA 94903-4189
15    Telephone: (415) 473-6450
Fax: (415) 473-3719
16    E-mail: Aperez@marincounty.org

**Exempt from filing fees pursuant to Government Code section 6103**

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUG ALLEN, State Bar No. 99239
Assistant District Attorney
  701 Ocean Street, Suite 200
Santa Cruz, CA. 95060
  Telephone: (831) 454-2930
Fax: (831) 454-2227
  E-mail:
Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
  211 West Temple Street, Suite 1000
Los Angeles, CA 90012
  Telephone: (213) 257-2450
  E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
The People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | Case No.: RG21095881 |
| Plaintiff, | |
| vs. | **DECLARATION OF MATT RIPLEY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| MARINER HEALTH CARE INC., et. al., | |
| Defendants. | DATE:  JANUARY 7, 2022<br>TIME:  10:30 A.M.<br>DEPT:  23 |

1

# DECLARATION OF MATT RIPLEY

I, MATT RIPLEY, declare as follows:

1.     I am a Special Agent with the State of California Department of Justice ("DOJ") – Division of Medi-Cal Fraud and Elder Abuse ("DMFEA"). I have personal knowledge of the matters set forth in this declaration.

2.     The California Department of Justice and the District Attorney's Offices of Santa Cruze, Alameda, Los Angeles, and Marin have been investigating Mariner's chain of nursing homes.

3.     In August of 2017, I joined the California Department of Justice, Bureau of Medi-Cal Fraud and Elder Abuse (BMFEA).  During my time at DOJ I have investigated Medi-Cal fraud, elder abuse, sexual assaults, and prescription drug diversion cases.

4.     Prior to becoming a Special Agent with Department of Justice, I served as a Penal Code 830.1(a), Peace Officer Standards and Training (P.O.S.T.) certified peace officer as a deputy sheriff with the Amador County Sheriff's Department for three years.  As such I effectuated arrests, communicated to dispatch in response to police calls, testified in court including as a Penal Code §872(b), qualified peace officer at preliminary hearings.  I investigated numerous criminal offenses, including neglect cases, sexual assault cases, theft cases, violent crime cases, narcotics cases, sex offender violation cases, and firearms related cases and as a Deputy Coroner, I conducted no less than thirty (30) death investigations.  I was employed as a police officer with the Perry Police Department in Iowa from 2007 to 2012, and the Jackson (California) Police Department, for a little under a year.  During this time, I also investigated numerous criminal offenses, including narcotics trafficking and manufacturing cases, robbery cases, sexual assault cases, fraud cases, violent crime cases, and firearms related cases.  I was assigned to the Internet Crimes Against Children (I.C.A.C.) task force from 2011 until 2012, and as a Perry Police Officer testified in Iowa courts numerous times.  In addition, and in connection with my duties, I have authored no less than fifty (50) search warrants and/or court orders.  I attended a P.O.S.T. certified Police Academy in Johnston, Iowa, in 2007, where I received over 540 hours of law enforcement training, to include training in neglect investigation.  In February

2

1  2013, I received a POST-certified Waiver of Attendance from the State of California POST. In

2  2018, I attended the Department of Justice Special Agent Orientation Academy where I received

3  over 120 hours of training on criminal investigations, surveillance operations, interview

4  techniques, and search warrant preparation. All totaled I have fourteen years of experience as a

5  P.O.S.T. certified peace officer.

6      5.      Throughout the course of my work as a peace officer I have reviewed many police

7  communications and dispatch reports and am familiar with such reports and their formats.

8      6.      I have been investigating incidents of abuse and neglect at both assisted living and

9  skilled nursing facilities in California on an ongoing basis for four years. With DMFEA I am

10  responsible for investigations from Bakersfield to the Oregon Border and have personally

11  inspected and investigated no less than one hundred skilled nursing facilities. I have been

12  engaged in investigation of the skilled nursing facilities operated by Mariner since 2018, and have

13  spoken to numerous residents, family members and staff. I have reviewed numerous records

14  from Mariner as well as police records from the Hayward Police Department who responded to

15  Parkview Healthcare Center.

16      7.      Like all modern police dispatch, Hayward Police Department has a central

17  communications hub for all police dispatch calls and communications. Hayward Police

18  Department receives and dispatches emergency resources in response to 911 calls and also

19  dispatches all police resources, i.e. patrol units, in response to non-emergency calls directly to the

20  agency.

21      8.      In 2018, I requested from the Hayward Police Department and then reviewed

22  printouts of the police call activity at the Parkview Healthcare Center nursing home located at

23  27350 Tampa Ave, in the City of Hayward.

24      9.      These records reflect all dispatch communications from the Hayward Police

25  Department hub dispatching patrol units to Parkview Healthcare. The records are kept by the

26  Hayward Police Department and can be obtained through a request to the respective agency.

27  These records are kept in the regular course of business and are in standardized format. When a

28  person calls law enforcement, a description of the call is concurrently memorialized by the 911

3

1   operator taking the call or the agency accepting a non-emergency call. Law enforcement relies on

2   these descriptions in responding to requests to respond and relies upon these descriptions kept in

3   the ordinary course of dispatch business.

4         10.     Parkview Healthcare Center had 47 calls between the time period of October 18,

5   2016 and August 17, 2018 for violence, neglect, and out of control residents. The calls for service

6   are attached as Exhibit 2.

7         11.     The Department of Public Health keeps track of nursing homes' self reported

8   incidents and lists the reports on its website. Only 3 of the 47 calls were reported to the

9   Department of Public Health.

10       12.     I selected 10 incidents that required police intervention and requested from

11   Mariner all relevant documentation showing what was reported to the Department of Public

12   Health, the Ombudsman, and nursing homes records of the incident.

13       13.     For all ten, Mariner could provide no record of a report made to the Department of

14   Public Health.

15       14.     For all ten, Mariner could provide no record of a report made to the Ombudsman.

16       15.     Mariner unable to provide any internal documents related to instances of violence

17   or where the police were called because a resident had wrapped a cord around his neck or a

18   resident with a lighter was threatening to burn down the building.

19       16.     I interviewed Mariner Vice President Linda Tatz regarding an incident of resident

20   on resident incident of violence, Vice President Tatz acknowledged that this was reportable.

21       17.     In 2018, I requested from the San Pablo Police Department and then reviewed

22   printouts of the police calls regarding Vale Healthcare Center nursing home located at 13484 San

23   Pablo Ave in the City of San Pablo and Creekside Healthcare Center nursing home located at

24   1900 Church Lane in the City of San Pablo.

25       18.     The logs are kept by the San Pablo Police Department and can be obtained through

26   a request to the respective agency. These records are kept in the regular course of business and

27   are in standardized format. When a person calls law enforcement, a description of the call is

28   concurrently memorialized by the 911 operator taking the call or the agency accepting a non-

4

1    emergency call. Law enforcement relies on these descriptions in responding to requests to

2    respond and relies upon these descriptions kept in the ordinary course of dispatch business.

3        19.    Vale Healthcare Center had 182 emergency service calls between November 2016

4    and November 2018. The call log is attached as Exhibit 3.

5        20.    Creekside Healthcare Center had 92 emergency service calls between January and

6    November 2018. The call log is attached as Exhibit 4.

7

8        I declare under penalty of perjury under the laws of the State of California that the

9    foregoing is true and correct. Executed this _22nd_ day of October, 2021, at Sacramento,

10   California.

11

12

13                                        _Matt Ripley_
                                          _____

14                                        MATT RIPLEY
                                          Special Agent
15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MATT RIPLEY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION (RG21095881)

# EXHIBIT

# 2

1   ROB BONTA
    Acting Attorney General of California
2   JENNIFER EULER
    Chief Assistant Attorney General
3   JOEL SAMUELS, State Bar No. 234574
    Supervising Deputy Attorney General
4     2329 Gateway Oaks Drive, Suite 200
      Sacramento, CA 95833-4252
5   Telephone: (916) 621-1822
    Fax: (916) 274-2929
6   E-mail: Joel.Samuels@doj.ca.gov

7   NANCY E. O'MALLEY
    District Attorney of Alameda County
8   LORI SCHNALL, State Bar No. 195556
    Deputy District Attorney
9     1225 Fallon Street, Suite 900
      Oakland, CA 94612-4208
10  Telephone: (510) 272-6222
    E-mail: Lori.Schnall@acgov.org
11
    LORI E. FRUGOLI
12  District Attorney of Marin
    ANDRES PEREZ, State Bar No. 186219
13  Deputy District Attorney
      3501 Civic Center Drive, Suite 145
14    San Rafael, CA 94903-4189
    Telephone: (415) 473-6450
15  Fax: (415) 473-3719
    E-mail: Aperez@marincounty.org

Exempt from filing fees pursuant to
Government Code section 6103

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**06/15/2022 at 03:04:55 PM**
By: Andrel Gospel,
Deputy Clerk

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUG ALLEN, State Bar No. 99239
Assistant District Attorney
  701 Ocean Street, Suite 200
  Santa Cruz, CA. 95060
  Telephone: (831) 454-2930
  Fax: (831) 454-2227
  E-mail:
  Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
  211 West Temple Street, Suite 1000
  Los Angeles, CA 90012
  Telephone: (213) 257-2450
  E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
  The People of the State of California

16

17

18          SUPERIOR COURT OF THE STATE OF CALIFORNIA

19              FOR THE COUNTY OF ALAMEDA

20

21  PEOPLE OF THE STATE OF CALIFORNIA,      Case No.: RG21095881

    Plaintiff,                              [Hearing Reservation No. 808108960867]

22  vs.                                     **SUPPLEMENTAL DECLARATION OF**
                                            **SPECIAL AGENT, MATT RIPLEY, IN**
23                                          **SUPPORT OF PLAINTIFF'S MOTION**
                                            **FOR PRELIMINARY INJUNCTION**
24  MARINER HEALTH CARE INC., et. al.,

25      Defendants.                         DATE:  JULY 19, 2022
                                            TIME:  3:00 P.M.
26                                          DEPT:  23

27

28
                                        1
    SUPPLEMENTAL DECLARATION OF SPECIAL AGENT, MATT RIPLEY, IN SUPPORT OF PLAINTIFF'S
           MOTION FOR PRELIMINARY INJUNCTION (RG21095581)

I, Matt Ripley, declare as follows:

1.  I am a Special Agent with the State of California Department of Justice ("DOJ") – Division of Medi-Cal Fraud and Elder Abuse ("DMFEA"). I have personal knowledge of the matters set forth in this declaration.

2.   Since my earlier declaration entitled, *DECLARATION OF MATT RIPLEY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*, dated October 22, 2021, I have continued to perform follow up investigations on complaints from residents and resident's family of the Mariner Health Care Inc. system of skilled nursing facilities.  Since I started this investigation, I am up to 60 reports on incidents of severe abuse and neglect.

3.   I recently documented seven more cases from Mariner facilities, two at the Rehabilitation Center of Santa Monica, one at Driftwood Healthcare Center, Hayward, two at Parkview Healthcare, Hayward, and one at Fruitvale Healthcare Center.

4.   I am not including names to protect patient confidentiality but can identify them *in camera* or pursuant to a protective order.

5.   Five of the victim residents died within the last six months, all who appear to have had facility neglect as a contributory cause.  One victim drowned in the facility.  Family of victims described unreported falls and assaults, including one black eye.  All victims reported inadequate staffing, and most complained of weight loss, gangrene, skin rashes, pneumonia, sepsis, dehydration, soiled linens and unchanged diapers and unstageable or stage 4 pressure ulcers.

6.   Below is an example of the skin issues from being left in bed.



SUPPLEMENTAL DECLARATION OF SPECIAL AGENT, MATT RIPLEY, IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION (RG21095581)

7. All of the victim families stated that they had made multiple reports to the California Department of Health.

I declare under penalty of perjury, under the laws of the State of California, the foregoing to be true and correct. Executed this 14th day of June, 2022, at Sacramento ,
California.

Special Agent Matt Ripley

3

# EXHIBIT

# 3

ROB BONTA
Acting Attorney General of California
JENNIFER EULER
Chief Assistant Attorney General
JOEL SAMUELS, STATE BAR NO. 234574
Supervising Deputy Attorney General
2329 Gateway Oaks Drive, Suite 200
Sacramento, CA 95833-4252
Telephone: (916) 621-1839
Fax: (916) 263-0426
E-mail: Luke.VanderDrift@doj.ca.gov

NANCY E. O'MALLEY
District Attorney of Alameda County
LORI SCHNALL, State Bar No. 195556
Deputy District Attorney
1225 Fallon Street, Suite 900
Oakland, CA 94612-4208
Telephone: (510) 272-6222
E-mail: Lori.Schnall@acgov.org

LORI E. FRUGOLI
District Attorney of Marin
ANDRES PEREZ, State Bar No. 186219
Deputy District Attorney
3501 Civic Center Drive, Suite 145
San Rafael, CA 94903-4189
Telephone: (415) 473-6450
Fax: (415) 473-3719
E-mail: Aperez@marincounty.org

Exempt from filing fees pursuant to
Government Code section 6103

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**06/15/2022 at 12:40:38 PM**
By: Andrel Gospel,
Deputy Clerk

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUG ALLEN, State Bar No. 99239
Assistant District Attorney
701 Ocean Street, Suite 200
Santa Cruz, CA. 95060
Telephone: (831) 454-2930
Fax: (831) 454-2227
E-mail:
Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
211 West Temple Street, Suite 1000
Los Angeles, CA 90012
Telephone: (213) 257-2450
E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
The People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | Case No.: RG21095881 |
| Plaintiff, | [Hearing Reservation No. 808108960867] |
| vs. | **DECLARATION OF MARTHEN LUMINGKEWAS, IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| MARINER HEALTH CARE INC., et. al., | |
| Defendants. | DATE: MARCH 18, 2022 |
| | TIME: 9:30 A.M. |
| | DEPT: 23 |

I, Marthen Lumingkewas, declare as follows:

1.    I am a career administrator of skilled nursing homes in California and am currently serving in that position for a different employer than Mariner.  I served as the Head of Administration at Driftwood Healthcare Center in Santa Cruz, a Mariner facility, from May of 2018 to April of 2019.

2.    At the time I served at Driftwood, the company was having difficulty retaining administrators at Driftwood.  I resigned from Driftwood Healthcare Center over frustration that I was not being allowed to hire sufficient staff to handle the workload at that facility. Many of the businesses in Santa Cruz County were service oriented due to the area's tourist industry. Restaurants, hotels, and other hospitality based businesses were a heavy draw on the labor pool making it difficult to get enough employees to work at the skilled nursing facility.

3.  My superiors within the Mariner Healthcare organization continually discouraged me from making management decisions that cost the organization too much money. I tried to suggest to my superiors that they should be advertising competitive wages and participating in job fairs to recruit more and better qualified employees. Those suggestions were never adopted. My intent was not to create new positions, but simply to be able to fill all of the positions that were already authorized.

I declare under the penalty of perjury, under the laws of the State of California, the foregoing to be true and correct.  Executed this ___ day of January 2022, at Grapevine, Texas.

Marthen Lumingkewas

# EXHIBIT

# 4

1  ROB BONTA
   Attorney General of California
2  JENNIFER EULER
   Chief Assistant Attorney General
3  JOEL SAMUELS
   Supervising Deputy Attorney General
4  State Bar No. 234574
   Division of Medi-Cal Fraud & Elder Abuse
5    2329 Gateway Oaks Drive, Ste. 200
     Sacramento, CA 95833
6    Telephone: (916) 621-1822
     Fax: (916) 274-2929
7    E-mail: Joel.Samuels@doj.ca.gov
   *Attorneys for The People of the State of California*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
06/15/2022 at 02:59:46 PM
By: Andrel Gospel,
Deputy Clerk

8

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                       COUNTY OF ALAMEDA

11

12

13  PEOPLE OF THE STATE OF CALIFORNIA,          Case No.: RG21095881

14                                              [Hearing Reservation No. 808108960867]
                              Plaintiff,
15                                              **DECLARATION OF JOEL SAMUELS**
           v.                                   **IN SUPPORT OF MOTION FOR**
16                                              **PRELIMINARY INJUNCTION**

17  MARINER HEALTH CARE INC. *ET AL.*
                                                DATE: JULY 19, 2022
18                            Defendant.         TIME: 3 :00 P .M.
                                                DEPT: 23
19

20                    **DECLARATION OF JOEL SAMUELS**

21       I, Joel Samuels, declare:

22       1.    I am an attorney licensed to practice law before all of the courts of the State of

23  California. I am employed as a Supervising Deputy Attorney General by the State of California,

24  Department of Justice, Division of Medi-Cal Fraud and Elder Abuse ("DMFEA"). I am the

25  attorney assigned to and handling the case currently pending in Alameda County Superior Court,

26  Case Number RG21095881, *People of the State of California v. Mariner Health Care Inc., et al.*

27  Except where indicated as based on information and belief, I offer the following as true and

28

                                    1

1    correct based on personal knowledge.  If called as a witness, I could and would competently

2    testify to the following facts of my own personal knowledge.

3        2.    I make this declaration in support of the People's Motion for Preliminary Injunction.

4        3.    I have reviewed the materials relevant to the investigation and litigation of this case

5    against the Defendants and their alleged failures to comply with statutes and regulations at their

6    owned and operated skilled nursing facilities ("SNFs").

7        4.    Based on my experience in the investigation and prosecution of cases involving

8    violations of federal and state laws governing the administration, operation, and regulation of

9    skilled nursing facilities, I am familiar with the regulations and statutes governing resident

10    discharge from SNFs. [Exhibit 1, 42 CFR 483.15 and Exhibit 2, 42 USCS § 1396r]

11        5.    In order to safeguard the health and welfare of a resident when he or she is discharged

12    or transferred from a SNF, federal regulations require that under listed conditions, the SNF

13    documents the event with a Discharge Notice that is placed in the resident's chart.

14        6.    The conditions that require a discharge notice include: when a resident's welfare and

15    needs cannot be met in a facility; when a resident's health has improved to the point where the

16    facility is no longer needed; when the resident's clinical or behavior endangers the safety or

17    health other individuals at the facility, and when the resident fails to pay for the stay at the

18    facility.  Each time a resident is discharged for any of these reasons, the facility must provide a

19    notice of discharge at least 30 days before the resident is discharged. The notice must be placed in

20    the resident's medical record and state the basis for the discharge. And, if the transfer is because

21    the facility cannot meet resident needs, the notice must state what needs could not be met.  Often,

22    this documentation must be made by a physician and include specified information for any

23    subsequent care provider.  The regulations explicitly state that a copy of the notice must be sent to

24    a representative of the Office of the State Long-Term Care Ombudsman. The notice must also

25    inform the resident of his or her right to appeal the discharge or transfer.

26        7.    On or about October 24, 2019, in response to a request from the Attorney General's

27    office, attorneys for Mariner provided reports generated from the MatrixCare Report computer

28    records system for thirteen of the SNFs owned and operated by Mariner. (Almaden Healthcare

2

1    and Rehabilitation Center, Autumn Hills Health Care Center, Creekside Healthcare Center,

2    Inglewood Health Care Center, La Crescenta Healthcare Center (licensed under Verdugo Vista

3    Operating Company), Monterey Palms Health Care Center, Palm Springs Healthcare and

4    Rehabilitation Center, Pine Ridge Care Center (licensed under San Rafael Operating Company),

5    Santa Monica Health Care Center, Skyline Healthcare Center, The Rehabilitation Center of Santa

6    Monica, Vale Healthcare Center, Village Square Healthcare Center (licensed under San Marcos

7    Operating Company).) For each of these facilities, these records included an

8    "Admission/Leave/Discharge/Tracking Report." These records are lengthy and contain personal

9    identifying and health information. As such, they are not attached to this declaration, but are

10    available for *in camera* review should the Court request.

11       8.    I have reviewed the records provided by Mariner, including the

12    "Admission/Leave/Discharge Tracking Reports." For all of the SNFs, these records lack both

13    individual discharge notices and any evidence that discharge notices were ever provided to any

14    resident.

15       9.    The "Admission/Leave/Discharge Tracking Report" for each SNF includes

16    information about resident admissions and discharges for the time period from August 12, 2015 to

17    August 12, 2019. Each SNF's report lists facility data under the same headings: Admit Date;

18    Resident [name]; MR#; Payer; Admitted From; Locations Category; Discharge/Leave Date;

19    Discharged/Transferred To; Location Category; Transfer Outcome; and Length of Stay. At the

20    end of each report, data is aggregated to show the number of residents discharged to each of the

21    types of other locations.

22       10.    In each report, the aggregated data for the SNF shows that residents were discharged

23    or transferred to the various locations, including mainly: acute hospitals; assisted living facilities;

24    home; SNFs; "other"; or "unknown". Across all facilities, "unknown" was the most frequently

25    listed discharge destination. In all, the records for the thirteen Mariner facilities for this period

26    showed that there had been 19,836 resident discharges. (Summary of Matrix data by facility

27    attached as Exhibit 3.)

28    ///

3

11.    My experience with SNFs informs me that SNF residents are sent to hospitals to receive services that cannot be supplied at the SNF.  Additionally, a resident is sent to assisted living after his or her health has improved to the point where the resident no longer needs the services provided in a SNF.  For both these circumstances, under the regulations, a SNF must document the discharge and provide notice. In these records, provided by Mariner, there was no evidence that discharge notices had been documented as required under law.

12.    On or about January 8, 2020, the People and the California Long Term Care Ombudsman stipulated that the Court may order disclosure of all complaints and discharge notices dated between November 1, 2016 and the date of the order, that relate to Mariner Health Care nursing homes in California.  On January 21, 2020, the Court signed the order to allow the People to receive these records. (Stipulation and Order Attached as Exhibit 4.)

13.    Pursuant to the order, the Long Term Care Ombudsman's office provided discharge and complaint records for nineteen SNFs licensed and operated by Mariner Health Care in California: Pine Ridge Health Care Center; Creekside Health Care Center; Vale Health Care Center; Fruitvale Healthcare Center; Fremont Healthcare Center; Driftwood Health Care Center-Hayward; Hayward Hills Health Care Center; Parkview Healthcare Center; Almaden Healthcare and Rehabilitation Center; Skyline Healthcare Center; Driftwood Healthcare Center-Santa Cruz; Autumn Hills Health Care Center; Inglewood Healthcare Center; La Crescenta Healthcare Center; The Rehabilitation Center of Santa Monica; Santa Monica Health Care Center; Monterey Palms Health Care Center; Palm Springs Healthcare and Rehabilitation Center; and Village Square Healthcare Center. These records are voluminous and contain personal identifying and health information. As such, these records are not attached, but are available for *in camera* review should the Court request it.

14.    I have reviewed the records relating to the discharge and transfer of residents submitted by the Long Term Care Ombudsman. Out of hundreds of discharge notices sent to the Long Term Care Ombudsman by Mariner's SNFs, only a handful of discharge notices were in full compliance with regulations and law.  In fact, for one Mariner facility, Driftwood Healthcare Center-Santa Cruz, there were not any, zero, individual discharge notices sent to the Ombudsman.

4

1    In many cases, Mariner facilities sent the Ombudsman aggregated lists of discharges that

2    provided far less than the required information.

3        15.   On April 2, 2021, after repeated requests by the Attorney General's office for copies

4    of discharge records, Mariner, through its attorneys, provided records for nine residents. I have

5    reviewed these records and they are related to either discharge notices or documentation

6    memorializing that there was some issue with a discharge notice. These records contain personal

7    identifying and health information and are not attached to this filing. They are available for *in*

8    *camera* inspection at the request of the Court.

9        I declare under penalty of perjury that the foregoing is true and correct and was executed on

10    June 13, 2022, in Sacramento, California.

11

12    Dated:  June 13, 2022              Respectfully Submitted,

13                               ROB BONTA
                              Attorney General of California

14

15

16                               JOEL SAMUELS

17                               Supervising Deputy Attorney General
                              *Attorneys for The People of the State of*

18                               *California*

19    (SF2018102591)

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

EXHIBIT 1

42 CFR 483.15 Admission, transfer, and discharge rights

(c) Transfer and discharge —

(1) Facility requirements —

(i) The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless—

(A) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility;

(B) The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

(C) The safety of individuals in the facility is endangered due to the clinical or behavioral status of the resident;

(D) The health of individuals in the facility would otherwise be endangered;

(E) The resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility. Non-payment applies if the resident does not submit the necessary paperwork for third party payment or after the third party, including Medicare or Medicaid, denies the claim and the resident refuses to pay for his or her stay. For a resident who becomes eligible for Medicaid after admission to a facility, the facility may charge a resident only allowable charges under Medicaid; or

(F) The facility ceases to operate.

(ii) The facility may not transfer or discharge the resident while the appeal is pending, pursuant to § 431.230 of this chapter, when a resident exercises his or her right to appeal a transfer or discharge notice from the facility pursuant to § 431.220(a)(3) of this chapter, unless the failure to discharge or transfer would endanger the health or safety of the resident or other individuals in the facility. The facility must document the danger that failure to transfer or discharge would pose.

(2) Documentation. When the facility transfers or discharges a resident under any of the circumstances specified in paragraphs (c)(1)(i)(A) through (F) of this section, the facility must ensure that the transfer or discharge is documented in the resident's medical record and appropriate information is communicated to the receiving health care institution or provider.

(i) Documentation in the resident's medical record must include:

(A) The basis for the transfer per paragraph (c)(1)(i) of this section.

(B) In the case of paragraph (c)(1)(i)(A) of this section, the specific resident need(s) that cannot be met, facility attempts to meet the resident needs, and the service available at the receiving facility to meet the need(s).

(ii) The documentation required by paragraph (c)(2)(i) of this section must be made by—

(A) The resident's physician when transfer or discharge is necessary under paragraph (c)(1)(A) or (B) of this section; and

(B) A physician when transfer or discharge is necessary under paragraph (c)(1)(i)(C) or (D) of this section.

(iii) Information provided to the receiving provider must include a minimum of the following:

(A) Contact information of the practitioner responsible for the care of the resident

(B) Resident representative information including contact information.

(C) Advance Directive information.

(D) All special instructions or precautions for ongoing care, as appropriate.

(E) Comprehensive care plan goals,

(F) All other necessary information, including a copy of the resident's discharge summary, consistent with § 483.21(c)(2), as applicable, and any other documentation, as applicable, to ensure a safe and effective transition of care.

(3) Notice before transfer. Before a facility transfers or discharges a resident, the facility must—

(i) Notify the resident and the resident's representative(s) of the transfer or discharge and the reasons for the move in writing and in a language and manner they understand. The facility must send a copy of the notice to a representative of the Office of the State Long-Term Care Ombudsman.

(ii) Record the reasons for the transfer or discharge in the resident's medical record in accordance with paragraph (c)(2) of this section; and

(iii) Include in the notice the items described in paragraph (c)(5) of this section.

(4) Timing of the notice.

(i) Except as specified in paragraphs (c)(4)(ii) and (8) of this section, the notice of transfer or discharge required under this section must be made by the facility at least 30 days before the resident is transferred or discharged.

(ii) Notice must be made as soon as practicable before transfer or discharge when—

(A) The safety of individuals in the facility would be endangered under paragraph (c)(1)(i)(C) of this section;

(B) The health of individuals in the facility would be endangered, under paragraph (c)(1)(i)(D) of this section;

(C) The resident's health improves sufficiently to allow a more immediate transfer or discharge, under paragraph (c)(1)(i)(B) of this section;

(D) An immediate transfer or discharge is required by the resident's urgent medical needs, under paragraph (c)(1)(i)(A) of this section; or

(E) A resident has not resided in the facility for 30 days.

(5) Contents of the notice. The written notice specified in paragraph (c)(3) of this section must include the following:

(i) The reason for transfer or discharge;

(ii) The effective date of transfer or discharge;

(iii) The location to which the resident is transferred or discharged;

(iv) A statement of the resident's appeal rights, including the name, address (mailing and email), and telephone number of the entity which receives such requests; and information on how to obtain an appeal form and assistance in completing the form and submitting the appeal hearing request;

(v) The name, address (mailing and email) and telephone number of the Office of the State Long-Term Care Ombudsman;

(vi) For nursing facility residents with intellectual and developmental disabilities or related disabilities, the mailing and email address and telephone number of the agency responsible for the protection and advocacy of individuals with developmental disabilities established under Part C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (402 Pub. L. 106-402, codified at 42 U.S.C. 15001 et seq.); and

(vii) For nursing facility residents with a mental disorder or related disabilities, the mailing and email address and telephone number of the agency responsible for the protection and advocacy of individuals with a mental disorder established under the Protection and Advocacy for Mentally Ill Individuals Act.

(6) Changes to the notice. If the information in the notice changes prior to effecting the transfer or discharge, the facility must update the recipients of the notice as soon as practicable once the updated information becomes available.

(7) Orientation for transfer or discharge. A facility must provide and document sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility. This orientation must be provided in a form and manner that the resident can understand.

(8) Notice in advance of facility closure. In the case of facility closure, the individual who is the administrator of the facility must provide written notification prior to the impending closure to the State Survey Agency, the Office of the State Long-Term Care Ombudsman, residents of the facility, and the resident representatives, as well as the plan for the transfer and adequate relocation of the residents, as required at § 483.70(l).

(9) Room changes in a composite distinct part. Room changes in a facility that is a composite distinct part (as defined in § 483.5) are subject to the requirements of § 483.10(e)(7) and must be

limited to moves within the particular building in which the resident resides, unless the resident voluntarily agrees to move to another of the composite distinct part's locations.

(d) Notice of bed-hold policy and return —

(1) Notice before transfer. Before a nursing facility transfers a resident to a hospital or the resident goes on therapeutic leave, the nursing facility must provide written information to the resident or resident representative that specifies—

(i) The duration of the state bed-hold policy, if any, during which the resident is permitted to return and resume residence in the nursing facility;

(ii) The reserve bed payment policy in the state plan, under § 447.40 of this chapter, if any;

(iii) The nursing facility's policies regarding bed-hold periods, which must be consistent with paragraph (e)(1) of this section, permitting a resident to return; and

(iv) The information specified in paragraph (e)(1) of this section.

(2) Bed-hold notice upon transfer. At the time of transfer of a resident for hospitalization or therapeutic leave, a nursing facility must provide to the resident and the resident representative written notice which specifies the duration of the bed-hold policy described in paragraph (d)(1) of this section.

# EXHIBIT 2

EXHIBIT 2

42 USCS § 1396r

(c)(2) Transfer and discharge rights.

(A) In general. A nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless—

(i) the transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;

(ii) the transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

(iii) the safety of individuals in the facility is endangered;

(iv) the health of individuals in the facility would otherwise be endangered;

(v) the resident has failed, after reasonable and appropriate notice, to pay (or to have paid under this title [42 USCS §§ 1396 et seq.] or title XVIII [42 USCS §§ 1395 et seq.] on the resident's behalf) for a stay at the facility; or

(vi) the facility ceases to operate.

In each of the cases described in clauses (i) through (iv), the basis for the transfer or discharge must be documented in the resident's clinical record. In the cases described in clauses (i) and (ii), the documentation must be made by the resident's physician, and in the case described in clause (iv) the documentation must be made by a physician. For purposes of clause (v), in the case of a resident who becomes eligible for assistance under this title [42 USCS §§ 1396 et seq.] after admission to the facility, only charges which may be imposed under this title [42 USCS §§ 1396 et seq.] shall be considered to be allowable.

(B) Pre-transfer and pre-discharge notice.

(i) In general. Before effecting a transfer or discharge of a resident, a nursing facility must—

(I) notify the resident (and, if known, an immediate family member of the resident or legal representative) of the transfer or discharge and the reasons therefor,

(II) record the reasons in the resident's clinical record (including any documentation required under subparagraph (A)), and

(III) include in the notice the items described in clause (iii).

(ii) Timing of notice. The notice under clause (i)(I) must be made at least 30 days in advance of the resident's transfer or discharge except—

(I) in a case described in clause (iii) or (iv) of subparagraph (A);

(II) in a case described in clause (ii) of subparagraph (A), where the resident's health improves sufficiently to allow a more immediate transfer or discharge;

(III) in a case described in clause (i) of subparagraph (A), where a more immediate transfer or discharge is necessitated by the resident's urgent medical needs; or

(IV) in a case where a resident has not resided in the facility for 30 days.

In the case of such exceptions, notice must be given as many days before the date of the transfer or discharge as is practicable.

(iii) Items included in notice. Each notice under clause (i) must include—

(I) for transfers or discharges effected on or after I) October 1, 1989, notice of the resident's right to appeal the transfer or discharge under the State process established under subsection (e)(3);

(II) the name, mailing address, and telephone number of the State long-term care ombudsman ( established under title III or VII of the Older Americans Act of 1965 [42 USCS §§ 3021 et seq. or 3058 et seq.] in accordance with section 712 of the Act [42 USCS § 3058g]);

(III) in the case of residents with developmental disabilities, the mailing address and telephone number of the agency responsible for the protection and advocacy system for developmentally disabled individuals established under subtitle C [of title I] of the Developmental Disabilities Assistance and Bill of Rights Act [42 USCS §§ 15041 et seq.]; and

(IV) in the case of mentally ill residents (as defined in subsection (e)(7)(G)(i)), the mailing address and telephone number of the agency responsible for the protection and advocacy system for mentally ill individuals established under the Protection and Advocacy for Mentally Ill Individuals Act [42 USCS §§ 10801 et seq.].

# EXHIBIT 3

EXHIBIT 3

Matrix Records from Mariner for the period 8/12/2015 to 8/12/2019

Almaden Health and Rehabilitation Center's report covered the period from 8/12/2015 to 8/12/2019 and is 143 pages. It showed the Discharge Summary Location Category for 1702 total residents discharged as:

867     to a location category listed as "Unknown"
454     to Acute Hospitals
27      to Assisted Living Facilities
318     to Home
13      to a Skilled Nursing Facility
23      to Other

Autumn Hills Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 95 pages. It showed the Discharge Summary Location Category for 1123 total residents discharged as:

563     to a location listed as "Unknown"
0       to Acute Hospitals
31      to Assisted Living Facilities
258     to Home
1       to Other

Creekside Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 91 pages. It showed the Discharge Summary Location Category for 1073 total Residents discharged as:

141     to Acute Hospital
1       to Assisted Living Facilities
260     to Home
5       to Other
666     to Unknown

Inglewood Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 91 pages. It showed the Discharge Summary Location Category for 1188 total Residents discharged as:

387     to Acute Hospital
5       to Assisted Living Facilities
160     to Home
2       to Other
631     to Unknown

La Crescenta Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 130 pages. It showed the Discharge Summary Location Category for 1524 total Residents discharged as:

|     |     |
| --- | --- |
| 327 | to Acute Hospital |
| 33  | to Assisted Living Facilities |
| 395 | to Home |
| 11  | to Other |
| 9   | to Skilled Nursing Facilities |
| 749 | to Unknown |

Monterey Palms Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 199 pages. It showed the Discharge Summary Location Category for 2373 total Residents discharged as:

|      |     |
| ---- | --- |
| 509  | to Acute Hospital |
| 42   | to Assisted Living Facilities |
| 1    | to Hospice |
| 1    | to LTAC Hospital |
| 37   | to Other |
| 16   | to Skilled Nursing Facilites |
| 1275 | to Unknown |

Palm Springs Healthcare and Rehabilitation Center's report covered the period from 8/12/2015 to 8/12/2019 and is 226 pages. It showed the Discharge Summary Location Category for 2690 total Residents discharged as:

|      |     |
| ---- | --- |
| 364  | to Acute Hospital |
| 43   | to Assisted Living Facility |
| 691  | to Home |
| 3    | to Hospice |
| 47   | to Other |
| 18   | to Skilled Nursing Facilties |
| 1524 | to Unknown |

Pine Ridge Care Center's report covered the period from 8/12/2015 to 8/12/2019 and is 66 pages. It showed the Discharge Summary Location Category for 732 total Residents discharged as:

|     |     |
| --- | --- |
| 105 | to Acute Hospital |
| 23  | to Assisted Living Facility |
| 1   | to LTAC Hospital |
| 3   | to Other |
| 2   | to Skilled Nursing Facility |
| 598 | to Unknown |

Santa Monica Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 79 pages. It showed the Discharge Summary Location Category for 925 total Residents discharged as:

| | |
|---|---|
| 358 | to Acute Hospital |
| 43 | to Assisted Living Facilities |
| 225 | to Home |
| 1 | to Independent Living Facilities |
| 7 | to Other |
| 9 | to Skilled Nursing Facilities |
| 282 | to Unknown |

Skyline Healthcare Center San Jose's report covered the period from 8/12/2015 to 8/12/2019 and is 207 pages. It showed the Discharge Summary Location Category for 2461 total Residents discharged as:

| | |
|---|---|
| 1101 | to Acute Hospital |
| 13 | to Assisted Living |
| 680 | to Home |
| 30 | to Other |
| 10 | to Skilled Nursing Facilities |
| 627 | to Unknown |

The Rehabilitation Center of Santa Monica's report covered the period from 8/12/2015 to 8/12/2019 and is 165 pages. It showed the Discharge Summary Location Category for 1959 total Residents discharged as:

| | |
|---|---|
| 685 | to Acute Hospital |
| 26 | to Assisted Living Facilities |
| 318 | to Home |
| 2 | to Hospice |
| 1 | to LTAC Hospital |
| 4 | to Other |
| 8 | to Skilled Nursing Facilities |
| 915 | to Unknown |

Vale Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 132 pages. It showed the Discharge Summary Location Category for 1559 total Residents discharged as:

| | |
|---|---|
| 550 | to Acute Hospital |
| 8 | to Assisted Living Facilities |
| 247 | to Home |
| 12 | to Other |
| 7 | to Skilled Nursing Facilities |
| 735 | to Unknown |

Village Square Healthcare Center's report covered the period from 8/12/2015 to 8/12/2019 and is 109 pages. It showed the Discharge Summary Location Category for 1292 total Residents discharged as:

| | |
|---|---|
| 281 | to Acute Hospital |
| 8 | to Assisted Living Facilities |
| 385 | to Home |
| 1 | to Hospice |
| 2 | to Other |
| 1 | to Psych Facility |
| 20 | to Skilled Nursing Facilities |
| 594 | to Unknown |

There were no Matrix system records submitted for Driftwood Healthcare Center of Hayward, Driftwood Healthcare Center of Santa Cruz, Freemont Healthcare Center, Fruitvale Healthcare Center, Hayward Hills Healthcare Center, and Parkview Healthcare Center.

# EXHIBIT 4

1  XAVIER BECERRA
   Attorney General of California
2  JENNIFER EULER
   Supervising Deputy Attorney General
3  LUKE VANDERDRIFT
   Deputy Attorney General
   State Bar No. 248235
4    2329 Gateway Oaks Drive, Suite 200
     Sacramento, CA 95833-4252
5    Telephone: (916) 621-1839
     Fax: (916) 263-0426
6    E-mail: Luke.VanderDrift@doj.ca.gov
   *Attorneys for the People of the State of California*
7

8

9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                      COUNTY OF ALAMEDA

12

13

14  | IN THE MATTER OF THE APPLICATION | No. |
    | OF THE PEOPLE FOR AN ORDER | |
15  | AUTHORIZING RELEASE OF | **STIPULATION AND [PROPOSED]** |
    | OMBUDSMAN RECORDS RELATING TO | **ORDER TO PRODUCE RECORDS** |
16  | MARINER HEALTH CARE FACILITIES. | **PURSUANT TO 42 U.S.C.** |
    | | **§ 3058g(d)(2)(B)(iii)** |
17  | | |
    | | **(AG Docket No. SF2018102591)** |
18

19

20

21        On or about November 15, 2019, the Bureau of Medi-Cal Fraud and Elder Abuse

22  (BMFEA) and several District Attorney's Offices (collectively "the People") requested from

23  Joseph Rodrigues, the California Long-Term Care Ombudsman (Ombudsman), all accessible

24  complaints and discharge notices dated between November 1, 2016 and the present, that relate to

25  Mariner Health Care nursing homes in California.

26        In response, the Ombudsman confirmed his position that pursuant to the Older Americans

27  Act, 42 U.S.C. § 3058g(d)(2) and California Welfare and Institutions Code § 9725 such records

28  cannot be produced in an unredacted form absent a court order.

                                    1

1    The Ombudsman and the People agree that this Court has authority to enter an Order

2  compelling production of documents pursuant to 42 U.S.C. § 3058g(d)(2)(B), which provides that

3  a court order may require disclosure of the complaints, 42 U.S.C. § 3058g(d)(2)(B)(iii). In its

4  Application, BMFEA has established (1) that it is conducting the investigation within its authority

5  under California Government Code § 12528; (2) there is good cause to believe that the records

6  are relevant to a legitimate health oversight activity; and (3) there are no other effective ways to

7  obtain the information sought and public interest and need for disclosure outweigh any potential

8  injury to the nursing home residents.

9    The People will limit its use and disclosure of the material to the uses and disclosures

10  described in 45 C.F.R. § 164.512(d). The Ombudsman agrees that upon issuance of a Court

11  Order, he will respond to the request and produce documents, in un-redacted form, to Bureau of

12  Medi-Cal Fraud and Elder Abuse, Deputy Attorney General, Luke VanderDrift, at 2329 Gateway

13  Oaks Drive, Suite 200, Sacramento, CA 95833-4252, or to another member of the prosecution

14  team, no later than thirty (30) days or as soon as practicable after the entry of such an order.

15  Names or other personally identifying information of such residents, complaints, or witnesses in

16  records provided by the Ombudsman shall not become part of the Court's record or available for

17  public access. The People agree to contact the Ombudsman prior to contacting any resident,

18  complainant or witnesses identified in the Ombudsman records released pursuant to this

19  Stipulation.

20

21    IT IS SO STIPULATED.                    Respectfully Submitted,
    Dated:

22
                                            XAVIER BECERRA
23                                          Attorney General of California

24

25                                          Luke VanderDrift
                                            Deputy Attorney General
26

27

28

2

Order

1   Dated: 1/6/20                    JEFFREY ROSELL
                                     District Attorney of Santa Cruz
2

3

4                                    Doug Allen
                                     Assistant District Attorney
5

6   Dated: 1/8/20                    LORI FRUGOLI
                                     District Attorney of Marin
7

8

9                                    Andy Perez
                                     Deputy District Attorney
10

11  Dated: 1/8/20                    NANCY O'MALLEY
                                     District Attorney of Alameda
12

13

14                                   Lori Schnall
                                     Assistant District Attorney
15

16  Dated: 1/8/20                    JACKIE LACEY
                                     District Attorney of Santa Cruz
17

18

19                                   Seza Mikklan
                                     Deputy District Attorney
20

21  Dated: 1/8/20                    JOSEPH RODRIGUES
                                     California Long-Term Care Ombudsman
22

23

24                                   ~~Chisorom O. Okwuosa~~ Carmen L. Gibbs
                                     ~~Chief Counsel~~ Senior Staff Counsel
25

26

27

28

                                     3
                                   Order

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

The Court finds the following:

1.    The investigation being conducted by the People is within the lawful jurisdiction of the government authority seeking access to the records; as provided in California Government Code § 12528;

2.    There is reason to believe that the records sought are relevant to the People's investigation;

3.    Good cause exists for the Order in that: (a) There are no other effective ways of obtaining the information sought; and (b) the public interest and need for disclosure of the records outweigh the potential injury to the nursing home resident.

Therefore, it is hereby ORDERED that:

1.    The People may obtain and use all complaints and discharge notices dated between January 1, 2016 and the present, and that pertain to the Mariner Health Care nursing homes located in California.

2.    The documents will be produced in un-redacted form to Deputy Attorney General, Luke VanderDrift, at 2329 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833-4252 or to another member of the prosecution team.

3.    Access to the un-redacted records shall be limited to:  BMFEA and Department of Justice attorneys, agents, auditors, nurse evaluators, and contracted experts; District Attorney Office attorneys, investigators, staff, and contracted experts; and witnesses who may be called to testify at any hearing to the extent the information in the confidential resident records may be relevant to their testimony; and, in the event of litigation, the superior and appellate court(s), and their staff.

\\

\\

\\

4

Order

4.     The People will limit its use and disclosure of the material to the uses and disclosures described in 45 C.F.R. § 164.512(d).  The People may make the documents available to the public, but only after redacting all resident, complainant, and witness identifying information.

DATED this 21st day of January, 2020.

IT IS SO ORDERED.

JUDGE

# EXHIBIT

# 5

ROB BONTA
Attorney General of California
JENNIFER EULER
Chief Assistant Attorney General
JOEL SAMUELS, STATE BAR No. 234574
Supervising Deputy Attorney General
  2329 Gateway Oaks Drive, Suite 200
  Sacramento, CA 95833-4252
  Telephone: (916) 621-1839
  Fax: (916) 263-0426
  E-mail: Joel.Samuels@doj.ca.gov

NANCY E. O'MALLEY
District Attorney of Alameda County
LORI SCHNALL, State Bar No. 195556
Deputy District Attorney
  1225 Fallon Street, Suite 900
  Oakland, CA 94612-4208
  Telephone: (510) 272-6222
  E-mail: Lori.Schnall@acgov.org

LORI E. FRUGOLI
District Attorney of Marin
ANDRES PEREZ, State Bar No. 186219
Deputy District Attorney
  3501 Civic Center Drive, Suite 145
  San Rafael, CA 94903-4189
  Telephone: (415) 473-6450
  Fax: (415) 473-3719
  E-mail: Aperez@marincounty.org

**Exempt from filing fees pursuant to
Government Code section 6103**

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
07/14/2022 at 05:06:08 PM
By: Suzanne Pesko,
Deputy Clerk

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUG ALLEN, State Bar No. 99239
Assistant District Attorney
  701 Ocean Street, Suite 200
  Santa Cruz, CA. 95060
  Telephone: (831) 454-2930
  Fax: (831) 454-2227
  E-mail:
  Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
  211 West Temple Street, Suite 1000
  Los Angeles, CA 90012
  Telephone: (213) 257-2450
  E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
  The People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>MARINER HEALTH CARE INC., et. al.,<br><br>Defendants. | Case No.: RG21095881<br>Hearing Reservation No. 80810896086<br><br>**AMENDED NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>DATE: OCTOBER 14, 2022<br>TIME: 10:30 A.M.<br>DEPT: 23<br>JUDGE: HON. BRAD SELIGMAN<br>TRIAL DATE:   NONE SET<br>ACTION FILED: APRIL 8, 2021 |

1

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 14, 2022, at 10:30 AM, or as soon thereafter that the matter may be heard in Department 23 of the above-entitled Court, located at 1221 Oak Street Oakland, CA 94612, the PEOPLE OF THE STATE OF CALIFORNIA (the People), will and do hereby move this Court for preliminary injunction and a monitor to oversee enforcement thereof for the nursing homes operated by Defendants.

The motion is brought pursuant to Business and Professions Code section 17203 and upon all matters set forth in the complaint on file herein and presented in the briefs and memoranda of points and authorities and if further based on this notice, briefs, memoranda of points and authorities, and declarations and documentary evidence heretofore filed and to be filed and such evidence as may be presented at the hearing including, percipient and expert testimony, documents, videotape, voice recordings and transcripts.  Attached is a modified proposed injunction.

Dated: July 14, 2022

JEFFREY S. ROSELL DISTRICT
ATTORNEY COUNTY OF SANTA CRUZ

By, Douglas B. Allen, Assistant
District Attorney

2

**AMENDED NOTICE OF MOTION FOR PRELIMINARY INJUNCTION** (RG21095581)

1  ROB BONTA
   Attorney General of California
2  JENNIFER EULER
   Chief Assistant Attorney General
3  JOEL SAMUELS, State Bar No. 234574
   Supervising Deputy Attorney General
4   2329 Gateway Oaks Drive, Suite 200
    Sacramento, CA 95833-4252
5   Telephone: (916) 621-1839
    Fax: (916) 263-0426
6   E-mail: Joel.Samuels@doj.ca.gov

7  NANCY E. O'MALLEY
   District Attorney of Alameda County
8  LORI SCHNALL, State Bar No. 195556
   Deputy District Attorney
9   1225 Fallon Street, Suite 900
    Oakland, CA 94612-4208
10  Telephone: (510) 272-6222
    E-mail: Lori.Schnall@acgov.org
11
   LORI E. FRUGOLI
12 District Attorney of Marin County
   ANDRES PEREZ, State Bar No. 186219
13 Deputy District Attorney
    3501 Civic Center Drive, Suite 145
14  San Rafael, CA 94903-4189
    Telephone: (415) 473-6450
15  Fax: (415) 473-3719
    E-mail: Aperez@marincounty.org
16

Exempt from filing fees pursuant to
Government Code section 6103

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUGLAS B. ALLEN, State Bar No.
99239
Assistant District Attorney
 701 Ocean Street, Suite 200
 Santa Cruz, CA. 95060
 Telephone: (831) 454-2930
 Fax: (831) 454-2227
 E-mail:
 Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
 211 West Temple Street, Suite 1000
 Los Angeles, CA 90012
 Telephone: (213) 257-2450
 E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
 The People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>MARINER HEALTH CARE INC., a Delaware corporation; *et. al.*<br><br>Defendants. | Case No.: RG21095881<br><br>[AMENDED PROPOSED]<br>**PRELIMINARY INJUNCTION** |

I

GOOD CAUSE APPEARING, THE COURT hereby orders as follows pending final

judgment:

## PARTIES AND APPLICATION

1.      This preliminary injunction is ordered against Defendants MARINER

HEALTH CENTRAL INC., ALMADEN OPERATING COMPANY LP, AUTUMN HILLS

OPERATING COMPANY LP, CREEKSIDE OPERATING COMPANY LP, DRIFTWOOD

HAYWARD OPERATING COMPANY LP, DRIFTWOOD SANTA CRUZ OPERATING

COMPANY LP, FREMONT HEALTHCARE OPERATING COMPANY LP, FRUITVALE

LONG TERM CARE, LLC, HAYWARD HILLS OPERATING COMPANY LP, INGLEWOOD

OPERATING COMPANY LP, VERDUGO VISTA OPERATING COMPANY LP,

MONTEREY PALMS OPERATING COMPANY LP, PARKVIEW OPERATING COMPANY

LP, SAN RAFAEL OPERATING COMPANY LP, PALM SPRINGS OPERATING COMPANY

LP, REHABILITATION CENTER OF SANTA MONICA OPERATING COMPAN LP,

SANTA MONICA OPERATING COMPANY LP, SKYLINE SAN JOSE OPERATING

COMPANY LP, VALE OPERATING COMPANY LP, SAN MARCOS OPERATING

COMPANY LP, and to each of their agents, servants, employees, representatives, officers,

directors, managers, successors in interest, affiliates, assigns, and subsidiaries, aiders and

abettors, as well as any corporation, limited liability company, partnership, or any other legal

entity or organization which are controlled, owned, managed, licensed, operated, administered by

them and which directly or indirectly controls the operations of the skilled nursing facilities in

California (as defined under California Health and Safety Code section 1250(c) and 22 CCR

72103), including those known as Almaden Care and Rehabilitation Center, Autumn Hills

Healthcare Center, Creekside Healthcare Center, Driftwood Healthcare Center-Hayward,

Driftwood Healthcare Center-Santa Cruz, Fremont Healthcare Center, Fruitvale Healthcare

Center, Hayward Hills Healthcare Center, Inglewood Healthcare Center, La Crescenta Healthcare

Center, Monterey Palms Healthcare Center, Parkview Healthcare Center, Pineridge Care Center,

Palm Springs Healthcare Center, The Rehabilitation Center of Santa Monica, Santa Monica

**PRELIMINARY INJUNCTION**
**RG21095881**

1   Healthcare Center, Skyline Healthcare Center-San Jose, Vale Healthcare Center, and Village

2   Square Healthcare Center (hereinafter collectively referred to as "Mariner").

3

4                                   **INJUNCTION**

5       8.      Pursuant to Business and Professions Code sections 17203 and 17535, Defendants

6   are hereby enjoined and precluded from:

7           A.   Improperly discharging a resident in violation of Federal or California laws and

8                regulations, including but not limited to the following:

9                a.   Failing to engage in proper discharge planning, including but not limited

10                    to,

11                        i.   Discharging or transferring a resident without providing to the

12                             resident or the resident's representative the preparation and

13                             orientation required under 42 U.S.C. section 1395i-3(c), 42 U.S.C.

14                             section 1396r(c), and 42 C.F.R. section 483.15(c), to ensure safe

15                             and orderly transfer or discharge;

16                       ii.   Causing the discharge of a resident without first properly

17                             developing and implementing a discharge plan, in violation of 42

18                             C.F.R. section 483.21;

19                b.   Failing to properly document discharges by failure to document and

20                    maintain medical records for residents required upon discharge or transfer,

21                        i.   including the discharge summary, in violation of 42 C.F.R. section

22                             483.15(c) and section 483.21(c);

23                       ii.   failing to document in the resident's medical file that a transfer or

24                             discharge is appropriate under 22 C.C.R. section 72527 and 42

25                             C.F.R. section 483. 15(c).

26                c.   Discharging or transferring a resident without giving the resident or

27                    resident's representative timely prior written notice in a language and

28                    manner they understand, including but not limited to,

1           i. violating of 42 U.S.C. section 1395i-3(c), 42 U.S.C. section

2               1396r(c), and 42 C.F.R. section 483.15(c), 483.10(g); and 22

3               C.C.R. section 72520(a);

4          ii. discharging or transferring a resident without sending a copy of the

5               written notice of transfer or discharge to the local Long-Term Care

6               Ombudsman within the time required by Cal. Health and Safety

7               Code section 1439.6 and 42 C.F.R. section 483.15(c);

8         iii. providing written notice to the resident and the resident's

9               representative **for all transfers or discharges**;

10        iv. except as specified in paragraphs (c)(4)(ii) and (8) of 42 CFR

11              483.15, the notice of transfer or discharge for **all discharges** must

12              be in writing in a form in compliance with 42 CFR 483.15(c)(5),

13              and made by the facility at least 30 days before the resident is

14              transferred or discharged, with a contemporaneous copy of the

15              notice to the local Long-Term Care Ombudsman within the time

16              required by Cal. Health and Safety Code section 1439.6 and 42

17              C.F.R. section 483.15(c)(3)(i);

18         v. and further providing a copy of the notice of transfer or discharge to

19              the Compliance Monitor (as defined in paragraph 10, below), by

20              email or facsimile transmission as directed by the Compliance

21              Monitor at the same time as the notice to the Ombudsman;

22     B. As defined by and in violation of California Business and Professions Code

23           section 17500, making, causing to be made, published or republished any false or

24           misleading statement or representation, including but not limited to, inflated

25           staffing data regarding the Five-Star Quality Rating, or a Five-Star Quality Rating

26           itself that is based upon any false or misleading statement or representation,

27           including but not limited to, inflated staffing data and/or submitting any false,

28           inflated or misleading information to the Centers for Medicare and Medicaid

Services (CMS) that may influence the Five-Star Quality Rating System calculations.

C. Failing to report incidents of suspected of abuse and neglect as required by Cal Welfare & Institutions Code § 15630, and similar or related statutes and regulations, and copy all written reports and confirmations to the Compliance Monitor contemporaneous with the report or written confirmation.

D. Failing to employ an adequate number of qualified personnel to carry out all of the functions of the facility as required by Health & Safety Code §1599.1(a); 22 Cal. Code of Regs §72501(e), and Compliance, at all times, with all applicable state and federal regulatory and statutory requirements regarding the levels at which a skilled nursing facility must provide staffing, including but not limited to, California Health & Safety Code sections 1599.1 and 1276.65; 22 C.C.R. sections 72329, 72329.2, 72501(e) and (g) and 22 C.C.R. section 72527(a)(24); 42 C.F.R. section 483.35; and 42 U.S.C. section 1396r(b)(2), and as required by 42 C.F.R. section 483.70(f).

9.    Should there exist a state of emergency concerning COVID-19 as declared by the United States Department of Health and Human Services or the Governor of California while the injunction herein is pending the Court may consider the impact the reasonable feasibility of Defendants' compliance with the obligations set forth in this Injunction in enforcement or in making any further orders.

## MONITORING COMPLIANCE

10.    Pending trial or further order of this Court, a Compliance Monitor (hereinafter whether singular or plural referred to as "Monitor") shall be appointed pursuant to California Business & Professions Code § 17203, and Code Civil Procedure §§ 639; 564(b)(9), to monitor and report on compliance with the terms of this injunction to the People and this Court as directed. The Parties shall meet and confer, and the People shall recommend one or more Monitors, by written notice to the Court with a copy to counsel for Defendants who may object in writing filed and served within 3 Court days of notice. The purpose of the Monitor is to oversee compliance

1    with the injunctive terms of this Judgment and to protect the personal and property rights of the

2    residents in the skilled nursing facilities operated by Defendants. Any replacement of a Monitor

3    shall follow the same procedure.

4         11.   The Monitor shall have access to all records of Defendants' California Nursing

5    Facilities including, but not limited to, *Matrix®* or other *cloud-based* or electronic patient records

6    and Defendants shall provide passwords and other required credentials to enable remote access to

7    patient records, including, but not limited to patient/resident charts, medical records, trust account

8    records and records reflecting cost sharing. The Monitor shall also have access to records related

9    to staffing, including but not limited to the general ledger of the operating companies.  Defendants

10   shall provide reasonable access to the facilities, residents and resident's representatives. The

11   Monitor shall be copied on all reports and notices as required herein and as required to be submitted

12   to any public agency or non-profit by law or regulation regarding the conduct of skilled nursing

13   activities in California.

14        12.    The Monitor shall be provided access to facilities on an unannounced basis to

15   engage in impromptu checks to ensure ongoing compliance with the injunctive terms herein and

16   reduce the need and expense of ongoing supervision.  The Monitor shall prepare compliance

17   reporting to the People on an ongoing basis and to the Court by written report 10 days before each

18   Case Management Conference set in this action.  The Monitor shall maintain confidentiality of

19   records as required by law.  A copy of written reports shall be provided to both the People and

20   Defendants.  Should the report contain any observed deficiencies the Defendants through the

21   appropriate management personnel shall meet and confer with the Monitor regarding the

22   observations and suggestions for improvement.  The Monitor's shall report violations of the

23   injunction and suggest compliance methods.

24        13. The Monitor shall maintain confidentiality of records covered by the Federal Health

25   Insurance Portability and Accountability Act of 1996 (HIPAA), California medical privacy laws,

26   and third-party privacy rights, such as employee records and non-public financial records,

27   disclosing them only to Monitor's staff, facility staff, counsel for both parties and their employees,

28   agents and experts, who shall also maintain such confidentiality.  The Monitor shall comply with

1   the requirements of 45 C.F.R. § 164.308; 45 C.F.R. § 164.314 and 45 C.F.R. § 164.504, including

2   but not limited to, not disclosing information except as required or allowed by law, employing

3   appropriate safeguards to protect information, reporting to the covered entity any unauthorized or

4   unlawful use or disclosure of the information, and taking steps to ensure that any subcontractors

5   that create, receive, maintain, or transmit protected health information on behalf of the Monitor

6   agree to the same restrictions and conditions.  This order shall be deemed "other arrangements" in

7   lieu of a business associate agreement in compliance with 45 C.F.R. § 164.308; 45 C.F.R. § 164.314

8   and 45 C.F.R. § 164.504.

9       14.  Defendants may withhold access to records privileged under attorney/client; attorney

10   work product and deliberative process or quality assurance privileges but shall promptly identify

11   such records or files so withheld by a privilege log which shall be provided to the Monitor and

12   plaintiff's counsel.  The Monitor shall be available to the Court, the People, Defendants and by

13   subpoena to administrative proceedings related to the facilities of Defendants, for testimony

14   regarding the Monitor's observations and opinions.

15       15.  The Monitor and the Monitor's staff shall document their activities on an hourly basis

16   and will prepare invoices that segregate costs according to each respective facility of Defendants

17   commensurate with the time allocated to perform duties for the respective skilled nursing facilities.

18   Any dispute in the billing shall first be presented to counsel for the People for the purpose of

19   meeting and conferring upon resolution, and if not resolved, may be presented to this Court upon

20   noticed motion.  Pending resolution of the dispute by this Court, the Defendants shall continue to

21   make payments for the services of the Monitor.  The Monitor's rate shall not exceed her/his

22   customary rate and shall be consistent with the rate charged by other professionals with similar

23   experience performing such oversight services.  The Monitor shall create an annual budget for each

24   calendar year of monitoring for the projected cost of monitoring all facilities as directed by the

25   Court for Monitoring.  The Monitor shall not exceed the total budgeted amount without first

26   meeting and conferring with Defendants and Plaintiffs and then only with approval by this Court.

27   The reasonable cost of the Monitor shall be borne by Defendants, the Monitor shall be paid by

28   Defendants upon presentment of invoices no more frequent than monthly.

1       16. Any dispute regarding any issue with the Monitor, including but not limited to, the cost,

2   scope or activities of the Monitor will be presented to this Court for resolution following meeting

3   and conferring between parties.

4

5   Dated: September _____, 2022

6

7

8                                  The Honorable Brad Seligman
                                      JUDGE OF THE SUPERIOR COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

**PRELIMINARY INJUNCTION**
**RG21095881**

1

## PROOF OF SERVICE

2

3   STATE OF CALIFORNIA, COUNTY OF ALAMEDA

4       I, Mary O'Malley, declare that I am a resident of the State of California, over the age of

5   eighteen years, and not a party to the within action. My business address is 7677 Oakport Street, Suite 650, Oakland, CA 94621.

6       On July 14, 2022, I served a copy of the following document:

7   **AMENDED NOTICE OF MOTION FOR PRELIMINARY INJUNCTION AND**
8   **AMENDED PROPOSED PRELIMINARY INJUNCTION**

9   on the following parties, as listed below:

10  Scott J. Kiepen, Esq.                          **Counsel for Defendants**:
11  Matthew Clark, Esq.                            Mariner Health Care, Inc.
    HOOPER, LUNDY & BOOKMAN, P.C.                  National Senior Care, Inc.
12  101 Montgomery Street, 11th Floor              Mariner Health Care Management Co.
    San Francisco, CA 94104                        Mariner Health Central, Inc.
13  skiepen@health-law.com                         Almaden Operating Company LP
    mclark@health-law.com                          Autumn Hills Operating Company LP
14                                                 Creekside Operating Company LP
15                                                 Driftwood Hayward Operating Company LP
    Darryl Ross, Esq.                              Driftwood Santa Cruz Operating Company LP
16  Mariner Health Central, Inc.                   Fremont Healthcare Operating Company LP
    5440 Trabuco Road                              Fruitvale Long Term Care, LLC
17  Irvine, CA 92620                               Hayward Hills Operating Company LP
    daross@marinerhealthcare.com                   Inglewood Operating Company LP
18                                                 Verdugo Vista Operating Company LP
19                                                 Monterey Palms Operating Company LP
                                                   Parkview Operating Company LP
20                                                 San Rafael Operating Company LP
                                                   Palm Springs Operating Company LP
21                                                 Rehabilitation Center of Santa Monica
                                                   Operating Company LP
22                                                 Santa Monica Operating Company LP
23                                                 Skyline San Jose Operating Company LP
                                                   Vale Operating Company LP
24                                                 San Marcos Operating Company LP

25

26

27

28

1

PROOF OF SERVICE - AMENDED NOTICE OF MOTION FOR PRELIMINARY INJUNCTION AND
AMENDED PROPOSED PRELIMINARY INJUNCTION

RG21095881

**By Electronic Service:** A copy of the document listed above was transmitted via electronic service to the persons at the e-mail addresses listed above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 14, 2022, in Oakland, California.

Mary O'Malley

---

2

PROOF OF SERVICE - AMENDED NOTICE OF MOTION FOR PRELIMINARY INJUNCTION AND
AMENDED PROPOSED PRELIMINARY INJUNCTION

RG21095881

# EXHIBIT
# 6(a)
# Tabler Depo

Page 1

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA


PEOPLE OF THE STATE OF CALIFORNIA,

        Plaintiff,

vs.                                              CASE NO:
                                                 RG21095881

MARINER HEALTH CARE INC., A DELAWARE
CORPORATION; NATIONAL SENIOR CARE, INC.,
A DELAWARE CORPORATION; MARINER HEALTH CARE
MANAGEMENT CO., A DELAWARE CORPORATION;
MARINER HEALTH CENTRAL INC., A DELAWARE
CORPORATION; ET. AL.

        Defendants.

                           /


REMOTE VIDEOCONFERENCE DEPOSITION OF:  KENNETH TABLER

DATE:  TUESDAY, FEBRUARY 15, 2022

TIME:  9:04 A.M.

PLACE:  REMOTE

REPORTER:  CONNIE WEBB, CSR NO. 10811

**Kenneth Tabler**
**February 15, 2022**

Page 2

```
 1                    APPEARANCES
 2
 3   For the plaintiff:
 4   District Attorney of Santa Cruz
     DOUG ALLEN, ESQUIRE
 5   Assistant District Attorney
     701 Ocean Street, Suite 200
 6   Santa Cruz, California 95060
     (831) 454-2930
 7   Douglas.Allen@santacruzcounty.us
 8   District Attorney of Marin
     ANDRES PEREZ, ESQUIRE
 9   Deputy District Attorney
     3501 Civic Center Drive, Suite 145
10   San Rafael, California 94903-4189
     (415) 473-6450
11   Aperez@marincounty.org
12   District Attorney of Alameda County
     LORI SCHNALL, ESQUIRE
13   Deputy District Attorney
     1225 Fallon Street, Suite 900
14   Oakland, California 94612-4208
     (510) 272-6222
15   Lori.Schnall@acgov.org
16   District Attorney of Los Angeles County
     SEZA MIKIKIAN, ESQUIRE
17   Deputy District Attorney
     211 West Temple Street, Suite 1000
18   Los Angeles, California 90012
     (213) 257-2450
19   Smikikian@da.lacounty.gov
20
     For the defendant:
21
     DARRYL A. ROSS, ESQUIRE
22   Mariner Health Central, Inc.
     5440 Trabuco Road
23   Irvine, California 92620-5704
     949-238-7775
24   daross@marinerhealthcare.com
25
```

Page 4

```
 1                    WITNESS INDEX
 2
 3   WITNESS                        PAGE
 4
 5   KENNETH TABLER
     By Mr. Allen:                    6
 6
 7
 8
 9                    EXHIBIT INDEX
10
11   NO.  DESCRIPTION                MARKED
12
13    1  Second-amended Notice of Deposition    12
14    2  Deponent's declaration in support of    12
         motion to quash service
15
         3  Organizational chart          12
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    APPEARANCES
 2                    (continued)
 3
 4   Also present:
 5   Matt Clark
     Devin Ehrlich, general counsel
 6   Linda Taetz
     Kristy Prince Owen
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20        DEPOSITION OF KENNETH TABLER, taken on behalf of
21   the plaintiff in Eureka, California, on February 15,
22   2022, at 9:04 a.m., before Connie Webb, CSR No. 10811.
23
24
25
```

Page 5

```
 1              TUESDAY, FEBRUARY 15, 2022
 2                    •  •  •
 3                    9:04 A.M.
 4                    •  •  •
 5
 6        THE REPORTER:  Good morning, everyone.
 7   My name is Connie Webb, CSR 10811, and I'm
 8   located at my office in Eureka, California.  Today's date
 9   is Tuesday, February 15, 2022, and the time is 9:04 a.m.
10   This is the remote Zoom deposition of Kenneth
11   Tabler in the matter of People of the State of California
12   versus Mariner Health Care Inc., et al., case number
13   RG21095881, taken on behalf of the plaintiff.
14        This deposition and any transcript produced
15   therefrom will be handled pursuant to California CCP
16   2025.
17        Will counsel please state your appearances
18   starting with the noticing attorney?
19        MR. ALLEN:  Yes.  Good morning.  This is
20   Douglas Allen.  I'm an assistant district attorney with
21   the County of Santa Cruz.
22        MR. ROSS:  Good morning.  Darryl Ross and Matt
23   Clark via Zoom for the defendants and for the witness.
24        Also present in the room with me is Devin
25   Ehrlich, general counsel; Linda Taetz who is president of
```

2  (Pages 2 to 5)

**Kenneth Tabler**
**February 15, 2022**

Page 6

1  the different operating companies named in the lawsuit;
2  and Kristy Prince Owen who's director of legal affairs
3  for Mariner Health Central.
4        Okay.  Is that everyone?
5        MR. ALLEN:  We also have Seza Mikikian from the
6  LA County's District Attorney's Office, Lori Schnall from
7  the Alameda District Attorney's Office, and Andy Perez
8  from the Marin County District Attorney's Office joining
9  us to observe.
10       THE REPORTER:  Okay.  And Mr. Tabler, if you
11  could raise your right hand to be sworn?
12
13             KENNETH TABLER,
14   a witness called on behalf of the plaintiff,
15  having been first duly sworn to testify to the truth,
16  the whole truth, and nothing but the truth, was
17  examined and testified on his oath as follows:
18       THE REPORTER:  Thank you.
19
20             EXAMINATION
21
22  BY MR. ALLEN:
23       Q   Good morning, Mr. Tabler.
24       A   Good morning, Mr. Allen.
25       Q   Can you hear me all right?

Page 7

1        A   Yes, sir.
2        Q   Okay.  So Mr. Tabler, you've had your
3  deposition taken before.  Can you give me a guesstimate
4  as to how many times you think you've had your deposition
5  taken?
6        A   I don't know the exact number, but I would say
7  it's in excess of 20 times.
8        Q   Okay.  So you understand that you're under oath
9  and that everything you say is being taken down, that
10  you're certainly entitled to take a break and consult
11  with counsel.
12       But if I have a question pending, I'm going to
13  ask you to finish the answer before you do that.  And
14  that you have to be able to give clear testimony, so I
15  assume you're not under any drugs or any other
16  impediments to keep you from giving good testimony.
17       You understand all of that, I assume?
18       A   Yes, I do.
19       Q   Okay.  Just briefly, is there anyone else in
20  the room with you today?
21       A   No.
22       Q   Do you have a cell phone with you?
23       A   Yes, I do.
24       Q   Where's the cell phone?
25       A   It's sitting on my desk right on my left-hand

Page 8

1  side.
2        Q   If you'd be so kind as to put it away from
3  where you are, I'd appreciate it.
4        A   Sure.
5        Q   If you want to consult with counsel, like I
6  said, we'll be able happy to allow you to do that.  I
7  would very much prefer that you don't communicate with
8  anybody by cell phone, including your attorneys, because
9  that just complicates everything.
10       And even if it's an innocent communication, I
11  would much prefer you talk to them over the -- the Zoom
12  either in a break out room or some fashion like that --
13  or actually have a phone call with them during a break.
14  That's -- that's --
15       A   Okay.  I'm going to put it in a drawer so that
16  I don't have access or see it.  So...
17       Q   Great.  Great.
18       A   Okay.  I'm set.
19       Q   Very good.  I'm sorry.  I missed you in
20  Baltimore.
21       A   Well, it's cold, about 12 degrees here.  So I
22  think you picked a good time to -- to do this via Zoom
23  from California.
24       Q   Yes.  Well, Mr. Perez and I were looking
25  forward to enjoying the cold weather back there, but

Page 9

1  that's one of the reasons I changed the arrangements.
2        So can you give us your residence address,
3  please?
4        MR. ROSS:  I'm sorry.  Did you ask him for his
5  residence address?
6        MR. ALLEN:  Yes.
7        MR. ROSS:  I'd object on privacy.  Why do you
8  need his home address?
9        MR. ALLEN:  So I know where he lives.
10       MR. ROSS:  Right.  I'd object on privacy.  I'd
11  like to know --
12       MR. ALLEN:  I promise I won't disseminate it to
13  the world.  I have no intention of doing that.  But being
14  as it's important that I know the residence address in
15  case we need to actually serve any kind of document
16  directly upon Mr. Tabler, who's an officer of the
17  company.
18       MR. ROSS:  I would object.  I don't want his
19  home address in a transcript.  I've never had an issue.
20  I'm happy, if he should leave the employ of Mariner
21  Health Central, to provide his home address if I no
22  longer represent him.  But he certainly can be served at
23  my office or at his business address.
24       And there's no issue with you having his
25  business address, but I do object on privacy grounds to

**Kenneth Tabler**
**February 15, 2022**

## Page 10

1  his home address, Mr. Allen.
2        MR. ALLEN: Well, Madam Court Reporter, would
3  you separately mark that question?
4        THE REPORTER: Sure.
5        (Record marked.)
6        And if you -- we'll address this more later.
7  But if you continue to object and refuse to answer, I'll
8  let you know right now that I will probably cite you into
9  superior court on a motion to compel. So --
10       MR. ROSS: Just so we're clear, you're entitled
11  to compel any -- any testimony you believe is
12  appropriate. And I'm entitled to assert objections,
13  including privacy.
14       So we don't need to get off on the wrong foot
15  here. So let's just move forward, and we'll see what
16  comes.
17       MR. ALLEN: I understand my duties, Mr. Ross.
18  You don't need to explain them to me.
19       Q   (By Mr. Allen) Now, Mr. Tabler, in what city is
20  your home address?
21       A   I really -- I don't live in a city. I live in
22  Upperco, Maryland.
23       Q   Say that again. Upper what?
24       A   Upperco, Maryland.
25       Q   Okay. And approximately how far is that from

## Page 11

1  Baltimore?
2        A   It's approximately 15 miles, maybe a half-hour,
3  45-minute drive.
4        Q   Are you currently in Sparks, Maryland?
5        A   Yes.
6        Q   Or -- okay.
7            Are you at an office?
8        A   Yes. I'm at my office.
9        Q   And your office -- is that the offices of one
10  of the Mariner entities, for instance, National Senior
11  Care?
12       A   It's at the office of Fundamental
13  Administrative Services.
14       Q   Okay. So you have a -- a college degree from
15  Loyola College in Baltimore, an accounting degree; is
16  that correct?
17       A   Yes, that's correct.
18       Q   And you received that in 1980. You're just a
19  young guy. And you are also a certified public
20  accountant; is that correct?
21       A   Yes, that's correct.
22       Q   You obviously have a lot of years of business
23  experience, but you have no education following those
24  matters I just mentioned?
25       A   That -- that's correct.

## Page 12

1        MR. ALLEN: Okay. Now, I sent out three
2  exhibits. One is the notice -- the second-amended notice
3  of your deposition.
4        (Exhibit 1 marked.)
5        MR. ALLEN: Exhibit 2 is your declaration that
6  you filed in this action in support of the motion to
7  quash service by Mariner Health Central, Mariner Health
8  Care Management Company and National Senior Care.
9        (Exhibit 2 marked.)
10       MR. ROSS: Mr. Allen, I think you misspoke when
11  you were naming the parties who are --
12       MR. ALLEN: You are correct, Counsel. Not
13  Mariner Health Central. Mariner Health Care, Inc. Thank
14  you. National Senior Care and Mariner Health Care
15  Management Company.
16       Q   (By Mr. Allen) Did you -- do you have a copy of
17  that with you?
18       A   Yes. I -- I have in front of me the exhibits
19  that you sent. So -- so I do have those in front of me
20  right now.
21       MR. ALLEN: Very good.
22       And Exhibit 3 is a organizational chart that
23  was attached to the declaration of Miss Owen.
24       (Exhibit 3 marked.)
25       Q   (By Mr. Allen) Do you have that in front of

## Page 13

1  you?
2        A   Yes, I do. Yes, sir.
3        Q   Have you seen that organizational chart before?
4        A   Yes.
5        Q   Are you familiar with it?
6        A   Yes.
7        Q   Okay. We'll come back to the organizational
8  chart.
9        Now, you indicate in your declaration you're an
10  officer and director of National Senior Care, Inc.
11  That's correct, I assume?
12       A   Yes.
13       Q   And what officer are you?
14       A   I -- I'm the president.
15       Q   Okay. Are there any other officers of National
16  Senior Care, Incorporated?
17       A   Yes.
18       Q   And who are they?
19       A   Devin Ehrlich.
20       Q   Anyone else?
21       A   Just the two of us.
22       Q   Okay. And how many shareholders does National
23  Senior Care have?
24       A   National Senior Care has one shareholder.
25       Q   Is that a member of the Grunstein family?

**CAL Reporting 925-425-9669**

**Kenneth Tabler**
**February 15, 2022**

|  | Page 14 |
|---|---|

1  A  Yes.
2  Q  Is it an individual?  Or is it held in a trust?
3  Or how is -- how is the stock held?
4  A  It's held by an individual.
5  Q  Now, my understanding is Harry Grunstein passed
6  away; is that correct?
7  A  Yes, sir, he did.
8  Q  And so who is the holder of the shares now?
9  A  His -- his wife Emily Grunstein.
10  Q  Can you spell that, please?
11  A  G-R-U-N-S-T-E-I-N.
12  Q  And she spells Emily how?
13  A  E-M-I-L-Y, I think.
14  Q  Okay.  Does National Senior Care have an
15  office?
16  A  There -- it -- it has no formal office.  I
17  believe we use an Atlanta address for its business
18  office.
19  Q  Okay.  This Atlanta address, is it, like, an
20  office suite of some kind?  Or what -- can you describe
21  it for me?
22  A  I believe it's an office in a law firm.
23  Q  Okay.  What's the name of the law firm?
24  A  I don't have that memorized.
25  Q  Is the law firm affiliated or ever been

|  | Page 15 |
|---|---|

1  affiliated with Harry Grunstein's brother Leonard?
2  A  No.
3  Q  Okay.  Does -- National Senior Care, does it
4  have an office in Sparks, Maryland?
5  A  No.
6  Q  Is your company Fundamental Administrative
7  Services in Sparks, Maryland?
8    MR. ROSS:  The question's vague.  Object to the
9  form.
10  Q  (By Mr. Allen) I may be a little less than
11  articulate in describing it as "your company."
12    Are you still affiliated with Fundamental
13  Administrative Services?
14  A  Yes.
15  Q  And Fundamental Administrative Services is a
16  company completely separate from the Mariner entities; is
17  that correct?
18  A  That's correct.
19  Q  The ownership's completely different?
20  A  Yes.  That -- the ownership is completely
21  different.
22  Q  And you are one of several owners, I take it,
23  of Fundamental Administrative Services?
24  A  I'm not an owner.  I'm an employee.
25  Q  You're just an employee.  Okay.  I apologize

|  | Page 16 |
|---|---|

1  for using the word "just."
2    So Fundamental Administrative Services provides
3  accounting and other financial-type administrative
4  services; is that correct?
5  A  Yes.
6  Q  Is Fundamental Administrative Services, as an
7  entity, providing services to any of the Mariner
8  entities -- and by that, I would include all the entities
9  we see in Exhibit 3?
10  A  Yes.
11  Q  And do they provide those services through you?
12  A  No.  Fundamental Administrative Services has a
13  contract with Mariner Health Central.  So it provides
14  services to that entity.
15  Q  Okay.  And what types of services does it
16  provide?
17  A  I'm going to categorize it as back office
18  support.  And I think you mentioned, Mr. Allen,
19  accounting, tax, cost accounting or cost reports,
20  those -- those types of support.
21  Q  Okay.  Let's get back to National Senior Care
22  for a moment.
23    When did you become the president of National
24  Senior Care?
25  A  I believe it was in my declaration, 2014.

|  | Page 17 |
|---|---|

1  Q  And did you hold an officer position prior to
2  2014?
3  A  Not with National Senior Care, no.
4  Q  You were acting as a consultant to National
5  Senior Care prior to 2014?
6  A  Prior to that, I provided services through FAS
7  to National Senior Care, so as a consultant, yes.
8  Q  And FAS -- by that you mean Fundamental
9  Administrative Services?
10  A  Yes, sir.
11  Q  Okay.  Okay.  Prior to 2014, who was the
12  president of National Senior Care?
13  A  I -- I don't know.  I think it was
14  Mr. Grunstein.
15  Q  Okay.  And prior to 2014, was Mr. Ehrlich an
16  officer of National Senior Care?
17  A  Yes.
18  Q  And prior to 2014, were there any other
19  officers?
20  A  Not to my knowledge.
21  Q  Prior to 2014, National Senior Care was
22  still -- had a sole shareholder at that time, it would
23  have been Harry Grunstein?
24  A  That's correct.
25  Q  Okay.  And so who hired you as the president?

**Kenneth Tabler**
**February 15, 2022**

| Page 18 |
|---|

1  I assume Emily Grunstein?
2      MR. ROSS:  Back in 2014?
3      MR. ALLEN:  In 2014, yes.
4      THE WITNESS:  In 2014, Mr. Grunstein was still
5  alive.
6      MR. ALLEN:  Ah, okay.
7      Q  (By Mr. Allen) When did he pass away?
8      A  I believe -- and my timeframe with COVID has
9  gotten very skewed.  I believe it's a 2017, 2018
10  timeframe.
11      Q  Okay.  And between 2014 and now, have there
12  been any other officers other than Mr. Ehrlich?
13      A  And myself, no.
14      Q  Okay.  In what state is Mr. Ehrlich's address?
15      A  He lives in Georgia.
16      Q  Okay.  Is the law firm where the office down
17  there, is that a law firm that's associated with
18  Mr. Ehrlich?
19      MR. ROSS:  Object to the form.
20      THE WITNESS:  When you say "associated," I -- I
21  think it was a prior acquaintance.  But I don't believe
22  he worked there or has any other relationship with them.
23      Q  (By Mr. Allen) Okay.  He wasn't an associate, a
24  member or a partner or anything like that?
25      A  Correct.

| Page 19 |
|---|

1      Q  Okay.  Does the law firm where this nominal
2  office is, do they do corporate formation and other
3  corporate advice for the company?
4      A  To my knowledge, we've never used them.  I
5  don't know -- Mr. Ehrlich may have had a conversation,
6  but I've never been involved in any discussions with
7  them.  And -- and I don't believe I've ever seen an
8  invoice for services.
9      Q  So they just provide a -- a nominal location
10  for the company; is that correct?
11      A  I don't know nom -- I think they provide an
12  office.  I believe there's a lease.
13      Q  Do you know how much the lease costs?
14      A  No, I don't.
15      Q  National Senior Care doesn't have any
16  employees, correct?
17      A  That's correct.
18      Q  So the only two people other than -- the only
19  three people affiliated with National Senior Care, in
20  terms of its ownership and control, is you, Mr. Ehrlich
21  and then the sole shareholder?
22      MR. ROSS:  Object to the form of the question.
23  Calls for a legal conclusion.
24      But go ahead, Mr. Tabler.
25      THE WITNESS:  Could you repeat the question

| Page 20 |
|---|

1  just so I understand the exact language you used, sir?
2      Q  (By Mr. Allen) All we have for National Senior
3  Care is you and Mr. Ehrlich as officers and the sole
4  shareholder.  There are no other employees, no other
5  officers, directors, any other person that has anything
6  to do with ownership or control of the company.
7      A  That's correct.
8      Q  Okay.  Does the company have income?
9      A  When you say "company" at --
10      Q  Does National Senior Care have income?
11      A  No.  It does not have a -- a regular stream of
12  income.
13      Q  It doesn't have any source of revenue?
14      A  Correct.
15      Q  How does it pay a lease?
16      A  Those -- those funds are advanced and paid by
17  Mariner Health Central.
18      Q  Okay.  Is -- does Mariner Health Central do
19  centralized accounting for National Senior Care, Mariner
20  Health Care Management and Mariner Health Care, Inc.?
21      A  Yes.  That entity would be responsible for --
22  for those functions.
23      Q  Okay.  Does the Grunstein family have any
24  ownership in Mariner Health Central?
25      A  Only an indirect ownership through -- through

| Page 21 |
|---|

1  National Senior Care.  They do not have direct ownership
2  of -- of Mariner Health Central from the standpoint of
3  owning any -- you know, a percentage of that entity.
4      Q  Okay.  You get paid a salary at National Senior
5  Care?
6      A  No.
7      Q  Does Miss -- do you know if Mr. Ehrlich gets
8  paid a salary at National Senior Care?
9      A  Yes, I know.  And he does not.
10      Q  Okay.  And when I say "at," I should have said
11  "from" National Senior Care.
12      So National Senior Care doesn't have any
13  payroll.  It doesn't have any source of revenue other
14  than to get advances to pay its expenses from Mariner
15  Health Central; is that correct?
16      A  Correct.
17      Q  Does National Senior Care, other than owning
18  Mariner Health Care, Inc. have ownership in any other
19  subsidiary or entity?
20      A  I'm sorry.  That -- you're asking me what --
21  what National Senior Care -- it only owns Mariner Health
22  Care, Inc.
23      Q  Okay.  That's -- that's exactly what I was
24  getting at.
25      Okay.  And feel free to refer to Exhibit 3 if

6  (Pages 18 to 21)

**Kenneth Tabler**
**February 15, 2022**

| Page 22 |
| --- |

1  you want 'cause I'm doing that. So let's -- let's turn
2  to Mariner Health Care, Inc.
3          Are you an officer with Mariner Health Care,
4  Inc.? I think you said you were.
5      A  Yes, sir.
6      Q  And what officer are you?
7      A  My entitle and office is president.
8      Q  Are there any other officers?
9      A  Devin Ehrlich.
10      Q  Do either you or Mr. Ehrlich receive a salary
11  from Mariner Health Care, Inc.?
12      A  No.
13      Q  Does Mariner Health Care, Inc. have a stream of
14  revenue?
15      A  No.
16      Q  Does -- Mariner Health Care, Inc. does not have
17  any employees, correct?
18      A  That's correct, sir.
19      Q  And it's sole shareholder is National Senior
20  Care, inc.?
21      A  Correct.
22      Q  Does Mariner Health Care, Inc. have an office?
23      A  It uses that Georgia address as its office.
24      Q  And as Mariner Health Central advances the cost
25  of that office for National Senior Care, so does it also

| Page 23 |
| --- |

1  advance the cost of the office on behalf of Mariner
2  Health Care, Inc.?
3      A  Well, I just -- just want to be clear that I
4  think the lease is actually in the name of Mariner Health
5  Central, Inc.
6      Q  Okay.
7      A  And those other entities also use that address.
8  So they don't have separate leases for each of those
9  entities with that law firm.
10      Q  Okay. All right.
11          Now, on our organizational chart, there is a
12  line to a company called Mariner Health Care Management
13  Company. Do you see that?
14      A  I'm sorry. There was a little noise. So I
15  think you were telling me on the org chart, Mariner
16  Health Care, Inc. also has an ownership with -- to
17  Mariner Health Care Management Company. Is that the
18  question, sir?
19      Q  Well, there's a line drawn there. And I was
20  going to ask you, is that an ownership interest?
21      A  Yes.
22      Q  And what is Mariner Health Care Management
23  Company?
24      A  It is a holding company. At this point, it
25  doesn't have any activity, or it holds -- it has no

| Page 24 |
| --- |

1  employees.
2      Q  Does it have any property?
3      A  No.
4      Q  Does it share the same office in Georgia with
5  National Senior Care and Mariner Health Care, Inc.?
6      A  Yes, sir.
7      Q  At the law firm there?
8      A  Correct.
9          MR. ALLEN: I'm sorry. Gentleman, I'm going to
10  get a lozenge so I don't cough into the microphone all
11  the time. Pardon me.
12      Q  (By Mr. Allen) Now, there's -- there's another
13  entity called MHC Recruiting Company.
14          Do you see that? That's on Exhibit 3.
15      A  Yes.
16      Q  What is MAC Recruiting Company?
17      A  It's a entity that was established to provide
18  recruiting services, particularly oversees recruiting of
19  nurses to -- to help alleviate, you know, the -- the
20  employment shortage. So it -- it was formed to, as its
21  name suggests, to -- to facilitate recruiting on behalf
22  of Mariner.
23      Q  When was it formed?
24      A  I believe that is a new entity within two or
25  three years --

| Page 25 |
| --- |

1      Q  Okay.
2      A  -- is the timeframe.
3      Q  Does it have any officers?
4      A  It does. But -- but at this point, it's new.
5  And I don't do a lot with it. So I'm not sure exactly
6  who the officers are of that entity.
7      Q  Does it have a source of revenue?
8      A  I -- I believe it -- the way it's established
9  is that it would earn fees in terms of whatever costs or
10  it needed to recover on behalf of the various recruiting
11  expenses that -- that it would incur from the facilities.
12      Q  Do you have a contact with the company that you
13  work with?
14          MR. ROSS: I'm sorry. I apologize.
15          What was the question, Mr. Allen? Or could we
16  read it back?
17          MR. ALLEN: Do you have a contact with the
18  company that you work with?
19          MR. ROSS: Thank you.
20          THE WITNESS: I believe Devin Ehrlich is much
21  more involved with that. And I believe because of
22  the -- the nature of what they do, we -- we had some
23  assistance with outside law firms with the various
24  requirements and treaties and visas, that sort of thing.
25      Q  (By Mr. Allen) Okay. Now, they're recruiting

7 (Pages 22 to 25)

**Kenneth Tabler**
**February 15, 2022**

## Page 26

1  health care personnel, nurses in particular; is that
2  correct?
3      A   Yes.
4      Q   And for whom are they recruiting the nurses and
5  other health care personnel?
6      A   For the -- the various Mariner facilities.
7      Q   When you say the "various Mariner facilities,"
8  are you referring to 18 facilities in California?
9      A   I believe there's 20, but of those 18, yes.
10  Yes.
11      Q   Okay.  So they're -- in terms of the health
12  care facilities we're referring to for which this
13  recruiting would be done, there's 20 facilities in
14  California; is that correct?
15      A   Yes.
16      Q   Okay.  There's no facilities outside of
17  California; is that correct?
18      A   During -- there were at one point.  I don't
19  know your timeframe.  But since I've been involved with
20  this company, that is true.
21      Q   Yes.  There was a lot of involvement
22  with a large number of facilities going back to the days
23  of SAVA and some of the formation of these companies, but
24  all that's been divested; is that correct?
25      A   That's -- that's correct.

## Page 27

1      Q   Okay.  So does Mariner Health Care Management
2  Company actually do anything other than just hold the
3  shares to Mariner Health Central and this recruiting
4  company?
5      A   At this point, yeah.  That's correct.  It's a
6  holding company.
7      Q   And that's all it does?
8      A   Correct.
9      Q   Okay.  Now, Mariner Health Central is now the
10  primary administrative, as you would say, back office
11  function company for the Mariner facilities in
12  California; is that right?
13      A   Yes.
14      Q   And, of course, they also do the work for
15  National Senior Care, Mariner Health Care, Inc. and
16  Mariner Health Care Management Company to the extent they
17  need it?
18      A   That's correct.
19      Q   Okay.  Where is Mariner Health Central, Inc.'s
20  office?
21      A   We -- we really don't have a physical location.
22  Our consultants -- we're like a sales force.  You put the
23  sales force out in the field.  And we want those people,
24  you know, serving the clients.
25      Q   Okay.  Does it have a nominal office somewhere?

## Page 28

1      A   I believe in Oakland, we have a billing office,
2  which is -- you know, could -- could accommodate, you
3  know, 20, 25 people.  But if people need it, they can use
4  that location.
5      Q   And that's in Oakland, California?
6      A   Yes, sir.
7      Q   Can you give me the address of that office?
8      A   I -- I don't have that memorized.  I've been
9  there.  Usually I'm with someone.  And so I don't have to
10  navigate.  So I don't know the address.
11      Q   Do you remember what street it's on?
12      A   No.  I -- I think it's on the main street, but
13  that doesn't mean anything.
14      Q   All right.
15      A   There's a good restaurant down the street.  But
16  other than that, I don't know too much about it.
17      Q   Well, maybe we'll get to go there some day.
18          Okay.  Thank you.
19          So are you the president of Mariner Health
20  Central as well?
21      A   Yes, sir.
22      Q   Okay.  So how many officers does Mariner Health
23  Central have?
24      A   Mariner Health Central, I believe, has -- has
25  several, but Devin Ehrlich and myself are officers.

## Page 29

1      Q   Okay.  What's Mr. Ehrlich's position with
2  Mariner Health Central?
3      A   I think he's an executive vice president and
4  general counsel.
5      Q   Okay.  Is there -- is there a consolidated tax
6  return or tax accounting for National Senior Care,
7  Mariner Health Care, Inc., Mariner Health Care Management
8  Company with Mariner Health Central, Inc.?
9      A   Yes.
10      Q   Okay.  In other words, you don't file a
11  different return for each one?  They're all consolidated
12  and filed together to report to the various government
13  agencies.
14      A   That -- that's correct.
15      Q   Okay.  Does the Grunstein shareholder receive
16  income from -- passed on through the various accounting
17  ultimately out of National Senior Care?
18      A   She -- she receives a salary from -- from
19  Mariner Health Central.
20      Q   Okay.  Does Mariner Health Central pay
21  dividends to its shareholder?
22      A   I believe in 2012, we paid a dividend, but no
23  dividends have been paid since that date.
24      Q   Okay.  So if Mariner Health Central paid a
25  dividend, that would have to actually pass through the

**CAL Reporting 925-425-9669**

**Kenneth Tabler**
**February 15, 2022**

## Page 30

1  other three entities in order to actually get back to the
2  Grunstein family; is that right?
3      MR. ROSS:  Object to the form.  The question's
4  vague.
5      MR. ALLEN:  Just trying to understand the
6  accounting here.
7      MR. ROSS:  Sure.
8      THE WITNESS:  Well, it -- it never -- it had,
9  you know, several years ago.  But -- but we haven't paid
10  dividends in such a long time.  I really can't -- that
11  would theoretically be the flow.  And what all that would
12  involve, I haven't had to think about all that for a
13  while.  But that would be the flow.
14      Q  (By Mr. Allen) Okay.  So in terms of actual
15  income to the Grunstein family, Emily in particular, the
16  only way that that's paid in recent history, at least
17  since 2012, has been via salary from Mariner Health
18  Care -- excuse me, Mariner Health Central, Inc.?
19      A  That's correct.
20      Q  Okay.  Let's turn to -- well, let me ask you
21  this question, is there a company that has an office in
22  Texas that's associated with the Mariner companies?
23      A  Not to my knowledge.  We have some employees --
24  one who may work out of their home.  But I'm not renting
25  or providing -- no -- an office building in Texas.

## Page 31

1      Q  Okay.  There used to be an address at 5300 Sam
2  Houston Parkway in north Houston, but nobody holds that
3  office anymore?
4      A  I believe in 2011 -- nothing since 2011 or '12.
5      Q  Okay.  So as we -- as we look at Exhibit 3, you
6  see below Mariner Health Care, Inc., that it has a
7  hundred percent ownership in MHC Holding Company.
8          Does that have any employees?
9      A  No, sir.
10      Q  And are you an officer of that company?  Are
11  you the president of that company?
12      A  Yes, I am.
13      Q  And does it also only have two officers, you
14  and Mr. Ehrlich?
15      A  That's correct.
16      Q  And it's sole -- does it share an office
17  address in the same law firm as National Senior Care?
18      A  Yes.
19      Q  Okay.  And does it have a stream of revenue?
20      A  No.
21      Q  Okay.  And it holds -- MAC West Holding
22  Company, is it also another holding company with just the
23  same two officers and the nominal office at the law firm
24  in Georgia?
25      A  Correct.

## Page 32

1      Q  Okay.  And it doesn't have a stream of revenue?
2      A  Correct.
3      Q  Okay.  Then we get to GrandCare, LLC.
4          Does that have any employees?
5      A  No.
6      Q  Does grand -- are you and Mr. Ehrlich the
7  officers of GrandCare, LLC -- or should I say members?
8      A  Officers is the correct term.
9      Q  Officers is the correct term.
10          You're the managers of GrandCare, LLC?
11      A  Correct.  Yes.
12      Q  Okay.  And does it have any members other than
13  MAC West Holding Company?
14      MR. ROSS:  So I'll just interpose an objection.
15  It's vague as to time.
16      MR. ALLEN:  At this time?
17      THE WITNESS:  To answer at this time, it has no
18  other members other than MAC West Holding Company.
19      Q  (By Mr. Allen) Okay.  Now at one point, if I
20  understand correctly, GrandCare, LLC actually held a
21  number of the licenses for the skilled nursing
22  facilities.  It was actually the licensee for the skilled
23  nursing facilities in California; is that correct?
24      A  That's correct.
25      Q  But that's no longer the case.  They have

## Page 33

1  individual operating companies that are the licensees
2  now; is that correct?
3      A  That's correct.
4      Q  And does GrandCare, LLC own any real estate?
5      A  No.
6      Q  Okay.  Does it have -- you have a GC Holding
7  Company 2, a GC Holding Company that it seems to have a
8  hundred percent membership, meaning that that would be
9  synonymous with ownership; is that correct?
10      A  That's correct.
11      Q  Those entities, do they own or operate real
12  estate at GC Holding Company and GC Holding Company 2?
13      A  They do not.
14      Q  Okay.  So if we're to look a little -- first of
15  all, I want to go back to the -- the title of this chart.
16          It says, Mariner California Lease Hold Interest
17  as of 2021.  Do you see that?
18      A  Yes, I do.
19      Q  And on the second page, it says the same thing
20  except it says, "Continued."
21          So other than the companies we see on this
22  chart -- and there's a little note here on the upper
23  left.  We'll get to that in a moment.  But are there --
24  does this chart show all the operating companies that
25  operate skilled nursing facilities in California?

9  (Pages 30 to 33)

**Kenneth Tabler**
**February 15, 2022**

Page 34

1      A   I believe it does.  I believe just -- there is
2   a GC Holding Company 3 that's been established.  But I
3   think all the operating entities are on these two pieces
4   of paper you have.
5      Q   What does the GC Holding Company 3 do?
6      A   It's a holding company without any -- at this
7   point, it has no interest.  But it's been formed.
8      Q   Okay.  Now, there has been developed real
9   estate operating companies to actually own the real
10  estate that is owned by the Mariner group of companies in
11  California; is that right?
12     A   What -- what is your -- Mariner, at this point,
13  does not have any real estate holdings in California.
14     Q   All the real estate holdings have been divested
15  into another company?
16     A   They've been divested, correct.
17     Q   Okay.  Does Emily Grunstein have an interest in
18  any of those other real estate companies?
19     A   No.
20     Q   Okay.  So when we look at the companies that
21  are on our chart here, we're looking at companies that
22  are all involved in the operation of the skilled nursing
23  facilities in California; is that correct?
24         MR. ROSS:  Object to the form.
25         MR. ALLEN:  I beg your pardon?

Page 35

1          MR. ROSS:  Just objecting to the form.
2          MR. ALLEN:  Oh.
3          MR. ROSS:  It's -- question's --
4          MR. ALLEN:  I'll point out, Counsel, that's not
5   an objection.
6          MR. ROSS:  I can make the specific ones.  But
7   some attorneys don't like speaking objections.  So it's
8   vague.
9          MR. ALLEN:  I don't -- vague is a specific
10  objection.  That is a good one.
11         MR. ROSS:  Okay.
12         MR. ALLEN:  And I understand.  And I --
13     Q   (By Mr. Allen) Mr. Tabler, I forgot my question
14  now.
15     A   Do you want to have the court reporter read it
16  or --
17         MR. ALLEN:  Yeah.
18         MR. ROSS:  And objecting to the form is, to my
19  knowledge, an appropriate objection.  But maybe we can
20  talk about that some other time.
21         MR. ALLEN:  Okay.  Madam Court Reporter, what
22  was my question?  Can you read it back?
23         THE REPORTER:  Sure.  One second.
24         "Q   So when we look at the companies
25         that are on our chart here, we're looking at

Page 36

1   companies that are all involved in the
2   operation of the skilled nursing facilities
3   in California; is that correct?"
4          MR. ALLEN:  Feel free to explain what you don't
5   know about that question.
6      A   I guess where I have a little trouble, you use
7   the word "involved."  And obviously, you know, we've gone
8   through a number of companies and entities, and some are
9   holding companies.
10         So I -- sometimes I -- and I don't want to be
11  misquoted, or I don't want to be misunderstood.  When you
12  use the word "involved" -- you know, I'm not referring to
13  direct operations.  I just want to -- there's nothing
14  hidden, is there?  Or that's what I'm just trying to
15  grapple with is I --
16     Q   And that's a fair concern.
17         So I understand that some of the companies are
18  merely holding companies.  They don't have any active
19  business.  They don't even have a revenue stream.  We've
20  talked about that.
21         But there's no other business out there in some
22  entity that is held, that is doing business other than
23  doing the skilled nursing business in California, except
24  we did talk about the recruiting company.  But that's
25  recruiting people for the purposes of the California

Page 37

1   skilled nursing; is that correct?
2      A   Correct.
3      Q   Okay.  And when I look at this chart, it's not
4   showing me the holding of any real estate in California
5   by any of these entities.  That's all been divested into
6   something separate.  That's not affiliated with this
7   group of companies?
8      A   That -- that's correct.
9      Q   Okay.  There's two -- on page one, there's two
10  blanks that have been blacked out.
11         Do you know why that is?
12     A   I believe that it was a divested entity three
13  or four years ago.  So it's really no longer operational.
14     Q   Do you remember what entity that was?
15     A   A Double Tree in Sacramento.  The lease ended.
16  And we -- we didn't renew the lease.
17     Q   Okay.  Is that true -- on page two, there's
18  another couple of blanks.  Is that because of another
19  entity that's been divested?
20     A   I -- I believe so.  But I -- I'm a little less
21  clear on that blank out than the first blank out.
22     Q   Okay.
23     A   But I believe that's why.
24     Q   All right.  The -- so the function of Mariner
25  Health Care -- Health Central, Inc. is to do the

**Kenneth Tabler**
**February 15, 2022**

Page 38

1 administrative functions not only for the holding
2 companies but for the skilled nursing facilities; is that
3 correct?
4     A    Yeah.  I -- I believe you said Mariner Health
5 Care or Mariner Health Central, Inc., yes.
6     Q    Mariner Health Central, Inc.  Mariner Health
7 Care now is pretty much just a holding company.  In fact,
8 is the just a holding company.
9     A    Correct.
10    Q    It didn't used to be that way.  You used to
11 have loan facilities and a lot of other things?
12    A    I believe you're mixing up some of the
13 entities.  So I think when we were talking about -- used
14 to be we were talking about GrandCare, we were down
15 further.  And I think you jumped up in the chain and
16 added some things where I answered that question.
17        So I don't want to mix up entities because I
18 know this has to be very exact.
19    Q    Well, I appreciate you being precise.  So
20 that's fine.  I'll rephrase my question.
21        In the past, isn't it true that, at some point,
22 Mariner Health Care Management Company had loan
23 facilities that it used to help finance GrandCare's
24 operations and -- and similar things?
25        MR. ROSS:  I apologize.  It broke up slightly.

Page 39

1 It had what facilities?
2        MR. ALLEN:  Loan facilities.
3        MR. ROSS:  Loan facilities.
4        MR. ALLEN:  In other words, it borrowed money
5 and used that money to assist these companies in their
6 operations.
7        MR. ROSS:  Thank you.
8        THE WITNESS:  I've been involved in this group
9 since 2011.  So from that point on, I'm not aware of that
10 activity, which is to say that may have occurred in the
11 past.  But I don't have the knowledge of that.  But from
12 2011, that's not true.
13    Q    (By Mr. Allen) Okay.  Is there a SAP software
14 program that is used to do the accounting by Mariner
15 Health Central, Inc.?
16    A    I don't think we use SAP -- well, first of all,
17 Mariner Health Central has contracted out for the --
18 the -- the accounting.  So -- so it's really not running
19 a software program itself.
20    Q    And has it contracted out with Fundamental
21 Administrative Services?
22    A    That's correct.
23    Q    Okay.
24    A    And so does Mariner Health Central, Inc. hire
25 the -- the administrator for the skilled nursing facility

Page 40

1 at Skyline San Jose Operating Company?  I believe the --
2 there's a process with the governing body and various
3 members of the governing body of that entity are involved
4 of the hiring for -- for the facility.
5     Q    And the given facility -- and I started with
6 Skyline San Jose -- who would be in this governing body?
7     A    Generally, the administrator.  Obviously, if
8 there's no administrator there, then that position isn't
9 fulfilled.  There's a DON.  I believe -- or Linda Taetz,
10 as the president, is on the governing body.  And we
11 have -- there's some RVPs of Mariner Health Central who
12 are also on their governing body who would be involved in
13 that process.
14    Q    What are RVPs?
15    A    Regional vice presidents.
16    Q    Okay.  Linda Taetz is the president of every
17 one of the operating companies; is that correct?
18    A    I think a general term, yes.  There may be one
19 or two where she's not.  But I think for the majority,
20 yes.
21    Q    Now, with the operating companies, there's
22 another holding company.  It appears above each of the
23 operating companies.  For instance, in San Jose, there's
24 a Skyline Holding Company.  And in Santa Cruz, there's a
25 Driftwood Holding Company.

Page 41

1        So is there a holding company and then below
2 that, an operating company with each of the skilled
3 nursing facilities?
4     A    Yes.  The example you just gave me, Skyline San
5 Jose Operating Company, LP is the operating entity.  And
6 as you pointed out, Skyline San Jose Holding Company, GP,
7 LLC has an ownership in GC Operating Company, just
8 looking at the chart.
9     Q    And who would be the officers of the holding
10 company, Skyline?
11    A    I believe Linda Taetz is the officer of --
12 president of Skyline San Jose Holding Company, GP, LLC.
13    Q    Do these operating companies have more than one
14 officer or just Linda?
15    A    You said operating companies or?
16    Q    Excuse me.  I'm sorry.  Let me rephrase that.
17        Does the holding company typically have more
18 than one officer or just Linda?
19    A    I don't completely know the structure off the
20 top of my head.  I believe it's just Linda Taetz.
21    Q    What's the purpose of having a holding company
22 again over each one of the operating companies?
23    A    Well, the company -- the operating companies
24 are LPs, which under California law, are limited
25 partnership.  And you have to have two partners for a

11 (Pages 38 to 41)

**Kenneth Tabler**
**February 15, 2022**

Page 42

1  partnership. So we have two partners.
2      Q   What's the purpose of forming the operating
3  companies as limited partnerships? Do you know?
4      A   It -- it has state tax advantages in
5  California.
6      Q   Okay. So you have a holding company that holds
7  one percent as a limited partner?
8      A   I -- you're breaking up just a little bit.
9      I think that's a GP, which is a general
10  partner, has one percent.
11      Q   Okay. So the holding -- is the holding
12  company -- Skyline San Jose Holding Company LLC, GP,
13  that's a general partner?
14      A   Yeah. I think you read the initials backwards.
15  But I think you're referring to Skyline San Jose Holding
16  Company GP, LLC as the general partner with a one percent
17  interest.
18      Q   Okay. And then there is a shareholder that has
19  99 percent interest in the operating company. Who would
20  that be?
21      A   GC Operating Company, LLC.
22      Q   Okay.
23      A   The chart is a little unclear in that, when I
24  look at Hayward Hills, the -- the two to the left do not
25  have any ownership. So the chart's not entirely correct

Page 43

1  in those -- the diagonals. It should have stopped. So
2  it's not as clear. It's sometimes hard to do on Excel.
3      Q   Okay. So let's talk about GC Operating
4  Company, LLC, a limited liability company. That says,
5  "Master tenant."
6      So does it hold the leases for the individual
7  operating companies?
8      A   Yes. It actually -- there's -- there's a lease
9  between GC Operating Company and the LLC. And then
10  there -- for each of those companies that are underneath
11  that, there's a lease to GC Operating Company. And then
12  there's a master lease.
13      Q   So the actual -- where the skilled nursing
14  facility sits, such as Skyline, has a lease from a
15  completely separate owner. And that lease is -- the
16  lessee is GC Operating Company, LLC; is that correct?
17      A   No. The lessee is Skyline San Jose Operating
18  Company. And it has a lease with GC Operating Company as
19  its landlord. But then GC Operating Company does not
20  actually own the property.
21      Q   Right.
22      A   And so there's -- it's more of a sublease.
23      Q   Correct.
24      So GC Operating Company is the entity that
25  leases from a third party and pays the rent to a third

Page 44

1  party that is the actual ownership of the land?
2      A   Correct.
3      Q   Okay. And then there are subleases with the
4  various operating companies between GC and the operating
5  company?
6      A   Correct.
7      Q   There's a similar arrangement, I take it, with
8  GC Holding Company 2, LLC between it as lessor of a
9  sublease arrangement with the other operating companies?
10      A   No.
11      Q   No?
12      Okay. Let's look at Monterey Palms Operating
13  Company. Is there a third party, I understand, that
14  would own the land upon which the Monterey Palms facility
15  sits?
16      A   Own the land and the building, correct.
17      Q   Okay.
18      And then who would be the lessee of that owner
19  of the land at Monterey?
20      A   The lessee would be Monterey Palms Operating
21  Company, LP.
22      Q   So GC Holding Company doesn't have a lease and
23  then sublease to Monterey Palms as GC Operating Company
24  does over at Skyline? Those GC Operating Company 2
25  doesn't have a sublease arrangement with Monterey Palms

Page 45

1  similar to GC Operating Company with Skyline?
2      A   True.
3      Q   Okay.
4      A   Yeah.
5      Q   When did -- when did you get hired again?
6  Remind me. Was it 2014 as president of Mariner Health
7  Central?
8      A   Yes.
9      Q   And who hired you?
10      A   Devin Ehrlich reached out and discussed it with
11  me.
12      Q   And did you talk to anybody besides Devin
13  Ehrlich before taking that position?
14      A   I -- I've had conversations with Harry
15  Grunstein over the years, yes.
16      Q   Okay. Were -- was there anybody else in the --
17  in the conversation about you taking this position as
18  president besides Devin Ehrlich and Harry Grunstein?
19      A   No. As I said before, I was informed by Devin
20  Ehrlich.
21      MR. ALLEN:  So we've been going for an hour
22  now. What I would like to do is take a short break, kind
23  of review my notes. I mean, I could probably go all day
24  with you. But I want to try to focus my examination so I
25  don't keep you here 'til all hours of the evening where

**Kenneth Tabler**
**February 15, 2022**

Page 46

1    you are.
2        So would that be convenient for you and
3    everybody else?
4        THE WITNESS: Sure. I -- I prefer to get it
5    done as fast as possible. So I don't want to take too
6    long a break. But I understand that and appreciate that
7    and want to answer your questions as fast and as
8    accurately as possible.
9        So I am going to -- can I talk with my counsel
10   at this point? Or I know you -- you didn't want me to
11   use my phone. But is that okay?
12       MR. ALLEN: You're welcome -- during the break
13   when we're off the record, you're welcome to speak with
14   your counsel, yes.
15       THE WITNESS: Okay. Do you have a time period
16   on how long you want, sir?
17       MR. ALLEN: Why don't we come back -- according
18   to my clock, it's eleven minutes after 10. Why don't we
19   come back at 25 after 10?
20       THE WITNESS: Okay. All right. I'm going to
21   turn my video off and mute, but I will be right here.
22       MR. ALLEN: I'm going to do the same thing.
23       MR. ROSS: All right. Thank you.
24       MR. ALLEN: Thank you.
25       (Pause in proceedings.)

Page 47

1        MR. ALLEN: Let's go back on the record.
2    Mr. Tabler, can you hear me?
3        THE WITNESS: Yes, sir. I hear you fine.
4        MR. ALLEN: Okay. Everybody's back.
5    Everybody's muted except for Mr. Ross and myself and the
6    witness. So we'll just proceed.
7        Q   (By Mr. Allen) The ownership of Mariner Health
8    Central, Inc. is a hundred percent owned by Mariner
9    Health Care Management Company; is that correct?
10       A   Yes, that's correct.
11       Q   Does -- well I assume Mariner Health Central is
12   a corporation. So does -- it has a board of directors, I
13   assume?
14       A   Yes.
15       Q   And who seats on that board of directors?
16       A   Devin Ehrlich and myself.
17       Q   When Emily Grunstein gets paid a salary, is she
18   being paid as an employee of Mariner Health Central,
19   Inc.?
20       A   Yes.
21       Q   And what is her position with Mariner Health
22   Central, Inc.?
23       A   She -- she doesn't really have a title.
24       Q   Does she have a task?
25       A   There -- there are no specific functions I look

Page 48

1    for her doing.
2        Q   Does she -- in your time as having been
3    president, that's been since 2014, correct?
4        A   Correct.
5        Q   Has she been to Oakland?
6        A   No.
7        Q   How about Harry Grunstein, had he been to
8    Oakland prior to his passing?
9        A   I don't know if he's ever been to Oakland.
10   I'll say from 2014 forward, I'm not aware of him going to
11   California. But he may, at some point, have been. But
12   prior -- but I don't have any knowledge prior to that.
13       Q   Fair enough for making that clear.
14       Did Harry Grunstein get a salary from Mariner
15   Health Central, Inc.?
16       A   Yes.
17       Q   Did he have a specific position with Mariner
18   Health Central, Inc.?
19       A   I believe at one point he was president up
20   until 2014.
21       Q   After 2014, did he get a salary?
22       A   Yes.
23       Q   And that was also from Mariner Health Central,
24   Inc.?
25       A   Correct.

Page 49

1        Q   And did he have a position between 2014 and
2    when he passed away with Mariner Health Central, Inc.?
3        A   I don't believe he had a formal title.
4        Q   Okay. Prior to Harry Grunstein passing, did
5    Emily Grunstein receive a salary from Mariner Health
6    Central, Inc.?
7        A   No.
8        Q   Okay. So she seceded to the salary that he
9    previously got?
10       A   I -- I don't know if that -- in terms like
11   there was an official proclamation. That seems to have a
12   legal thing. But she -- she continue -- the salary was
13   continued that had been paid to -- to Harry to
14   Miss Grunstein.
15       Q   Okay. Is she his widow? Sister? What is her
16   relationship to Harry?
17       A   She was his wife.
18       Q   Yes. Okay. Approximately how old is Emily?
19       A   I -- I don't know.
20       Q   Is she an elder person? Is she over 65?
21       A   Have to be careful with that, sir.
22       Q   Yeah. I'm going to get you in trouble, aren't
23   I?
24       A   Right. Right. I assume she's over 50. But
25   I -- I don't know her age. I'll just leave it at that.

13  (Pages 46 to 49)

**Kenneth Tabler**
**February 15, 2022**

## Page 50

1    Q   All right. I'll let you off the hook on that
2  one.
3    A   Thank you.
4    Q   Do you do some kind of quarterly report to
5  Emily Grunstein?
6    A   No.
7    Q   Did you do a quarterly report to Harry
8  Grunstein?
9    A   We -- Harry would attend various meetings,
10  which I think were done on a quarterly basis. But Emily
11  has not participated in those.
12    Q   Okay. So is Linda Taetz an executive vice
13  president?
14    A   Of which entity? Or you --
15    Q   I'm sorry. That's fair enough.
16        Is Linda Taetz an executive vice president of
17  Mariner Health Central, Inc.?
18    A   I believe so. I don't know her exact title.
19  But she is an officer of Mariner Health Central, Inc.,
20  yes.
21    Q   Okay. And how did she get hired?
22    A   Miss Taetz has been with the company a number
23  of years. So when I became involved, she was already in
24  that position.
25    Q   Okay. And does Ms. Owen have a position with

## Page 51

1  Mariner Health Central, Inc.?
2    A   Yes.
3    Q   Ask is that as a legal officer?
4    A   I think litigation managements. I don't know
5  her exact title. You're asking Kristy -- Kristy Owen,
6  right?
7    Q   Yes.
8        Does she have any executive function other than
9  managing litigation or legal affairs?
10    A   I -- Kristy's a very valuable employee who gets
11  into a lot of things. But that's her primary function.
12    Q   Okay. Does she -- I take it that neither Linda
13  nor Kristy have any position with National Senior Care,
14  Mariner Health Care, Inc. or Mariner Health Care
15  Management Company since they have no employees and they
16  often have the two officers, correct?
17    A   That's absolutely correct.
18    Q   Okay. So when you were hired -- let me
19  rephrase that.
20        Hired or appointed -- however one would
21  describe that -- to the position of president of Mariner
22  Health Central, Inc., the only conversations you had
23  regarding -- assuming that position was with Harry
24  Grunstein and Devin Ehrlich, correct?
25    A   I told -- that's a very general question. I

## Page 52

1  told my wife, but those are the official conversations I
2  had, yes.
3    Q   Yes.
4    A   So...
5    Q   And fair enough.
6        In terms of representatives of the Mariner
7  Health Care system, those are the people that made the
8  decision along with you to take -- assume that role?
9    A   Correct.
10    Q   Okay. And I assume there is some kind of board
11  of directors' resolution appointing you?
12    A   Yeah. I -- I've sign that. And that was done
13  seven or eight years ago, so yes.
14    Q   Okay. How often are there board of director
15  meetings of Mariner Health Central, Inc.?
16    A   I believe under Delaware law, we're required to
17  meet annually. So we hold an annual meeting.
18    Q   Okay. And that's -- the board of directors is
19  just you and Mr. Ehrlich; is that correct?
20    A   Correct.
21    Q   The board of directors -- well, that's
22  an LLC. So the managing members of GrandCare, LLC are
23  whom again?
24    A   GrandCare, LLC would be myself and Devin
25  Ehrlich.

## Page 53

1    Q   Okay. Off to the left of MAC Holding
2  Company -- and let me -- let me get to MAC Holding
3  Company and MAC West Holding Company. Both those
4  companies are the officers of MAC Holding Company and MAC
5  West Holding Company -- you and Mr. Ehrlich?
6    A   That's correct.
7    Q   And are you -- the two of you also the board of
8  directors?
9    A   Correct.
10    Q   And there's no one else involved in either one
11  of those companies as an officer, director or employee?
12    A   That's correct.
13    Q   They're a hundred percent owned as indicated
14  here on the org chart by the holding company above them;
15  is that correct?
16    A   Yeah. The chart is accurate -- appears
17  accurate.
18    Q   Okay. And neither one of them own any real
19  estate. They have no employees. And their office, is it
20  also at the Georgia law firm?
21    A   That's correct.
22    Q   What is Mariner Insurance Company, LLC?
23    A   It is an entity that holds -- as in the title,
24  it is involved in a captive insurance company for
25  Workers' Comp.

**CAL Reporting 925-425-9669**

**Kenneth Tabler**
**February 15, 2022**

Page 54

1    Q   Okay.  Is it actually a writer of a policy?
2    A   No.  It doesn't write the policy.  But it has
3  an ownership in a company -- an offshore company that --
4  that is involved in the Work Comp program for Mariner.
5    Q   Does Mariner insurance company have any
6  employees?
7    A   No.
8    Q   Does it have any purpose other than being a
9  facility to provide the Workers' Comp insurance for the
10  operating companies and, I assume, Mariner Health
11  Central, Inc.?
12    A   That -- that's correct.
13    Q   Okay.  And the form of the insurance that it's
14  facilitating, for lack of a better word, is Worker's
15  Compensation insurance?
16    A   That's what Mariner uses them for, yes.
17    Q   Okay.  What does the role Bio Pacific, LLC?
18    A   Bio Pacific provides therapy service to the
19  Mariner facilities.
20    Q   Okay.  When you say "therapy service," what
21  type of therapy are we talking about?
22    A   Physical, occupational, what -- what -- speech,
23  the various therapies that -- that are required by the
24  patients, residents at the facility-level entities.
25    Q   Does Bio Pacific have a board of directors?

Page 55

1    A   Yes.
2    Q   Is it a hundred percent owned by MAC Holding
3  Company?
4    A   Yes.
5    Q   Is the board of directors you and Mr. Ehrlich?
6    A   I believe I am not on that board.  I may be
7  mistaken, but I don't know.
8    Q   Do you know who else would be on that board?
9    A   I think Dennis Sarcauga is.
10    Q   Okay.  Do you believe anybody else besides
11  Mr. Ehrlich and Mr. Sarcauga?
12    A   And maybe Marilyn Washington.
13    Q   But you're not sure about that?
14    A   I'm not a hundred percent sure.
15    Q   Okay.  Does it have an office?
16    A   No.
17    Q   The therapy services it provides are all those
18  services to the operating skilled nursing facilities in
19  California?
20    A   Correct.
21    Q   And it doesn't provide services to anyone else?
22    A   That's correct.
23    Q   And do you know how many employees it has?
24    A   It has several hundred.  But I don't believe
25  they're all full-time; some are part-time.  And it also

Page 56

1  contracts out to third parties.
2         So there are a number of part-time therapists.
3  So that number may be like -- I think I asked, like,
4  number of W-2s for a year.  So it may have a smaller FTE.
5  But that's kind of the range of it.
6    Q   Okay.  So I would -- I take it it has a revenue
7  stream of income that goes into Bio Pacific, LLC that
8  derives from providing these services to the various
9  operating companies; is that correct?
10    A   That's correct.
11    Q   And it's a hundred percent owned by MAC Holding
12  Company.  Does it pay any revenue back to MAC Holding
13  Company?
14    A   Nothing's ever been paid to date.
15    Q   Is a hundred percent of the revenue that goes
16  into Bio Pacific, after expenses, paid to the employees
17  and to whoever else might be involved like the officers
18  or directors?
19    A   I think it makes a small profit.  But I don't
20  know if that answers your question.
21    Q   In other words, there's no revenue going from
22  Bio Pacific to MAC Holding Company?
23    A   That is true.
24    Q   Okay.  It's all dispersed or held within Bio
25  Pacific, LLC?

Page 57

1    A   That's correct.
2    Q   Okay.  I think I've asked this, and I
3  apologize.  And I might be repeating myself.
4         But the board of directors of Mariner Health
5  Central, again, is that just you and Mr. Ehrlich?
6    A   Yes.
7    Q   Okay.
8    A   I was answering the question -- you did ask me
9  that before.  And that was the same answer.  So, yes.
10    Q   Okay.  That's what I remember, but I didn't
11  write it down.
12         With regard to National Senior Care, Inc.,
13  Mariner Health Central -- Health Care, Inc., Mariner
14  Health Care Management Company and Mariner Health
15  Central, Inc., as to those entities, whether it be merely
16  holding or whether it be providing the administrative
17  services that we previously discussed, there is no
18  service or holding participation except for the
19  California skilled nursing facility, operating companies
20  and related entities; is that correct?
21    MR. ROSS:  Madam Reporter, would you read
22  question back, please?
23    THE REPORTER:  Sure.
24    "Q   With regard to National Senior Care,
25  Inc., Mariner Health Central -- Health Care, Inc.,

**CAL Reporting 925-425-9669**

**Kenneth Tabler**
**February 15, 2022**

Page 58

1    Mariner Health Care Management Company and Mariner Health
2    Central, Inc., as to those entities, whether it be merely
3    holding or whether it be providing the administrative
4    services that we previously discussed, there is no
5    service or holding participation except for the" --
6        MR. ROSS: I think have enough.
7        MR. ALLEN: You don't need to object to it,
8    Counsel. I'm going to rephrase.
9        MR. ROSS: Thank you.
10       Q (By Mr. Ross) Okay. So I'm going to ask this
11    question in a summary fashion to try to get a gist
12    of -- of where we're going here.
13       So I'm asking this question about four
14    companies. And the four companies are National Senior
15    Care, Inc., Mariner Health Care, Inc., Mariner Health
16    Care Management Company and, lastly, Mariner Health
17    Central, Inc. Other than their involvement, as we've
18    previously discussed, including Bio Pacific, LLC and the
19    recruiting company MAC Recruiting -- but other than those
20    functions and the administrative functions that we've
21    previously discussed and to the degree that they just
22    represent a holding company, but there's no involvement
23    by them, no business by them anywhere except in doing
24    business for the skilled nursing facilities and their
25    related operating companies in California; is that

Page 59

1    correct?
2        MR. ROSS: And I would just object. It's
3    vague. It's compound. It's incomplete, hypothetical.
4    But go ahead, Mr. Tabler.
5        THE WITNESS: Okay. There was a lot in that
6    question. And I think over the course of my testimony,
7    we've discussed those four entities. And I think there
8    was no -- there's no other -- outside the state of
9    California -- or, you know, I discussed, like, National
10    Senior Care and it has a holding company and it owns
11    Mariner Health Central, Inc. That's all it does.
12       And the same for Mariner Health Care, Inc.,
13    we've discussed it as a holding company. And it has
14    ownership in Mariner Health Care Management Company and
15    MAC Holding Company. And MAC Holding Company, we did
16    discuss those holdings. And we've discussed Mariner
17    Health Central, Inc. And it performs services on behalf
18    of the California entity. So that's all it does.
19       Q (By Mr. Allen) Okay. And so there's not some
20    business in Canada or something that it does. It doesn't
21    have skilled nursing facilities anywhere in the country
22    except for these skilled nursing facilities in
23    California?
24       A Yes. That -- that is true.
25       Q Okay.

Page 60

1       A And I say that in relative -- the time period,
2    prior to 2011 or -- Mariner was in a number of states.
3    But 2011 forward, it's really only operated in
4    California.
5       Q Okay. All right.
6       We're getting near the end, Mr. Tabler. Thank
7    you for your patience. Oh, in the upper-left corner on
8    both pages one and two of Exhibit 3, it says: Note
9    Mariner Health Care, Inc. directly and indirectly owns
10    other entities that are not shown on this chart.
11       Do you know what other entities there are that
12    are not shown in this chart?
13       A I don't know all the names. I will tell you,
14    at one point, as we've previously discussed, Mariner
15    Health Care, Inc. was a public company and operated in,
16    you know, 15 and 20 states.
17       So you see -- you know, MAC West holds -- there
18    were various holding companies for other operations, you
19    know, outside the state of California. And those
20    companies are no longer active, so to speak.
21       So there may have been a few hundred -- if this
22    chart gave you every entity that Mariner owned or
23    operated in its history, it would be several hundred
24    companies. But these are the -- related to California
25    and are the active companies now.

Page 61

1       Q Are there -- of these other companies, are
2    there any of them that are still actively involved in
3    business of any kind?
4       A No. Some -- some when you say -- some may
5    still be active in a state in terms of still incorporated
6    or still -- but there's no business activity.
7       Q Okay. So the shell may still be a valid
8    corporation registered with the state where in -- it has
9    its domicile. But it's not doing business?
10       A I would say the entity, as opposed to the
11    shell, the entity is still registered or domiciled.
12       Q Fair enough.
13       Okay. But it's not doing business?
14       A That's correct.
15       Q Okay. So all the business function of all the
16    entities we see is all -- done in -- involved these
17    facilities in California?
18       A Was that a question?
19       Yes.
20       Q Yes. Okay.
21       All right. I think that's all I have of you,
22    Mr. Tabler. You've been very cooperative, and I
23    appreciate it very much.
24       I don't know if any of my compatriots wanted to
25    have me ask one more question?

16 (Pages 58 to 61)

**Kenneth Tabler**
**February 15, 2022**

Page 62

1    THE WITNESS: Did you want to take a break for
2  a few minutes and we'll come back and see if you've got
3  anything else or --
4    MR. ALLEN: I probably should do that.
5    Q   (By Mr. Allen) Can you tell me -- do you know
6  approximately how much -- this is going to inspire an
7  objection.
8    Do you know how much Linda Taetz -- excuse
9  me -- how much money Emily Grunstein receives in her
10  salary?
11    The question is do you know how much? That's
12  the first question.
13    A   I -- I have known that amount, but it's not
14  something I keep at the top of my head.
15    Q   Is it a -- is it a significant salary? Is it
16  over six figures, for instance?
17    A   I believe it's over -- when you say -- it's not
18  seven figures. It's over -- it's in the six-figure
19  range, low six-figure range.
20    Q   Okay. I these that's probably close enough.
21    MR. ALLEN: Yeah. Let me take another break.
22  Let's see if we can wrap this up real quick.
23    THE WITNESS: Do you have a time period? Or do
24  you want me to just stay on or?
25    MR. ALLEN: Let's -- let's take -- it's now

Page 63

1  10:57. Let's come back at ten after 11:00 and see if we
2  can wrap this up.
3    THE WITNESS: Okay. Thank you.
4    MR. ALLEN: Thank you.
5    (Pause in proceedings.)
6    MR. ALLEN: Let's go back on the record. Okay.
7  We're back on the record.
8    Q   (By Mr. Allen) Mr. Tabler, so as we discussed
9  before, there are lease holds involved with the entities
10  that we see on Exhibit 3 with the skill -- associated
11  with the skilled nursing facilities.
12    Is there anyone involved with the Grunstein
13  family that owns any of the real estate upon which sit
14  the skilled nursing facilities in California?
15    A   Len Grunstein owns a portion of an entity
16  that -- that owns the real estate.
17    Q   Okay. Was this an entity that was formed back
18  at the -- as all part of the -- the SAVA deal and the
19  spin off of Mariner, things like that?
20    A   Yes, sir.
21    Q   Okay. To your knowledge, does Emily Grunstein
22  have an ownership interest in any of those entities
23  that -- or entity that owns the real estate upon which
24  sit the California skilled nursing facilities?
25    A   To -- to my knowledge, she does not.

Page 64

1    Q   To your knowledge, do any of the companies that
2  we see on Exhibit 3 have any ownership interest in any of
3  the real estate upon which sit the skilled nursing
4  facilities in California?
5    A   They -- they have no ownership interest in any
6  of the real estate.
7    Q   To your knowledge, does either you, Mr. Ehrlich
8  any other officer, director or employee of any of the
9  entities we see on Exhibit 3 have any ownership interest
10  directly or indirectly in the real estate upon which sit
11  the skilled nursing facilities in California?
12    A   For the Mariner entities, no one has -- no one,
13  to my knowledge -- I don't or Devin Ehrlich or any
14  employees have any ownership of any of the facilities
15  with the real estate.
16    Q   With the real estate or the buildings attached
17  thereto?
18    A   Correct.
19    Q   Okay. All right. I think that -- that does
20  it. It's all the questions that I have on the subject of
21  jurisdiction. And that's what we confined this
22  deposition to.
23    Whether I'll have other questions on another
24  day, we'll -- we'll cross that bridge when we get to it.
25  But that's all I have on this subject matter.

Page 65

1    So thank you very much for your participation.
2  And with that, I'll conclude.
3    THE REPORTER: And who would like copies of the
4  transcript?
5    MR. ROSS: Well, before we do that, Mr. Allen,
6  do any of your colleagues have questions? Or do you
7  speak on their behalf as well?
8    MR. ALLEN: If anybody has a question, they can
9  speak up.
10    MR. PEREZ: At least on behalf of Marin County,
11  I have no questions. Thank you.
12    MR. ROSS: I like the mustache, Andy.
13    THE WITNESS: Hey, you look different than your
14  picture.
15    MR. PEREZ: My wife calls it my cop stash.
16    MS. SCHNALL: I also have no further questions,
17  but thank you.
18    MS. MIKIKIAN: No questions, Doug. Thank you.
19    MR. ALLEN: Yeah. We pretty much were of the
20  opinion that it was fair to have one examiner.
21    MR. ROSS: We appreciate that.
22    MR. ALLEN: So I do appreciate the -- the
23  invitation. No. I think -- I think we're concluded.
24    And yes, I do want a transcript. And I would
25  like to get a condensed one as well.

17  (Pages 62 to 65)

**Kenneth Tabler**
**February 15, 2022**

Page 66

```
1          THE REPORTER:  Okay.
2          MR. ROSS:  Madam Reporter, this is Darryl Ross.
3   I would like a transcript as well and condensed in a text
4   file too, please.
5          THE REPORTER:  Okay.
6          MR. ALLEN:  And you'll contact Mr. Tabler
7   directly to allow him to read and sign the deposition
8   transcripts, I assume?
9          THE REPORTER:  Yes.  And can I get his email
10  address to send that?
11         THE WITNESS:  I'd say provide it to Darryl or
12  my attorney.  And then he'll get it to me --
13         THE REPORTER:  Okay.  All right.  Thank you.
14         MR. ROSS:  Thank you.
15     (Deposition concluded at 11:11 a.m.)
16              •  •  •
17
18
19
20
21
22
23
24
25
```

18  (Page 66)

**Kenneth Tabler**
**February 15, 2022**

Page 67

1                    CERTIFICATE OF REPORTER

2

3       I, CONNIE WEBB, CSR NO. 10811, hereby certify that

4  the witness in the foregoing deposition, KENNETH

5  TABLER, has duly affirmed, remotely via Zoom

6  videoconference, to tell the truth, the whole truth,

7  and nothing but the truth in the within-entitled cause;

8  that the testimony of said witness was taken down in

9  shorthand by me, a Certified Shorthand Reporter and a

10 disinterested person, at the time and place herein

11 stated, and that the testimony of the said witness was

12 thereafter reduced to typewriting, by computer, under

13 my direction and supervision;

14      I further certify that I am not of counsel or

15 attorney for either or any of the parties to the said

16 deposition nor in any way interested in the outcome of

17 this case, and that I am not related to any of the

18 parties thereto.

19      I hereto declare under penalty of perjury that the

20 foregoing is true and correct.  I have hereunto set my

21 hand on March 1, 2022.

22

23

24                     CONNIE WEBB, CSR NO. 10811

25

Kenneth Tabler
February 15, 2022

| A | | | | |
|---|---|---|---|---|

**A**
**a.m** 1:18 3:22
  5:3,9 66:15
**able** 7:14 8:6
**absolutely** 51:17
**access** 8:16
**accommodate**
  28:2
**accountant**
  11:20
**accounting**
  11:15 16:3,19
  16:19 20:19
  29:6,16 30:6
  39:14,18
**accurate** 53:16
  53:17
**accurately** 46:8
**acquaintance**
  18:21
**acting** 17:4
**action** 12:6
**active** 36:18
  60:20,25 61:5
**actively** 61:2
**activity** 23:25
  39:10 61:6
**actual** 30:14
  43:13 44:1
**added** 38:16
**address** 9:2,5,8
  9:14,19,21,23
  9:25 10:1,6,20
  14:17,19 18:14
  22:23 23:7
  28:7,10 31:1
  31:17 66:10
**administrative**
  11:13 15:6,13
  15:15,23 16:2
  16:3,6,12 17:9
  27:10 38:1
  39:21 57:16
  58:3,20
**administrator**

39:25 40:7,8
**advance** 23:1
**advanced** 20:16
**advances** 21:14
  22:24
**advantages** 42:4
**advice** 19:3
**affairs** 6:2 51:9
**affiliated** 14:25
  15:1,12 19:19
  37:6
**affirmed** 67:5
**age** 49:25
**agencies** 29:13
**ago** 30:9 37:13
  52:13
**Ah** 18:6
**ahead** 19:24
  59:4
**al** 1:10 5:12
**Alameda** 1:2
  2:12 6:7
**alive** 18:5
**Allen** 2:4 4:5
  5:19,20 6:5,22
  6:24 9:6,9,12
  10:1,2,17,19
  12:1,5,10,12
  12:16,21,25
  15:10 16:18
  18:3,6,7,23
  20:2 24:9,12
  25:17,25 30:5
  30:14 32:16,19
  34:25 35:2,4,9
  35:12,13,17,21
  36:4 39:2,4,13
  45:21 46:12,17
  46:22,24 47:1
  47:4,7 58:7
  59:19 62:4,5
  62:21,25 63:4
  63:6,8 65:5,8
  65:19,22 66:6
**alleviate** 24:19

**allow** 8:6 66:7
**amount** 62:13
**ANDRES** 2:8
**Andy** 6:7 65:12
**Angeles** 2:16,18
**annual** 52:17
**annually** 52:17
**answer** 7:13
  10:7 32:17
  46:7 57:9
**answered** 38:16
**answering** 57:8
**answers** 56:20
**anybody** 8:8
  45:12,16 55:10
  65:8
**anymore** 31:3
**Aperez@mari...**
  2:11
**apologize** 15:25
  25:14 38:25
  57:3
**appearances** 2:1
  3:1 5:17
**appears** 40:22
  53:16
**appointed** 51:20
**appointing**
  52:11
**appreciate** 8:3
  38:19 46:6
  61:23 65:21,22
**appropriate**
  10:12 35:19
**approximately**
  10:25 11:2
  49:18 62:6
**arrangement**
  44:7,9,25
**arrangements**
  9:1
**articulate** 15:11
**asked** 56:3 57:2
**asking** 21:20
  51:5 58:13

**assert** 10:12
**assist** 39:5
**assistance** 25:23
**assistant** 2:5
  5:20
**associate** 18:23
**associated** 18:17
  18:20 30:22
  63:10
**assume** 7:15,17
  13:11 18:1
  47:11,13 49:24
  52:8,10 54:10
  66:8
**assuming** 51:23
**Atlanta** 14:17,19
**attached** 12:23
  64:16
**attend** 50:9
**attorney** 2:4,5,8
  2:9,12,13,16
  2:17 5:18,20
  66:12 67:15
**Attorney's** 6:6,7
  6:8
**attorneys** 8:8
  35:7
**aware** 39:9
  48:10

| B | | | | |
|---|---|---|---|---|

**back** 8:25 13:7
  16:17,21 18:2
  25:16 26:22
  27:10 30:1
  33:15 35:22
  46:17,19 47:1
  47:4 56:12
  57:22 62:2
  63:1,6,7,17
**backwards**
  42:14
**Baltimore** 8:20
  11:1,15
**basis** 50:10

**beg** 34:25
**behalf** 3:20 5:13
  6:14 23:1
  24:21 25:10
  59:17 65:7,10
**believe** 10:11
  14:17,22 16:25
  18:8,9,21 19:7
  19:12 24:24
  25:8,20,21
  26:9 28:1,24
  29:22 31:4
  34:1,1 37:12
  37:20,23 38:4
  38:12 40:1,9
  41:11,20 48:19
  49:3 50:18
  52:16 55:6,10
  55:24 62:17
**better** 54:14
**billing** 28:1
**Bio** 54:17,18,25
  56:7,16,22,24
  58:18
**bit** 42:8
**blacked** 37:10
**blank** 37:21,21
**blanks** 37:10,18
**board** 47:12,15
  52:10,14,18,21
  53:7 54:25
  55:5,6,8 57:4
**body** 40:2,3,6,10
  40:12
**borrowed** 39:4
**break** 7:10 8:12
  8:13 45:22
  46:6,12 62:1
  62:21
**breaking** 42:8
**bridge** 64:24
**briefly** 7:19
**broke** 38:25
**brother** 15:1
**building** 30:25

**CAL Reporting 925-425-9669**

44:16
**buildings** 64:16
**business** 9:23,25
11:22 14:17
36:19,21,22,23
58:23,24 59:20
61:3,6,9,13,15

**C**

**California** 1:1,4
2:6,10,14,18
2:23 3:21 5:8
5:11,15 8:23
26:8,14,17
27:12 28:5
32:23 33:16,25
34:11,13,23
36:3,23,25
37:4 41:24
42:5 48:11
55:19 57:19
58:25 59:9,18
59:23 60:4,19
60:24 61:17
63:14,24 64:4
64:11
**call** 8:13
**called** 6:14
23:12 24:13
**calls** 19:23 65:15
**Canada** 59:20
**captive** 53:24
**care** 1:7,8,8 5:12
11:11 12:8,8
12:13,14,14
13:10,16,23,24
14:14 15:3
16:21,24 17:3
17:5,7,12,16
17:21 19:15,19
20:3,10,19,20
20:20 21:1,5,8
21:11,12,17,18
21:21,22 22:2
22:3,11,13,16

22:20,22,25
23:2,12,16,17
23:22 24:5,5
26:1,5,12 27:1
27:15,15,16
29:6,7,7,17
30:18 31:6,17
37:25 38:5,7
38:22 47:9
51:13,14,14
52:7 57:12,13
57:14,24,25
58:1,15,15,16
59:10,12,14
60:9,15
**careful** 49:21
**case** 1:6 5:12
9:15 32:25
67:17
**categorize** 16:17
**cause** 22:1 67:7
**CCP** 5:15
**cell** 7:22,24 8:8
**Center** 2:9
**Central** 1:9 2:22
6:3 9:21 12:7
12:13 16:13
20:17,18,24
21:2,15 22:24
23:5 27:3,9,19
28:20,23,24
29:2,8,19,20
29:24 30:18
37:25 38:5,6
39:15,17,24
40:11 45:7
47:8,11,18,22
48:15,18,23
49:2,6 50:17
50:19 51:1,22
52:15 54:11
57:5,13,15,25
58:2,17 59:11
59:17
**centralized**

20:19
**certainly** 7:10
9:22
**CERTIFICATE**
67:1
**certified** 11:19
67:9
**certify** 67:3,14
**chain** 38:15
**changed** 9:1
**chart** 4:15 12:22
13:3,8 23:11
23:15 33:15,22
33:24 34:21
35:25 37:3
41:8 42:23
53:14,16 60:10
60:12,22
**chart's** 42:25
**cite** 10:8
**city** 10:19,21
**Civic** 2:9
**Clark** 3:5 5:23
**clear** 7:14 10:10
23:3 37:21
43:2 48:13
**clients** 27:24
**clock** 46:18
**close** 62:20
**cold** 8:21,25
**colleagues** 65:6
**college** 11:14,15
**come** 13:7 46:17
46:19 62:2
63:1
**comes** 10:16
**communicate**
8:7
**communication**
8:10
**Comp** 53:25
54:4,9
**companies** 6:1
26:23 30:22
33:1,21,24

34:9,10,18,20
34:21 35:24
36:1,8,9,17,18
37:7 38:2 39:5
40:17,21,23
41:13,15,22,23
42:3 43:7,10
44:4,9 53:4,11
54:10 56:9
57:19 58:14,14
58:25 60:18,20
60:24,25 61:1
64:1
**company** 9:17
12:8,15 15:6
15:11,16 19:3
19:10 20:6,8,9
23:12,13,17,23
23:24 24:13,16
25:12,18 26:20
27:2,4,6,11,16
29:8 30:21
31:7,10,11,22
31:22 32:13,18
33:7,7,12,12
34:2,5,6,15
36:24 38:7,8
38:22 40:1,22
40:24,25 41:1
41:2,5,6,7,10
41:12,17,21,23
42:6,12,16
42:19,21 43:4
43:4,9,11,16
43:18,18,19,24
44:5,8,13,21
44:22,23,24
45:1 47:9
50:22 51:15
53:2,3,3,4,5,14
53:22,24 54:3
54:3,5 55:3
56:12,13,22
57:14 58:1,16
58:19,22 59:10

59:13,14,15,15
60:15
**compatriots**
61:24
**compel** 10:9,11
**Compensation**
54:15
**completely**
15:16,19,20
41:19 43:15
**complicates** 8:9
**compound** 59:3
**computer** 67:12
**concern** 36:16
**conclude** 65:2
**concluded** 65:23
66:15
**conclusion**
19:23
**condensed** 65:25
66:3
**confined** 64:21
**Connie** 1:20
3:22 5:7 67:3
67:24
**consolidated**
29:5,11
**consult** 7:10 8:5
**consultant** 17:4
17:7
**consultants**
27:22
**contact** 25:12,17
66:6
**continue** 10:7
49:12
**continued** 3:2
33:20 49:13
**contract** 16:13
**contracted**
39:17,20
**contracts** 56:1
**control** 19:20
20:6
**convenient** 46:2

**Kenneth Tabler**
**February 15, 2022**

Page 70

conversation
19:5 45:17
conversations
45:14 51:22
52:1
cooperative
61:22
cop 65:15
copies 65:3
copy 12:16
corner 60:7
corporate 19:2,3
corporation 1:8
1:8,9,10 47:12
61:8
correct 11:16,17
11:20,21,25
12:12 13:11
14:6 15:17,18
16:4 17:24
18:25 19:10,16
19:17 20:7,14
21:15,16 22:17
22:18,21 24:8
26:2,14,17,24
26:25 27:5,8
27:18 29:14
30:19 31:15,25
32:2,8,9,11,23
32:24 33:2,3,9
33:10 34:16,23
36:3 37:1,2,8
38:3,9 39:22
40:17 42:25
43:16,23 44:2
44:6,16 47:9
47:10 48:3,4
48:25 51:16,17
51:24 52:9,19
52:20 53:6,9
53:12,15,21
54:12 55:20,22
56:9,10 57:1
57:20 59:1
61:14 64:18

67:20
correctly 32:20
cost 16:19,19
22:24 23:1
costs 19:13 25:9
cough 24:10
counsel 3:5 5:17
5:25 7:11 8:5
12:12 29:4
35:4 46:9,14
58:8 67:14
country 59:21
County 1:2 2:12
2:16 5:21 6:8
65:10
County's 6:6
couple 37:18
course 27:14
59:6
court 1:1 10:2,9
35:15,21
COVID 18:8
cross 64:24
Cruz 2:4,6 5:21
40:24
CSR 1:20 3:22
5:7 67:3,24
currently 11:4

**D**
daross@mari...
2:24
Darryl 2:21 5:22
66:2,11
date 1:17 5:8
29:23 56:14
day 28:17 45:23
64:24
days 26:22
deal 63:18
decision 52:8
declaration 4:14
12:5,23 13:9
16:25
declare 67:19

defendant 2:20
defendants 1:11
5:23
degree 11:14,15
58:21
degrees 8:21
Delaware 1:7,8
1:9,9 52:16
Dennis 55:9
Deponent's 4:14
deposition 1:16
3:20 4:13 5:10
5:14 7:3,4 12:3
64:22 66:7,15
67:4,16
Deputy 2:9,13
2:17
derives 56:8
describe 14:20
51:21
describing 15:11
**DESCRIPTION**
4:11
desk 7:25
developed 34:8
Devin 3:5 5:24
13:19 22:9
25:20 28:25
45:10,12,18,19
47:16 51:24
52:24 64:13
diagonals 43:1
different 6:1
15:19,21 29:11
65:13
direct 21:1
36:13
direction 67:13
directly 9:16
60:9 64:10
66:7
director 6:2
13:10 52:14
53:11 64:8
directors 20:5

47:12,15 52:18
52:21 53:8
54:25 55:5
56:18 57:4
directors' 52:11
discuss 59:16
discussed 45:10
57:17 58:4,18
58:21 59:7,9
59:13,16 60:14
63:8
discussions 19:6
disinterested
67:10
dispersed 56:24
disseminate 9:12
district 2:4,5,8,9
2:12,13,16,17
5:20 6:6,7,8
divested 26:24
34:14,16 37:5
37:12,19
dividend 29:22
29:25
dividends 29:21
29:23 30:10
document 9:15
doing 9:13 22:1
36:22,23 48:1
58:23 61:9,13
domicile 61:9
domiciled 61:11
DON 40:9
Double 37:15
Doug 2:4 65:18
Douglas 5:20
Douglas.Allen...
2:7
drawer 8:15
drawn 23:19
Driftwood 40:25
drive 2:9 11:3
drugs 7:15
duly 6:15 67:5
duties 10:17

**E**
E-M-I-L-Y
14:13
earn 25:9
education 11:23
Ehrlich 3:5 5:25
13:19 17:15
18:12,18 19:5
19:20 20:3
21:7 22:9,10
25:20 28:25
31:14 32:6
45:10,13,18,20
47:16 51:24
52:19,25 53:5
55:5,11 57:5
64:7,13
Ehrlich's 18:14
29:1
eight 52:13
either 8:12
22:10 53:10
64:7 67:15
elder 49:20
eleven 46:18
email 66:9
Emily 14:9,12
18:1 30:15
34:17 47:17
49:5,18 50:5
50:10 62:9
63:21
employ 9:20
employee 15:24
15:25 47:18
51:10 53:11
64:8
employees 19:16
20:4 22:17
24:1 30:23
31:8 32:4
51:15 53:19
54:6 55:23
56:16 64:14
employment

**Kenneth Tabler**
**February 15, 2022**

24:20
ended 37:15
enjoying 8:25
entirely 42:25
entities 11:10
  15:16 16:8,8
  23:7,9 30:1
  33:11 34:3
  36:8 37:5
  38:13,17 54:24
  57:15,20 58:2
  59:7 60:10,11
  61:16 63:9,22
  64:9,12
entitle 22:7
entitled 7:10
  10:10,12
entity 16:7,14
  20:21 21:3,19
  24:13,17,24
  25:6 36:22
  37:12,14,19
  40:3 41:5
  43:24 50:14
  53:23 59:18
  60:22 61:10,11
  63:15,17,23
ESQUIRE 2:4,8
  2:12,16,21
established
  24:17 25:8
  34:2
estate 33:4,12
  34:9,10,13,14
  34:18 37:4
  53:19 63:13,16
  63:23 64:3,6
  64:10,15,16
et 1:10 5:12
Eureka 3:21 5:8
evening 45:25
everybody 46:3
Everybody's
  47:4,5
exact 7:6 20:1

38:18 50:18
  51:5
exactly 21:23
  25:5
examination
  6:20 45:24
examined 6:17
examiner 65:20
example 41:4
Excel 43:2
excess 7:7
excuse 30:18
  41:16 62:8
executive 29:3
  50:12,16 51:8
Exhibit 4:9 12:4
  12:5,9,22,24
  16:9 21:25
  24:14 31:5
  60:8 63:10
  64:2,9
exhibits 12:2,18
expenses 21:14
  25:11 56:16
experience
  11:23
explain 10:18
  36:4
extent 27:16
_____
        F
facilitate 24:21
facilitating
  54:14
facilities 25:11
  26:6,7,8,12,13
  26:16,22 27:11
  32:22,23 33:25
  34:23 36:2
  38:2,11,23
  39:1,2,3 41:3
  54:19 55:18
  58:24 59:21,22
  61:17 63:11,14
  63:24 64:4,11

64:14
facility 39:25
  40:4,5 43:14
  44:14 54:9
  57:19
facility-level
  54:24
fact 38:7
fair 36:16 48:13
  50:15 52:5
  61:12 65:20
Fallon 2:13
familiar 13:5
family 13:25
  20:23 30:2,15
  63:13
far 10:25
FAS 17:6,8
fashion 8:12
  58:11
fast 46:5,7
February 1:17
  3:21 5:1,9
feel 21:25 36:4
fees 25:9
field 27:23
figures 62:16,18
file 29:10 66:4
filed 12:6 29:12
finance 38:23
financial-type
  16:3
fine 38:20 47:3
finish 7:13
firm 14:22,23,25
  18:16,17 19:1
  23:9 24:7
  31:17,23 53:20
firms 25:23
first 6:15 33:14
  37:21 39:16
  62:12
flow 30:11,13
focus 45:24
following 11:23

follows 6:17
foot 10:14
force 27:22,23
foregoing 67:4
  67:20
forgot 35:13
form 15:9 18:19
  19:22 30:3
  34:24 35:1,18
  54:13
formal 14:16
  49:3
formation 19:2
  26:23
formed 24:20,23
  34:7 63:17
forming 42:2
forward 8:25
  10:15 48:10
  60:3
four 37:13 58:13
  58:14 59:7
free 21:25 36:4
front 12:18,19
  12:25
FTE 56:4
fulfilled 40:9
full-time 55:25
function 27:11
  37:24 51:8,11
  61:15
functions 20:22
  38:1 47:25
  58:20,20
Fundamental
  11:12 15:6,12
  15:15,23 16:2
  16:6,12 17:8
  39:20
funds 20:16
further 38:15
  65:16 67:14
_____
        G
G-R-U-N-S-T-...

14:11
GC 33:6,7,12,12
  34:2,5 41:7
  42:21 43:3,9
  43:11,16,18,19
  43:24 44:4,8
  44:22,23,24
  45:1
general 3:5 5:25
  29:4 40:18
  42:9,13,16
  51:25
Generally 40:7
Gentleman 24:9
Georgia 18:15
  22:23 24:4
  31:24 53:20
getting 21:24
  60:6
gist 58:11
give 7:3,14 9:2
  28:7
given 40:5
giving 7:16
go 19:24 28:17
  33:15 45:23
  47:1 59:4 63:6
goes 56:7,15
going 7:12 8:15
  16:17 23:20
  24:9 26:22
  45:21 46:9,20
  46:22 48:10
  49:22 56:21
  58:8,10,12
  62:6
good 5:6,19,22
  6:23,24 7:16
  8:19,22 12:21
  28:15 35:10
gotten 18:9
governing 40:2
  40:3,6,10,12
government
  29:12

**Kenneth Tabler**
**February 15, 2022**

GP 41:6,12 42:9
  42:12,16
grand 32:6
GrandCare 32:3
  32:7,10,20
  33:4 38:14
  52:22,24
GrandCare's
  38:23
grapple 36:15
Great 8:17,17
grounds 9:25
group 34:10
  37:7 39:8
Grunstein 13:25
  14:5,9 17:14
  17:23 18:1,4
  20:23 29:15
  30:2,15 34:17
  45:15,18 47:17
  48:7,14 49:4,5
  49:14 50:5,8
  51:24 62:9
  63:12,15,21
Grunstein's 15:1
guess 36:6
guesstimate 7:3
guy 11:19

**H**
half-hour 11:2
hand 6:11 67:21
handled 5:15
happy 8:6 9:20
hard 43:2
Harry 14:5 15:1
  17:23 45:14,18
  48:7,14 49:4
  49:13,16 50:7
  50:9 51:23
Hayward 42:24
he'll 66:12
head 41:20
  62:14
health 1:7,8,9

2:22 5:12 6:3
  9:21 12:7,7,13
  12:13,14 16:13
  20:17,18,20,20
  20:24 21:2,15
  21:18,21 22:2
  22:3,11,13,16
  22:22,24 23:2
  23:4,12,16,17
  23:22 24:5
  26:1,5,11 27:1
  27:3,9,15,16
  27:19 28:19,22
  28:24 29:2,7,7
  29:8,19,20,24
  30:17,18 31:6
  37:25,25 38:4
  38:5,6,6,22
  39:15,17,24
  40:11 45:6
  47:7,9,11,18
  47:21 48:15,18
  48:23 49:2,5
  50:17,19 51:1
  51:14,14,22
  52:7,15 54:10
  57:4,13,13,14
  57:14,25,25
  58:1,1,15,15
  58:16 59:11,12
  59:14,17 60:9
  60:15
hear 6:25 47:2,3
held 14:2,3,4
  32:20 36:22
  56:24
help 24:19 38:23
hereto 67:19
hereunto 67:20
Hey 65:13
hidden 36:14
Hills 42:24
hire 39:24
hired 17:25 45:5
  45:9 50:21

51:18,20
hiring 40:4
history 30:16
  60:23
hold 17:1 27:2
  33:16 43:6
  52:17
holder 14:8
holding 23:24
  27:6 31:7,21
  31:22 32:13,18
  33:6,7,12,12
  34:2,5,6 36:9
  36:18 37:4
  38:1,7,8 40:22
  40:24,25 41:1
  41:6,9,12,17
  41:21 42:6,11
  42:11,12,15
  44:8,22 53:1,2
  53:3,4,5,14
  55:2 56:11,12
  56:22 57:16,18
  58:3,5,22
  59:10,13,15,15
  60:18
holdings 34:13
  34:14 59:16
holds 23:25 31:2
  31:21 42:6
  53:23 60:17
  63:9
home 9:8,19,21
  10:1,20 30:24
hook 50:1
hour 45:21
hours 45:25
Houston 31:2,2
hundred 31:7
  33:8 47:8
  53:13 55:2,14
  55:24 56:11,15
  60:21,23
hypothetical
  59:3

**I**
impediments
  7:16
important 9:14
Inc.'s 27:19
include 16:8
including 8:8
  10:13 58:18
income 20:8,10
  20:12 29:16
  30:15 56:7
incomplete 59:3
incorporated
  13:16 61:5
incur 25:11
INDEX 4:1,9
indicate 13:9
indicated 53:13
indirect 20:25
indirectly 60:9
  64:10
individual 14:2
  14:4 33:1 43:6
informed 45:19
initials 42:14
innocent 8:10
inspire 62:6
instance 11:10
  40:23 62:16
insurance 33:22
  53:24 54:5,9
  54:13,15
intention 9:13
interest 23:20
  33:16 34:7,17
  42:17,19 63:22
  64:2,5,9
interested 67:16
interpose 32:14
invitation 65:23
invoice 19:8
involve 30:12
involved 19:6
  25:21 26:19
  34:22 36:1,7

36:12 39:8
  40:3,12 50:23
  53:10,24 54:4
  56:17 61:2,16
  63:9,12
involvement
  26:21 58:17,22
Irvine 2:23
issue 9:19,24

**J**
joining 6:8
Jose 40:1,6,23
  41:5,6,12
  42:12,15 43:17
jumped 38:15
jurisdiction
  64:21

**K**
keep 7:16 45:25
  62:14
Kenneth 1:16
  3:20 4:5 5:10
  6:13 67:4
kind 8:2 9:15
  14:20 45:22
  50:4 52:10
  56:5 61:3
know 7:6 9:9,11
  9:14 10:8
  17:13 19:5,11
  19:13 21:3,7,9
  24:19 26:19
  27:24 28:2,3
  28:10,16 30:9
  36:5,7,12
  37:11 38:18
  41:19 42:3
  46:10 48:9
  49:10,19,25
  55:7,8,23
  56:20 59:9
  60:11,13,16,17

**Kenneth Tabler**
**February 15, 2022**

Page 73

60:19 61:24
62:5,8,11
**knowledge**
17:20 19:4
30:23 35:19
39:11 48:12
63:21,25 64:1
64:7,13
**known** 62:13
**Kristy** 3:6 6:2
51:5,5,13
**Kristy's** 51:10

──────── **L** ────────
**LA** 6:6
**lack** 54:14
**land** 44:1,14,16
44:19
**landlord** 43:19
**language** 20:1
**large** 26:22
**lastly** 58:16
**law** 14:22,23,25
18:16,17 19:1
23:9 24:7
25:23 31:17,23
41:24 52:16
53:20
**lawsuit** 6:1
**lease** 19:12,13
20:15 23:4
33:16 37:15,16
43:8,11,12,14
43:15,18 44:22
63:9
**leases** 23:8 43:6
43:25
**leave** 9:20 49:25
**left** 33:23 42:24
53:1
**left-hand** 7:25
**legal** 6:2 19:23
49:12 51:3,9
**Len** 63:15
**Leonard** 15:1

**lessee** 43:16,17
44:18,20
**lessor** 44:8
**let's** 10:15 16:21
22:1,1 30:20
43:3 44:12
47:1 62:22,25
62:25 63:1,6
**liability** 43:4
**licensee** 32:22
**licensees** 33:1
**licenses** 32:21
**limited** 41:24
42:3,7 43:4
**Linda** 3:6 5:25
40:9,16 41:11
41:14,18,20
50:12,16 51:12
62:8
**line** 23:12,19
**litigation** 51:4,9
**little** 15:10 23:14
33:14,22 36:6
37:20 42:8,23
**live** 10:21,21
**lives** 9:9 18:15
**LLC** 32:3,7,10
32:20 33:4
41:7,12 42:12
42:16,21 43:4
43:9,16 44:8
52:22,22,24
53:22 54:17
56:7,25 58:18
**loan** 38:11,22
39:2,3
**located** 5:8
**location** 19:9
27:21 28:4
**long** 30:10 46:6
46:16
**longer** 9:22
32:25 37:13
60:20
**look** 31:5 33:14

34:20 35:24
37:3 42:24
44:12 47:25
65:13
**looking** 8:24
34:21 35:25
41:8
**Lori** 2:12 6:6
**Lori.Schnall...**
2:15
**Los** 2:16,18
**lot** 11:22 25:5
26:21 38:11
51:11 59:5
**low** 62:19
**Loyola** 11:15
**lozenge** 24:10
**LP** 41:5 44:21
**LPs** 41:24

──────── **M** ────────
**MAC** 24:16
31:21 32:13,18
53:1,2,3,4,4
55:2 56:11,12
56:22 58:19
59:15,15 60:17
**Madam** 10:2
35:21 57:21
66:2
**main** 28:12
**majority** 40:19
**making** 48:13
**Management**
1:9 12:8,15
20:20 23:12,17
23:22 27:1,16
29:7 38:22
47:9 51:15
57:14 58:1,16
59:14
**managements**
51:4
**managers** 32:10
**managing** 51:9

52:22
**March** 67:21
**Marilyn** 55:12
**Marin** 2:8 6:8
65:10
**Mariner** 1:7,8,9
2:22 5:12 6:3
9:20 11:10
12:7,7,13,13
12:14 15:16
16:7,13 20:17
20:18,19,20,24
21:2,14,18,21
22:2,3,11,13
22:16,22,24
23:1,4,12,15
23:17,22 24:5
24:22 26:6,7
27:1,3,9,11,15
27:16,19 28:19
28:22,24 29:2
29:7,7,8,19,20
29:24 30:17,18
30:22 31:6
33:16 34:10,12
37:24 38:4,5,6
38:6,22 39:14
39:17,24 40:11
45:6 47:7,8,11
47:18,21 48:14
48:17,23 49:2
49:5 50:17,19
51:1,14,14,21
52:6,15 53:22
54:4,5,10,16
54:19 57:4,13
57:13,14,25
58:1,1,15,15
58:16 59:11,12
59:14,16 60:2
60:9,14,22
63:19 64:12
**mark** 10:3
**marked** 4:11
10:5 12:4,9,24

**Maryland** 10:22
10:24 11:4
15:4,7
**master** 43:5,12
**Matt** 3:5 5:22
**matter** 5:11
64:25
**matters** 11:24
**mean** 17:8 28:13
45:23
**meaning** 33:8
**meet** 52:17
**meeting** 52:17
**meetings** 50:9
52:15
**member** 13:25
18:24
**members** 32:7
32:12,18 40:3
52:22
**membership**
33:8
**memorized**
14:24 28:8
**mentioned** 11:24
16:18
**merely** 36:18
57:15 58:2
**MHC** 24:13 31:7
**microphone**
24:10
**Mikikian** 2:16
6:5 65:18
**miles** 11:2
**minutes** 46:18
62:2
**misquoted** 36:11
**missed** 8:19
**misspoke** 12:10
**mistaken** 55:7
**misunderstood**
36:11
**mix** 38:17
**mixing** 38:12
**moment** 16:22

**CAL Reporting 925-425-9669**

33:23
**money** 39:4,5
  62:9
**Monterey** 44:12
  44:14,19,20,23
  44:25
**morning** 5:6,19
  5:22 6:23,24
**motion** 4:14
  10:9 12:6
**move** 10:15
**Mr.Allen** 25:15
**mustache** 65:12
**mute** 46:21
**muted** 47:5

**———— N ————**
**name** 5:7 14:23
  23:4 24:21
**named** 6:1
**names** 60:13
**naming** 12:11
**National** 1:8
  11:10 12:8,14
  13:10,15,22,24
  14:14 15:3
  16:21,23 17:3
  17:4,7,12,16
  17:21 19:15,19
  20:2,10,19
  21:1,4,8,11,12
  21:17,21 22:19
  22:25 24:5
  27:15 29:6,17
  31:17 51:13
  57:12,24 58:14
  59:9
**nature** 25:22
**navigate** 28:10
**near** 60:6
**need** 9:8,15
  10:14,18 27:17
  28:3 58:7
**needed** 25:10
**neither** 51:12

53:18
**never** 9:19 19:4
  19:6 30:8
**new** 24:24 25:4
**noise** 23:14
**nom** 19:11
**nominal** 19:1,9
  27:25 31:23
**north** 31:2
**note** 33:22 60:8
**notes** 45:23
**Nothing's** 56:14
**notice** 4:13 12:2
  12:2
**noticing** 5:18
**number** 5:12 7:6
  26:22 32:21
  36:8 50:22
  56:2,3,4 60:2
**nurses** 24:19
  26:1,4
**nursing** 32:21
  32:23 33:25
  34:22 36:2,23
  37:1 38:2
  39:25 41:3
  43:13 55:18
  57:19 58:24
  59:21,22 63:11
  63:14,24 64:3
  64:11

**———— O ————**
**Oakland** 2:14
  28:1,5 48:5,8,9
**oath** 6:17 7:8
**object** 9:7,10,18
  9:25 10:7 15:8
  18:19 19:22
  30:3 34:24
  58:7 59:2
**objecting** 35:1
  35:18
**objection** 32:14
  35:5,10,19

62:7
**objections** 10:12
  35:7
**observe** 6:9
**obviously** 11:22
  36:7 40:7
**occupational**
  54:22
**occurred** 39:10
**Ocean** 2:5
**office** 5:8 6:6,7,8
  9:23 11:7,8,9
  11:12 14:15,16
  14:18,20,22
  15:4 16:17
  18:16 19:2,12
  22:7,22,23,25
  23:1 24:4
  27:10,20,25
  28:1,7 30:21
  30:25 31:3,16
  31:23 53:19
  55:15
**officer** 9:16
  13:10,13 17:1
  17:16 22:3,6
  31:10 41:11,14
  41:18 50:19
  51:3 53:11
  64:8
**officers** 13:15
  17:19 18:12
  20:3,5 22:8
  25:3,6 28:22
  28:25 31:13,23
  32:7,8,9 41:9
  51:16 53:4
  56:17
**offices** 11:9
**official** 49:11
  52:1
**offshore** 54:3
**Oh** 35:2 60:7
**okay** 6:4,10 7:2
  7:8,19 8:15,18

10:25 11:6,14
  12:1 13:7,15
  13:22 14:14,19
  14:23 15:3,25
  16:15,21 17:11
  17:11,15,25
  18:6,11,14,16
  18:23 19:1
  20:8,18,23
  21:4,10,23,25
  23:6,10 25:1
  25:25 26:11,16
  26:21 27:1,9
  27:19,25 28:18
  28:22 29:1,5
  29:10,15,20,24
  30:14,20 31:1
  31:5,19,21
  32:1,3,12,19
  33:6,14 34:8
  34:17,20 35:11
  35:21 37:3,9
  37:17,22 39:13
  39:23 40:16
  42:6,11,18,22
  43:3 44:3,12
  44:17 45:3,16
  46:11,15,20
  47:4 49:4,8,15
  49:18 50:12,21
  50:25 51:12,18
  52:10,14,18,21
  53:1,18 54:1
  54:13,17,20
  55:10,15 56:6
  56:24 57:2,7
  57:10 58:10
  59:5,19,25
  60:5 61:7,13
  61:15,20 62:20
  63:3,6,17,21
  64:19 66:1,5
  66:13
**old** 49:18
**ones** 35:6

**operate** 33:11,25
**operated** 60:3
  60:15,23
**operating** 6:1
  33:1,24 34:3,9
  40:1,17,21,23
  41:2,5,5,7,13
  41:15,22,23
  42:2,19,21
  43:3,7,9,11,16
  43:17,18,19,24
  44:4,4,9,12,20
  44:23,24 45:1
  54:10 55:18
  56:9 57:19
  58:25
**operation** 34:22
  36:2
**operational**
  37:13
**operations** 36:13
  38:24 39:6
  60:18
**opinion** 65:20
**opposed** 61:10
**order** 30:1
**org** 23:15 53:14
**organizational**
  4:15 12:22
  13:3,7 23:11
**outcome** 67:16
**outside** 25:23
  26:16 59:8
  60:19
**oversees** 24:18
**Owen** 3:6 6:2
  12:23 50:25
  51:5
**owned** 34:10
  47:8 53:13
  55:2 56:11
  60:22
**owner** 15:24
  43:15 44:18
**owners** 15:22

**Kenneth Tabler**
**February 15, 2022**

ownership 15:20
  19:20 20:6,24
  20:25 21:1,18
  23:16,20 31:7
  33:9 41:7
  42:25 44:1
  47:7 54:3
  59:14 63:22
  64:2,5,9,14
ownership's
  15:19
owning 21:3,17
owns 21:21
  59:10 60:9
  63:13,15,16,23

**P**
Pacific 54:17,18
  54:25 56:7,16
  56:22,25 58:18
page 4:3 33:19
  37:9,17
pages 60:8
paid 20:16 21:4
  21:8 29:22,23
  29:24 30:9,16
  47:17,18 49:13
  56:14,16
Palms 44:12,14
  44:20,23,25
paper 34:4
pardon 24:11
  34:25
Parkway 31:2
part 63:18
part-time 55:25
  56:2
participated
  50:11
participation
  57:18 58:5
  65:1
particular 26:1
  30:15
particularly

24:18
parties 12:11
  56:1 67:15,18
partner 18:24
  42:7,10,13,16
partners 41:25
  42:1
partnership
  41:25 42:1
partnerships
  42:3
party 43:25 44:1
  44:13
pass 18:7 29:25
passed 14:5
  29:16 49:2
passing 48:8
  49:4
patience 60:7
patients 54:24
Pause 46:25
  63:5
pay 20:15 21:14
  29:20 56:12
payroll 21:13
pays 43:25
penalty 67:19
pending 7:12
people 1:4 5:11
  19:18,19 27:23
  28:3,3 36:25
  52:7
percent 31:7
  33:8 42:7,10
  42:16,19 47:8
  53:13 55:2,14
  56:11,15
percentage 21:3
Perez 2:8 6:7
  8:24 65:10,15
performs 59:17
period 46:15
  60:1 62:23
perjury 67:19
person 20:5

49:20 67:10
personnel 26:1,5
phone 7:22,24
  8:8,13 46:11
physical 27:21
  54:22
picked 8:22
picture 65:14
pieces 34:3
place 1:19 67:10
plaintiff 1:5 2:3
  3:21 5:13 6:14
please 5:17 9:3
  14:10 57:22
  66:4
point 23:24 25:4
  26:18 27:5
  32:19 34:7,12
  35:4 38:21
  39:9 46:10
  48:11,19 60:14
pointed 41:6
policy 54:1,2
portion 63:15
position 17:1
  29:1 40:8
  45:13,17 47:21
  48:17 49:1
  50:24,25 51:13
  51:21,23
possible 46:5,8
precise 38:19
prefer 8:7,11
  46:4
present 3:4 5:24
president 5:25
  13:14 16:23
  17:12,25 22:7
  28:19 29:3
  31:11 40:10,16
  41:12 45:6,18
  48:3,19 50:13
  50:16 51:21
presidents 40:15
pretty 38:7

65:19
previously 49:9
  57:17 58:4,18
  58:21 60:14
primary 27:10
  51:11
Prince 3:6 6:2
prior 17:1,5,6,11
  17:15,18,21
  18:21 48:8,12
  48:12 49:4
  60:2
privacy 9:7,10
  9:25 10:13
probably 10:8
  45:23 62:4,20
proceed 47:6
proceedings
  46:25 63:5
process 40:2,13
proclamation
  49:11
produced 5:14
profit 56:19
program 39:14
  39:19 54:4
promise 9:12
property 24:2
  43:20
provide 9:21
  16:11,16 19:9
  19:11 24:17
  54:9 55:21
  66:11
provided 17:6
provides 16:2,13
  54:18 55:17
providing 16:7
  30:25 56:8
  57:16 58:3
public 11:19
  60:15
purpose 41:21
  42:2 54:8
purposes 36:25

pursuant 5:15
put 8:2,15 27:22

**Q**
quarterly 50:4,7
  50:10
quash 4:14 12:7
question 7:12
  10:3 19:22,25
  23:18 25:15
  30:21 35:13,22
  36:5 38:16,20
  51:25 56:20
  57:8,22 58:11
  58:13 59:6
  61:18,25 62:11
  62:12 65:8
question's 15:8
  30:3 35:3
questions 46:7
  64:20,23 65:6
  65:11,16,18
quick 62:22

**R**
Rafael 2:10
raise 6:11
range 56:5 62:19
  62:19
reached 45:10
read 25:16 35:15
  35:22 42:14
  57:21 66:7
real 33:4,11 34:8
  34:9,13,14,18
  37:4 53:18
  62:22 63:13,16
  63:23 64:3,6
  64:10,15,16
really 10:21
  27:21 30:10
  37:13 39:18
  47:23 60:3
reasons 9:1
receive 22:10

29:15 49:5
received 11:18
receives 29:18
  62:9
record 10:5
  46:13 47:1
  63:6,7
recover 25:10
recruiting 24:13
  24:16,18,18,21
  25:10,25 26:4
  26:13 27:3
  36:24,25 58:19
  58:19
reduced 67:12
refer 21:25
referring 26:8
  26:12 36:12
  42:15
refuse 10:7
regard 57:12,24
regarding 51:23
Regional 40:15
registered 61:8
  61:11
regular 20:11
related 57:20
  58:25 60:24
  67:17
relationship
  18:22 49:16
relative 60:1
remember 28:11
  37:14 57:10
Remind 45:6
remote 1:16,19
  5:10
remotely 67:5
renew 37:16
rent 43:25
renting 30:24
repeat 19:25
repeating 57:3
rephrase 38:20
  41:16 51:19

58:8
report 29:12
  50:4,7
reporter 1:20
  5:6 6:10,18
  10:2,4 35:15
  35:21,23 57:21
  57:23 65:3
  66:1,2,5,9,13
  67:1,9
reports 16:19
represent 9:22
  58:22
representatives
  52:6
required 52:16
  54:23
requirements
  25:24
residence 9:2,5
  9:14
residents 54:24
resolution 52:11
responsible
  20:21
restaurant 28:15
return 29:6,11
revenue 20:13
  21:13 22:14
  25:7 31:19
  32:1 36:19
  56:6,12,15,21
review 45:23
RG21095881 1:6
  5:13
right 6:11,25
  7:25 9:10 10:8
  12:20 23:10
  27:12 28:14
  30:2 34:11
  37:24 43:21
  46:20,21,23
  49:24,24 50:1
  51:6 60:5
  61:21 64:19

66:13
Road 2:22
role 52:8 54:17
room 5:24 7:20
  8:12
Ross 2:21 5:22
  5:22 9:4,7,10
  9:18 10:10,17
  12:10 15:8
  18:2,19 19:22
  25:14,19 30:3
  30:7 32:14
  34:24 35:1,3,6
  35:11,18 38:25
  39:3,7 46:23
  47:5 57:21
  58:6,9,10 59:2
  65:5,12,21
  66:2,2,14
running 39:18
RVPs 40:11,14

**S**
Sacramento
  37:15
salary 21:4,8
  22:10 29:18
  30:17 47:17
  48:14,21 49:5
  49:8,12 62:10
  62:15
sales 27:22,23
Sam 31:1
San 2:10 40:1,6
  40:23 41:4,6
  41:12 42:12,15
  43:17
Santa 2:4,6 5:21
  40:24
SAP 39:13,16
Sarcauga 55:9
  55:11
SAVA 26:23
  63:18
says 33:16,19,20

43:4 60:8
Schnall 2:12 6:6
  65:16
seats 47:15
seceded 49:8
second 33:19
  35:23
second-amend...
  4:13 12:2
see 8:16 10:15
  16:9 23:13
  24:14 31:6
  33:17,21 60:17
  61:16 62:2,22
  63:1,10 64:2,9
seen 13:3 19:7
send 66:10
Senior 1:8 11:10
  12:8,14 13:10
  13:16,23,24
  14:14 15:3
  16:21,24 17:3
  17:5,7,12,16
  17:21 19:15,19
  20:2,10,19
  21:1,4,8,11,12
  21:17,21 22:19
  22:25 24:5
  27:15 29:6,17
  31:17 51:13
  57:12,24 58:14
  59:10
sent 12:1,19
separate 15:16
  23:8 37:6
  43:15
separately 10:3
serve 9:15
served 9:22
service 4:14 12:7
  54:18,20 57:18
  58:5
services 11:13
  15:7,13,15,23
  16:2,4,6,7,11

16:12,14,15
  17:6,9 19:8
  24:18 39:21
  55:17,18,21
  56:8 57:17
  58:4 59:17
serving 27:24
set 8:18 67:20
seven 52:13
  62:18
Seza 2:16 6:5
share 24:4 31:16
shareholder
  13:24 17:22
  19:21 20:4
  22:19 29:15,21
  42:18
shareholders
  13:22
shares 14:8 27:3
shell 61:7,11
short 45:22
shortage 24:20
shorthand 67:9
  67:9
show 33:24
showing 37:4
shown 60:10,12
side 8:1
sign 52:12 66:7
significant 62:15
similar 38:24
  44:7 45:11
sir 7:1 13:2 14:7
  17:10 20:1
  22:5,18 23:18
  24:6 28:6,21
  31:9 46:16
  47:3 49:21
  63:20
Sister 49:15
sit 63:13,24 64:3
  64:10
sits 43:14 44:15
sitting 7:25

six 62:16
six-figure 62:18
  62:19
skewed 18:9
skill 63:10
skilled 32:21,22
  33:25 34:22
  36:2,23 37:1
  38:2 39:25
  41:2 43:13
  55:18 57:19
  58:24 59:21,22
  63:11,14,24
  64:3,11
Skyline 40:1,6
  40:24 41:4,6
  41:10,12 42:12
  42:15 43:14,17
  44:24 45:1
slightly 38:25
small 56:19
smaller 56:4
Smikikian@d...
  2:19
software 39:13
  39:19
sole 17:22 19:21
  20:3 22:19
  31:16
sorry 8:19 9:4
  21:20 23:14
  24:9 25:14
  41:16 50:15
sort 25:24
source 20:13
  21:13 25:7
Sparks 11:4
  15:4,7
speak 46:13
  60:20 65:7,9
speaking 35:7
specific 35:6,9
  47:25 48:17
speech 54:22
spell 14:10

spells 14:12
spin 63:19
standpoint 21:2
started 40:5
starting 5:18
stash 65:15
state 1:4 5:11,17
  18:14 42:4
  59:8 60:19
  61:5,8
stated 67:11
states 60:2,16
stay 62:24
stock 14:3
stopped 43:1
stream 20:11
  22:13 31:19
  32:1 36:19
  56:7
street 2:5,13,17
  28:11,12,15
structure 41:19
subject 64:20,25
sublease 43:22
  44:9,23,25
subleases 44:3
subsidiary 21:19
suggests 24:21
suite 2:5,9,13,17
  14:20
summary 58:11
superior 1:1
  10:9
supervision
  67:13
support 4:14
  12:6 16:18,20
sure 8:4 10:4
  25:5 30:7
  35:23 46:4
  55:13,14 57:23
sworn 6:11,15
synonymous
  33:9
system 52:7

**T**
Tabler 1:16 3:20
  4:5 5:11 6:10
  6:13,23 7:2
  9:16 10:19
  19:24 35:13
  47:2 59:4 60:6
  61:22 63:8
  66:6 67:5
Taetz 3:6 5:25
  40:9,16 41:11
  41:20 50:12,16
  50:22 62:8
take 7:10 15:22
  44:7 45:22
  46:5 51:12
  52:8 56:6 62:1
  62:21,25
taken 3:20 5:13
  7:3,5,9 67:8
talk 8:11 35:20
  36:24 43:3
  45:12 46:9
talked 36:20
talking 38:13,14
  54:21
task 47:24
tax 16:19 29:5,6
  42:4
tell 60:13 62:5
  67:6
telling 23:15
Temple 2:17
ten 63:1
tenant 43:5
term 32:8,9
  40:18
terms 19:20 25:9
  26:11 30:14
  49:10 52:6
  61:5
testified 6:17
testify 6:15
testimony 7:14
  7:16 10:11

59:6 67:8,11
Texas 30:22,25
text 66:3
thank 6:18
  12:13 25:19
  28:18 39:7
  46:23,24 50:3
  58:9 60:6 63:3
  63:4 65:1,11
  65:17,18 66:13
  66:14
theoretically
  30:11
therapies 54:23
therapists 56:2
therapy 54:18
  54:20,21 55:17
therefrom 5:15
thereto 64:17
  67:18
thing 25:24
  33:19 46:22
  49:12
things 38:11,16
  38:24 51:11
  63:19
think 7:4 8:22
  12:10 14:13
  16:18 17:13
  18:21 19:11
  22:4 23:4,15
  28:12 29:3
  30:12 34:3
  38:13,15 39:16
  40:18,19 42:9
  42:14,15 50:10
  51:4 55:9 56:3
  56:19 57:2
  58:6 59:6,7
  61:21 64:19
  65:23,23
third 43:25,25
  44:13 56:1
three 12:1 19:19
  24:25 30:1

37:12
time 1:18 5:9
  8:22 17:22
  24:11 30:10
  32:15,16,17
  35:20 46:15
  48:2 60:1
  62:23 67:10
timeframe 18:8
  18:10 25:2
  26:19
times 7:4,7
title 33:15 47:23
  49:3 50:18
  51:5 53:23
today 7:20
Today's 5:8
told 51:25 52:1
top 41:20 62:14
Trabuco 2:22
transcript 5:14
  9:19 65:4,24
  66:3
transcripts 66:8
treaties 25:24
Tree 37:15
trouble 36:6
  49:22
true 26:20 37:17
  38:21 39:12
  45:2 56:23
  59:24 67:20
trust 14:2
truth 6:15,16,16
  67:6,6,7
try 45:24 58:11
trying 30:5
  36:14
Tuesday 1:17
  5:1,9
turn 22:1 30:20
  46:21
two 13:21 19:18
  24:24 31:13,23
  34:3 37:9,9,17

Kenneth Tabler
February 15, 2022

40:19 41:25
42:1,24 51:16
53:7 60:8
**type** 54:21
**types** 16:15,20
**typewriting**
67:12
**typically** 41:17

**U**

**ultimately** 29:17
**unclear** 42:23
**underneath**
43:10
**understand** 7:8
7:17 10:17
20:1 30:5
32:20 35:12
36:17 44:13
46:6
**understanding**
14:5
**upper** 10:23
33:22
**upper-left** 60:7
**Upperco** 10:22
10:24
**use** 14:17 23:7
28:3 36:6,12
39:16 46:11
**uses** 22:23 54:16
**Usually** 28:9

**V**

**vague** 15:8 30:4
32:15 35:8,9
59:3
**valid** 61:7
**valuable** 51:10
**various** 25:10,23
26:6,7 29:12
29:16 40:2
44:4 50:9
54:23 56:8
60:18

**versus** 5:12
**vice** 29:3 40:15
50:12,16
**video** 46:21
**videoconference**
1:16 67:6
**visas** 25:24
**vs** 1:6

**W**

**W-2s** 56:4
**want** 8:5 9:18
22:1 23:3
27:23 33:15
35:15 36:10,11
36:13 38:17
45:24 46:5,7
46:10,16 62:1
62:24 65:24
**wanted** 61:24
**Washington**
55:12
**wasn't** 18:23
**way** 25:8 30:16
38:10 67:16
**we'll** 8:6 10:6,15
13:7 28:17
33:23 47:6
62:2 64:24,24
**we're** 10:10
26:12 27:22
33:14 34:21
35:25 46:13
52:16 58:12
60:6 63:7
65:23
**we've** 19:4 36:7
36:19 45:21
58:17,20 59:7
59:13,16 60:14
**weather** 8:25
**Webb** 1:20 3:22
5:7 67:3,24
**welcome** 46:12
46:13

**West** 2:17 31:21
32:13,18 53:3
53:5 60:17
**widow** 49:15
**wife** 14:9 49:17
52:1 65:15
**within-entitled**
67:7
**witness** 4:1,3
5:23 6:14 18:4
18:20 19:25
25:20 30:8
32:17 39:8
46:4,15,20
47:3,6 59:5
62:1,23 63:3
65:13 66:11
67:4,8,11
**word** 16:1 36:7
36:12 54:14
**words** 29:10
39:4 56:21
**work** 25:13,18
27:14 30:24
54:4
**worked** 18:22
**Worker's** 54:14
**Workers'** 53:25
54:9
**world** 9:13
**wrap** 62:22 63:2
**write** 54:2 57:11
**writer** 54:1
**wrong** 10:14

**X**

**Y**

**yeah** 27:5 35:17
38:4 42:14
45:4 49:22
52:12 53:16
62:21 65:19
**year** 56:4
**years** 11:22

24:25 30:9
37:13 45:15
50:23 52:13
**young** 11:19

**Z**

**Zoom** 5:10,23
8:11,22 67:5

**0**

**1**

**1** 4:13 12:4
67:21
**10** 46:18,19
**10:57** 63:1
**1000** 2:17
**10811** 1:20 3:22
5:7 67:3,24
**11:00** 63:1
**11:11** 66:15
**12** 4:13,14,15
8:21 31:4
**1225** 2:13
**145** 2:9
**15** 1:17 3:21 5:1
5:9 11:2 60:16
**18** 26:8,9
**1980** 11:18

**2**

**2** 4:14 12:5,9
33:7,12 44:8
44:24
**20** 7:7 26:9,13
28:3 60:16
**200** 2:5
**2011** 31:4,4 39:9
39:12 60:2,3
**2012** 29:22
30:17
**2014** 16:25 17:2
17:5,11,15,18
17:21 18:2,3,4
18:11 45:6
48:3,10,20,21

49:1
**2017** 18:9
**2018** 18:9
**2021** 33:17
**2022** 1:17 3:22
5:1,9 67:21
**2025** 5:16
**211** 2:17
**213** 2:18
**25** 28:3 46:19
**257-2450** 2:18
**272-6222** 2:14

**3**

**3** 4:15 12:22,24
16:9 21:25
24:14 31:5
34:2,5 60:8
63:10 64:2,9
**3501** 2:9

**4**

**415** 2:10
**45-minute** 11:3
**454-2930** 2:6
**473-6450** 2:10

**5**

**50** 49:24
**510** 2:14
**5300** 31:1
**5440** 2:22

**6**

**6** 4:5
**65** 49:20

**7**

**701** 2:5

**8**

**831** 2:6

**9**

**9:04** 1:18 3:22
5:3,9

**Kenneth Tabler**
**February 15, 2022**

**900** 2:13
**90012** 2:18
**92620-5704** 2:23
**94612-4208** 2:14
**949-238-7775**
  2:23
**94903-4189** 2:10
**95060** 2:6
**99** 42:19

# EXHIBIT

# 6(b)

# Taetz Depo

**Page 1**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ALAMEDA

PEOPLE OF THE STATE OF          )
CALIFORNIA,                     )
                                )
          Plaintiff,            )
                                )
     -vs-                       ) Case No.: RG21095881
                                )
MARINER HEALTH CARE, INC.,      )
a Delaware corporation;         )
NATIONAL SENIOR CARE, INC.,     )
a Delaware corporation;         )
MARINER HEALTH CARE             )
MANAGEMENT CO., a Delaware      )
corporation; MARINER HEALTH     )
CENTRAL, INC., a Delaware       )
corporation; et al.             )
                                )
          Defendants.           )
_____)

VIDEOCONFERENCE DEPOSITION OF LINDA TAETZ
Wednesday, February 16, 2022

**Page 2**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ALAMEDA

PEOPLE OF THE STATE OF          )
CALIFORNIA,                     )
                                )
          Plaintiff,            )
                                )
     -vs-                       ) Case No.: RG21095881
                                )
MARINER HEALTH CARE, INC.,      )
a Delaware corporation;         )
NATIONAL SENIOR CARE, INC.,     )
a Delaware corporation;         )
MARINER HEALTH CARE             )
MANAGEMENT CO., a Delaware      )
corporation; MARINER HEALTH     )
CENTRAL, INC., a Delaware       )
corporation; et al,             )
                                )
          Defendants.           )
_____)

          Videoconference deposition of LINDA TAETZ, taken
on behalf of Plaintiff, before Viola Fedden, Certified
Shorthand Reporter No. 5586, for the State of California;
commencing at 9:08 a.m., Pacific time, on Wednesday,
February 16, 2022, taken remotely via Zoom.

**Page 3**

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:
     DOUGLAS ALLEN
     Assistant District Attorney
     701 Ocean Street, Suite 200
     Santa Cruz, California 95060
     (831) 454-2930
     Douglas.Allen@santacruzcounty.us

     ANDRES PEREZ
     Deputy District Attorney
     3501 Civic Center Drive, Suite 145
     San Rafael, California 94903-4189
     (415) 473-6450
     Aperez@marincounty.org
     LORI SCHNALL
     Deputy District Attorney
     1225 Fallon Street, Suite 900
     Oakland, California 94612-4208
     (510) 272-6222
     Lori.Schnall@acgov.org

     SEZA MIKIKIAN
     Deputy District Attorney
     211 West Temple Street, Suite 1000
     Los Angeles, California 90012
     (213) 257-2450
     Smikikian@da.lacounty.gov

**Page 4**

APPEARANCES (CONTINUED):

FOR DEFENDANTS:

     DARRYL ROSS
     Attorney at Law
     MARINER HEALTH CENTRAL, INC.
     5440 Trabuco Road
     Irvine, California 92620
     (949) 238-7775
     daross@marinerhealthcare.com


FOR SPECIALLY APPEARING DEFENDANTS MARINER HEALTH CARE,
INC., NATIONAL SENIOR CARE, INC., AND MARINER HEALTH CARE
MANAGEMENT COMPANY:

     HOOPER, LUNDY & BOOKMAN, P.C.
     Attorneys at Law
     101 Montgomery Street, 11th Floor
     San Francisco, California 94104
     (415) 875-8500
     Mclark@health-law.com
     BY:  MATTHEW CLARK

1 (Pages 1 to 4)

INDEX

EXAMINATION                                    PAGE
Mr. Allen                        6

EXHIBITS

NUMBER        DESCRIPTION                      PAGE

EXHIBIT 1     Notice of Deposition            8

EXHIBIT 2     Declaration of Linda Taetz      8

EXHIBIT 3     Mariner - California Leasehold
              Interests as of January, 2021    8

QUESTIONS NOT ANSWERED

Page    Line
6      25

INFORMATION REQUESTED

(None)

5

---

Wednesday, February 16, 2022
oooOOooo

LINDA TAETZ,

having been first duly sworn,

testified as follows:

EXAMINATION

BY MR. ALLEN:

Q.  Give us your full name and spell the last name, please, Ms. Taetz.

A.  Linda Worthen, W-O-R-T-H-E-N.  Last name Taetz, T-A-E-T-Z.

Q.  You've had your deposition taken before, I take it?

A.  Yes, I have.

Q.  About how many times?

A.  Approximately between 15 and 20.

Q.  So you understand you're under oath; that you're required to give competent testimony today; and you have to listen to the questions and be precise in your answers.  You understand all that; correct?

A.  Yes, I do.

Q.  Okay.  Where is your residence, Ms. Taetz?

6

---

MR. ROSS:  What city, Mr. Allen?  If you're asking for the address, I have an objection.

MR. ALLEN:  So I'll instruct the court reporter to mark the question, please, because I may make a motion to compel on this.  However, I'm not going to cite the witness at this point.

BY MR. ALLEN:

Q.  Next question:  What city is your residence?

A.  It is in Oxnard, California.

MR. ROSS:  Just for the record, Mr. Allen, as was discussed yesterday at Mr. Tabler's deposition, Ms. Taetz can be made available at any time through either Mr. Clark's office or my office.  And should she separate from the company, we're happy to provide her last known address at that time.

But aside from that, we would assert privacy consideration and grounds.  I know you understand the objection and appreciate you moving on.  So thank you.

BY MR. ALLEN:

Q.  Sure.  So, Ms. Taetz -- well, before I get into that, what's your educational background?

A.  I hold a master's degree from the University of Phoenix, after completing an undergraduate and graduate work at the University of Connecticut, UConn, in Storrs, Connecticut.

7

---

Q.  And the master's degree was in what?

A.  Nursing.

Q.  Nursing?

A.  Yes.

Q.  I have attached three exhibits to your deposition.  Exhibit 1 is the notice.  Exhibit 2 is your declaration.  And I'm going to ask you some questions about your declaration.  And one of those is, you have identified what I count as 18 operating companies.  They appear to be limited partnerships, all of them, of which you refer to yourself as the president; is that correct?

A.  That is correct.

(Deposition Exhibits 1, 2, and 3 were marked for identification.)

BY MR. ALLEN:

Q.  So is there a general partner in each of these limited partnerships?

A.  Yes, there is.

Q.  And who is the general partner?  I take it it varies.

A.  Yes, it does, based on the operating company, the LP.  Yes.

Q.  So in every one of these 18 operating companies, there is a corporate general partner; is that correct?

A.  There is a general partner, yes.

8

2  (Pages 5 to 8)

1   Q.  But is the general partner a corporation?

2       And feel free to refer to Exhibit 3 which is your

3   organization chart, if that helps.

4       A.  Thank you for bearing with me, as a nurse.  Yes.

5   Thank you.  There is a -- let me see what I'm looking at

6   here.  I apologize.  For each of the LPs, there is a

7   holding company, yes.

8       Q.  Okay.  Let's take this one piece at a time.  The

9   holding company, according to the org. chart, has a one

10  percent interest, which makes it a general partner.

11      A.  Yes.

12      Q.  Is that correct?

13      A.  Yes.

14      Q.  So is there a different corporation that holds

15  the other 99 percent?  It seems to be, in some cases, GC

16  Holding Company 2, LLC and the other one seems to be GC

17  Operating Company, LLC that holds the 99 percent interest,

18  according to Exhibit 3.

19      Do you see that?

20      A.  Yes, I do.

21      Q.  To the best of your knowledge; is that correct?

22      A.  Yes, it is.

23      Q.  So when you refer to yourself as the president of

24  these individual operating companies which are limited

25  partnerships, is it because you have that title in the

9

1   actual operating company?  Or to your understanding, do

2   you have that title in the holding company?

3       A.  I am the president of the operating company.

4       Is that what you're asking?

5       Q.  So I'm trying to understand the legal structure

6   here, because it gets rather complicated, and I'm trying

7   to get to your understanding specifically.

8       So in a limited partnership, as a matter of law,

9   it is not actually a corporation; it's a partnership.  It

10  has a limited partner, which we've identified as the

11  respective GC companies and then it has a general partner.

12  And in partnership, the general partner is obligated with

13  the management.

14      The general partner in these companies is the one

15  percent holder which is the operating companies that we

16  see depicted on Exhibit 3, to my understanding.

17      A.  That is correct.

18      Q.  Okay.  So my question is, do you have an

19  understanding as to whether your position as president is

20  with the actual limited partnership, that's the title

21  you've been given in that entity, or are you the president

22  of the one percent general partner which is actually the

23  general partner is the corporation managing the holding

24  company?

25      MR. ROSS:  Well --

10

1   BY MR. ALLEN:

2       Q.  Do you understand the difference?  And can you do

3   your best to explain it.

4       MR. ROSS:  Just for the record, I think perhaps

5   you misspoke in referring to the general as a

6   "corporation."  It's an LLC.

7       MR. ALLEN:  Fair enough.  That's a good point.

8       MR. ROSS:  The question remains the same.  Just I

9   would appreciate an acknowledgment that they're not

10  corporations, because those, obviously, carry different

11  responsibilities and duties.

12      MR. ALLEN:  I agree.

13  BY MR. ALLEN:

14      Q.  Let me come back and summarize and make the

15  question very specific.

16      Do you have an understanding one way or the other

17  as to whether you are the president of the holding company

18  general partner which are LLCs or are you the president of

19  the operating company?

20      A.  President of the operating company.

21      Q.  Okay.  Do you know whether or not you were named

22  as a manager of the holding companies?

23      A.  I believe I am, yes.

24      Q.  In each of the operating companies, are there

25  other officers, corporate officers, besides you as

11

1   president?

2       A.  There are none.

3       Q.  Okay.  In each of the operating companies, is

4   there a facility administrator?

5       A.  Yes, there is.

6       Q.  In each of the operating companies, is there a

7   chief of nursing?

8       A.  There is a director of nursing, yes.

9       Q.  Thank you.  And is there a social services

10  director in each of the operating companies?

11      A.  Yes, there is.

12      Q.  Are there any otherwise management positions in

13  the operating companies that I haven't identified?

14      A.  Yes, there are.  We call them department heads.

15      Q.  Okay.

16      A.  And that would be, for instance, Activities, the

17  Dietary Department, Medical Records Department.  Each

18  would have an assigned manager.

19      Q.  Is it true that all of these people that we've

20  identified, including the administrator, the director of

21  Nursing, the director of Social Services, and the

22  department heads all report to you as president?

23      A.  They really report to the administrator.  That's

24  really the structure.

25      Q.  Do the administrators report to you?

12

3 (Pages 9 to 12)

1    A.  They do not.  Not technically.  They report to
2    the governing body.
3    Q.  The governing body is whom?
4    A.  That would be the respective administrator,
5    director of Nursing, regional vice president of Operations
6    and myself.  There are four of us.
7    Q.  Who's the regional vice president?
8    A.  We had three depending on the area.  We have one
9    in the south, in Southern California, and we have two in
10   the north.
11   Q.  Can you tell me their names please?
12   A.  Yes.  Certainly.  Mr. Marlon DeGuzman is in the
13   south.  Ms. Remy Dise, D-I-S-E, is in Northern California,
14   in the East Bay.  And Ms. Kathleen Lovato, L-O-V-A-T-O, is
15   in the South Bay and has those facilities.
16       Mr. DeGuzman has all of Southern California.
17   Q.  Can you spell DeGuzman's last name, please?
18   A.  D-E capital G-U-Z-M-A-N.
19   Q.  The regional -- I'm sorry.  What was the title
20   again?  Regional directors?
21   A.  Vice president of Operations.
22   Q.  The regional vice president of Operations, with
23   what entity do they hold that title?
24   A.  That would be Mariner Health Central, Inc.
25   Q.  So what is your role as being the president of

13

1    each of these operating companies?
2    A.  I do oversee and certainly participate, but our
3    roles are very different.
4    Q.  Do you have the ability to fire the
5    administrators?
6    A.  Yes, I do.
7    Q.  Do you have the ability to fire the other members
8    of the management team of the operating companies?
9    A.  I could.  I don't, but I could.  Or have not.
10   Q.  You have a position with Mariner Health Central
11   as well; is that correct?
12   A.  That is correct.
13   Q.  Before I get onto that, yesterday, I believe it
14   was Ms. Owen that indicated that she thought there were 20
15   operating companies, operating -- or licensees, I think
16   she referred to it as.
17       Is it 20 or is it 18?  Can you explain that to
18   me?
19   A.  Certainly.  Certainly.  There are 18 operating
20   companies where the licensee is that operating company.
21   But we have two that she was referring to; one in
22   Glendale, at Glendale Adventist Hospital, where we have
23   that unit, that TCC.  And then Fruitvale Operating Company
24   is actually an LLC.
25   Q.  Are they license holders?

14

1    A.  Those are the license holders, Fruitvale, LLC and
2    also Glendale Adventist, Adventist Glendale Hospital.
3    They hold the licenses.
4    Q.  Okay.  And those two companies are operating as
5    skilled nursing facilities?
6    A.  Yes, they are.
7    Q.  Those are not listed in the 18 operating
8    companies that are mentioned in your declaration; is that
9    correct?  Or did I miss that?
10   A.  I'm checking.  Yes.  I don't see them.  I agree.
11   Q.  Are you the president of those two companies?
12   A.  Yes, I am.
13   Q.  Okay.  Do those two companies have a management
14   committee as you described with the other companies?
15   A.  Yes, they do.
16   Q.  And are they also under the joint supervision of
17   the respective regional supervisory vice president?
18   A.  Yes, they are.
19   Q.  And do you have the right to -- whether you do or
20   you don't, but do you have the right to fire people in
21   those companies as well?
22   A.  Yes, I do.
23   Q.  How long have you held -- well, what is your
24   position with Mariner Health Central, Incorporated?
25   A.  With Mariner Health Central, Inc., I am a chief

15

1    compliance officer.
2    Q.  To your understanding, is that a corporate
3    officer or is that a job title, management job title?
4    A.  That is a job title.
5    Q.  Okay.  Who is on the board of directors at
6    Mariner Health Central, to your understanding?
7    A.  I believe that that is Mr. Dennis Sarcauga and
8    Mr. Devin Ehrlich and Mr. Ken Tabler.
9    Q.  Is Mr. Sarcauga also an officer of Mariner Health
10   Central?
11   A.  Yes, I believe he is.
12   Q.  Is Mr. Tabler also the president of Mariner
13   Health Central, Inc.?
14   A.  Yes, he is.
15   Q.  And Mr. Ehrlich is a vice president as well?
16   A.  I believe he is, in addition to general counsel,
17   yes.
18   Q.  Okay.  Do you meet with and report to Mariner
19   Health Central?
20   A.  Yes, I do.
21   Q.  So according to your declaration, you meet with
22   the board of directors of Mariner Health Central.  That
23   would include Mr. Tabler, Mr. Ehrlich, and Mr. Sarcauga;
24   is that correct?
25   A.  I meet with Mr. Ehrlich and Mr. Tabler.

16

4  (Pages 13 to 16)

1  Q.  Okay.  Is Mr. Sarcauga on the board of directors?
2  A.  He —
3  Q.  I'm sorry, what?
4  A.  I'm so sorry.  I didn't let you finish.
5  Q.  I apologize.  I thought I interrupted you.  So
6  let's see if we can get this straight.
7  I may have misunderstood.  Is Mr. Sarcauga on the
8  board of directors of Mariner Health Central?
9  A.  I believe he has a title.  I'm quite sure he
10  does.  But the board of directors, per se, is really
11  Mr. Tabler and Mr. Ehrlich.
12  Q.  Okay.
13  A.  They are the board of directors.
14  Q.  All right.  Thank you.
15  A.  Sure.
16  Q.  You have the responsibility to discuss clinical
17  operations with them, I take it?
18  A.  I do.
19  Q.  And according to your declaration, you have
20  discussions with those two gentlemen, as board of
21  directors of Mariner Health Central, Inc., regarding
22  activities that are going on with the various license
23  holders?
24  A.  That is correct.
25  Q.  So in your declaration, you have indicated that

17

1  you have that discussion -- when you have that discussion
2  with the board of directors of Mariner Health Central,
3  Inc., you're having the discussion with Mr. Tabler and
4  Mr. Ehrlich; correct?
5  A.  That is correct.
6  Q.  Do you know that Mr. Tabler and Mr. Ehrlich are
7  also on the board of directors of National Senior Care,
8  Mariner Healthcare, Inc. and Mariner Healthcare Management
9  Company?
10  A.  Yes, I do.
11  Q.  So the actual physical people you're having the
12  conversation with are the same people that are the board
13  of directors of these other companies?
14  A.  That is true.
15  Q.  Have you ever spoken to Emily Grunstein?
16  A.  I have not.
17  Q.  Have you ever spoken to Harry Grunstein?
18  A.  Oh, yes.
19  Q.  You've been in your position with the company —
20  these various positions with the company, since 2006; is
21  that correct?
22  A.  Actually, 2003.
23  Q.  2003?
24  A.  Yes.
25  Q.  Over the course of the years, until his passing,

18

1  how often would you speak to Harry Grunstein?
2  A.  Could you repeat the time frame, please, for me
3  again?  From the beginning of my tenure?
4  Q.  From 2003 until he passed away, which I think
5  was -- we said yesterday it was in 2017; is that right?
6  A.  I believe so, yes.
7  Q.  As a matter of practice, what was your normal
8  number of occasions to speak with him routinely?  How
9  often would that happen?
10  A.  Initially, and I'm somewhat vague on the dates,
11  approximately 2006-2007, it was more often.  The company
12  had a different structure in regard to SAVA.
13  There was a -- when the various facilities were
14  divested, I had a different role at that point in time,
15  and I did know Mr. Grunstein, at that point, in a
16  different capacity.
17  Q.  He was actually president of more than one
18  corporation at that time; is that correct?
19  A.  I couldn't say definitely, but that was an
20  assumption on my part.  Yes.
21  Q.  And after the corporate reorganization, so that
22  we no longer have the association with SAVA, did you speak
23  with Mr. Grunstein on any regular basis?
24  A.  Generally much less, but yes, I did.
25  Approximately two or three times a year.

19

1  Q.  And on what topics would you have a conversation
2  with him?
3  A.  Similar topics to the ones you just described.
4  Clinical, high-level snapshot overview.  Also thinking
5  about compliance.
6  Q.  When you would have these conversations with
7  Mr. Grunstein, was it common to have Mr. Ehrlich and
8  Mr. Tabler present?
9  MR. ROSS:  Vague as to time.  But go ahead.
10  BY MR. ALLEN:
11  Q.  In the period of time after the reorganization of
12  the company until his passing, when you had these
13  conversations with Mr. Grunstein, was it common to have
14  Mr. Tabler and Mr. Ehrlich included?
15  A.  Yes, it was.
16  Q.  In your role as president, do you work on a
17  budget for the various operating companies?
18  A.  On occasion, I provide input, yes.
19  Q.  Do you get paid a salary from each of the
20  operating companies?
21  A.  No, I do not.
22  Q.  Do you get paid a salary from Mariner Health
23  Central, Inc.?
24  A.  Yes, I do.
25  Q.  Do you get paid a salary from any otherwise

20

5  (Pages 17 to 20)

1    entity besides Mariner Health Central, Inc.?
2        A.  No, I do not.
3        Q.  Besides having a direct conversation with her,
4    have you ever communicated with Emily Grunstein, whether
5    by e-mail, telephone, text message, anything?
6        A.  No, I have not.
7        Q.  Have you gotten messages from her repeated to you
8    from either Mr. Tabler or Mr. Ehrlich?
9        A.  Could you define "messages repeated"?  I know
10    there's documents that Ms. Owen has provided.  Other than
11    that, no.
12        Q.  So you don't recall an occasion where, for
13    instance, Mr. Tabler would say, "Well, Mrs. Grunstein
14    called me and said she wants this," or "she wants done" or
15    something like that?
16        A.  Never.
17        Q.  And I take it you've never seen Ms. Grunstein at
18    Mariner Health Central, Inc., correct?
19        A.  Never.  No.
20        Q.  Do you have any understanding that Ms. Grunstein
21    has any position with Mariner Health Central, Inc.?
22        A.  I've never heard that.  No.
23        Q.  Have you had any communications with the entity
24    known as Mariner Insurance Company, LLC?
25        A.  No, I have not.

21

1        Q.  Have you had any communications with the company
2    that provides the therapy, Bio-Pacific, LLC?
3        A.  Excuse me.  Did you say have I had contact with
4    them?
5        Q.  Well, I said "communications," but you can
6    rephrase it as "contact" if that makes you more
7    comfortable.
8        A.  Yes, I have.
9        Q.  And what is the nature of your contacts with
10    them?
11        A.  As part of the governing body, I certainly have
12    looked at the services provided by Bio-Pacific.
13        Q.  And does Bio-Pacific bill your various operating
14    companies for their services?
15        A.  My understanding is they do, yes.
16        Q.  Is all that billing and accounting for that
17    billing handled through Mariner Health Central, Inc.?
18        A.  It's handled through Mariner Health Central,
19    Inc., but also through Fundamental Administrative
20    Services, through our Operational, Administrative and
21    Clinical Support Agreement.
22        Q.  Fundamental Administrative Services also provides
23    administrative accounting services to the Mariner system
24    that you work with; is that correct?
25        A.  Yes, they do.

22

1        Q.  And you sat through the depositions yesterday,
2    both Ms. Owen and Mr. Tabler; correct?
3        A.  That's correct.
4        Q.  So to the best of my understanding, based on both
5    of those depositions, all the skilled nursing facilities
6    that are currently in the Mariner group of companies that
7    are depicted on Exhibit 3 are in California; is that
8    correct?
9        A.  That is correct.
10        Q.  Pacific and Bio-Pacific, LLC and Mariner
11    Insurance Company, LLC both provide services to those
12    California facilities and no other facilities?
13        A.  Nothing outside of California.
14        Q.  Okay.  And when is the last time -- strike that.
15            Have you ever had communication with Mariner
16    Health Central Recruiting Company?
17        A.  Yes, I have.
18        Q.  And when was the last time they provided services
19    to any of your operating companies?
20        A.  Recently.  They're providing nurses.  As was
21    discussed yesterday.
22        Q.  Okay.  And to your knowledge, that company is
23    there to provide services to your California operating
24    companies; correct?
25        A.  That is correct.

23

1        Q.  They don't provide services elsewhere?
2        A.  Not to my knowledge, no.
3        Q.  For the services of each of these three
4    companies, MHC Recruiting Company, Mariner Insurance
5    Company, LLC and Bio-Pacific, LLC, the accounting for
6    those billings and services, the payments, the invoices,
7    all that stuff is handled through the Mariner Health
8    Central administrative services, also aided by the
9    contractual services of Fundamental -- I don't remember
10    the rest of the name of Fundamental, but they're all done
11    through that same administrative accounting services;
12    correct?
13        A.  I'm not sure they're all done that way.  I
14    believe, as was discussed yesterday, the MHC Recruiting I
15    know does use a variety of outside attorneys -- two, not a
16    variety, but two attorneys.  And I do believe there's some
17    financial handling between the nurses that they provide
18    and orchestrate.  That's my understanding.
19        Q.  When a nurse is hired by one of your operating
20    companies, do you get a bill for the recruiting services?
21        A.  I don't, but my understanding is, of course, that
22    they would have one, yes.
23        Q.  And that bill would be paid through the Mariner
24    Health Central administration; is that right?
25        A.  And our outside counsel, yes.

24

1    Q.  Well, does the outside counsel work with Mariner
2  Health Central to pay the bill?
3    A.  Yes.
4    Q.  How does that work, to your knowledge?
5    A.  To my knowledge, we have the director of the HR
6  that works very closely with the two members of outside
7  counsel.  And, once again, that's orchestrated between
8  them.
9    Q.  And who is your director of HR?
10    A.  Her name is Liszel, L-I-S-Z-E-L, Justice,
11  J-U-S-T-I-C-E.
12    Q.  By whom is Liszel Justice employed?
13    A.  Mariner Health Central, Inc.
14    Q.  Is she employed by any of the individual
15  operating companies or the general partners thereof?
16    A.  To my knowledge, no, she is not.
17    Q.  Is she also employed by MHC Recruiting Company?
18    A.  To my knowledge, she is not.
19    Q.  And do you know who the outside lawyers are that
20  you're referring to that work with MHC Recruiting Company?
21    MR. ROSS:  Let me just object on relevance.  It's
22  outside the scope of jurisdictional discovery.
23    But you can answer if you know.
24    THE WITNESS:  The two, I believe, are Carmen
25  Villamor.  I think it is V-I-L-L-A-M-O-R.  In Los Angeles.

25

1  And Timothy Burns, B-U-R-N-S, and he's located in Santa
2  Cruz, California.
3    Q.  I may know him.
4    Since the reorganization of the company, up until
5  now, have you traveled to any location in Georgia,
6  Maryland or Texas or some other location outside of
7  California to meet or confer or have a meeting with any of
8  the directors of any of the other Mariner entities?
9    A.  I'm so sorry.  Directors of other entities?
10    Q.  Of the other Mariner entities, such as National
11  Senior Care, Inc., Mariner Health Care, Inc., MHC Holding
12  Company, MHC West Holding Company, Grand Care, LLC.  Have
13  you traveled to another state in order to meet or confer
14  with those other folks?
15    A.  We've had meetings before and I've certainly met
16  with both Mr. Tabler and Mr. Ehrlich at company meetings,
17  but not specific to those entities, no.
18    Q.  My specific question is in order to have those
19  meetings, as opposed to either doing it by telephone or
20  computer or doing it in California, have you actually
21  traveled to Baltimore?  Have you actually traveled
22  somewhere else?
23    A.  I'm not being difficult, but I've traveled and
24  we've had company meetings.  But if you mean have I met
25  with those entities specifically, no.  Never.  Never.

26

1    Q.  Let's find out where did you travel to?  And how
2  often would that happen?
3    A.  I've traveled to Sparks, Maryland.  I've traveled
4  to Houston, Texas for meetings.  And also, in years past,
5  to Atlanta, but not recently.
6    Q.  So do you recall having a meeting in Houston,
7  Texas with somebody regarding Mariner?
8    A.  I've worked with Ms. Owen before on projects.
9    Q.  And she lives in Houston, Texas?
10    A.  Yes, she does.
11    Q.  And did you travel out there to work with her on
12  something?
13    A.  Yes, I did.
14    Q.  And when you met with her, where did you meet?
15    A.  We met in her home, her home office.
16    Q.  Okay.  When you traveled to Houston, how many
17  times did you travel to Houston to have those kinds of
18  meetings?
19    A.  Perhaps three or four.
20    Q.  Were they always in Ms. Owen's home?
21    A.  After the SAVA, as you mentioned, change, yes.
22    Q.  And when you traveled to Baltimore, was that to
23  meet with Mr. Tabler?
24    A.  Only peripherally.  I went there to meet with
25  their compliance officer to share information the last two

27

1  times I was there.  So it was for other reasons, but his
2  office was there.  So he did stop in to say hello, yes.
3    Q.  Who was the compliance officer that you were
4  meeting with?
5    A.  Glenn, G-L-E-N-N, Hussey, H-U-S-S-E-Y.
6    Q.  And what is Mr. Hussey's position?
7    A.  He's the chief compliance officer for Fundamental
8  Administrative Services.
9    Q.  And Fundamental Administrative Services is a
10  contractor that Mr. Tabler also has an interest in -- and
11  is employed by.  But they're an independent third-party
12  that contracts for services with Mariner entities;
13  correct?
14    A.  That is correct.  By agreement, yes.
15    Q.  Okay.  Do you recall when -- well, before I get
16  off that.  When you met with Mr. Hussey, would you meet at
17  the offices of Fundamental Administrative Services?
18    A.  Yes, we did.
19    Q.  Did you ever travel to Baltimore on any other
20  occasion to meet with somebody involved with Mariner other
21  than Mr. Hussey?
22    A.  Yes, I did.
23    Q.  And when I -- I got to be careful about saying
24  "ever."
25    Let me confine that question to since the

28

7  (Pages 25 to 28)

1  reorganization where SAVA was divested?
2     A. Yes, I had.
3     Q. And with whom did you meet?
4     A. I met with Jane Moore, M-O-O-R-E -- and Jane is a
5  registered nurse -- and her team is in the Fundamental
6  Administrative Service IT Department.
7     Q. Have you met with anyone else in traveling to a
8  different state besides Mr. Hussey, Ms. Moore and Ms. Owen
9  in Texas?
10    A. At Fundamental, the offices that I just
11 mentioned, we also had Nancy Taylor who was a vice
12 president at the time of IT. We were converting to our
13 new, at the time, electronic risk documentation system.
14    Q. What is your electronic documentation system?
15    A. MatrixCare.
16    Q. And so when you say Ms. Moore is a VP of IT,
17 that's a VP of Fundamental Administrative Services?
18    A. That's correct.
19    Q. Okay. They assisted you in transitioning to the
20 MatrixCare?
21    A. They did.
22    Q. Okay. Is there anyone else that you have met
23 with outside of California regarding Mariner business
24 since the reorganization that we haven't discussed?
25    A. Not that I can think of at the moment.

29

1     Q. Fair enough. When you sat through the
2  depositions of Mr. Tabler and Ms. Owen, did you hear them,
3  to your recollection, misstate anything or make a mistake
4  that you think ought to be corrected?
5     A. Two things. I believe -- and it wasn't a
6  mistake. I believe that Mr. Tabler said he knew I was
7  president of "most" of the operating companies. I don't
8  believe he said "all" of the operating companies.
9  Operating companies that we've just discussed.
10    And the only other thing I could think of is the
11 office in Northern California for Mariner Health Central,
12 Inc. is actually in Hayward, not in Oakland.
13    Q. Okay.
14    A. And I believe it's on Foothill Boulevard. I know
15 it's Foothill Boulevard. I'm not sure of the actual
16 address, but it is on Foothill Boulevard in Hayward.
17    Q. Okay. That's the only two things that you recall
18 that you would want to correct?
19    A. Yes. The only thing I could think of at the
20 moment, yes.
21    Q. And when you would correct his answer about
22 "most," you mean to correct it that you're president of
23 all the operating companies?
24    A. Correct.
25    Q. Okay. So going back to the various holding

30

1  companies that are one percent general partners in the 18
2  operating companies, do you know whether or not you hold a
3  position in those holding companies?
4     A. The holding companies that you were referring to?
5     Q. Right. So for instance, starting on page 1 of
6  Exhibit 3, second row to the bottom. We have Driftwood
7  Hayward Holding, Skyline San Jose Holding, Verdugo Vista
8  Holding. That line there, all the way across to the
9  right, describes a number of holding companies. Not the
10 ones above it.
11    Do you know if you have a position with any of
12 those companies?
13    A. Yes. I believe I'm president of those holding
14 companies.
15    Q. Okay. You also, to your knowledge, are president
16 of the bottom line which are the operating companies; is
17 that correct?
18    A. That is correct.
19    Q. Okay. If we look at the next row above that, do
20 those things also apply to Hayward Hills Operating
21 Company, LLC and Hayward Hills Operating Company, LP? Are
22 you president of both those companies?
23    A. I believe so, yes.
24    Q. Is that also true of Autumn Hills Holding
25 Company, GP, LLC and Autumn Hills Operating Company, LP?

31

1     A. That I don't recall. I apologize.
2     Q. So you don't know whether you're president or
3  not, one way or the other; is that correct?
4     A. I believe I am, yes.
5     Q. Okay. You believe you are, but that would be
6  consistent with your understanding of the corporate
7  organization, but you don't have a specific recollection;
8  is that a fair statement?
9     A. That is a fair statement.
10    Q. Okay. Do you have a position with GC Operating
11 Company, LLC?
12    A. I don't recall at this moment.
13    Q. Do you have a recollection as to who is the
14 manager of GC Operating Company, LLC?
15    A. Was the manager?
16    Q. Well, it's an LLC, so typically we refer to the
17 person in charge as a manager, but they may have some
18 other title. But who is the person that is the
19 decision-maker for GC Operating Company, LLC, if you
20 recall?
21    A. I don't recall at this moment.
22    Q. I'm going to ask the same question. Who's the
23 person that's the decision-maker, the actual person, the
24 manager of GC Holding Company 2, LLC, if you know?
25    A. I don't recall.

32

8  (Pages 29 to 32)

1    Q. Okay. Let's move over to Inglewood Operating
2    Company GP, LLC and Inglewood Operating Company, LP. Are
3    you the president of both of those, to the best of your
4    recollection?
5    A. Yes, I am.
6    Q. And San Raphael Operating Company GP, LLC and San
7    Raphael Operating Company, LP, are you the president of
8    both of those, to the best of your recollection?
9    A. Yes, I am.
10    Q. And when we look at page 2 of the Exhibit 3, we
11    have another list on the bottom two lines that includes
12    holding companies and operating companies.
13        To the best of your recollection, you're the
14    president of each of those?
15    A. Yes, I am.
16    Q. Okay. To the best of your recollection, do you
17    have a position with GranCare, LLC?
18    A. I do not.
19    Q. To the best of your recollection, do you have any
20    position with MHC West Holding Company?
21    A. I do not.
22    Q. To the best of your recollection, do you have any
23    position with MHC Holding Company?
24    A. I do not.
25    Q. Are you familiar with the OSHPD reports?

33

1    A. Yes, I am.
2    Q. Are those generated through Mariner Health
3    Central, Inc.?
4    A. No. I believe those are generated from
5    Administrative Services at Fundamental.
6    Q. And is it Mariner Health Central that would
7    communicate the specific data for those reports to
8    Fundamental Administrative Services?
9    A. Yes, it would. Although, it's my understanding,
10    as an administrator in California, that some information
11    is just generated. Rates and so forth are generated
12    through the OSHPD report. Some are automatic, is my
13    understanding.
14    Q. But the data of profit, loss, cost expenses,
15    those kinds of things that actually deal with the
16    accounting issues that go on with the actual operating
17    companies, that's all funneled through Mariner Health
18    Central, Inc.; is that correct?
19        MR. ROSS: I'll just object to the phrase
20    "funneled." It's vague.
21        But go ahead.
22        THE WITNESS: It's my understanding it's reviewed
23    by Mariner Health Central, Inc. Yes.
24    BY MR. ALLEN:
25    Q. Just so I kind of have an understanding of how

34

1    this works, the individual companies each have their own
2    profit center and reporting center and then that
3    information would be communicated to Mariner Health
4    Central, Inc. for a combined report, set of reports, and
5    then that would go to Fundamental to finish the reporting;
6    is that correct?
7    A. That's my understanding, yes.
8    Q. Okay. My examination of you today is limited to
9    jurisdictional issues. I'm sure I would have other
10    questions, but I am getting to the end of the questions
11    related to jurisdiction.
12        I do want to thank you for your cooperation. And
13    for some of the confusion we've had between trying to set
14    up depositions in person, and that was my hope to do that,
15    to be able to sit down and talk to you face-to-face, but
16    it has been pleasant to do it this way. It saved me a lot
17    of time and energy.
18        So what I would like to do is take a break,
19    confer with my co-counsel and see if there's other
20    questions I have, but we're getting near the end here.
21        So if we could do that for 15 minutes and come
22    back at 10:20.
23        MR. ROSS: Sounds good.
24        (Recess taken.)
25    BY MR. ALLEN:

35

1    Q. Ms. Taetz, you realize you're still under oath?
2    A. Yes, sir.
3    Q. I just have a few more questions.
4        First of all, you've been looking at some things
5    in front of you. I assume that those are just the
6    exhibits that have been provided today; is that correct?
7    A. Yes, sir.
8    Q. So you don't have any other notes or anything
9    that you've been referring to?
10    A. No. I have the one from yesterday. It's the
11    same thing that you gave us in Exhibit 3, I believe.
12    Q. Okay. Thank you. Exhibit 3 is the same for all
13    three depositions.
14        I have a couple of follow-up questions on your
15    out-of-state visits to Maryland and Houston since the
16    reorganization.
17        Those were to discuss matters that pertain to
18    your California skilled nursing facilities; correct?
19    A. That is correct.
20    Q. During that period of time since the
21    reorganization, you haven't had any meetings outside of
22    the state with Fundamental or Mr. Tabler or any of these
23    other folks or Ms. Owen about somebody else's business
24    other than the skilled nursing facilities in California;
25    correct?

36

9  (Pages 33 to 36)

1    A. Correct.

2    Q. Okay. The Hayward office, what kind of an office

3    is it? The one on Foothill Boulevard. Is it a

4    self-standing building? Is it an office rented? Is it an

5    office suite shared with other officials? What kind of an

6    office is it?

7    A. It's an office in -- I think there are four in a

8    row. It's just a small office. It's the Central Billing

9    Office. I believe yesterday we're referred to it as the

10   CBO, Central Billing Office.

11   Q. Okay.

12   A. Yes.

13   Q. Are there accounting-type people that work there

14   regularly?

15   A. Yes, there are.

16   Q. Okay. And are there meetings for sales staff

17   held there too, I understand?

18   A. There's a conference room there, so other people

19   can use it if they want to, yes.

20   Q. And you have an office in Los Angeles; is that

21   right?

22   A. An office in Los Angeles?

23   Q. Is it Los Angeles? What city in Southern

24   California?

25   A. There is an HR payroll office in Monrovia, I

37

1    believe. It's right on the border, but I believe it's

2    Monrovia.

3    Q. How big is that office?

4    A. Small, very small.

5    Q. And that just does HR work?

6    A. And there is the Central Referral Office. Office

7    admissions come into that area, so there's several people

8    there that take admission calls as well.

9    Q. Okay. So the Monrovia office, is that the one

10   that just deals with HR?

11   A. Once again, I'm saying Monrovia. It's

12   probably -- it's right on the Montrose line. So it's

13   either Montrose or Monrovia. It's my understanding --

14   I've only been there once -- but it's both payroll, if you

15   will, HR -- when I say "HR," I mean payroll -- and also

16   the Central Referral Office as well.

17   Q. Do they do the interface with MHC Recruiting

18   Company or do you do that?

19   A. It's really done remotely. Our HR director that

20   I mentioned before is the one that is primarily involved

21   with them.

22   Q. Okay. And so there's a second office in Southern

23   California?

24   MR. ROSS: A "second," is that what you said?

25   MR. ALLEN: Yes.

38

1    MR. ROSS: Do you mean two Southern California

2    offices or the second --

3    BY MR. ALLEN:

4    Q. Are there two Southern California offices, is

5    what I'm getting at.

6    A. Only one, to my knowledge.

7    Q. Okay. All right. Do you personally maintain a

8    physical office somewhere?

9    A. In my home.

10   Q. Okay. And we talked about where that was. Okay.

11   A. Yes.

12   MR. ALLEN: I think that's all I have in this

13   jurisdictional deposition. So unless anybody else wants

14   to speak up, I think we can conclude this.

15   MR. ROSS: I don't have any questions. I don't

16   know if any of your colleagues do.

17   MR. PEREZ: I do not. Thank you for asking,

18   Mr. Ross. And thank you, Ms. Taetz, for your testimony

19   today.

20   THE WITNESS: You're welcome.

21   MS. SCHNALL: Thank you for your time in

22   answering the questions.

23   MR. ALLEN: Okay. I think we're ready to

24   conclude. As I said earlier, I do want a transcript,

25   including the soft transcript that Mr. Ross always asks

39

1    for as well.

2    MR. ROSS: Okay. Let's go off the record.

3    (The deposition was adjourned at 10:30 a.m.)

4    (Declaration under penalty of perjury attached on

5    following page hereof.)

40

10   (Pages 37 to 40)

Taetz, Linda
People of the State of California v. Mariner Health care, Inc.

* * * *

I do solemnly declare under penalty of perjury that the foregoing is my deposition under oath; are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions or changes to my answers that I deem necessary.

I witness thereof, I hereby subscribe my name this _____ day of _____,_____.

_____
LINDA TAETZ

41

CERTIFICATION
OF
CERTIFIED SHORTHAND REPORTER

The undersigned certified shorthand reporter of the state of Californa does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date February 17, 2022.

_____
Viola Fedden
Certifcate No.: 5586

42

CASE NAME: _____
WITNESS NAME: _____
DATE TAKEN: _____
TRANSCRIPT ERRATA SHEET
The reasons for making changes are as follow:
    1. To Clarify the record;
    2. To conform to the facts;
    3. To correct major transcription errors.

_____

PAGE    LINE    CORRECTION & REASON

_____
_____
_____.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____        _____
Signature of Deponent        Date

43

11 (Pages 41 to 43)

# EXHIBIT
# 6(c)
# Owen Depo

**Kristy Prince Owen**
**February 15, 2022**

Page 1

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA


PEOPLE OF THE STATE OF CALIFORNIA,

       Plaintiff,

vs.                                    CASE NO:
                                       RG21095881

MARINER HEALTH CARE INC., A DELAWARE
CORPORATION; NATIONAL SENIOR CARE, INC.,
A DELAWARE CORPORATION; MARINER HEALTH CARE
MANAGEMENT CO., A DELAWARE CORPORATION;
MARINER HEALTH CENTRAL INC., A DELAWARE
CORPORATION; ET. AL.

       Defendants.

                              /


REMOTE VIDEOCONFERENCE DEPOSITION OF:

       KRISTY PRINCE OWEN

DATE:  TUESDAY, FEBRUARY 15, 2022

TIME:  11:48 A.M.

PLACE:  REMOTE

REPORTER:  CONNIE WEBB, CSR NO. 10811

**Kristy Prince Owen**
**February 15, 2022**

---

Page 2

```
1
2                    APPEARANCES
3   For the plaintiff:
4   District Attorney of Santa Cruz
    DOUG ALLEN, ESQUIRE
5   Assistant District Attorney
    701 Ocean Street, Suite 200
6   Santa Cruz, California 95060
    (831) 454-2930
7   Douglas.Allen@santacruzcounty.us
8   District Attorney of Marin
    ANDRES PEREZ, ESQUIRE
9   Deputy District Attorney
    3501 Civic Center Drive, Suite 145
10  San Rafael, California 94903-4189
    (415) 473-6450
11  Aperez@marincounty.org
12  District Attorney of Alameda County
    LORI SCHNALL, ESQUIRE
13  Deputy District Attorney
    1225 Fallon Street, Suite 900
14  Oakland, California 94612-4208
    (510) 272-6222
15  Lori.Schnall@acgov.org
16  District Attorney of Los Angeles County
    SEZA MIKIKIAN, ESQUIRE
17  Deputy District Attorney
    211 West Temple Street, Suite 1000
18  Los Angeles, California 90012
    (213) 257-2450
19  Smikikian@da.lacounty.gov
20
    For the defendant:
21
    DARRYL A. ROSS, ESQUIRE
22  Mariner Health Central, Inc.
    5440 Trabuco Road
23  Irvine, California 92620-5704
    949-238-7775
24  daross@marinerhealthcare.com
25
```

Page 3

```
1                    APPEARANCES
2                    (continued)
3
4   Also present:
5   Matt Clark
    Devin Ehrlich, general counsel
6   Linda Taetz
    Kristy Prince Owen
7
8
9
10
11
12
13
14
15
16
17
18
19
20       DEPOSITION OF KRISTY PRINCE OWEN, taken on behalf
21  of the plaintiff in Eureka, California, on February 15,
22  2022, at 11:48 a.m., before Connie Webb, CSR No. 10811.
23
24
25
```

Page 4

```
1                    WITNESS INDEX
2
3   WITNESS                          PAGE
4
5   KRISTY PRINCE OWEN
    By Mr. Allen:                    7
6
7
8
9                    EXHIBIT INDEX
10
11  NO.  DESCRIPTION                 MARKED
12
13  1  Second-amended notice of deposition    8
14  2  Deponent's declaration        8
15  3  Organization chart            8
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1            TUESDAY, FEBRUARY 15, 2022
2                     • • •
3                   11:48 A.M.
4                     • • •
5
6        THE REPORTER:  Good morning, everyone.
7   My name is Connie Webb, CSR 10811, and I'm
8   located at my office in Eureka, California.  Today's date
9   is Tuesday, February 15, 2022, and the time is 11:48 a.m.
10       This is the remote Zoom deposition of Kristy
11  Prince Owen in the matter of People of the State of
12  California versus Mariner Health Care Inc., et al., case
13  number RG21095881, taken on behalf of the plaintiff.
14       This deposition and any transcript produced
15  therefrom will be handled pursuant to California CCP
16  2025.
17       Will counsel please state your appearances
18  starting with the noticing attorney?
19       MR. ALLEN:  Yes.  Douglas Allen from the Santa
20  Cruz County District Attorney's Office for the People of
21  the State of California.
22       I'm also joined by Andy Perez from the Marin
23  County District Attorney's Office, Laurie Schnall from
24  the Alameda County District Attorney's Office and Seza
25  Mikikian from the Los Angeles County District Attorney's
```

**Kristy Prince Owen**
**February 15, 2022**

## Page 6

1  Office.
2      MR. ROSS: Darryl Ross on behalf of defendants,
3  present with the witness. Matt Clark is participating by
4  Zoom. And also present on site in the deposition room
5  are Devin Ehrlich, general counsel; and Linda Taetz as
6  designee on behalf of the operating companies named in
7  this lawsuit.
8      THE REPORTER: Okay. And Ms. Prince Owen, if
9  you could raise your right hand to be sworn?
10
11      KRISTY PRINCE OWEN,
12  a witness called on behalf of the plaintiff,
13  having been first duly sworn to testify to the truth,
14  the whole truth, and nothing but the truth, was
15  examined and testified on her oath as follows:
16      THE REPORTER: Thank you.
17      MR. ROSS: And Mr. Allen, before we start, is
18  it possible to pull the boom mic part maybe a little bit
19  closer? You're a little more faint.
20      Okay. Let's try that. Thank you.
21      MR. ALLEN: Yeah. Tell me if I'm having any
22  issues with audio.
23  ///
24  ///
25  ///

## Page 7

1          EXAMINATION
2
3  BY MR. ALLEN:
4      Q   Can you hear me, Miss Owen?
5      A   I can hear you, yes. Thank you.
6      Q   All right. So I was going to -- I have all
7  these nice copies of your declaration that you -- all 378
8  pages of it that you filed in the superior court action.
9      A   Okay.
10      Q   Could we agree to make that -- well, I'm going
11  to refer to it today. We'll discuss at the conclusion.
12      You want to make it an exhibit of this
13  transcript? It's an awful lot of pages. But it would
14  make more sense since I'm going to ask her a few
15  questions about the declaration.
16      MR. ROSS: So, Mr. Allen, the declaration
17  itself, at least on the copy I've printed out, appears to
18  be 11 pages. And then the rest are supporting exhibits,
19  correct? So perhaps, we should just attach the
20  declaration. And if you feel it's -- if you feel it's
21  necessary to refer to or attach any particular portion of
22  those exhibits, then perhaps, we could do it that way.
23      But I do agree the -- the complete declaration
24  is voluminous, probably unnecessary. And I do have a
25  clean copy of it, no annotations, that Ms. Owen can look

## Page 8

1  at here at the proceeding today.
2      MR. ALLEN: If -- I'm fine with that if you
3  could then, at the conclusion of this proceeding, scan
4  that and send it to the court reporter so we have a clean
5  copy as Exhibit 1.
6      MR. ROSS: Sure.
7      MR. ALLEN: And let's also attach the
8  organization chart that we referred to in Mr. Tabler's
9  deposition as Exhibit 2.
10      MR. ROSS: And for consistency sake, did you
11  want to attach the amended deposition notice?
12      MR. ALLEN: Well, that -- maybe we should do
13  that. Let's -- let's redo these numbers.
14      Sorry, Madam Court Reporter -- Connie.
15      So let's make the deposition -- second-amended
16  deposition notice or amended, whatever it says on it,
17  Exhibit 1.
18      (Exhibit 1 marked.)
19      MR. ALLEN: We'll make the declaration, without
20  exhibits, Exhibit 2.
21      (Exhibit 2 marked.)
22      MR. ALLEN: And we'll make the organization
23  chart, which is one of the exhibits to the declaration,
24  as Exhibit 3.
25      (Exhibit 3 marked.)

## Page 9

1      MR. ROSS: Very well.
2      Q   (By Mr. Allen) Okay. So Miss Owen, you're an
3  attorney licensed to practice law?
4      A   I am not.
5      Q   Are you an attorney?
6      A   I am not.
7      Q   That's right. I did read that.
8      So what is your educational background?
9      A   I just attended college, never graduated.
10      Q   Which college was that?
11      A   I went to University of Houston, San Jacinto
12  Junior College and Houston Community College.
13      Q   Okay. And you didn't get your AA or your BA
14  from any of those?
15      A   I did not.
16      Q   Okay. You took a position in 2016 with Mariner
17  Health Central, Inc., correct?
18      A   I've been employed with them longer than that.
19      Q   Okay. When did you first become employed with
20  Mariner Health Central, Inc.?
21      A   Mariner Health Central was -- I think we
22  switched my employer then in late 2006, early 2007. But
23  prior to that, I worked for another entity starting in
24  2002.
25      Q   And what entity was that?

**Kristy Prince Owen**
**February 15, 2022**

---

Page 10

1    A    Mariner Health Care Management Company.
2    Q    Okay.  Is that the same Mariner Health Care
3    Management Company that we see as -- if you look on
4    Exhibit 3, that extends from a line away from Mariner
5    Health Care, Inc.?
6    A    Yes, that's correct.
7    Q    Okay.  Mariner Health Care Management Company
8    used to do a lot of the administrative function that is
9    now done by Mariner Health Central, Inc.; is that
10   correct?
11   A    They were -- they were a management company at
12   one point, yes.
13   Q    That was -- that involved the larger network of
14   companies that were since divested as well as the
15   California companies that we see on Exhibit 3?
16   A    That is correct.
17   Q    Okay.
18        You sat through the entirety of Mr. Tabler's
19   deposition, did you not?
20   A    I did, yes.
21   Q    Did you happen to notice anything erroneous
22   about his answers, whether he made a mistake or said
23   something incorrect about the state of any of the
24   entities that we discussed?
25   A    Yes.  There were a couple of things.

---

Page 11

1    Q    Can you identify those for me, please?
2    A    Sure.  One of them is the officers for several
3    of the entities, at one point or another, had additional
4    officers.
5    Q    Lets take these one at a time.
6    A    National Senior Care.
7    Q    National Senior Care?
8    A    Correct.  Do we want to limit it to a
9    timeframe, per se, because, you know, some of these go
10   back years.  So...
11   Q    Well -- well, let's pin that down so we can be
12   precise.  So as to National Senior Care today, did he
13   correctly describe the officers and directors?
14   A    Yes, he did.
15   Q    Okay.  And that would be Mr. Tabler and
16   Mr. Ehrlich.
17        And was there a time when that changed, so that
18   sometime before that date when the change took place,
19   there were other officers?
20   A    Yes.  Yes.
21   Q    And what was that date?
22   A    Well, there's -- there's a few dates.  Because
23   Mr. Grunstein and Mr. Ehrlich were officers of that
24   entity starting, I believe, in 2004 in the acquired
25   Mariner Health Care, Inc.

---

Page 12

1    Q    Okay.
2    A    And also at one time, Christine Zack was, I
3    believe, executive vice president from September 2014 to
4    December 2017.
5    Q    Okay.
6    A    And that same -- that same information would
7    apply to Mariner Health Care, Inc., MHC Holding Company,
8    MHC West Holding Company, GC Operating Company, LLC, GC
9    Holding Company 2, LLC, Grand Care, LLC.
10        And she was also an officer of Mariner Health
11   Central from that time period as well, Ms. Zack was.
12        Oh, and I believe he may have stated that
13   Miss Taetz was a officer of Mariner Health Central; she
14   is not and has not been.
15   Q    She is not an officer of Mariner Health
16   Central?
17   A    No, she is not.
18   Q    Does she hold a title of chief compliance
19   officer?
20   A    Yes, she does.
21   Q    But that's not considered an actual corporate
22   officer?
23   A    Correct.
24   Q    Okay.  Let me go digress for a moment.
25        Can -- prior to becoming affiliated with any

---

Page 13

1    entity owned or associated with Mariner or the
2    Grunstein's, what was your work experience?
3    A    Prior to --
4    Q    I can't hear you.  That -- that answer failed.
5        Okay.  Let's try that again.
6    A    Prior to working to -- prior to when
7    Mr. Grunstein's company acquired the company?
8    Q    Yes.
9    A    Is that what you're asking?
10   Q    Yes.
11   A    Well, I worked for Mariner -- as I stated
12   earlier, Mariner Health Care Management Company from, I
13   think it was, 2002 to 2006 or '07, is when we switched to
14   Mariner Health Central.  So I was -- if I recall
15   correctly -- it's been a while.  I think I was senior
16   paralegal of insured litigation, I think was my title at
17   some point back then.
18        Prior to that, do you want me to go back
19   further?
20   Q    Yeah.  I'm trying to get -- get through this,
21   but get a summary of your background so I kind of
22   understand --
23   A    Okay.
24   Q    -- where your expertise comes from?
25   A    I am -- prior to that, I think I worked at a

---

**CAL Reporting 925-425-9669**

**Kristy Prince Owen**
**February 15, 2022**

## Page 14

1　couple of law firms for a couple of years as a paralegal
2　and doing med-mal litigation.
3　　　Prior to that for, like, eleven years, I owned
4　by my own business that was a record service company,
5　process serving company and video deposition company.
6　And prior to that, I worked at a company that did the
7　same things.
8　　Q　Okay. And when you came into the Mariner group
9　of companies, was your role to work in relation to
10　litigation -- liability litigation, things like that?
11　　A　Correct. And actually, I apologize. There was
12　a time in '98/'99, I also worked for a Mariner company --
13　entity that actually was a Living Center. And they
14　acquired Mariner at that time. I worked as a paralegal
15　there as well in the regulatory side.
16　　Q　How did you happen to get hired into the
17　Mariner companies? Did you know somebody? Did you
18　respond to a job announcement? How did that happen?
19　　A　A friend of mine actually worked at the Living
20　Center/Mariner -- just do the two together. And the
21　regulatory paralegals -- regulatory attorney paralegal
22　was on maternity leave. I had sold my business and was
23　being a school mom. And he needed help, and so he asked
24　Tommy if she knew anyone. And she said me and here I am.
25　　Q　So you've been through a lot with the Mariner

## Page 15

1　companies, including the original creation acquisition
2　when they had something like 170 nursing homes, all that
3　stuff; is that right?
4　　A　I think we had 200-and-some when I first
5　started, yes. Uh-huh. Yes.
6　　Q　So those -- those -- a number of entities and
7　those other skilled nursing homes that are outside of
8　California, they were all divested at some point from the
9　entities we are looking at on Exhibit 3?
10　　A　Correct. Yes.
11　　Q　When did all that happen?
12　　A　It varied from 2004 and -- I think our last
13　divestiture outside of California was 2010, I think, if I
14　recall correctly.
15　　Q　Okay.
16　　A　Uh-huh.
17　　Q　The -- where is Christine Zack now?
18　　A　Last I heard, she was working for Easter Seals,
19　but I don't know if she's still there or not.
20　　Q　Okay. So did you put this chart together,
21　Exhibit 3?
22　　A　No. That organization chart is compiled by
23　our -- an outside counsel for us.
24　　Q　Okay.
25　　A　Uh-huh.

## Page 16

1　　Q　The -- does the -- whether -- let me put it
2　this way, whether as -- functioning as merely a holding
3　company with no employees, no real estate, et cetera, as
4　you heard described by Mr. Tabler, or whether we get down
5　to the actual operation companies and the administrative
6　work done by Mariner Health Care, Inc. and including the
7　work done by the function of buyouts from Pacific and one
8　it used to do -- or no, it still does -- and Mariner
9　Insurance and Recruiting, all of that is directed toward
10　the skilled nursing facilities in California; is that
11　correct?
12　　A　The current chart -- so I look at it as these
13　are the -- you know, if you start at the bottom and go
14　all the way up to the top that you see on there, that is
15　also associated with the facilities in the State of
16　California, yes.
17　　Q　Okay. And there's no facilities outside of
18　California they're associated with?
19　　A　No -- well, no. So -- as noted in the little
20　box, Mariner Health Care Inc. does own some direct and
21　indirect subsidiaries outside of the State of California;
22　however, they are not doing any kind of business
23　whatsoever.
24　　Q　And how long has that been the case where they
25　haven't been doing any business whatsoever?

## Page 17

1　　A　So it would vary on the divestiture dates of
2　the state and when we got, you know, divested certain
3　facilities in certain states.
4　　Q　When was the last time they were doing any
5　business outside of California?
6　　A　Again, if I could recall correctly, I believe
7　it was 2010.
8　　Q　Okay. Attached to your exhibit are
9　administrative clinical and operational support
10　agreements. There's more than one.
11　　A　Yes.
12　　Q　Is there an agreement similar to that for every
13　one of the operating companies between the operating
14　company and Mariner Health Central, Inc.?
15　　A　Correct. Yes.
16　　Q　Okay. And --
17　　A　Well, let's define "operator companies." I
18　refer to them as the licensees of the building, because
19　GC Operating Company is a -- has the word "operating" in
20　it. But it does not have an administrative support
21　agreement with Mariner Health Central.
22　　Q　Okay. At this point in time, GC -- we have GC
23　Holding Company. Do we have GC Operating Company?
24　　　Yeah, we do. GC Operating Company, does that
25　do any business now other than hold these other

**CAL Reporting 925-425-9669**

**Kristy Prince Owen**
**February 15, 2022**

## Page 18

1  companies?
2      A   Not to my knowledge.
3      Q   Okay.  And to the best of your knowledge,
4  Mr. Tabler's correct, there's no real estate holdings by
5  any of the companies on Exhibit 3?
6      A   That is correct.
7      Q   Ownership.  There are lease holds, but not
8  ownership --
9      A   Correct.
10      Q   -- correct?
11      A   Correct.
12      Q   Okay.
13      A   Uh-huh.
14      Q   And all those lease holds involved the skilled
15  nursing facilities in California?
16      A   Yes.  The leases are to operate out of a
17  skilled nursing facility building.
18      Q   Except for the one exception to that would be
19  the nominal office on the law firm in Georgia that is
20  maintained.  Apparently, there's some kind of lease
21  agreement involved there?
22      MR. ROSS:  Now, I -- I would just object to the
23  term "nominal" as somewhat vague.  But go ahead, please.
24      THE WITNESS:  Yeah.  So we do have an office in
25  Georgia that Mr.Ehrlich goes to.  So we have a lease

## Page 19

1  there as well, yes.
2      Q   (By Mr. Allen) That's the same office in
3  Georgia that you heard described by Mr. Tabler?
4      A   Correct.
5      Q   Mr. Ehrlich maintains an office there?
6      A   Yes, he does.
7      Q   Anything other than a single office?
8      A   I do not know the answer to that.
9      Q   Pardon me.  I'm going to take another --
10      A   Uh-huh.
11      Q   -- excuse me -- lozenge.
12      Now, you describe yourself in your declaration
13  as the director of legal affairs for Mariner Health
14  Central, Inc.?
15      A   Yes.  That is my title.
16      Q   Is that an officer position?
17      A   No.  I am not an officer of any of the
18  entities.
19      Q   Okay.  Do you have the ability to hire and fire
20  anybody?
21      A   Yes.  I can hire help if I need it, yes.
22      Q   Okay.
23      A   Uh-huh.
24      Q   And by whom were you retained?
25      A   Oh, years ago.  I believe it was -- I believe

## Page 20

1  it was Ms. Whittle.  Susan Whittle hired me.
2      Q   What was her position at the time?
3      A   I believe she was general counsel at the time.
4      Q   Okay.  When you report to somebody, to whom do
5  you report?
6      A   I report to Mr. Ehrlich.
7      Q   Okay.
8      Mariner Health Care Management Company, Mariner
9  Health Care, Inc., and National Senior Care, Inc., do not
10  own any real property, period.  Is -- that's correct,
11  right?
12      A   Correct.
13      Q   Okay.
14      As to those three companies, the only office
15  they have is the office in Georgia?
16      A   Correct.
17      Q   As to those companies -- we just talked about
18  this -- but they don't own or possess any real property
19  at all?
20      A   No.
21      Q   They don't hold mortgages.  They don't have
22  loans.  They don't have any of those things.  All they
23  own is the shares of the company as depicted on the
24  organizational chart?
25      MR. ROSS:  Object.  It's compound.

## Page 21

1      MR. ALLEN:  It is.
2      THE WITNESS:  Not to my knowledge, no.
3      Q   (By Mr. Allen) Okay.  I'm referring
4  specifically to paragraph four.
5      A   Of my declaration?
6      Q   In your declaration, Exhibit 2.
7      A   Yes.
8      Q   And -- and paragraph seven.
9      At one point, Grand Care, LLC actually held the
10  licenses for the skilled nursing facilities; is that
11  correct?
12      A   That's correct.
13      Q   And then that was changed to the operating
14  companies?
15      A   Correct.
16      Q   Do you know why that was done?
17      A   I believe it had to do with insurance purposes
18  and requirements under -- HUD requirement.
19      Q   So I'm not -- paragraph 12 says:  Fruitvale
20  Long-term Care, LLC is not affiliated with the corporate
21  structure of Mariner Health Care Management Company,
22  Mariner Health Care, Inc. or National Senior Care.
23      Exactly to what are you -- what do you mean by
24  not affiliated with?  I mean, what would -- it's a little
25  vague.  I'm not quite sure what you're saying there.

**Kristy Prince Owen**
**February 15, 2022**

## Page 22

1    A    It is not a -- it is not in the Mariner family
2    of companies, for lack of a better way to put it.  It's
3    a -- it's a totally other company owned by somebody else
4    not owned by any of our entities.
5    Q    Okay.  Is it on the org chart?
6    A    No, it would not be.
7    Q    Okay.  That was named as a defendant in the
8    complaint; is that correct?
9    A    You're asking me?
10    Okay.  Yes.  I believe it is part of the -- the
11    defense list -- defendant list.
12    Q    That's why you brought it up in the
13    declaration; is that right?
14    A    Sure.  I would have to ask my attorney why we
15    brought it up, but --
16    Q    Okay.
17    A    -- that's --
18    Q    All right.  That's fair enough.  Fair enough.
19    A    Yeah.
20    Q    Well, I can explain more of that off the
21    record.  We don't need to waste the record for it.
22    So there's also associate agreements attached
23    to the -- they're part of the exhibits to your
24    declaration, business associate agreements.  Those are
25    standard agreements to ensure that anybody that signs 'em

## Page 23

1    is obligated to maintain the confidentiality of patient
2    records under HIPPA; is that correct?
3    A    Correct.  Yes.
4    Q    Have you ever met any member of the Grunstein
5    family?
6    A    Yes.
7    Q    Who?
8    A    I have met Mr. Grunstein.
9    Q    Which one?
10    A    Harry.  I may have met Lenny, but I'm not
11    exactly sure if I recall that correctly.
12    Q    Okay.  Have you ever met Emily?
13    A    I have not.
14    Q    Have you ever spoken to her on the phone?
15    A    No.
16    Q    Have you ever had an email communication with
17    her?
18    A    Yes.
19    Q    What type of communication?  Have you had the
20    occasion to email with her?
21    A    It -- my typical correspondence with
22    Ms. Grunstein is to do with getting documents signed by
23    her in order to -- one was to update her as the owner of
24    the company.  And if we had the change of ownerships --
25    like, from when we went -- a few facilities after she

## Page 24

1    became the owner -- went from Grand Care, LLC to their
2    separate operating entity, she had documents that she
3    needed to sign.  And I would forward those to her.
4    Q    Did she have a direct ownership interest in the
5    Grand Care company at the time?
6    A    No.  But the state requires all the -- all the
7    way up -- documentation from all the way up to the
8    hierarchy when you do a change of ownership.
9    Q    Okay.  I understand.
10    So did we touch on all the things that you
11    caught in Mr. Tabler's testimony that he may have made
12    some mistakes on?
13    A    I think so.  That's all I recall at the moment.
14    Q    Okay.
15    A    But, yeah.
16    MR. ROSS:  Was there anything regarding Bio
17    Pacific?
18    THE WITNESS:  I'm not sure what his testimony
19    was regarding officers of Bio Pacific, but it is just
20    Mr. Sarcauga, Dennis Sarcauga and Marilyn Washington.  No
21    others are officers of that entity.
22    Q    (By Mr. Allen) Okay.
23    A    Just in case he mentioned others.
24    Q    And there -- the function of that company is
25    provide therapy services to the skilled nursing

## Page 25

1    facilities in California?
2    A    Correct.
3    Q    Okay.
4    MR. ALLEN:  Let me take a break and see if
5    there's more that I need to ask you, keeping in mind this
6    is limited to jurisdiction.
7    And before I take that break, let me apologize
8    that -- if we've inconvenienced you to the extent that
9    this deposition ends up short, let's hope we call that a
10    blessing and not otherwise.
11    THE WITNESS:  Yes.
12    MR. ROSS:  We'll stipulate to it.  How long
13    would you like, Doug?
14    MR. ALLEN:  Give me 15 minutes.
15    MR. ROSS:  Thank you.
16    MR. ALLEN:  So let's come back about -- let's
17    see.  We'll make it -- we'll make it -- let's make it --
18    let's make it 12:40.  Give it 19 minutes.
19    MR. ROSS:  Okay.
20    MR. ALLEN:  Okay.)
21    (Pause in proceedings.)
22    MR. ALLEN:  Let's go back on the record.
23    Q    (By Mr. Allen) Ms. Owen, in the organizational
24    chart -- incidentally, I didn't ask you, have you been
25    deposed before?

7  (Pages 22 to 25)

**Kristy Prince Owen**
**February 15, 2022**

<table>
<tr><td>

Page 26

1  A  Yes, I have.
2  Q  How many times?
3  A  Probably similar to Mr. Tabler, at least 20 or
4  more.
5  Q  You know that you're under oath and obligated
6  to let me know if you don't understand my questions,
7  things like that, right?
8  A  Yes, I do.
9  Q  Okay.  So on the organization chart, we have a
10  line from Mariner Health Care, Inc., down to Mariner Health
11  Care Management Company and then down to Mariner Health
12  Central, Inc.
13     Is that a line, to your knowledge, that
14  indicates ownership?
15  A  Yes.  So Mariner Health Care Management Company
16  owns Mariner Health Central, Inc., yes.
17  Q  Okay.  So Mariner Health Care Management
18  Company, however, doesn't own anything other than Mariner
19  Health Care, Inc., to my understanding.
20     That's correct?
21  A  Correct.
22  Q  I'm sorry.  What?
23  A  Correct.
24  Q  Okay.  Mariner Health Care -- excuse me --
25  Mariner Health Central, Inc. --

</td><td>

Page 28

1  A  I believe they -- oh, sorry.
2     Yes.  They do assist with that as well.
3  Q  Does Mr. Sarcauga -- can you pronounce his name
4  for me?  I always get it wrong.
5  A  Sarcauga.
6  Q  Sarcauga.  Thank you.
7  A  Uh-huh.
8  Q  Does he -- he is employed by Mariner Health
9  Central, Inc., is he not?
10  A  He is.
11  Q  What's his position with Mariner Health Central
12  Inc.?
13  A  I think he's executive vice president of
14  operations, I believe is his title.
15  Q  And is -- does he -- to your knowledge, does he
16  give direction to the administrators of the licensees?
17     MR. ROSS:  Objection.  Vague.  Go ahead.
18     THE WITNESS:  I'm sure he does.  But --
19  Q  (By Mr. Allen)  Okay.
20  A  -- you'd have to be more specific on --
21  Q  Okay.  In terms of the lines that go down from
22  National Senior Care, Mariner Health Care, Inc., MAC
23  Holding Company, MAC West down to Grand Care, LLC and
24  then to GC 2 and then over to GC Operating Company and
25  on, those are lines of ownership; is that -- am I

</td></tr>
<tr><td>

Page 27

1  A  Well, I apologize.  Mariner Health Care
2  Management Company does own MHC Recruiting Company as
3  well.  Sorry.
4  Q  Very good.  Okay.  We talked about that in
5  Mr. Tabler's deposition.
6  A  Yes.
7  Q  Mariner Health Central, Inc. does the
8  administrative functions for the operating companies,
9  correct?
10  A  For the licensees, yes, of the facilities, yes.
11  Q  Okay.  Does that include payroll?
12  A  Yes.  They assist in payroll.
13  Q  Includes tax preparation, things of that
14  nature?
15  A  That is part of the contract, yes.
16  Q  Okay.  And does it include any assistance in
17  personnel retention or personnel management?
18  A  We employ HR services if they -- if they
19  request it, yes.
20  Q  Okay.  So Mariner Health Central, Inc.'s
21  revenue all comes from providing those administrative
22  services to the license -- license holders?
23  A  That is my understanding, yes.
24  Q  And do you know if Mariner Health Central
25  provides any budget or budgetary assistance to --

</td><td>

Page 29

1  understanding the organizational chart properly?
2  A  That -- yes.  That's how I would phrase it,
3  yes.
4  Q  And do you know why the title of the chart is
5  Mariner California Leasehold Interest as of January 2021?
6  A  No.  That was named like that by outside
7  counsel.  So I'm not sure why they named it that.
8  Q  Oh, okay.
9     To your knowledge, is any of Mariner Health
10  Central's revenue stream passed on up to Mariner Health
11  Care Management Company now?
12  A  Not to my knowledge, no.
13  Q  Okay.  So not up to any of the other entities
14  either; is that correct?
15  A  That would be my -- that would be correct, yes.
16  Sorry.
17  Q  Okay.  Other than doing change of ownership --
18  other than doing change of ownership records, do you
19  recall having communications with Emily Grunstein to get
20  her to sign things?
21  A  No.  It was for -- well, initially, I think I
22  had to get the -- the will and death certificate to see
23  who was the -- who the company was left to.  So that was
24  probably my first step.  And then it was all -- all still
25  ultimately related to the change of ownership.  And

</td></tr>
</table>

8  (Pages 26 to 29)

**Kristy Prince Owen**
**February 15, 2022**

---

Page 30

1  that's really the only correspondence I've had with her.
2  Q   Okay.
3      Are you aware of any plans to acquire other
4  property in the Mariner system outside of California?
5  For instance, there's these other entities that are still
6  out there that are being kept current.
7      Do you -- are you aware of if there's
8  some -- some plan or intention to acquire other
9  facilities or entities or operations elsewhere?
10  A   I am not.
11  Q   Okay.  Well, I think -- so with each of these
12  operating companies, the operating companies are the
13  license holder that you're referring to, correct?
14  A   Correct.  With -- other than the Fruitvale, it
15  doesn't -- Fruitvale Operating doesn't own the license.
16  Q   Okay.
17  A   It manages -- and Glendale.
18      (Court reporter interruption.)
19      THE WITNESS:  And Glendale.  And Glendale.
20  Q   (By Mr. Allen) Fruitvale and Glendale are just
21  management companies.
22      Who holds the license in those two?
23  A   So for the Fruitvale one, it would be that
24  Fruitvale Long-term Care, LLC.  And for Glendale, I
25  believe it's -- I get it backwards sometimes -- Adventist

---

Page 31

1  Glendale or Glendale Adventist Hospital.  It's one of
2  those two.
3  Q   Okay.  These various holding companies we see,
4  such as Driftwood Hayward, Skyline San Jose, Driftwood
5  Santa Cruz, San Marcos Holding, Monterey Palms Holding,
6  Almaden Holding, do they do anything other than just be
7  the general partner in the operating companies?
8  A   No.  They don't do anything else.
9  Q   And with regard to the holding companies, is
10  that -- the person that functions for the holding company
11  in acting as a general partner, would that be Linda
12  Taetz?
13  A   She's the president of those entities as well,
14  uh-huh.
15  Q   Okay.  So if the -- if San Marcos Holding
16  Company was going to do some function as a general
17  partner of San Marcos Operating Company, that would --
18  the literal aspect of that would be Linda Taetz would do
19  something; is that right?
20  A   I don't -- I don't know the legalities of that,
21  whether it's the entity or the president.  So I'm not
22  sure how to answer that.
23  Q   Well, I'm actually looking more for your
24  understanding of the practical aspect of it.  Does the
25  holding company really serve any function other than just

---

Page 32

1  being a holding company and a conduit of ownership
2  between it and companies above, to your knowledge?
3      MR. ROSS:  Object to the extent it calls for a
4  legal conclusion.  But I believe he asked just for your
5  knowledge.  So...
6      THE WITNESS:  Correct.  It just serves as the
7  holding company --
8  Q   (By Mr. Allen) Okay.
9  A   -- or the general partner, yes.
10  Q   Do you know if the holding companies have
11  separate insurance policies?
12  A   They do not.
13  Q   Do you know if National Senior Care has a
14  separate insurance policy?
15  A   It does not.
16  Q   Is that true also of Mariner Health Care, Inc.
17  and Mariner Health Care Management Company?
18  A   That is true.
19      MR. ALLEN:  Well, I -- I think, frankly, you're
20  a wealth of knowledge.  But I don't really see that we
21  need to continue this any further because I think we've
22  discussed the companies and the -- in so far as it
23  relates to jurisdictional matters.
24      So unless one of my compatriots has another
25  question, I think I should -- burning question I should

---

Page 33

1  have asked, I don't have any more questions.
2      MR. ROSS:  None here, Doug.  Thank you.
3      MS. SCHNALL:  No, thank you, Doug.
4      MS. MIKIKIAN:  No, thank you, Doug.  You
5  covered them.  Thank you.
6      MR. ALLEN:  Well, I'm glad we got this out of
7  the way.  And once again, I apologize for the
8  inconvenience of -- of the arrangements.  But hopefully,
9  this will assist you.  And with that --
10      MR. ROSS:  All right.  Thank you very much.
11      MR. ALLEN:  Again, reading and signing handled
12  through your counsel?
13      THE WITNESS:  Yes, please.  Thank you.
14      MR. ALLEN:  I do want a transcript and
15  condensed copy.
16      MR. ROSS:  Okay.  And I will send the exhibits
17  as we discussed, and I'll copy you, Doug.  And I'd like
18  the same order on this transcript, please, Madam
19  Reporter.
20      THE REPORTER:  Okay.  Thank you.
21      MR. ROSS:  All right. `
22      MR. ALLEN:  Thank you.
23      (Deposition concluded at 12:52 p.m.)
24          • • •
25

---

9  (Pages 30 to 33)

**Kristy Prince Owen**
**February 15, 2022**

Page 34

 1                    CERTIFICATE OF REPORTER

 2

 3        I, CONNIE WEBB, CSR NO. 10811, hereby certify that

 4   the witness in the foregoing deposition, KENNETH

 5   TABLER, has duly affirmed, remotely via Zoom

 6   videoconference, to tell the truth, the whole truth,

 7   and nothing but the truth in the within-entitled cause;

 8   that the testimony of said witness was taken down in

 9   shorthand by me, a Certified Shorthand Reporter and a

10   disinterested person, at the time and place herein

11   stated, and that the testimony of the said witness was

12   thereafter reduced to typewriting, by computer, under

13   my direction and supervision;

14        I further certify that I am not of counsel or

15   attorney for either or any of the parties to the said

16   deposition nor in any way interested in the outcome of

17   this case, and that I am not related to any of the

18   parties thereto.

19        I hereto declare under penalty of perjury that the

20   foregoing is true and correct.  I have hereunto set my

21   hand on March 1, 2022.

22

23

24
                          CONNIE WEBB, CSR NO. 10811
25

**A**

a.m 1:19 3:22
5:3,9
AA 9:13
ability 19:19
acquire 30:3,8
acquired 11:24
13:7 14:14
acquisition 15:1
acting 31:11
action 7:8
actual 12:21
16:5
additional 11:3
administrative
10:8 16:5 17:9
17:20 27:8,21
administrators
28:16
Adventist 30:25
31:1
affairs 19:13
affiliated 12:25
21:20,24
affirmed 34:5
ago 19:25
agree 7:10,23
agreement 17:12
17:21 18:21
agreements
17:10 22:22,24
22:25
ahead 18:23
28:17
al 1:10 5:12
Alameda 1:2
2:12 5:24
Allen 2:4 4:5
5:19,19 6:17
6:21 7:3,16 8:2
8:7,12,19,22
9:2 19:2 21:1,3
24:22 25:4,14
25:16,20,22,23
28:19 30:20

32:8,19 33:6
33:11,14,22
Almaden 31:6
amended 8:11
8:16
ANDRES 2:8
Andy 5:22
Angeles 2:16,18
5:25
annotations
7:25
announcement
14:18
answer 13:4
19:8 31:22
answers 10:22
anybody 19:20
22:25
Aperez@mari...
2:11
apologize 14:11
25:7 27:1 33:7
Apparently
18:20
appearances 2:1
3:1 5:17
appears 7:17
apply 12:7
arrangements
33:8
asked 14:23 32:4
33:1
asking 13:9 22:9
aspect 31:18,24
assist 27:12 28:2
33:9
assistance 27:16
27:25
Assistant 2:5
associate 22:22
22:24
associated 13:1
16:15,18
attach 7:19,21
8:7,11

attached 17:8
22:22
attended 9:9
attorney 2:4,5,8
2:9,12,13,16
2:17 5:18 9:3,5
14:21 22:14
34:15
Attorney's 5:20
5:23,24,25
audio 6:22
aware 30:3,7
awful 7:13

**B**

BA 9:13
back 11:10
13:17,18 25:16
25:22
background 9:8
13:21
backwards
30:25
becoming 12:25
behalf 3:20 5:13
6:2,6,12
believe 11:24
12:3,12 17:6
19:25,25 20:3
21:17 22:10
28:1,14 30:25
32:4
best 18:3
better 22:2
Bio 24:16,19
bit 6:18
blessing 25:10
boom 6:18
bottom 16:13
box 16:20
break 25:4,7
brought 22:12
22:15
budget 27:25
budgetary 27:25

building 17:18
18:17
burning 32:25
business 14:4,22
16:22,25 17:5
17:25 22:24
buyouts 16:7

**C**

California 1:1,4
2:6,10,14,18
2:23 3:21 5:8
5:12,15,21
10:15 15:8,13
16:10,16,18,21
17:5 18:15
25:1 29:5 30:4
call 25:9
called 6:12
calls 32:3
Care 1:7,8,8
5:12 10:1,2,5,7
11:6,7,12,25
12:7,9 13:12
16:6,20 20:8,9
20:9 21:9,20
21:21,22,22
24:1,5 26:10
26:11,15,17,19
26:24 27:1
28:22,22,23
29:11 30:24
32:13,16,17
case 1:6 5:12
16:24 24:23
34:17
caught 24:11
cause 34:7
CCP 5:15
Center 2:9 14:13
Center/Mariner
14:20
Central 1:9 2:22
9:17,20,21
10:9 12:11,13

12:16 13:14
17:14,21 19:14
26:12,16,25
27:7,20,24
28:9,11
Central's 29:10
certain 17:2,3
certificate 29:22
34:1
Certified 34:9
certify 34:3,14
cetera 16:3
change 11:18
23:24 24:8
29:17,18,25
changed 11:17
21:13
chart 4:15 8:8
8:23 15:20,22
16:12 20:24
22:5 25:24
26:9 29:1,4
chief 12:18
Christine 12:2
15:17
Civic 2:9
Clark 3:5 6:3
clean 7:25 8:4
clinical 17:9
closer 6:19
college 9:9,10,12
9:12
come 25:16
comes 13:24
27:21
communication
23:16,19
communicatio...
29:19
Community
9:12
companies 6:6
10:14,15 14:9
14:17 15:1
16:5 17:13,17

Kristy Prince Owen
February 15, 2022

18:1,5 20:14
20:17 21:14
22:2 27:8
30:12,12,21
31:3,7,9 32:2
32:10,22
company 10:1,3
10:7,11 12:7,8
12:8,9 13:7,7
13:12 14:4,5,5
14:6,12 16:3
17:14,19,23,23
17:24 20:8,23
21:21 22:3
23:24 24:5,24
26:11,15,18
27:2,2 28:23
28:24 29:11,23
31:10,16,17,25
32:1,7,17
compatriots
32:24
compiled 15:22
complaint 22:8
complete 7:23
compliance
12:18
compound 20:25
computer 34:12
concluded 33:23
conclusion 7:11
8:3 32:4
condensed 33:15
conduit 32:1
confidentiality
23:1
Connie 1:21
3:22 5:7 8:14
34:3,24
considered
12:21
consistency 8:10
continue 32:21
continued 3:2
contract 27:15

copies 7:7
copy 7:17,25 8:5
33:15,17
corporate 12:21
21:20
CORPORATI...
1:8,8,9,10
correct 7:19
9:17 10:6,10
10:16 11:8
12:23 14:11
15:10 16:11
17:15 18:4,6,9
18:10,11 19:4
20:10,12,16
21:11,12,15
22:8 23:2,3
25:2 26:20,21
26:23 27:9
29:14,15 30:13
30:14 32:6
34:20
correctly 11:13
13:15 15:14
17:6 23:11
correspondence
23:21 30:1
counsel 3:5 5:17
6:5 15:23 20:3
29:7 33:12
34:14
County 1:2 2:12
2:16 5:20,23
5:24,25
couple 10:25
14:1,1
court 1:1 7:8 8:4
8:14 30:18
covered 33:5
creation 15:1
Cruz 2:4,6 5:20
31:5
CSR 1:21 3:22
5:7 34:3,24
current 16:12

30:6
_____
    D
daross@mari...
2:24
Darryl 2:21 6:2
date 1:18 5:8
11:18,21
dates 11:22 17:1
death 29:22
December 12:4
declaration 4:14
7:7,15,16,20
7:23 8:19,23
19:12 21:5,6
22:13,24
declare 34:19
defendant 2:20
22:7,11
defendants 1:11
6:2
defense 22:11
define 17:17
DELAWARE
1:7,8,9,9
Dennis 24:20
depicted 20:23
Deponent's 4:14
deposed 25:25
deposition 1:16
3:20 4:13 5:10
5:14 6:4 8:9,11
8:15,16 10:19
14:5 25:9 27:5
33:23 34:4,16
Deputy 2:9,13
2:17
describe 11:13
19:12
described 16:4
19:3
DESCRIPTION
4:11
designee 6:6
Devin 3:5 6:5

digress 12:24
direct 16:20
24:4
directed 16:9
direction 28:16
34:13
director 19:13
directors 11:13
discuss 7:11
discussed 10:24
32:22 33:17
disinterested
34:10
District 2:4,5,8,9
2:12,13,16,17
5:20,23,24,25
divested 10:14
15:8 17:2
divestiture
15:13 17:1
documentation
24:7
documents
23:22 24:2
doing 14:2 16:22
16:25 17:4
29:17,18
Doug 2:4 25:13
33:2,3,4,17
Douglas 5:19
Douglas.Allen...
2:7
Driftwood 31:4
31:4
Drive 2:9
duly 6:13 34:5

_____
    E
earlier 13:12
early 9:22
Easter 15:18
educational 9:8
Ehrlich 3:5 6:5
11:16,23 19:5
20:6

either 29:14
34:15
eleven 14:3
em 22:25
email 23:16,20
Emily 23:12
29:19
employ 27:18
employed 9:18
9:19 28:8
employees 16:3
employer 9:22
ends 25:9
ensure 22:25
entirety 10:18
entities 10:24
11:3 15:6,9
19:18 22:4
29:13 30:5,9
31:13
entity 9:23,25
11:24 13:1
14:13 24:2,21
31:21
erroneous 10:21
ESQUIRE 2:4,8
2:12,16,21
estate 16:3 18:4
et 1:10 5:12 16:3
Eureka 3:21 5:8
exactly 21:23
23:11
EXAMINATI...
7:1
examined 6:15
exception 18:18
excuse 19:11
26:24
executive 12:3
28:13
exhibit 4:9 7:12
8:5,9,17,18,20
8:21,24,25
10:4,15 15:9
15:21 17:8

18:5 21:6
exhibits 7:18,22
  8:20,23 22:23
  33:16
experience 13:2
expertise 13:24
explain 22:20
extends 10:4
extent 25:8 32:3

**F**
facilities 16:10
  16:15,17 17:3
  18:15 21:10
  23:25 25:1
  27:10 30:9
facility 18:17
failed 13:4
faint 6:19
fair 22:18,18
Fallon 2:13
family 22:1 23:5
far 32:22
February 1:18
  3:21 5:1,9
feel 7:20,20
filed 7:8
fine 8:2
fire 19:19
firm 18:19
firms 14:1
first 6:13 9:19
  15:4 29:24
follows 6:15
foregoing 34:4
  34:20
forward 24:3
four 21:4
frankly 32:19
friend 14:19
Fruitvale 21:19
  30:14,15,20,23
  30:24
function 10:8
  16:7 24:24

31:16,25
functioning 16:2
functions 27:8
  31:10
further 13:19
  32:21 34:14

**G**
GC 12:8,8 17:19
  17:22,22,23,24
  28:24,24
general 3:5 6:5
  20:3 31:7,11
  31:16 32:9
Georgia 18:19
  18:25 19:3
  20:15
getting 23:22
give 25:14,18
  28:16
glad 33:6
Glendale 30:17
  30:19,19,20,24
  31:1,1
go 11:9 12:24
  13:18 16:13
  18:23 25:22
  28:17,21
goes 18:25
going 7:6,10,14
  19:9 31:16
good 5:6 27:4
graduated 7:4
Grand 12:9 21:9
  24:1,5 28:23
group 14:8
Grunstein 11:23
  23:4,8,22
  29:19
Grunstein's 13:2
  13:7

**H**
hand 6:9 34:21
handled 5:15

33:11
happen 10:21
  14:16,18 15:11
Harry 23:10
Hayward 31:4
Health 1:7,8,9
  2:22 5:12 9:17
  9:20,21 10:1,2
  10:5,7,9 11:25
  12:7,10,13,15
  13:12,14 16:6
  16:20 17:14,21
  19:13 20:8,9
  21:21,22 26:10
  26:10,11,15,16
  26:17,19,24,25
  27:1,7,20,24
  28:8,11,22
  29:9,10 32:16
  32:17
hear 7:4,5 13:4
heard 15:18
  16:4 19:3
held 21:9
help 14:23 19:21
hereto 34:19
hereunto 34:20
hierarchy 24:8
HIPPA 23:2
hire 19:19,21
hired 14:16 20:1
hold 12:18 17:25
  20:21
holder 30:13
holders 27:22
holding 12:7,8,9
  16:2 17:23
  28:23 31:3,5,5
  31:6,9,10,15
  31:25 32:1,7
  32:10
holdings 18:4
holds 18:7,14
  30:22
homes 15:2,7

hope 25:9
hopefully 33:8
Hospital 31:1
Houston 9:11,12
HR 27:18
HUD 21:18

**I**
identify 11:1
Inc.'s 27:20
incidentally
  25:24
include 27:11,16
Includes 27:13
including 15:1
  16:6
inconvenience
  33:8
inconvenienced
  25:8
incorrect 10:23
INDEX 4:1,9
indicates 26:14
indirect 16:21
information
  12:6
initially 29:21
instance 30:5
insurance 16:9
  21:17 32:11,14
insured 13:16
intention 30:8
interest 24:4
  29:5
interested 34:16
interruption
  30:18
involved 10:13
  18:14,21
Irvine 2:23
issues 6:22

**J**
Jacinto 9:11
January 29:5

job 14:18
joined 5:22
Jose 31:4
Junior 9:12
jurisdiction 25:6
jurisdictional
  32:23

**K**
keeping 25:5
KENNETH 34:4
kept 30:6
kind 13:21 16:22
  18:20
knew 14:24
know 11:9 14:17
  15:19 16:13
  17:2 19:8
  21:16 26:5,6
  27:24 29:4
  31:20 32:10,13
knowledge 18:2
  18:3 21:2
  26:13 28:15
  29:9,12 32:2,5
  32:20
Kristy 1:17 3:6
  3:20 4:5 5:10
  6:11

**L**
lack 22:2
larger 10:13
late 9:22
Laurie 5:23
law 9:3 14:1
  18:19
lawsuit 6:7
lease 18:7,14,20
  18:25
Leasehold 29:5
leases 18:16
leave 14:22
left 29:23
legal 19:13 32:4

legalities 31:20
Lenny 23:10
let's 6:20 8:7,13
  8:13,15 11:11
  13:5 17:17
  25:9,16,16,17
  25:18,22
liability 14:10
license 27:22,22
  30:13,15,22
licensed 9:3
licensees 17:18
  27:10 28:16
licenses 21:10
limit 11:8
limited 25:6
Linda 3:6 6:5
  31:11,18
line 10:4 26:10
  26:13
lines 28:21,25
list 22:11,11
literal 31:18
litigation 13:16
  14:2,10,10
little 6:18,19
  16:19 21:24
Living 14:13,19
LLC 12:8,9,9
  21:9,20 24:1
  28:23 30:24
loans 20:22
located 5:8
long 16:24 25:12
Long-term
  21:20 30:24
longer 9:18
look 7:25 10:3
  16:12
looking 15:9
  31:23
LORI 2:12
Lori.Schnall...
  2:15
Los 2:16,18 5:25

lot 7:13 10:8
  14:25
lozenge 19:11

——— M ———
MAC 28:22,23
Madam 8:14
  33:18
maintain 23:1
maintained
  18:20
maintains 19:5
management 1:9
  10:1,3,7,11
  13:12 20:8
  21:21 26:11,15
  26:17 27:2,17
  29:11 30:21
  32:17
manages 30:17
March 34:21
Marcos 31:5,15
  31:17
Marilyn 24:20
Marin 2:8 5:22
Mariner 1:7,8,9
  2:22 5:12 9:16
  9:20,21 10:1,2
  10:4,7,9 11:25
  12:7,10,13,15
  13:1,11,12,14
  14:8,12,14,17
  14:25 16:6,8
  16:20 17:14,21
  19:13 20:8,8
  21:21,22 22:1
  26:10,10,11,15
  26:16,17,18,24
  26:25 27:1,7
  27:20,24 28:8
  28:11,22 29:5
  29:9,10 30:4
  32:16,17
marked 4:11
  8:18,21,25

maternity 14:22
Matt 3:5 6:3
matter 5:11
matters 32:23
mean 21:23,24
med-mal 14:2
member 23:4
mentioned 24:23
merely 16:2
met 23:4,8,10,12
MHC 12:7,8
  27:2
mic 6:18
Mikikian 2:16
  5:25 33:4
mind 25:5
mine 14:19
minutes 25:14
  25:18
mistake 10:22
mistakes 24:12
mom 14:23
moment 12:24
  24:13
Monterey 31:5
morning 5:6
mortgages 20:21
Mr.Ehrlich
  18:25

——— N ———
name 5:7 28:3
named 6:6 22:7
  29:6,7
National 1:8
  11:6,7,12 20:9
  21:22 28:22
  32:13
nature 27:14
necessary 7:21
need 19:21
  22:21 25:5
  32:21
needed 14:23
  24:3

network 10:13
never 9:9
nice 7:7
nominal 18:19
  18:23
noted 16:19
notice 4:13 8:11
  8:16 10:21
noticing 5:18
number 5:13
  15:6
numbers 8:13
nursing 15:2,7
  16:10 18:15,17
  21:10 24:25

——— O ———
Oakland 2:14
oath 6:15 26:5
object 18:22
  20:25 32:3
Objection 28:17
obligated 23:1
  26:5
occasion 23:20
Ocean 2:5
office 5:8,20,23
  5:24 6:1 18:19
  18:24 19:2,5,7
  20:14,15
officer 12:10,13
  12:15,19,22
  19:16,17
officers 11:2,4
  11:13,19,23
  24:19,21
oh 12:12 19:25
  28:1 29:8
okay 6:8,20 7:9
  9:2,13,16,19
  10:2,7,17
  11:15 12:1,5
  12:24 13:5,23
  14:8 15:15,20
  15:24 16:17

17:8,16,22
  18:3,12 19:19
  19:22 20:4,7
  20:13 21:3
  22:5,7,10,16
  23:12 24:9,14
  24:22 25:3,19
  25:20 26:9,17
  26:24 27:4,11
  27:16,20 28:19
  28:21 29:8,13
  29:17 30:2,11
  30:16 31:3,15
  32:8 33:16,20
once 33:7
operate 18:16
operating 6:6
  12:8 17:13,13
  17:19,19,23,24
  21:13 24:2
  27:8 28:24
  30:12,12,15
  31:7,17
operation 16:5
operational 17:9
operations 28:14
  30:9
operator 17:17
order 23:23
  33:18
org 22:5
organization
  4:15 8:22
  15:22 26:9
organizational
  20:24 25:23
  29:1
original 15:1
outcome 34:16
outside 15:7,13
  15:23 16:17,21
  17:5 29:6 30:4
Owen 1:17 3:6
  3:20 4:5 5:11
  6:8,11 7:4,25

Kristy Prince Owen
February 15, 2022

Page 39

9:2 25:23
owned 13:1 14:3
22:3,4
owner 23:23
24:1
ownership 18:7
18:8 24:4,8
26:14 28:25
29:17,18,25
32:1
ownerships
23:24
owns 26:16

**P**

p.m 33:23
Pacific 16:7
24:17,19
PAGE 4:3
pages 7:8,13,18
Palms 31:5
paragraph 21:4
21:8,19
paralegal 13:16
14:1,14,21
paralegals 14:21
Pardon 19:9
part 6:18 22:10
22:23 27:15
participating
6:3
particular 7:21
parties 34:15,18
partner 31:7,11
31:17 32:9
passed 29:10
patient 23:1
Pause 25:21
payroll 27:11,12
penalty 34:19
People 1:4 5:11
5:20
Perez 2:8 5:22
period 12:11
20:10

perjury 34:19
person 31:10
34:10
personnel 27:17
27:17
phone 23:14
phrase 29:2
pin 11:11
place 1:20 11:18
34:10
plaintiff 1:5 2:3
3:21 5:13 6:12
plan 30:8
plans 30:3
please 5:17 11:1
18:23 33:13,18
point 10:12 11:3
13:17 15:8
17:22 21:9
policies 32:11
policy 32:14
portion 7:21
position 9:16
19:16 20:2
28:11
possess 20:18
possible 6:18
practical 31:24
practice 9:3
precise 11:12
preparation
27:13
present 3:4 6:3,4
president 12:3
28:13 31:13,21
Prince 1:17 3:6
3:20 4:5 5:11
6:8,11
printed 7:17
prior 9:23 12:25
13:3,6,6,18,25
14:3,6
probably 7:24
26:3 29:24
proceeding 8:1,3

proceedings
25:21
process 14:5
produced 5:14
pronounce 28:3
properly 29:1
property 20:10
20:18 30:4
provide 24:25
provides 27:25
providing 27:21
pull 6:18
purposes 21:17
pursuant 5:15
put 15:20 16:1
22:2

**Q**

question 32:25
32:25
questions 7:15
26:6 33:1
quite 21:25

**R**

Rafael 2:10
raise 6:9
read 9:7
reading 33:11
real 16:3 18:4
20:10,18
really 30:1 31:25
32:20
recall 13:14
15:14 17:6
23:11 24:13
29:19
record 14:4
22:21,21 25:22
records 23:2
29:18
Recruiting 16:9
27:2
redo 8:13
reduced 34:12

refer 7:11,21
17:18
referred 8:8
referring 21:3
30:13
regard 31:9
regarding 24:16
24:19
regulatory 14:15
14:21,21
related 29:25
34:17
relates 32:23
relation 14:9
remote 1:16,20
5:10
remotely 34:5
report 20:4,5,6
reporter 1:21
5:6 6:8,16 8:4
8:14 30:18
33:19,20 34:1
34:9
request 27:19
requirement
21:18
requirements
21:18
requires 24:6
respond 14:18
rest 7:18
retained 19:24
retention 27:17
revenue 27:21
29:10
RG21095881 1:6
5:13
right 6:9 7:6 9:7
15:3 20:11
22:13,18 26:7
31:19 33:10,21
Road 2:22
role 14:9
room 6:4
Ross 2:21 6:2,2

6:17 7:16 8:6
8:10 9:1 18:22
20:25 24:16
25:12,15,19
28:17 32:3
33:2,10,16,21

**S**

sake 8:10
San 2:10 9:11
31:4,5,15,17
Santa 2:4,6 5:19
31:5
Sarcauga 24:20
24:20 28:3,5,6
sat 10:18
saying 21:25
says 8:16 21:19
scan 8:3
Schnall 2:12
5:23 33:3
school 14:23
se 11:9
Seals 15:18
second-amend...
4:13 8:15
see 10:3,15
16:14 25:4,17
29:22 31:3
32:20
send 8:4 33:16
senior 1:8 11:6,7
11:12 13:15
20:9 21:22
28:22 32:13
sense 7:14
separate 24:2
32:11,14
September 12:3
serve 31:25
serves 32:6
service 14:4
services 24:25
27:18,22
serving 14:5

Kristy Prince Owen
February 15, 2022

set 34:20
seven 21:8
Seza 2:16 5:24
shares 20:23
short 25:9
shorthand 34:9
  34:9
side 14:15
sign 24:3 29:20
signed 23:22
signing 33:11
signs 22:25
similar 17:12
  26:3
single 19:7
site 6:4
skilled 15:7
  16:10 18:14,17
  21:10 24:25
Skyline 31:4
Smikikian@d...
  2:19
sold 14:22
somebody 14:17
  20:4 22:3
somewhat 18:23
sorry 8:14 26:22
  27:3 28:1
  29:16
specific 28:20
specifically 21:4
spoken 23:14
standard 22:25
start 6:17 16:13
started 15:5
starting 5:18
  9:23 11:24
state 1:4 5:11,17
  5:21 10:23
  16:15,21 17:2
  24:6
stated 12:12
  13:11 34:11
states 17:3
step 29:24

stipulate 25:12
stream 29:10
Street 2:5,13,17
structure 21:21
stuff 15:3
subsidiaries
  16:21
Suite 2:5,9,13,17
summary 13:21
superior 1:1 7:8
supervision
  34:13
support 17:9,20
supporting 7:18
sure 8:6 11:2
  21:25 22:14
  23:11 24:18
  28:18 29:7
  31:22
Susan 20:1
switched 9:22
  13:13
sworn 6:9,13
system 30:4

**T**
Tabler 11:15
  16:4 19:3 26:3
  34:5
Tabler's 8:8
  10:18 18:4
  24:11 27:5
Taetz 3:6 6:5
  12:13 31:12,18
take 11:5 19:9
  25:4,7
taken 3:20 5:13
  34:8
talked 20:17
  27:4
tax 27:13
tell 6:21 34:6
Temple 2:17
term 18:23
terms 28:21

testified 6:15
testify 6:13
testimony 24:11
  24:18 34:8,11
thank 6:16,20
  7:5 25:15 28:6
  33:2,3,4,5,10
  33:13,20,22
therapy 24:25
therefrom 5:15
thereto 34:18
things 10:25
  14:7,10 20:22
  24:10 26:7
  27:13 29:20
think 9:21 13:13
  13:15,16,25
  15:4,12,13
  24:13 28:13
  29:21 30:11
  32:19,21,25
three 20:14
time 1:19 5:9
  11:5,17 12:2
  12:11 14:12,14
  17:4,22 20:2,3
  24:5 34:10
timeframe 11:9
times 26:2
title 12:18 13:16
  19:15 28:14
  29:4
today 7:11 8:1
  11:12
Today's 5:8
Tommy 14:24
top 16:14
totally 22:3
touch 24:10
Trabuco 2:22
transcript 5:14
  7:13 33:14,18
true 32:16,18
  34:20
truth 6:13,14,14

  34:6,6,7
try 6:20 13:5
trying 13:20
Tuesday 1:18
  5:1,9
two 14:20 30:22
  31:2
type 23:19
typewriting
  34:12
typical 23:21

**U**
uh-huh 15:5,16
  15:25 18:13
  19:10,23 28:7
  31:14
ultimately 29:25
understand
  13:22 24:9
  26:6
understanding
  26:19 27:23
  29:1 31:24
University 9:11
unnecessary
  7:24
update 23:23

**V**
vague 18:23
  21:25 28:17
varied 15:12
various 31:3
vary 17:1
versus 5:12
vice 12:3 28:13
video 14:5
videoconference
  1:16 34:6
voluminous 7:24
vs 1:6

**W**
want 7:12 8:11
  11:8 13:18

33:14
Washington
  24:20
waste 22:21
way 7:22 16:2
  16:14 22:2
  24:7,7 33:7
  34:16
we'll 7:11 8:19
  8:22 25:12,17
  25:17
we've 25:8 32:21
wealth 32:20
Webb 1:21 3:22
  5:7 34:3,24
went 9:11 23:25
  24:1
West 2:17 12:8
  28:23
whatsoever
  16:23,25
Whittle 20:1,1
within-entitled
  34:7
witness 4:1,3 6:3
  6:12 18:24
  21:2 24:18
  25:11 28:18
  30:19 32:6
  33:13 34:4,8
  34:11
word 17:19
work 13:2 14:9
  16:6,7
worked 9:23
  13:11,25 14:6
  14:12,14,19
working 13:6
  15:18
wrong 28:4

**X**

**Y**
yeah 6:21 13:20

17:24 18:24
22:19 24:15
**years** 11:10 14:1
14:3 19:25

**Z**

**Zack** 12:2,11
15:17
**Zoom** 5:10 6:4
34:5

**0**

**07** 13:13

**1**

**1** 4:13 8:5,17,18
34:21
**1000** 2:17
**10811** 1:21 3:22
5:7 34:3,24
**11** 7:18
**11:48** 1:19 3:22
5:3,9
**12** 21:19
**12:40** 25:18
**12:52** 33:23
**1225** 2:13
**145** 2:9
**15** 1:18 3:21 5:1
5:9 25:14
**170** 15:2
**19** 25:18

**2**

**2** 4:14 8:9,20,21
12:9 21:6
28:24
**20** 26:3
**200** 2:5
**200-and-some**
15:4
**2002** 9:24 13:13
**2004** 11:24
15:12
**2006** 9:22 13:13
**2007** 9:22

**2010** 15:13 17:7
**2014** 12:3
**2016** 9:16
**2017** 12:4
**2021** 29:5
**2022** 1:18 3:22
5:1,9 34:21
**2025** 5:16
**211** 2:17
**213** 2:18
**257-2450** 2:18
**272-6222** 2:14

**3**

**3** 4:15 8:24,25
10:4,15 15:9
15:21 18:5
**3501** 2:9
**378** 7:7

**4**

**415** 2:10
**454-2930** 2:6
**473-6450** 2:10

**5**

**510** 2:14
**5440** 2:22

**6**

**7**

**7** 4:5
**701** 2:5

**8**

**8** 4:13,14,15
**831** 2:6

**9**

**900** 2:13
**90012** 2:18
**92620-5704** 2:23
**94612-4208** 2:14
**949-238-7775**
2:23

**94903-4189** 2:10
**95060** 2:6
**98/'99** 14:12

# EXHIBIT

# 7



**User Name:** Douglas Allen
**Date and Time:** Tuesday, February 22, 2022 2:05:00 PM EST
**Job Number:** 164903662

## Document (1)

1. *Schron v Grunstein, 36 Misc. 3d 1238(A)*

   **Client/Matter:** Santa Cruz DA
   **Search Terms:** 36 Misc. 3d 1238 (N.Y. Sup. Ct. 2012)
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Court: State Courts > New York |

 Positive
As of: February 22, 2022 7:05 PM Z

# *Schron v Grunstein*

Supreme Court of New York, New York County

September 6, 2012, Decided

650702/2010

## Reporter

36 Misc. 3d 1238(A) *; 2012 N.Y. Misc. LEXIS 4279 **; 2012 NY Slip Op 51730(U) ***; 2012 WL 3887665

[***1] Rubin Schron, CAM-ELM COMPANY, LLC, SMV PROPERTY HOLDINGS LLC, SWC PROPERTY HOLDINGS LLC, SWC SPECIAL HOLDINGS, LLC, SMV SPECIAL HOLDINGS, LLC, CAMMEBY'S EQUITY HOLDINGS LLC, CAMMEBY'S FUNDING LLC, CAMMEBY'S FUNDING II LLC, CAMMEBY'S FUNDING III LLC, CAMFIVE HOLDINGS, LLC, CAMMEBY'S MANAGEMENT CO. LLC, and CAMMEBY'S INTERNATIONAL, LTD., Plaintiffs, against Leonard Grunstein, MURRAY FORMAN, TROUTMAN SANDERS LLP, CANYON SUDAR PARTNERS LLC, SVCARE HOLDINGS, LLC, SAVASENIORCARE LLC, FUNDAMENTAL LONG TERM CARE HOLDINGS, LLC, THI OF BALTIMORE, INC., NATIONAL SENIOR CARE, INC., MARINER HEALTH CARE, INC., METCAP SECURITIES, LLC, METCAP HOLDING, LLC, METCAP ADVISORY SERVICES, LLC, HARRY GRUNSTEIN, and LAWRENCE LEVINSON, Defendants.

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Subsequent History:** Affirmed by, in part *Schron v. Grunstein, 2013 N.Y. App. Div. LEXIS 2128 (N.Y. App. Div. 1st Dep't, Apr. 2, 2013)*

**Prior History:** *Schron v. Troutman Saunders LLP, 97 A.D.3d 87, 945 N.Y.S.2d 25, 2012 N.Y. App. Div. LEXIS 3929 (N.Y. App. Div. 1st Dep't, 2012)*

## Core Terms

funds, parties, promissory note, loans, deposited, documents, escrow account, term loan, defendants', loan agreement, nursing home, obligations, outstanding, affiliate, expenses, wired, real estate, Restated, mortgage, recorded, books and records, Holdings, acquire, leased, collateral, financing, borrowed, entities, conclusions of law, letter of credit

## Headnotes/Summary

### Headnotes

[*1238A] Bills, Notes and Checks--Promissory Note--Funding of Loan.

**Judges:** [**1] O. Peter Sherwood, J.S.C.

**Opinion by:** O. Peter Sherwood

## Opinion

O. Peter Sherwood, J.

## I. BACKGROUND

The genesis of this case lies in the execution of a successful leveraged buyout plan devised by defendants, Leonard Grunstein ("Grunstein") and Murray Forman ("Forman"), to acquire a publicly held company that was engaged in the nursing home business. Grunstein approached [***2] plaintiff, Rubin Schron ("Schron"), a sophisticated real estate investor and client of many years, to participate and to serve as the principal source of the financial resources required to consummate the deal. Schron, who had no experience operating nursing homes, was interested in acquiring the real estate only. Grunstein and Forman devised a "PropCo/OpCo" structure, pursuant to which entities affiliated with Schron would acquire and mortgage the real estate (the PropCo), which would then be leased to an operator of the nursing homes (the OpCo) under long term leases. Rents from the properties would supply revenue to pay principal and interest on the mortgages assumed in connection with the acquisition.

The $1.3 billion transaction, referred to as the Mariner Transaction, closed on December 10, 2004. Schron and his associates provided the [**2] financing. Schron affiliates acquired the PropCo, options to acquire control of the OpCo, and certain other assets. Grunstein's brother, Harry Grunstein, was hired to run the OpCo and was installed as the nominal owner of the company. Harry Grunstein had experience operating nursing homes (Tr. 838:7-22; Tr. 839:10-12)[1]. Shortly after the closing, the OpCo came to be controlled by Grunstein and Forman through Canyon Sudar Partners LLC ("Canyon Sudar"), a company formed by them to hold the OpCo.

The Fifteenth Cause of Action of the complaint alleges that defendants, Canyon Sudar and

SVCARE Holdings, LLC ("SVCARE"), who are parties to an Amended and Restated Unit Purchase Option Agreement ("Option") and an Amended and Restated Term Loan and Credit Facility Agreement ("2006 Term Loan"), both dated as of June 9, 2006, breached the Option when they refused to honor exercise of the Option by its holder, CamEquity Holdings, LLC ("CamEquity"). Under the terms of the Option, CamEquity was granted the right to purchase up to 99.999% of all membership units of [**3] SVCARE for $100 million. In rejecting the notice of exercise, SVCARE claimed, *inter alia*, that the Option was unenforceable because CamEquity or its affiliates failed to fund a loan to SVCARE in the amount of $100 million, which loan is alleged to have been a condition of granting the Option.

In a Decision and Order, dated January 20, 2011, the court (Yates, J.) granted a motion of plaintiffs to preclude defendants from offering extrinsic evidence in connection with a determination of whether the alleged loan was a condition precedent to exercise of the Option and whether the loan was actually funded (*see* 32 Misc 3d 231, 917 N.Y.S.2d 820). That decision and the Decision and Order on defendants' motion to renew and reargue, dated September 9, 2011 (*see* 2011 NY Misc LEXIS 6612) reaffirming Justice Yates' decision, were affirmed by the Appellate Division First Department (*see* Schron v Troutman Sanders LLP, 97 AD3d 87, 945 N.Y.S.2d 25 [1st Dept 2012]).

On December 2, 2011, plaintiffs moved for summary judgment as to the Fifteenth Cause of Action. In a Decision and Order, dated March 5, 2012, this court granted the motion but determined that there was a question of fact as to what portion of the $100 million purchase price [**4] could be defrayed by assumption/release of the SVCARE

---

[1] As used in this Decision and Order, "Tr._" refers to the trial transcript and "PX_" and "SVX _" refer to admitted trial exhibits.

indebtedness to CamEquity. The court then scheduled an immediate trial pursuant to *CPLR 3212(c)* "on the limited issue of the amount, if any, of indebtedness available to be paid at the closing toward the purchase price."

A 10-day non-jury trial was held. Despite the limited nature of the inquiry, the parties offered and the court heard live testimony of nine (9) witnesses, including plaintiff, Schron; defendants, **[***3]** Grunstein and Forman; plaintiffs' expert Harvey A. Kelly, CPA ("Kelly"); and defendants' expert David S. Williams ("Williams"). In addition, the court reviewed excerpts of video deposition testimony of nineteen (19) witnesses and considered more than a hundred exhibits. Following closing arguments, the parties submitted proposed findings of fact and conclusions of law. The case is now ready for decision.

## II. FINDINGS OF FACT

### A. The Parties

Plaintiff Schron is a New York real estate investor. He is the manager of SMV, Cam III and CamEquity, companies majority-owned by Schron and members of his family.

Plaintiff SMV Property Holdings LLC ("SMV") owns and controls real estate properties acquired in the Mariner Transaction (Tr. **[**5]** 840:16-25). SMV is majority-owned by Schron and members of his family. Grunstein and Forman hold minority interests in SMV.

Defendant Grunstein is an attorney who represented Schron companies for more than two decades. Grunstein represented Schron in "dozens of matters," serving as his primary legal counsel in business matters, including acquisition of Mariner Health Care Inc. ("Old Mariner", the acquisition referred to as the

"Mariner Transaction")(Tr. 122:11-13, 128:9-11).

Defendant Forman is the principal of MetCap Securities LLC ("MetCap"). He acted as Schron's investment banker in the Mariner Transaction (Tr. 821:13-18, 1165:14-25; Tr.393:26-394:16).

Defendant SVCARE Holdings, LLC is a holding company formed in connection with the Mariner Transaction. SVCARE directly owns Sava Senior Care LLC ("Sava") and through Sava owns approximately 170 nursing home operating entities.

Defendant, Canyon Sudar Partners, LLC is the owner and sole member of SVCARE. Canyon Sudar is jointly owned by Grunstein and Forman.

### B. The 2004 Mariner Transaction

In 2004, Grunstein and Forman approached Schron and others with a proposal to acquire Old Mariner in a leveraged buyout. At the time, Old Mariner was **[**6]** a public company which operated more than 250 nursing homes and owned the real estate associated with approximately 170 of them (Tr. 830:4-831:12).

Schron was interested in owning the real estate, not operating nursing homes (Tr. 127:23-25, 825:3-12). Grunstein and Forman proposed a complex transaction employing a "PropCo/OpCo" structure whereby Old Mariner's real estate would be separated from the nursing home operations (Tr. 127:15-16, 831:13-18). Through subsidiaries, SMV would acquire Mariner's real estate assets ("PropCo"). Sava, a newly formed company, would lease the SMV properties pursuant to the terms of a master lease and operate nursing homes on those sites (the "OpCo") (Tr. 126:12-25, 130:6-21, 831:13-18). SVCARE is the sole owner of Sava (PX 61.0030).

As structured by the parties, a newly formed company, National Senior Care, Inc. ("New

Mariner", "NSC" or "NSC/Mariner"), purchased all of the shares of stock of Old Mariner and then sold the real estate to Schron's company, SMV (PX 2, PX 41). SMV then leased the properties to Sava (Tr. 130:16-25, 830:16-831:18). NSC retained the residual operations consisting of the roughly 100 nursing homes located on properties that were **[\*\*7]** leased from third parties. All options to purchase leased property were transferred to Schron entities (Tr. 830:19-831:12, 837:10-25).

As of December 10, 2004, the day of the closing, Grunstein's brother, Harry Grunstein, **[\*\*\*4]** nominally owned both NSC and SVCARE (Tr. 142:13-16). Thereafter, effective as of February 1, 2005, Grunstein and Forman acquired SVCARE, through Canyon Sudar, a company created for that purpose (Tr. 102:2-11; PX 182.0006; Tr. 480:13-20, PX 314.0001, PX 278.0001).

As discussed at length below, documents signed at the closing provide that Cam III made a loan of $100 million to SVCARE. Defendants claim that the loan was never funded and that there is no indebtedness to be released and contributed toward a purchase of SVCARE.

Grunstein and Forman negotiated and structured the Mariner Transaction (Tr. 127:12-14). A team of attorneys acting under the leadership of Grunstein worked on the transaction and drafted the deal documents (Tr. 98:21-99:10). The legal team, all members of which were associated with the law firm of Jenkens & Gilchrist Parker Chapin ("Jenkens"), included Larry Levinson ("Levinson"), who acted as the chief draftsman, and Mitchel Hill ("Hill"). Hill worked **[\*\*8]** closely with Vincent Barra ("Barra"), a partner in Marks, Paneth & Shron ("MPS"), the accounting firm engaged by the acquiring parties to compile the sources and uses schedules for the deal and to ensure there was adequate funding to close (Tr. 1121:13-18, 1118:23-1119:9).

Defendants' accounting expert, David Williams, testified that parties to complex transactions such as this typically prepare a "deal book" to document the agreement of the parties (Tr 1516,1568). In this case, no deal book was prepared following the closing, but schedules of sources and uses of the funds transferred at the closing were prepared by MPS. Much of the defense in this case involves the alleged unreliability of the documents generated in connection with the closing (*see* the SVCARE Parties' Proposed Findings of Fact and Conclusions of Law, pp. 9-16).

None of the lawyers on the team except Grunstein heard prior to the closing in December 2004 or for the next five years that the $100 million loan was not funded at the closing. Hill, who directed the flow of funds on the closing date, testified that he understood that "the conditions to closing occurred" (Tr. 280:10-11). Levinson, who was in charge of drafting **[\*\*9]** the documents, testified that he was "surprised" when Grunstein told him in the Spring of 2009 that the loan had not been funded, given the structure of the deal, the work that they had done for years to document the loan and Grunstein's prior statements (Tr. 169:3-183:23).

## C. Financing of the Mariner Transaction

Schron raised about $1.1 billion in financing for the Mariner Transaction (Tr. 845:21-851:2, 1224:3-7).

The real estate was acquired by SMV for approximately $834 million. SVCARE and NSC/Mariner borrowed approximately $250 million from Capital Source Finance LLC ("CapSource") to fund their operations (Tr. 849:19-25). The borrowings were partially secured by Schron. Schron's contribution took multiple forms. Column Financial, an affiliate of Credit Suisse First Boston ("Credit Suisse"), provided $918 million in mortgage and

mezzanine loans (PX 24, PX 55, PX 56). Those loans included $70 million from refinancing properties owned by a separate Schron company, SWC Property Holdings LLC ("SWC"). PX 51.0107-0108. Schron also raised an additional $25 million from Credit Suisse (PX 51.007; PX 241.0030).

Additionally, Schron borrowed $50 million from Arbor Realty ("Arbor")(PX 303.0001; [**10] Tr. 405:26-406:4). He also obtained a $75 million letter of credit from HSBC as a credit enhancement to the Credit Suisse mortgage (PX 53; Tr. 205:13-21). As discussed below, Schron contributed $40 million obtained pursuant to the terms of a contract to sell a former Mariner asset that Schron [***5] acquired and resold on the closing date to Omnicare, Inc. ("Omnicare")(SVX 1075-0010). Along with certain partners, Schron contributed $56 million in cash (PX 51.0108; PX 241, PX 303)(see also Tr. 214:25-215:22, 413:17-414:8, 857:2-11, 1235:3-1236:8).

Separate from these direct advances, Schron provided a $75 million guarantee to NSC/Mariner, (PX 313.0001), and signed a $50 million Put Agreement with Sava's lender, CapSource (PX 58.0002). The Put Agreement was an essential term of the CapSource loans to Sava. Schron maintains that the various resources he provided enabled Sava to obtain the CapSource loans.

Grunstein and Forman did not personally contribute any cash or provide any personal guarantees in connection with the Mariner Transaction (Tr. 126:2-3, 395:11-13). Their respective firms were paid substantial sums for professional services each firm provided (PX 318.0001, PX 114.0001, SVX 1086.0197).

Schron [**11] claims that he provided more than $1 billion to an escrow account at Fidelity National Title Insurance Company ("Fidelity", the account "Escrow Account"). He states that he provided all of the money Grunstein advised was needed for the closing and that in fact he was refunded over $23 million upon Grunsteins' determination that the funds were not needed (Tr.860, 994). Grunstein and Forman directed the distribution of over $1.2 billion (including funds loaned to SVCARE and Mariner by CapSource) from the Escrow Account at closing as well as, apparently, $200 million more outside the escrow (Tr. 416:7-12, 1076:11-21, 1223:14-1224:7).

Following the closing, Fidelity returned $26.5 million to Schron, representing funds that were not needed (PX 54.0001, PX 325; Tr. 860:4-18).

## D. The $100 Million Cam III-SVCARE Note

Much of the evidence offered at the trial was devoted to the hotly contested issue of whether or not sufficient Schron funds were available at the closing to fund a $100 million loan to SVCARE. Aided by testimony of a forensic accountant, Harvey Kelly, plaintiffs argue that at least $118 million of excess Schron funds are shown on the sources and uses schedules preparedby MPS in [**12] December 2004.[2] Defendants' forensic expert, David Williams, opined that insufficient funds remained in the Escrow Account to fund a $100 million SVCARE Loan after paying for real estate and

---

[2] Defendants have attacked the schedules as unreliable (see, e.g., Defendants' Proposed Finding of Fact 24 and 39). Defendants' forensic expert, David Williams, concurred and complained that no "deal book" was ever prepared following the closing (SVX 1254.0004; Tr. 1633, 1568). Preparation of a deal book would have been a responsibility of the legal team supervised by Grunstein (Tr. 1748-49). The MPS sources and uses compilation was directed by Mitch Hill, a partner on the legal team assembled and lead by Grunstein to negotiate and document the Mariner Transaction. Williams testified that the compilation is "[t]he only thing that comes as close [as] possible to [describing what happened in the transaction]." (Tr. 1551). On these facts, any doubts resulting from [**13] a lack of clarity of what occurred at the closing will be resolved against defendants.

associated expenses. Williams testified that after paying these costs and deducting $26,732,500 in "over-funded" resources returned to Schron after the closing (PX 1254.0005), only $8,271,063 remained to fund the SVCARE loan (SVX 1254.0007).

As discussed below, this argument is a red herring and is not dispositive because the dispute must be resolved on the basis of the 2006 Term Loan and the 2006 Note. In any event, the evidence of what the parties did at the closing is at odds with the *post hoc* accounting arguments offered at trial.

Schron testified and it is undisputed that he provided all of the funds for the Mariner [***6] Transaction in the form of cash, letters of credit, loan proceeds and various guarantees. SVCARE had no resources and NSC/Mariner also lacked sufficient funds to close. Schron also testified that he raised more funds than was needed to pay his costs and help defray expenses of SVCARE and NSC and that he signed a Put Agreement that enabled SVCARE to obtain a loan from CapSource (Tr. 858-59; 848-49).

Schron states broadly that in exchange for providing $1.1 billion in financing and additional guarantees to fund the entire transaction, he received a number of things, including the Mariner real estate and two promissory notes — a $100 million note payable by SVCARE to Cam III and a $75 million note payable by NSC to Cammeby's [**14] Funding II LLC ("Cam II")[3] (Tr. 747:10-26, 858:20-859:20; 994; 977-78). The structure of the transaction as reflected in the legal documents prepared by Grunstein in and around December 2004, supports Schron's testimony.

Credit Suisse and CapSource required that Sava be capitalized with $100 million in equity so as to provide a cushion for the newly formed operating company (Tr. 692:9-13; PX 36, PX 37.0004 [CapSource], PX 47.0018-19, PX 55.0107 [Credit Suisse]).

According to a memorandum, dated November 11, 2004 (prior to the closing), from Grunstein to an HSBC banker regarding the $100 million "OpCo Note", the parties contemplated that $100 million of the funds raised by Schron and sent to the Escrow Account would be funded to SVCARE at the closing out of the sources and uses and recorded as a loan from "a Cammeby's entity" (PX [**15] 18.0004; *see also* PX 37.0010). The parties implemented this plan. In a memorandum, dated April 12, 2005 (after the closing), Grunstein advised Barra that SVCARE borrowed $100 million from Cam III (PX-88.0001). SVCARE in turn contributed that $100 million to Sava. Sava advanced the sum to a subsidiary, SVCARE Intermediate Holdings LLC ("SVCARE Intermediate"), which used the funds as collateral for a separate loan from CapSource (PX 88.0001, PX 51.0167; Tr. 146:19-147:11, 1228:3-6). These transactions all happened simultaneously at the closing, resulting in a $100 million wire transfer from the Escrow Account to a bank account maintained by SVCARE Intermediate (PX 51.0167).

Contemporaneous accounting documents reveal that an equity contribution was made to Sava. Specifically, a compilation of the sources and uses for the closing identifies a $100 million wire as "Sava Equity Capital" (PX 304.0004). The compilation was prepared by Barra at the direction of Forman and Hill. Subsequently, Barra prepared two sources and uses schedules for Sava under the supervision of Forman (Tr. 1148:26-1149:25), both of which identify the $100 million equity contribution

---

[3] Although the original Cam II Note fixed that amount of the debt at $75 million, Cam II's books reflected from the outset $25 million as the outstanding *net balance* of inter-company obligations (PX 245.0002; Tr. 723:10-22). The Cam II Note was amended to reflect the lower amount at the time the mortgages were refinanced in June 2006 (SVX 1156.0001; Tr. 884-885).

(PX124, PX85).

Plaintiffs argue that, **[\*\*16]** in sum, Sava and its affiliates received about $209 million at the closing: $100 million in equity from SVCARE; $98.5 million, representing the net proceeds of a $100 million term loan from CapSource and $11 million drawn down on a line of credit from CapSource (PX 124.0004, PX 68.0007-0011; Tr. 1242:14-24).

Defendants disagree. Forman testified that Sava did not receive $100 million in equity from **[\*\*\*7]** Schron and, thus, Sava had only $109 million to use at the closing (Tr. 530:12-14). Defendants claim that the $100 million wire shown on the Barra sources and uses compilation actually reflects the proceeds of the CapSource term loan. Although the MPS sources and uses show that $100 million was wired to Sava, there is no credible evidence that the loan from CapSource was the source of the wired funds. Plaintiffs note that net proceeds of the CapSource was only $98.5 million (Tr. 164:19-22, 467:15-18; PX 68.0010-11).

Plaintiffs maintain that without the $100 million from Cam III, SVCARE and its subsidiaries would not have had sufficient funds to meet their obligations. At closing, Sava wired $100 million to Wachovia Bank to serve as collateral for the CapSource loan (Tr. 133:21-134:2, 427:18-428:7; **[\*\*17]** PX 51.0167; PX 88.0001). Sava also had over $28 million in closing expenses and fees (Tr. 419:23-421:11, 440:22-441:21; PX 114, PX 124.0004) and an indirect obligation to reimburse SMV for the $37.5 million in cash collateral for the HSBC letter of credit (Tr. 406:21-410:8; PX 38.0042, PX 53.0025-0030, PX 241.0032-0033). Thus,

Sava required more than $109 million to meet its obligations at the closing.

In addition, Sava advanced $65,153,266.87 to New Mariner as a loan (PX 45.0001). A MPS sources and uses compilation prepared for Sava shows that the same amount had been used by New Mariner from sources attributed to Sava (PX 124.0004). Those funds were necessary for New Mariner to meet its more than $1 billion in obligations on December 10, 2004 (PX 59). Defendants contend that the loan was never made, but, as noted, the $65 million loan is documented by a promissory note that was executed after Sava's accountants completed the allocation of funds from the closing (PX 45). The loan is also confirmed in Sava's audited financial statements (PX 300.0002-0003; PX 174.0028).

Absent the Cam III loan, Sava would not have had funds sufficient to make the loan.[4]

### E. Confirmation of Funding of $100 Million and $20 Million Loans

Plaintiffs emphasize that documents executed by the parties as part of the 2004 Mariner Transaction, as well as confirmations made thereafter, conclusively demonstrate that the $100 million loan was funded and remains outstanding and that an additional $20 million loan was made in 2006.

1. *2004 Loan Documents* On December 10, 2004, SVCARE executed and delivered a promissory note evidencing a $100 million debt to Cam III (the "2004 Note")(PX 43; Tr. 97:20-98:14, 394:20-24). In the 2004 Note, **[\*\*19]** SVCARE "promise[d] to pay to the

---

[4] Defendants also asserted that allocation **[\*\*18]** to Sava of $8 million of the legal fees payable to the Jenkens firm at the closing was not a Sava expense (PX 304, PX 124). In 2005, the Jenkens partner in charge of billing relating to the Mariner Transaction, Sava's senior accountant, and Sava's outside accountant all confirmed the correctness of this allocation (Tr.

1209.7-26; PX 114).

In another *post hoc* argument, defendants assert that they are entitled to a $17.8 million offset due to Sava in connection with Sava's security deposit under the terms of the Master Lease. Suffice it to say that any such payment from SMV to Sava need not be repaid until the Master Lease ends (SVX 1137).

order of CAMMEBY'S FUNDING III LLC . . . the principal sum of ONE HUNDRED MILLION AND NONE/100 Dollars ($100,000,000) or such other amount of the Term Loan (as [***8] defined in the Loan Agreement) as may then be outstanding, as applicable, together with interest thereon . . . " (PX 43.0001). The parties also agreed that "[a]ll advances and payments . . . made pursuant to [the] Note, the Loan Agreement, and other Loan Documents may be recorded by the Lender on its books and records, and such books and records shall be conclusive as to the existence and amounts thereof absent manifest error" id. Cam III recorded the $100 million note on its books and records starting with its first set of books, dated December 2004 (PX 245.0003). The 2004 Note was accompanied by a Term Loan and Credit Facility Agreement ("2004 Term Loan Agreement")(PX 42.0001). Other contemporaneous deal documents confirm the $100 million loan (PX 48.0003; see also PX 55, 46). Grunstein and Forman testified that these records do not reflect the facts. According to Grunstein, at some point prior to the 2004 closing, Schron told him that he wasn't going to fund the loan at the closing and that [**20] Schron did not fund the loan[5] (Tr. 118, 154, 161). Both testified that, despite full knowledge that Schron was not going to fund the loan, the parties proceeded to the closing without amending the loan documents to reflect the version of the facts they now assert. If true, they are guilty of perpetuating a fraud. The evidence of what occurred at the closing and thereafter reveals that this testimony is not credible (see fn. 6).2. The 2006 RefinancingIn June 2006, Schron refinanced the Credit Suisse loans and at that time restated the 2004 loan

agreement and promissory note. On behalf of SVCARE and Canyon Sudar, Forman signed a number of documents confirming the $100 million loan. In the Amended and Restated Subordinated Term Promissory Note dated as of June 9, 2006 (the "2006 Amended Note"), SVCARE reiterated its promise to "pay" the $100 million in "outstanding" indebtedness "together with unpaid and accrued interest" (PX 153.0001) ("Term Note A"). Term Note A, like the 2004 Note, provides that the loan amounts recorded on Cam III's books and records would be conclusive, absent "manifest error" (PX 153.0001; Tr. 558:21-24, 560:22-25). As part of the 2006 refinancing, the parties successfully [**21] requested that Credit Suisse remove an existing restriction on repaying the $100 million Cam III loan (PX 145.0001-0002). Forman also signed an Amended and Restated Term Loan and Credit Facility Agreement in which the parties reaffirmed that the 2004 loan had been "made" and was "still outstanding" (PX 151.0006)(the "2006 Loan Agreement"). The 2006 Loan Agreement further confirms that the "proceeds of the Term Loan A [were used] for the purpose of making an equity contribution" to Sava (PX 151.0029). SVCARE agreed that the $100 million Cam III loan "continue[s] in full force and effect" and that its repayment obligations "are not subject . . . to any defense, counterclaim, setoff, right of recoupment, abatement, reduction or other claim or determination . . . " (PX 151.0027; see also Tr. 106:12-107:8, 556:3-9). SVCARE and Canyon Sudar also agreed that "pursuant to the Existing Term Note, interest has accrued on the Existing Term Loan but has not been paid" (PX 151.0027).

As part of the refinancing, Cam III also agreed

---

[5] In an affidavit submitted to this court and at his deposition, Grunstein stated that the conversation took place within "a few days" of the December 10, 2004 closing (Tr. 116-117, 162). At a subsequent deposition session [**22] and at trial, Grunstein testified that the conversation took place a month earlier, in early November (Tr. 170). The timing of the conversation is

significant because other evidence reveals that CapSource, which purportedly supplied a $100 million to replace the hole created by Schron's alleged refusal to provide funding, had tentatively agreed to make the loan in early November, much more than "a few days" before the closing (PX-16.0002; Tr. 165-170).

to provide a discretionary line of credit of up [***9] to an additional $100 million to SVCARE, which SVCARE would contribute to Sava as additional equity (PX 151.0027, 0029). SVCARE delivered a second note, Term Note B, evidencing advances under this line of credit (PX 154.0001). At the closing, Cam III wired a $20 million advance under Term Note B to SSC Disbursement Company, an affiliate of Sava and SVCARE[6] (Tr. 312:13-17; 562:11-15; 1605:2-12; PX 158, PX 162.0002). Defendants insist that this amount cannot be contributed to the purchase because the funds were paid to SSC Disbursement Company, not SVCARE. That the funds were wired to a SVCARE affiliate and not to SVCARE is of no moment. In [**23] 2006, Forman and SVCARE acknowledged the $20 million as an equity contribution to SVCARE (PX 157, PX 164). The 2006 Loan Agreement and the 2006 Amended Note, together with undisputed proof at trial that no payment of either principal or accrued interest has been paid on either the $100 million loan or the $20 million loan, establishes that the outstanding indebtedness is substantially in excess of the option price of $100 million. The sums outstanding are sufficient to pay the entire purchase price under the terms of the Option by assumption or release of debt evidenced by the 2006 note (Tr. 892:8-20; 1254:20-1255:9; Tr. 1071:12-1071:23).

3. *Financial Books and Records* Plaintiffs insist that the accounting records prepared by the parties, Credit Suisse, and CapSource to reflect the flow of funds at the closing, as well as the books and records of Cam III and Sava, record that Cam III funded a $100 million loan. Following the closing, MPS prepared a final compilation of the sources and uses for SMV, SVCARE and NSC, dated December 15, 2004. The compilation shows that at the closing, a Sava company received a $100 million wire, which was identified as "Sava Equity Capital" (PX 73.0002, PX 304.0004). The compilation, which was prepared by Barra [***10] under the direction of Forman, Grunstein and Hill (PX 272.0001, PX 273.0001; Tr. 196:3-10, 680:12-17, 1119:3-1122:10), does not reveal the source of these funds. The CapSource and Credit Suisse sources and uses charts similarly record Sava's receipt of the $100 million (PX 75.0003, PX 78.0002; Tr. 140:16-25). Additionally, following [**26] the closing, Sava retained MPS to prepare a Sava-specific schedule to help the company set up its initial balance sheet (*see* PX 85, PX 124; Tr. 1143:4-18). These schedules all show the $100 million loan. Cam III's books and records also record a $100 million loan as well as accrual of interest

---

[6] The record contains extensive additional documentary evidence of admissions by Grunstein and Forman that the SVCARE loans were made, funded and remain outstanding. In an attempt to explain away the admissions, Grunstein and Forman testified that they repeatedly misrepresented in writings that the loans were made and funded in order to induce third parties, including lenders and the United States Department of Housing and Urban Development, to advance money to SMV, SVCARE and NSC. They assert that together with Schron, they conspired to defraud third [**24] parties by falsely stating that the loans were funded by Cam III. They make the implausible claim that although loan documents and various other documents they signed reflect that the loans were funded, the lenders closed the deal without any amendments to reflect the purported fact that the Cam III loans were not funded (Tr. 636-37, 639, 693). According to Forman the lenders simply "looked the other way" and "allowed the deal to close." *Id.*

Other than the testimony of Grunstein and Forman, the trial record contains no evidence of any such conspiracy. To the contrary, virtually every witness involved in the 2004 Mariner Transaction testified that they had no knowledge that the Cam III loan was not funded and when asked, testified that they believed the loan was funded. Details of this extensive testimony, conflicting statements of Grunstein and Forman and other evidence are set forth at plaintiffs' proposed findings of fact numbers 48-64 and 72-88 and will not be recounted here.

In face of the evidence referenced here and elsewhere in this Decision and Order, the court rejects as a prevarication, the testimony of Forman and Grunstein regarding the circumstances of the alleged non-funding [**25] of the loan. Apart from the fact that all of the documentary and non-party witness evidence contradict their testimony, their evasive answers and manner on the witness stand left the court with a firm belief that both gave testimony that was less than candid.

for each year starting with December 2004 (PX 245.0003, PX 246.0003, PX 247.0003, PX 248.0003, PX 244). Cam III filed tax returns showing the principal and accrued interest on the $100 million and $20 million loans (PX 122.0003, 0006, PX 175.0016, 0022). Grunstein and Forman, who have a minority interest in Cam III, received K-1's from Cam III each year since 2005 reflecting the same information (Tr. 582:8-585:26, 720:18-721:16). Although no taxes were required to be paid, there was no evidence presented at trial of either ever having questioned the information recorded on the K-1's received. **F. Funding of the $100 Million Loan** Schron purports to have received two promissory notes at the closing of the Mariner Transaction in return for funding the entire Mariner Transaction, including the financing and guarantees he provided for the benefit of SVCARE and NSC, an assertion defendants have not [**27] challenged directly (Tr. 994, 977-78, 982-84, 987, 1021). Instead, defendants assume the notes were given simply for loans in the amounts stated thereon. Following this premise, the parties sought to prove that sufficient Schron funds were available (or not available) at the closing in 2004 to fully fund a $100 million Cam III loan. This hotly disputed issue is immaterial (*see* Conclusions of Law, *infra*).Cam III did not transfer cash directly to SVCARE. Schron contends however, that the Cam III Loan was fully funded on December 10, 2004 from the funds he made available at the closing, including sums deposited into the Escrow Account and $100 million wired to a SVCARE affiliate from the Escrow Account. Williams, on behalf of the defendants, testified that he conducted a forensic analysis of the funds associated with the 2004 closing, as well as all of the relevant bank accounts (SVX 1254; Tr. 1513:25-1515:15; 1517:24-1521:5). He opined

that the Schron related entities did not deposit enough money into the Escrow Account to fund both the necessary expenses to close the Mariner Transaction and a $100 million loan to SVCARE (SVX 1254). Plaintiffs, through Kelly, testified that $118.4 million [**28] in excess funds was available at the closing to fund a $100 million Cam III loan. Much of the testimony of the experts, who are accountants, involved their respective interpretations of contracts signed by the parties to the Mariner Transaction, matters as to which neither possesses any technical or professional expertise. Such matters are more likely in the ken of professionals in the field of law (*see People v Taylor, 75 NY2d 277, 288, 552 N.E.2d 131, 552 N.Y.S.2d 883 [1990]* ["expert opinion is admissible if it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror"] [internal quotations omitted]). Nevertheless, both provided helpful analyses concerning the allocation of fees and expenses paid at the closing. According to Williams, the funds from Schron entities deposited into the Escrow Account are: (1) mortgage and mezzanine financing from Credit Suisse, totaling $871,497,069; (2) individual mortgage financing from Credit Suisse on three other nursing homes; (3) a $10,831,684 mortgage loan from First Mariner Bank; (4) a $49,232,500 loan from Arbor Financial, a lender to Schron; and (5) $3.5 million in cash from Schron. The [**29] total is [***11] $947,725,079 (SVX 1254.0007). From this amount, Williams deducted $834,380,500, representing the cost of the Mariner real estate plus $78,341,016 of Schron related fees and expenses.[7]

Williams also analyzed the sources and uses of funds transferred outside the Escrow Account. The MPS compilation records Schron sources as contributing $93,964,410 "additional cash

---

[7] According to Kelly, Schron related fees and expenses inside the Escrow Account aggregate to $62,728,736. The difference

is a result of Kelly having allocated certain of the fees and expenses to SVCARE and NSC. Compare SVX 1254.0007 with PX 241.0027.

and letter of credit equity" (SVX 1086.0007) from which Williams deducted $37,500,000 representing "the unfunded amount of a $75 million letter of credit required of Mr. Schron by the [Credit Suisse] mortgage for which he posted only $37.5 million of cash collateral." SVX 1254.0008. Williams then deducted all of the remaining balance of $56,464,410 as funds spent on specifically identifiable closing related costs charged to Schron (SVX 1254.0008). Of this amount, $37.5 million consists of the cash collateral for the letter of credit. Williams did not take into account any **[\*\*30]** of the funds withheld by Credit Suisse to cover the cost of lender fees, taxes and other expenses, some of which were non-Schron related expenses. Pursuant to section 10.4 of the Master Lease between SMV affiliates and SVCARE affiliate, SSC Equity Holdings LLC (the "Tenant"), the Tenant is obligated to provide "escrows, cash collateral accounts, letters of credit, insurance deposits, bonds and other financial requirements imposed by any mortgage" (SVX 1047.0042). Defendants argue that obligations governed by section 10.4 should be excluded because they are obligations of the Tenant and not obligations of either SVCARE or Sava (see Defendant's Proposed Findings of Fact and Conclusions of Law, p. 22).For purposes of determining whether sufficient Schron resources were available at the closing, the separate corporate existence of the various SVCARE affiliated entities is irrelevant. These costs were incurred at the closing and were paid from Schron funds, but they were not Schron obligations. Kelly properly allocated them as SVCARE related costs. According to Kelly, the funds withheld by Credit Suisse to cover costs consisted of (1) $20.1 million held in "Servicer Escrows and Sub-

accounts" **[\*\*31]** of which $16.8 million were "Engineering Reserve" and "Environmental Reserve" amounts attributable to non-Schron entities[8] and (2) $26.98 million in "Lender Fees and Expenses" of which $10.1 million were related to redemption of Mariner bonds and, therefore, were attributable to NSC/Mariner. Similar fees and expenses arising from mortgaging of four SMV and SWC properties resulted in additional non-Schron expenses of $0.6 million (PX 241.0031). The total of these non-Schron expenses is $37.5 million. Williams did not credit Schron for $37.5 million deposited in an HSBC bank as cash collateral for a $75 million line of credit, the cost of which was an obligation of SSC Equity Holdings pursuant to section 10.4 of the Master Lease. In Williams' opinion, the cash collateral could not be counted as a contribution to the $100 million loan because the funds were deposited in a Schron account and were eventually returned with interest. Williams failed to **[\*\*\*12]** recognize that as of December 10, 2004, which is the relevant date for purposes of this analysis, Schron was deprived of use of these funds. The $37.5 million deposit should be classified as a Schron source. Williams also excluded as Schron **[\*\*32]** sources $1,800,835 that was wired into the title company by Mariner, as well as a deposit of $40 million relating to the sale of Mariner Medical Supply, Inc. ("MMS") to Omnicare for $50 million. These amounts are also classified on the MPS schedule as "cash equity." Williams classified this $40 million as Mariner money (Tr. 1528:26-1529:7, 1531:7-1534:3). On December 10, 2004, Harry Grunstein certified that SMV will be acquiring "all of the outstanding stock of [MMS]" and that "immediately following the acquisition of MMS by SMV, SMV and MMS will enter into

---

[8] As discussed above, Defendants contend that these are costs of the Tenant and should not be counted toward the $100 million loan. The court finds that these and any other proper expense of a SVCARE or NSC/Mariner affiliate may be counted for purposes of this analysis. It appears that **[\*\*34]** SVCARE

assumed some NSC/Mariner costs at the closing and took back a note from NSC/Mariner in connection with those assumed costs (PX 124.0004; PX 45.0001). The court need not analyse the details of this arrangement as the court has found that the defendants have failed to show that there was not sufficient funds available to fully fund the Cam III equity loan to SVCARE.

Schron v Grunstein

an Asset Purchase Agreement with Omnicare pursuant to which Omnicare will purchase from MMS ... the assets of the MMS Business" (SVX 1075.0004). This is precisely what the MMS Asset Purchase Agreement, dated December 10, 2004, provides. The Asset Purchase Agreement also contains an agreement by SMV to provide a guaranty to Omnicare in connection with the $40 million that was deposited in the Escrow Account. An agreement by Schron to assure return of the money Omnicare deposited is consistent with ownership of MMS by Schron. On these facts Williams' classification of the $40 million must be rejected. The deposit of the Omnicare supplied [**33] funds is properly classified as a Schron source (Tr. 1795-1801). These amounts - - 37.5 million withheld by Credit Suisse, $37.5 million security deposit and $40 million from the MMS asset sale - - aggregate to more than $100 million and illustrate that defendants claim that Schron lacked the resources at the closing to fund a $100 million Cam III loan has not been established. **III. CONCLUSIONS OF LAW** It is well settled that a *prima facie* case is established by introducing the operative, signed promissory notes and loan documents (*see, e.g.*, *Citibank, N.A. v. Silverman ["Citibank II"], 84 AD3d 425, 425, 922 N.Y.S.2d 56 (1st Dept 2011)*; *UrbanAmerica, L.P. II v. Carl Williams Grp., L.L.C., 95 AD3d 642, 643, 945 N.Y.S.2d 233 [1st Dept 2012]*). The court has found that the loan agreements and promissory notes were properly signed and delivered and that no portion of the outstanding balance has been repaid (Tr. 373:26-374:5; Tr. 560:3-561:2).

The burden then shifts to the defendants to demonstrate a *bona fide* defense (*see Quest Commercial, LLC v. Rovner, 35 AD3d 576, 576, 825 N.Y.S.2d 766 [2d Dept 2006]*). The borrower must prove that a loan was *not* funded (*see Carlin v. Jemal, 68 AD3d 655, 656, 891 N.Y.S.2d 391 [1st Dept 2009]* [borrower could not establish a defense through "conclusory allegations that the loan was not fully funded"];

*UrbanAmerica, 95 AD3d at 643* [plaintiff was not required to prove funds "were actually disbursed" to make out a *prima facie* case]).

In this case, the parties restated the $100 million note in 2006, and at that time SVCARE waived all defenses relating to the 2004 note (PX 151.0027)("the obligations of the Term Borrower to repay th[e] Existing Loans . . . (B) are not subject as of the date of this Agreement to any defense, counterclaim, setoff, right of recoupment, [**35] abatement, reduction or other claim or determination . . . ."). Further and as described above, Cam III provided $20 million in additional consideration.

New York courts recognize that parties to an agreement may waive their defenses and will enforce validly executed waiver clauses (*see Bank of Suffolk Cnty. v. Kite, 49 NY2d 827, 828, 404 N.E.2d 1323, 427 N.Y.S.2d 782 [1980]* [defendants' claims were "clearly inconsistent" with the agreement's "explicit waiver of the right to interpose any defense, set-off, or counterclaim whatsoever'"]; *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs., 214 AD2d 359, 361, 625 N.Y.S.2d 152 [1st Dept 1995]*; *Quest, 35 AD3d at [***13] 576*). The Appellate Division, First Department has specifically recognized that when parties sue on a restated note, the funding of the original note is irrelevant (*see UrbanAmerica, 95 AD3d at 643* ["Plaintiff did not have to prove that the funds that it lent [the defendant] under the original note were actually disbursed to [the defendant]; plaintiff was suing on the amended and restated note, not the original note."]). Nothing more is required to resolve the issue before the court. The Schron Parties are entitled to judgment based on the 2006 Loan Agreement and the related [**36] Note.

Defendants cast aside the express waiver as well as the multiple written statements of Grunstein and Forman as mere extrajudicial admissions which must be weighed like any other evidence and may be explained by other

evidence, especially objective evidence (see e.g. Bondy & Schloss v Strategic Dev. Ptnrs. LLC, 82 AD3d 615, 918 N.Y.S.2d 722 [1st Dept 2011] and Mason v Allstate Ins., 12 AD2d 138, 142, 209 N.Y.S.2d 104 [2d Dept 1960]). Defendants would also have the court ignore its prior ruling that where there is a general merger provision, extrinsic evidence to vary or contradict the terms of the writing is barred (see 32 Misc 3d at 236). Defendants maintain that "[a] failure of consideration for the $100 million promissory note voids any waiver of defenses in the promissory note." Defendants' Proposed Findings of Fact Conclusions of Law, p. 4.

Although the courts have considered objective proof to contradict admissions that are contrary to the actual fact (see, e.g. Mason v Allstate Ins. Co., 12 AD2d 138, 142, 209 N.Y.S.2d 104 [2d Dept 1960]), this is not such a case. Here, it is the documentary evidence that shows that the loans were made and funded. Defendants would have the court ignore such evidence and substitute the self-serving **[\*\*37]** testimony of Grunstein and Forman and unpersuasive evidence as to where funds were directed at the closing. Such evidence cannot rebut documentary evidence of the indebtedness in the form of loan agreements and promissory notes or avoid the effects of a waiver provision that was executed after defendants had knowledge of the defense (see Lumber Indus., Inc. v Woodlawn Furniture Corp., 26 AD2d 924, 925, 274 N.Y.S.2d 813 [1st Dept 1966]).

The court has found that the 2004 and 2006 loans were funded. Assuming, as defendants contend, that the loans were not fully funded, the loan agreements and notes would not be voided for lack of consideration. The general rule is that where a party has received some benefit," "the adequacy of consideration is not a proper subject of judicial scrutiny" Laham v Chambi, 299 AD2d 151, 152, 753 N.Y.S.2d 34 [1st Dept 2002]). By defendants' calculations, between $8 and $18 million of excess uses were available for SVCARE at the closing in 2004 and $20 million more was loaned in 2006 (see SVX 1254.0006; Defendants' Proposed Findings of Fact Conclusions of Law, p. 26). The evidence defendants presented in an attempt to avoid the legal effect of the acknowledgments and waiver of defenses is unpersuasive. **[\*\*38]** As mounted at trial, defendants' defense has two branches: the credibility of Grunstein's and Forman's denial of funding and defendants' arguments as to the flow of funds (Tr. 1004:24-1006:10).

The mendacity of Grunstein and Forman entitles their testimony to be given no weight. Their shifting explanations and the difficult to imagine contention that a $100 million loan that was documented and relied upon for years by numerous sophisticated parties went unfunded is not credible[9] (see, e.g. Andersen v. Weinroth, 48 A.D.3d 121, 136, 849 N.Y.S.2d 210 [1st Dept 2007]). Further, defendants **[\*\*\*14]** did not explain why the parties would prepare and execute the 2006 loan documents in

---

[9] To the extent defendants are making a fraudulent inducement argument, the claim is barred, the court having already denied defendants' motion to amend their answer. Additionally, the argument fails because fraudulent inducement is barred by the specific language and merger clause set forth in the Amended and Restated Loan Agreement.

Such claim preclusion considerations aside, to prevail on a fraudulent inducement claim, the proponent must prove (see Boxberger v New York N.H. & H. Railroad Co., 237 NY 75, 78, 142 N.E. 357 [1923]) by clear and convincing evidence (see M. Entertainment, Inc. v Leydier, 71 AD3d 517, 519, 897 N.Y.S.2d

402 [1st Dept 2010]; Chopp v Welbourne & Purdy Agcy, Inc., 135 AD2d 958, 959, 522 N.Y.S.2d 367 [3d Dept 1987]) that (1) the signer knows the terms of the contract, (2) assents to these terms and intends to execute the contract but (3) the assent itself has been induced by fraudulent representations (see Maji Communications, Inc. v Jac-Lu Assoc., 65 A.D.2d 727, 410 N.Y.S.2d 297[1st Dept 1978]; Dalessio v. Kressler, 6 A.D.3d 57, 61, 773 N.Y.S.2d 434 [2d Dept 2004]). Defendants' evidence falls far short of "the high standards of clear and convincing evidence required for proof of fraud" (see 10-162 Corp. v Tompkins Green Assoc., 179 AD2d 450, 577 N.Y.S.2d 867 [1st Dept 1992]).

perpetuation of the charade alleged when, by that time, Credit Suisse no longer required the Cam III loan (PX 145.0001-0002). Moreover, if the loan had not been funded as of the time of refinancing, one would expect that it would have been noted and addressed at that time as was the amount of a $75 million loan to Mariner which was reduced to $25 million. It is difficult to imagine sophisticated businessman such as Grunstein and Forman reaffirming the 2004 loan and waiving all defenses knowing that by doing so they would be left without **[\*\*39]** legal redress.

New **[\*\*40]** York courts are skeptical of self-serving arguments from borrowers claiming that they should be absolved from repaying a promissory note. This is especially true, where, as here, the arguments are expressly contradicted by the contracts the parties signed (*see, e.g.*, LaMar v. Vasile, 49 AD3d 1218, 1219, 852 N.Y.S.2d 900 [4th Dept 2008] [rejecting defense of lack of consideration where "notes recited that consideration had already' been received by defendant at the time of the execution."]). Generally, even a single document acknowledging a loan suffices for judgment in the lender's favor (*see, e.g.* ABKCO Music & Records, Inc. v. Montague, 90 A.D.3d 402, 402, 938 N.Y.S.2d 504 [1st Dept 2011]).

Defendants treated the debt as valid and owing from the 2004 transaction until 2009, when the relationship between the Schron and the Grunstein parties broke down. "[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties." Fed. Ins. Co. v. Ams. Ins. Co., 258 AD2d 39, 44, 691 N.Y.S.2d 508 (1st Dept 1999). Here, the consistent "practical interpretation of (the) contract by the parties to it" for five years before it became "the subject of controversy" has "great, if **[\*\*41]** not controlling, influence" *id.* (internal citations omitted).

Plaintiffs' books and records show the loans and Sava's audited financial statements reflect a capital contribution from SVCARE in December 2004 in the amount of $100 million and a second capital contribution from SVCARE in June 2006 in the amount of $20 million. There is no proof of a "manifest error" in Cam III's books and records, and they are thus entitled to controlling weight under the terms of the promissory notes and loan agreements executed by the parties (*see Domansky v. Berkovitch, 243 AD2d 374, 374-75, 664 N.Y.S.2d 556 [1st Dept 1997]; In re Moak, 92 AD3d 1040, 1044, 938 N.Y.S.2d 648 [3d Dept 2012]).

Moreover, promissory notes, like other contracts, are, in the first instance, interpreted and enforced based on their plain language (*see Embraer Fin. Ltd. v. Servicios Aereos Profesionales, S.A., 42 AD3d 380, 381, 839 N.Y.S.2d 756 [1st Dept 2007]). Here, the 2006 Note contains an unequivocal promise by SVCARE to repay $100 million (PX 153.0001) and Term Note B contains a similar unequivocal promise to repay all amounts advanced thereunder, namely the additional $20 million (PX 154.0001). Both notes also include merger and integration clauses (PX 153.0003, PX 154.0003; **[\*\*42]** Tr. 560:11-18).

Even if the court were inclined to give some weight to defendants' assertion that the $100 **[\*\*\*15]** million was not funded, that testimony is inadmissible. The loan documents are fully integrated contracts, which may not be modified by parol evidence (*see Citibank, N.A. v. Plapinger ["Citibank I"], 66 NY2d 90, 95-96, 485 N.E.2d 974, 495 N.Y.S.2d 309 [1985]; see also Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC, 92 AD3d 449, 450, 938 N.Y.S.2d 57 [1st Dept 2012]).

The second branch of the defense is also meritless. Contemporaneous financial records demonstrate that the $100 million loan was funded on December 10, 2004. To the extent

that defendants challenge that finding on various technical and *post hoc* grounds, the court rejects them based on the findings of fact set forth above.

The court specifically rejects defendants' hyper-technical arguments as to compliance with Section 2.1(b) of the 2004 Agreement and Section 2.1(d) of the 2006 Agreement. Parties to a contract may not avoid their obligations under an unambiguous promissory note by pleading technical defects in loan-related documentation. *Citibank II, 84 AD3d at 426*. That is especially true here where the documents were prepared (and the closing processes **[**43]** were managed) by Grunstein and the lawyers he directed. Moreover, as noted above, defendants broadly waived their defenses in 2006 and that waiver encompasses the current challenges to repayment.

The court therefore holds that Cam III's $100 million loan to SVCARE, as evidenced by Term Note A, and Cam III's $20 million loan to SVCARE, as evidenced by Term Note B, both remain outstanding and are not subject "to any defense, counterclaim, setoff, right of recoupment, abatement, reduction or other claim or determination" (PX 151.0027; *see also* PX 153.0001, PX 154.0001). Based on recent records of Cam III, the total debt owed by SVCARE to Cam III as of July 2012 is $157,376,399, consisting of the $100 million Term Loan, the $20 million advance under Term Note B, and accrued interest (PX 323).

## IV. CONCLUSION AND ORDER

In an action filed on March 23, 2010, SVCARE, Grunstein, Forman and others sought, *inter alia*, a declaration that the Option was not enforceable because the $100 million loan was not made. That claim was dismissed (*see 32 Misc 3d 231, 917 N.Y.S.2d 820*). On June 22, 2010, CamEquity served written notice of exercise of the Option. This court and the Appellate Division have upheld the validity of **[**44]** the Option. This court has found that plaintiffs have a right to take control of SVCARE. Further, the parties were allowed to explore fully the question of whether or not there is in fact outstanding indebtedness in amounts sufficient to satisfy the exercise price of the Option.

In its Decision and Order, dated March 15, 2012 granting plaintiffs' motion for summary judgment, the court ordered that "SVCARE and Canyon Sudar shall comply immediately and ingood faith with their obligations pursuant to Sections 6 and 7 of the Option". The court has seen little evidence of progress in this regard.

CamEquity is entitled to reap the benefit of its bargain now. Pursuant to the terms of the Amended and Restated Unit Purchase Option Agreement (PX 155), Cam Equity may complete exercise of the Option and without further delay acquire 99.999% of the outstanding shares of SVCARE by forgiving $100 million of the debt evidenced by Term Note A and Term Note B. Plaintiffs' request for imposition of sanctions against Grunstein and Forman is denied. Accordingly, it is hereby

**ORDERED** that defendants, Canyon Sudar and SVCARE are hereby directed to proceed without further delay to a closing pursuant to the terms **[**45]** of the Amended and Restated Option Agreement, dated as of June 9, 2006, and shall deliver 99.999% of all membership units of SVCARE **[***16]** to CamEquity or its designee, together with all voting rights attendant thereto including the rights of election and removal of directors and managers of SVCARE; and it is further

**ORDERED** that SVCARE, its existing officers, directors and managers are hereby enjoined from taking any action that (1) would violate this order or any prior order of this court; (2) would conflict with or interfere with the rights of CamEquity or its designee as owner of

Schron v Grunstein

SVCARE or (3) would otherwise be inconsistent with the rights of CamEquity pursuant to sections 6 and 7 of the Option; and it is further

**ORDERED** that counsel for the parties shall appear at a status conference at Part 49, Courtroom 252, 60 Centre Street, on Monday, November 5, 2012 at 10:00 AM to discuss the remaining issues in this case.

This constitutes the decision and order of the Court.

**DATED: September 6, 2012 ENTER,**

**O. PETER SHERWOOD**

**J.S.C.**

**End of Document**

# EXHIBIT

# 8

## Mariner – California Leasehold Interests as of January, 2021



Note: Mariner Health Care, Inc. directly and indirectly owns other entities that are not shown on this chart.

**National Senior Care, Inc.**
a Delaware Corporation
EIN: 20-1390414

100% Shareholder

**Mariner Health Care, Inc.**
a Delaware Corporation
EIN: 74-2012902

100% Shareholder

**Mariner Health Care Management Company (DE)**
(DE) (f/k/a LC Management Company)

**MHC Recruiting Company (DE)**
EIN 61-418669

**MHC Holding Company**
a Delaware Corporation
EIN: 04-3590685

**Mariner Health Central, Inc.**
(DE)

100% Shareholder

**Bio-Pacific LLC**
(DE)
EIN: 46-3451369

**Mariner Insurance Company, LLC** (DE)
EIN: 46-2828894

**MHC West Holding Company**
a Delaware Corporation
EIN: 01-0581249

100% Member

**GranCare, LLC**
a Delaware limited liability company
EIN: 95-4336136

100% Member

100% Member

**Hayward Hills Operating Company GP LLC**
EIN: 20-4001104

**Autumn Hills Holding Company GP, LLC**
EIN: 47-1847802

**Inglewood Operating Company GP LLC**
EIN: 20-4000946

**San Rafael Operating Company GP LLC**
EIN: 20-4000703

1% GP

1% GP

1% GP

1% GP

**Hayward Hills Operating Company LP**
EIN: 20-4002224
**Hayward Hills HealthCare Center**

**Autumn Hills Operating Company, LP**
EIN: 27-3981443
**Autumn Hills Health Care Center**

**GC Operating Company, LLC**
a Delaware limited liability company
EIN: 45-4040892
**MASTER TENANT**

**GC Holding Company 2, LLC**
a Delaware limited liability company
EIN: 47-2320394

**Inglewood Operating Company LP**
EIN: 20-4002247
**Inglewood HealthCare Center**

**San Rafael Operating Company LP**
EIN: 20-4001690
**Pine Ridge Care Center**

100% Member

99% LP

100% Member

100% Member

99% LP

99% LP

**Driftwood Hayward Holding Company GP, LLC**
EIN: 47-1756224

**Skyline San Jose Holding Company GP, LLC**
EIN: 47-1779455

**Verdugo Vista Holding Company GP, LLC**
EIN: 47-1789177

**Driftwood Santa Cruz Holding Company GP, LLC**
EIN: 47-1756186

**San Marcos Holding Company GP, LLC**
EIN: 81-0842648

**Monterey Palms Holding Company GP, LLC**
EIN: 47-1935762

**Almaden Holding Company GP, LLC**
EIN: 47-1815648

**Fruitvale Holding Company GP, LLC**
EIN: 47-2021365

1% GP

1% GP

1% GP

1% GP

1% GP

1% GP

1% GP

1% GP

**Driftwood Hayward Operating Company LP**
EIN: 27-4129496
**Driftwood HealthCare Center-Hayward**

**Skyline San Jose Operating Company, LP**
EIN: 27-3981379
**Skyline HealthCare Center-San Jose**

**Verdugo Vista Operating Company, LP**
EIN: 27-4129338
**Verdugo Vista Health Care Center**

**Driftwood Santa Cruz Operating Company, LP**
EIN: 27-4129578
**Driftwood HealthCare Center-Santa Cruz**

**San Marcos Operating Company, LP**
EIN: 47-5633684
**Village Square Healthcare Center**

**Monterey Palms Operating Company, LP**
EIN: 27-4129406
**Monterey Palms Health Care Center**

**Almaden Operating Company, LP**
EIN: 27-4129642
**Almaden Health and Rehabilitation Center**

**Fruitvale Operating Company, LP**
EIN: 46-3996006
**Fruitvale Health Care Center [Management Agreement]**

### Mariner – California Leasehold Interests as of January, 2021 (continued)



Note: Mariner Health Care, Inc. directly and indirectly owns other entities that are not shown on this chart.

**National Senior Care, Inc.**
a Delaware Corporation
EIN: 20-1390414

100% Shareholder

**Mariner Health Care, Inc.**
a Delaware Corporation
EIN: 74-2012902

100% Shareholder

**MHC Holding Company**
a Delaware Corporation
EIN: 04-3590685

100% Shareholder

**MHC West Holding Company**
a Delaware Corporation
EIN: 01-0581249

100% Member

**GranCare, LLC**
a Delaware limited liability company
EIN: 95-4336136

100% Member

**GC Holding Company 2, LLC**
a Delaware limited liability company
EIN: 47-2320394

100% Member

| Rehabilitation Center of Santa Monica Holding Company GP, LLC EIN: 81-2813576 | Creekside Holding Company GP, LLC EIN: 81-2765517 | Fremont Holding Company GP, LLC EIN: 81-2793596 | Parkview Holding Company GP, LLC EIN: 81-2071536 | Santa Monica Holding Company GP, LLC EIN: 81-280808 | | Palm Springs Holding Company GP, LLC EIN: 81-2059391 | Vale Holding Company GP, LLC EIN: 81-2856338 |

1% GP

| Rehabilitation Center of Santa Monica Operating Company, LP EIN: 46-4721939 **The Rehabilitation Center of Santa Monica** | Creekside Operating Company, LP EIN: 46-4633827 **Creekside HealthCare Center** | Fremont Healthcare Operating Company, LP EIN: 46-4728161 **Fremont HealthCare Center** | Parkview Operating Company, LP EIN: 46-4677273 **Parkview HealthCare Center** | Santa Monica Operating Company, LP EIN: 46-4664729 **Santa Monica Health Care Center** | | Palm Springs Operating Company, LP EIN: 46-4706286 **Palm Springs HealthCare and Rehabilitation Center** | Vale Operating Company, LP EIN: 46-4646405 **Vale HealthCare Center** |

# EXHIBIT

# 9

ROB BONTA
Acting Attorney General of California
JENNIFER EULER
Chief Assistant Attorney General
LUKE VANDERDRIFT, State Bar No. 248235
Deputy Attorney General
  2329 Gateway Oaks Drive, Suite 200
  Sacramento, CA 95833-4252
  Telephone: (916) 621-1839
  Fax: (916) 263-0426
  E-mail: Luke.VanderDrift@doj.ca.gov

NANCY E. O'MALLEY
District Attorney of Alameda County
LORI SCHNALL, State Bar No. 195556
Deputy District Attorney
  1225 Fallon Street, Suite 900
  Oakland, CA 94612-4208
  Telephone: (510) 272-6222
  E-mail: Lori.Schnall@acgov.org

LORI E. FRUGOLI
District Attorney of Marin
ANDRES PEREZ, State Bar No. 186219
Deputy District Attorney
  3501 Civic Center Drive, Suite 145
  San Rafael, CA 94903-4189
  Telephone: (415) 473-6450
  Fax: (415) 473-3719
  E-mail: Aperez@marincounty.org

**Exempt from filing fees pursuant to Government Code section 6103**

JEFFREY S. ROSELL
District Attorney of Santa Cruz County
DOUG ALLEN, State Bar No. 99239
Assistant District Attorney
  701 Ocean Street, Suite 200
  Santa Cruz, CA. 95060
  Telephone: (831) 454-2930
  Fax: (831) 454-2227
  E-mail:
  Douglas.Allen@santacruzcounty.us

GEORGE GASCON
District Attorney of Los Angeles County
SEZA MIKIKIAN, State Bar No. 245285
Deputy District Attorney
  211 West Temple Street, Suite 1000
  Los Angeles, CA 90012
  Telephone: (213) 257-2450
  E-mail: Smikikian@da.lacounty.gov

*Attorneys for Plaintiff,*
  The People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff, <br><br> vs. <br><br> MARINER HEALTH CARE INC., et. al., <br><br> Defendants. | Case No.: RG21095881 <br><br> **DECLARATION OF VALERIE J. GRAY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> DATE:  JANUARY 7, 2022 <br> TIME:  10:30 A.M. <br> DEPT:  23 |

1  ROB BONTA
   Acting Attorney General of California
2  JENNIFER EULER
   Chief Assistant Attorney General
3  LUKE VANDERDRIFT, State Bar No. 248235
   Deputy Attorney General
4     2329 Gateway Oaks Drive, Suite 200
      Sacramento, CA 95833-4252
5     Telephone: (916) 621-1839
      Fax: (916) 263-0426                          JEFFREY S. ROSELL
6     E-mail: Luke.VanderDrift@doj.ca.gov          District Attorney of Santa Cruz County
                                                   DOUG ALLEN, State Bar No. 99239
7  NANCY E. O'MALLEY                               Assistant District Attorney
   District Attorney of Alameda County                701 Ocean Street, Suite 200
8  LORI SCHNALL, State Bar No. 195556                 Santa Cruz, CA. 95060
   Deputy District Attorney                            Telephone: (831) 454-2930
9     1225 Fallon Street, Suite 900                    Fax: (831) 454-2227
      Oakland, CA 94612-4208                           E-mail:
10    Telephone: (510) 272-6222                         Douglas.Allen@santacruzcounty.us
      E-mail: Lori.Schnall@acgov.org
11                                                 GEORGE GASCON
   LORI E. FRUGOLI                                 District Attorney of Los Angeles County
12 District Attorney of Marin                      SEZA MIKIKIAN, State Bar No. 245285
   ANDRES PEREZ, State Bar No. 186219              Deputy District Attorney
13    3501 Civic Center Drive, Suite 145              211 West Temple Street, Suite 1000
      San Rafael, CA 94903-4189                        Los Angeles, CA 90012
14    Telephone: (415) 473-6450                        Telephone: (213) 257-2450
      Fax: (415) 473-3719                              E-mail: Smikikian@da.lacounty.gov
15    E-mail: Aperez@marincounty.org
                                                   *Attorneys for Plaintiff,*
16                                                  The People of the State of California

17             SUPERIOR COURT OF THE STATE OF CALIFORNIA

18                   FOR THE COUNTY OF ALAMEDA

19
   PEOPLE OF THE STATE OF CALIFORNIA,      Case No.: RG21095881
20
                   Plaintiff,
21
   vs.                                     DECLARATION OF VALERIE J. GRAY
22
23 MARINER HEALTH CARE INC., et. al.,
24                 Defendants.
25
26             **DECLARATION OF VALERIE J. GRAY**

   I, VALERIE J. GRAY, declare as follows:
27
28
                                 1

1. My name is Valerie J. Gray. I am a Certified Public Accountant (CPA), licensed in the states of Texas, California, and South Carolina. In addition, I am Accredited in Business Valuation (ABV) and Certified in Financial Forensics (CFF) through the American Institute of Certified Public Accountants (AICPA), a Certified Fraud Examiner (CFE) via the Association of Certified Fraud Examiners and am a Certified Cost Report Specialist (CCRS) with the American Institute of Healthcare Compliance. I received a Bachelor of Science in Accounting in 1991 as well as a Master of Science in Accounting in 1995, both from San Diego State University.

2. I have been deposed on nursing home finance and staffing approximately 25 times in more than a dozen states. I have testified as an expert in nursing home litigation in a California arbitration and as an expert in nursing home trials in Oklahoma and Missouri.

3. I am calculating how the amount of nursing staff reported by Parkview compares with the amount of nursing staff the Centers for Medicare and Medicaid Services (CMS) estimated, through the STM (as defined below) Study, those residents needed on average.

4. All the data relied upon in my calculations – other than the results of the CMS Time Study – can be sourced back to Parkview including RUG (as defined below) scores; Payroll Based Journal (PBJ) data; cost report information; timecard detail; and census data.

5. The CMS 1995 – 97 Time Study (STM) was intended to derive expected nursing time benchmarks as estimates of quality care by including nursing homes that had a reputation for delivering high quality care. The STM Study used independent observers to record how much nursing care was required to meet resident's needs.

6. I have relied on the following data and peer reviewed article:

   - CMS's 2017, 2018 and 2019 Provider Data Archive

   - Parkview's 2017, 2018, and 2019 Medicare and MediCal Cost Reports

   - Parkview's 2017, 2018 and 2019 PBJ Data

   - Parkview's 2017, 2018 and 2019 Timecard Data

   - Parkview's RUG Score Submissions to CMS

   - Harrington C, Dellefield ME, Halifax E, et al. Appropriate nurse staffing levels for U.S. nursing homes. Health Serv Insights 2020 June 29 EE pub ahead of print]. doi: 10.1177/1178632920934785

2

7. Skilled Nursing Facilities (SNFs) serve the needs of both post-acute care patients (typically funded by Medicare or Managed Care providers) and long-term care residents (typically funded by MediCal or private resources).

8. Most SNFs, including Parkview, receive most of their revenues from government programs including Medicare, MediCal, and the Veterans Administration. Parkview is both a Medicare and MediCal provider, and it is therefore required to comply with both federal and state laws and regulations.

9. Medicare providers are required to file an annual facility specific cost report with the government's fiscal intermediary or Medicare Administrative Contractor (MAC) containing the specified information required in the federal program. This report, commonly referred to as the "Medicare Annual Cost Report" contains voluminous data concerning revenue, expenses, assets, liabilities, contractual write-offs, net income or loss, census, transactions with related parties, nursing staff hours, salaries, capital expenditures, number and classification of RUG days submitted to Medicare for reimbursement, as well as other detailed financial information. MediCal providers file similar cost reporting information annually with the State of California.

10. The Medicare and MediCal systems reimburse skilled nursing facility providers by way of a prospective payment system which is based on each resident's acuity. Each resident's needs (acuity) are uniquely assessed using a Resident Assessment Instrument (RAI), also known as the Minimum Data Set (MDS). This assessment is required in the federal regulations at 42 CFR §483.20(b)(1). The MDS assessment generates a Resource Utilization Group (RUG) score. Each RUG score has a corresponding number of nursing hours, by nursing class – RN, LPN, CNA, estimated as needed to meet resident's needs in each RUG group which is based on the resources necessary to provide for those needs. The nursing time estimates apply to all residents, no matter their payor source.

11. A SNF's census may vary daily as patients are newly admitted or discharged. The industry uses a measurement of staff time that is expressed in the number of hours provided per patient day or HPPD. This metric allows management to review the staffing provided in an apples-to-apples comparison even when daily census fluctuates.

12. Census information is a critical component to the financial and operational elements of a SNF. The overall census number is important for calculating information in terms of per patient day (PPD) statistics, such as hours per patient day (HPPD) and cost per patient day ($PPD).

### Staffing

13. Nursing services are typically broken into two broad categories – nursing administration and direct nursing care. Nursing administration includes the director of nursing (DON), assistant director of nursing (ADON), and MDS nurses.

3

14. Direct care nursing staff consists of registered nurses (RNs), licensed practical nurses (LPNs), and certified nursing assistants (CNAs) who provide care directly to the patient.

15. Direct nursing care staff consists of the licensed component (the RNs and LPNs) and the unlicensed or custodial portion provided by the CNAs. The CNAs provide most of the activities of daily living (ADL) care which consists of toileting, feeding, bathing, ambulating, transferring, dressing, and other activities that do not require a licensed nurse.

16. The nursing services provided by the licensed nursing staff (RNs and LPNs) are dictated by the state's statutes governing the scope of practice for each of the nursing licenses. RNs must complete a more rigorous educational and training program and have a more complex scope of practice than LPNs.

17. CMS's concern with staffing is addressed in the Technical User's Guide for the Five-Star System:

   • "There is considerable evidence of a relationship between nursing home staffing levels and resident outcomes. The CMS Staffing Study found a clear association between nurse staffing ratios and nursing home quality of care, identifying specific ratios of staff to residents below which residents are at substantially higher risk of quality problems." Design for *Nursing Home Compare* Five-Star Quality Rating System: Technical User's Guide, pg. 7.

**Parkview's Reported Staffing to Medicare, MediCal and CMS's PBJ System**

18. Medicare defines "paid hours" such that it includes "regular hours, overtime hours, paid holiday, vacation, sick and other paid time-off hours and hours associated with severance pay." *Medicare Provider Reimbursement Manual, Part 2, Provider Cost Reporting Forms and Instructions, Chapter 41, Form CMS 2540-10, section 4105.4.* I have added the Nursing Administration hours from CMS 2540-10, Worksheet S-3-III to the RN category. The CMS cost reports filed by Parkview indicates staffing of 4.18 HPPD in 2017, 4.14 HPPD in 2018, and 4.42 HPPD in 2019 (which includes the non-direct care labor mentioned above).

19. The hours reported to Medicare are expected to be slightly higher than the nursing hours reported to MediCal and the PBJ system as the Medicare nursing hours are paid hours and the MediCal and PBJ nursing hours represent worked hours, also commonly referred to as productive hours. The significant variance in Parkview's reported hours to Medicare cannot be explained by paid time off. The variances are an indication that Parkview inflated the nursing hours reported to Medicare. See graph below paragraph 24.

20. The worked nursing hours reported on Parkview's MediCal Cost Report indicate staffing of 3.35 HPPD, including .37 HPPD of RN time, in 2017, 3.51 HPPD, including .36 HPPD of RN time, in 2018, and 3.77 HPPD, including .43 HPPD of RN time, in 2019. This data is included for comparative purposes in the graphs below paragraph 24.

4

21. The worked nursing hours reported by Parkview to CMS's PBJ system indicate staffing of 3.25 HPPD, including .35 HPPD of RN time, in 2017, 3.35 HPPD, including .35 HPPD of RN time, in 2018, and 3.67 HPPD, including .41 HPPD of RN time, in the first three quarters of 2019. The graphs below illustrate the difference between expected nursing hours based on resident acuity and the nursing hours reported to the PBJ system.





DECLARATION OF VALERIE J. GRAY

22. The worked nursing hours supported by Parkview's timecard data plus the agency nursing hours reported to Medicare indicate staffing of 3.51 HPPD, including .55 HPPD of RN time, in 2017, 3.15 HPPD, including .16 HPPD of RN time, in 2018, and 2,81 HPPD, including .05 HPPD of RN time, in the first three quarters of 2019. The graphs below illustrate the difference between expected nursing hours based on resident acuity and the nursing hours supported by Parkview's timecard data and agency hours reported to Medicare.





Note: Parkview reported 13,695 RN agency hours in 2017 on its Medicare Cost Report. The RN agency hours have not been verified. There were no agency hours reported by Parkview in 2018 or 2019.

DECLARATION OF VALERIE J. GRAY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

23. The variance by nursing class between expected nursing hours and nursing hours supported by Parkview's timecard and agency hours data is shown in the chart below. The facility was below CMS expected nursing hours for RNs and CNAs in every period analyzed. The LPN hours reported were above expected, but RN and LPN hours are not interchangeable as licensed nurses may only work within their licensed scope of practice.

| Comparison of Expected Nursing Hours to Nursing Hours Supported by Parkview's Timecard + Agency Data | 2017 | 2018 | 2019 Q1-Q3 |
|---|---|---|---|
| RN Expected Nursing Hours | 0.99 | 0.94 | 0.91 |
| RN Timecard + Agency Nursing Hours | 0.55 | 0.16 | 0.05 |
| Percentage Below Expected RN Nursing Hours | -44% | -84% | -95% |
| | | | |
| LPN Expected Nursing Hours | 0.66 | 0.59 | 0.57 |
| LPN Timecard + Agency Nursing Hours | 0.80 | 0.76 | 0.72 |
| Percentage Above Expected LPN Nursing Hours | 21% | 28% | 26% |
| | | | |
| CNA Expected Nursing Hours | 2.52 | 2.29 | 2.12 |
| CNA Timecard + Agency Nursing Hours | 2.16 | 2.24 | 2.05 |
| Percentage Below Expected CNA Nursing Hours | -14% | -2% | -3% |
| | | | |
| Total Expected Nursing Hours | 4.17 | 3.82 | 3.59 |
| Total Timecard + Agency Nursing Hours | 3.51 | 3.15 | 2.81 |
| Percentage Below Total Expected Nursing Hours | -16% | -17% | -22% |

DECLARATION OF VALERIE J. GRAY

**Comparison of Parkview's Reported Staffing Information**

24. Parkview reported staffing on their Medicare Cost Report, MediCal Cost Report. and by way of the PBJ system. The following graphs illustrate Parkview's RN and total reported staffing, as well as their nursing hours supported by timecards plus agency time, as compared to CMS's expected nursing hours based on facility reported acuity to the federal government.



DECLARATION OF VALERIE J. GRAY

25. The total number of hours staffed *below* CMS expected nursing hours are approximately 27,547 hours in 2017, 28,533 hours in 2018, and 24,617 in the first three quarters of 2019 as illustrated in the chart below, calculated as the difference between CMS expected nursing hours and Parkview's nursing hours supported by timecards and agency hours.



26. By staffing below CMS expected nursing hours, Parkview was able to save approximately $1,322,663 in 2017, $1,524,890 in 2018, and $1,270,801 in the first three quarters of 2019 in nursing staff costs. The savings are a result of staffing below CMS expected nursing hours as compared to Parkview's timecard and agency hour data.



DECLARATION OF VALERIE J. GRAY

1       I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct. Executed this 22nd day of October 2021, in Columbia, South

3   Carolina.

4

5

6   *Valerie Gray*

    _____

7       Valerie J. Gray, CPA, ABV, CFF, CFE, CCRS, MSA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# 10

**Valerie J. Gray**
**August 31, 2022**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA


PEOPLE OF THE STATE OF CALIFORNIA,

             Plaintiff,
                              **CERTIFIED COPY**
vs.                                No. RG21095881

MARINER HEALTH CARE, INC., et al.,
a Delaware Corporation,

             Defendants.

_____/


DEPOSITION OF VALERIE GRAY


Taken before STACY L. LOZANO, CSR No. 12831

a Certified Shorthand Reporter

for the State of California

Wednesday, August 31, 2022

---oOo---

Page 1

**Valerie J. Gray**
**August 31, 2022**

1  facilities.

2       And so what I need is the punch detail for all

3  five facilities for all five years downloaded directly

4  from the payroll system into Excel.  And it literally is

5  just a few clicks to do that.  And if you don't know how

6  to do it, you can call the software provider, and they'll

7  tell you how to do it.  It's easy.  So I need that.

8       I need the roster from you.  I have the roster

9  from Luke Vanderdrift.

10      I would -- the job codes that are going to be an

11  exhibit of this deposition, I'll be using those.  That

12  makes my job a lot easier.

13      In addition to that, from your payroll system, I

14  need a download of the audit log that shows all of the

15  manual changes, administrative changes to the payroll

16  record.

17      So if an administrator of the payroll record went

18  in and made changes, added hours, deleted hours, did

19  whatever, I need a record of every single administrative

20  change,  so I can -- and I'm telling you what I need all

21  so I can be -- you know, do the best analysis that I

22  possibly can for you with timecard detail.

23      And then I need all of your agency hours.  And I

24  want to see the invoice, like I do in other cases, from

25  the agency that was paid, along with the timecard slips

Page 103

# EXHIBIT

# 11

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## Rene C. Davidson Courthouse

| | |
|---|---|
| The People of the State of California<br>　　　　　Plaintiff/Petitioner(s)<br>　　　　　vs.<br>National Senior Care, INC., a Delaware Corporation et al<br>　　　　　Defendant/Respondent(s) | No.　　RG21095881<br><br>Date:　07/19/2022<br>Time:　3:00 PM<br>Dept:　23<br>Judge:　Brad Seligman<br><br>ORDER re: Hearing on Demurrer (Name Extension) |

The Demurrer - with Motion to Strike (CCP 430.10) filed by Mariner Health Central INC,a Delaware Corporation on 10/26/2021 is Denied.

BACKGROUND

On April 8, 2021, the People of the State of California (the "People") filed a complaint against several California-based skilled nursing facilities ("SNF") as well as Defendants Mariner Health Care, Inc., National Senior Care, Inc., and Mariner Health Care Management Company, which are Delaware corporations ("Specially Appearing Defendants" or "SAD" and together with SNF Defendants, "Defendants"). The SNF Defendants demur to the People's complaint and the Specially Appearing Defendants separately move to quash service for lack of jurisdiction.

A. The Complaint

The People's Complaint asserts three causes of action against all Defendants (including SAD) for (1) unfair competition (Bus. & Prof. Code, § 17200); (2) false advertising (Bus. & Prof. Code, § 17500); and (3) public nuisance (Civ. Code, § 3494).

The Complaint alleges that Defendants (1) "understaffed facilities," (2) "unsafely discharged residents," and (3) artificially "inflate[d] their advertised ratings" in order to "generate increased profits at the expense of resident care." (Complaint, ¶ 1.)

The Complaint alleges that Defendants provided insufficient staff and insufficient nursing care hours for residents. (Complaint, ¶¶ 67-71.) For example, the Complaint alleges that "Defendants counted vacation and other leave time as 'worked' hours for purposes of compiling the number of staff working in a facility." (Complaint, ¶ 4.) As a result of understaffing, the Complaint alleges, the SNF are unable to protect residents from violence, from "wandering off," and from infestations of lice and other pests. (Complaint, ¶¶ 72-77.) The Complaint also alleges that Defendants purposefully understaff in order to "syphon[] off funds." (Complaint, ¶ 2.)

Similarly, the Complaint alleges that Defendants routinely discharge residents when their insurance (e.g., Medicare /Medi-Cal) expires in order to "open beds for new residents with Medicare coverage thereby generating greater profits." (Complaint, ¶ 3; see also Complaint, ¶¶

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

78-85.)

Third, the People allege that Defendants provided false information (e.g., "distorted and inflated staffing numbers") to the Center for Medicare and Medicaid Services ("CMS") in order to obtain a "Five Star Rating." (Complaint, ¶ 4.) In turn, Defendants published the "Five Star Rating" in order to mislead consumers. (Ibid.; see also Complaint, ¶¶ 86-92.)

B. The Demurrer

SNF Defendants demur to the entire Complaint on the basis that each cause of action fails to state sufficient facts.

Second, the SNF Defendants demur to the first two causes of action (for violations of the UCL and FAL) on the basis of judicial abstention and primary jurisdiction, arguing that the court should defer to the California Department of Public Health ("CDPH") and Centers for Medicare and Medicaid Services ("CMS") to evaluate and remedy any non-compliance with applicable laws and regulations. Alternatively, the SNF Defendants argue a stay is warranted to allow the matter to be referred to the CDPH and CMS.

Third, the SNF Defendants demur to the nuisance cause of action as barred by Civil Code § 3482, which exempts acts done with "express authority of a statute" from being deemed a nuisance.

LEGAL FRAMEWORK

The standard for construing a complaint on demurrer is long settled: "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed. [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (Blank v. Kirwan (1985) 39 Cal.3d 311, 318.)

DISCUSSION

The SNF Defendants demur to the entire Complaint, arguing that (1) the court should abstain in deference to the CMS and CDPH; (2) the action should be stayed under the primary jurisdiction doctrine pending input from CMS and CDPH; (3) the FAL cause of action fails to state a claim; (4) the UCL cause of action fails to state a claim based on resident discharges; and (5) the public nuisance cause of action fails to state a claim.

A. Judicial Abstention

A court may abstain from adjudicating claims that seek equitable remedies in three circumstances: (1) where the court would assume or interfere with the functions of an administrative agency, (2) where the lawsuit involves determinations of complex economic policy best left to the Legislature or administrative agency, or (3) where the requested injunctive relief would be "unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress." (Arce v. Kaiser Foundation Health Plan, Inc.

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

(2010) 181 Cal.pp.4th 471, 496 [internal quotation marks omitted], quoting Alvarado v. Selma Convalescent Hosp. (2007) 153 Cal.App.4th 1292.)

The parties cite several cases where courts both approved of and disapproved of the application of the doctrine of judicial abstention.

Defendants cite Alvarado v. Selma Convalescent Hosp. (2007) 153 Cal.App.4th 1292 and Desert Healthcare Dist. v. PacifiCare FHP, Inc. (2001) 94 Cal.App.4th 781 (disapproved of on other grounds in Centinela Freeman Emergency Medical Assoc. v. Health Net of California, Inc. (2016) 1 Cal.5th 994).

Alvarado held that the trial court did not abuse its discretion in applying the doctrine of abstention and sustaining defendant's demurrer. The Alvarado plaintiff—a private individual seeking to represent a class—alleged that defendants, who owned and operated a network of care facilities, intentionally understaffed its facilities and "falsely advertised that they provided greater nursing levels than those actually provided." (Id., at p. 1296.)

In Desert Healthcare, the court affirmed the trial court's dismissal of plaintiff's claims under the doctrine of judicial abstention. (Desert Healthcare Dist., supra, 94 Cal.App.4th at p. 795.) The plaintiff hospital sued defendant, a health care service plan licensed under the Knox-Keene Act, for the outstanding debts of a third party that contracted with the defendant to provide services but filed for bankruptcy. (Id., at p. 785.) The court determined that the "instant case is a perfect example of when a court of equity should abstain," because the court would be required to determine appropriate levels of oversight and capitalization under the Knox-Keene Act. (Id., at p. 796.)

More recently, two courts found the application of the doctrine inappropriate. (Shuts v. Covenant Holdco LLC (2012) 208 Cal.App.4th 609; Arce v. Kaiser Foundation Health Plan, Inc. (2010) 181 Cal.App.4th 471.)

In Arce, the court found the trial court abused its discretion in sustaining a demurrer under the doctrine of equitable abstention. (Arce, supra, at p. 496.) The court reasoned that the claims did not require "individualized determinations of medical necessity for each putative class member," but rather the court merely needed to determine whether the defendant "systematically breached its health plan contract by denying coverage…" (Id., at p. 499.)

Similarly, Shuts reversed the trial court, finding its application of abstention doctrine inappropriate. "We note this will not be the first time courts have been called upon to adjudicate whether skilled nursing facilities have violated applicable staffing standards." (Shuts, supra, at p. 623, citing Conservatorship of Gregory (2000) 80 Cal.App.4th 514.)

In Shuts, as in this case, the plaintiffs sought to enforce the statutory staffing floor contained in Health & Safety Code §1276.65. This benchmark is a legislative mandate. The court is equipped to enforce this mandate.

B. Primary Jurisdiction

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## Rene C. Davidson Courthouse

The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." (Farmers Ins. Exchange v. Superior Court (1992) 2 Cal.4th 377, 390 [emphasis omitted], quoting United States v. Western Pac. R. Co. (9156) 352 U.S. 59, 63-64.)

The doctrine is motivated by dual policy concerns: "it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws." (Id., at p. 391.) Although there is no precise formula for application of the doctrine, "resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case." (Ibid.)

In Rojo v. Klinger, the California Supreme Court engaged in a two-step analysis. (Farmers Ins. Exchange, supra, at p. 396, citing Rojo v. Kliger (1990) 52 Cal.3d 65.) First, the court considered whether there is a "pervasive and self-contained system of administrative procedure," and, if so, whether "there is good reason to require that these administrative procedures be invoked…" (Rojo, supra, at p. 87.)

The SNF Defendants argue that the court should exercise its discretion in applying the primary jurisdiction doctrine because (1) CMS should determine the "star ratings"; (2) CMS and CDPH should determine discharge requirements; and (3) CMS and CDPH review of the allegations in the complaint "is not difficult to obtain."

Here, the court declines to dismiss or stay this action under the doctrine of primary jurisdiction.

First, the claims, as alleged, do not require the court to engage in a complex multi-factor analysis or "mini-trials." (Shuts, supra, 208 Cal.App.4th at p. 623 [noting "courts have been called upon to adjudicate whether skilled nursing facilities have violated applicable staffing standards"].) The People allege that Defendants reported vacation and other leave time as "worked" hours. (Complaint, ¶ 4.) This does not require the court to consider patient needs or any of the various factors the SNF Defendants argue go into the consideration of sufficiency of staffing levels. (See, e.g., Reply, at pp. 8-10.) Likewise, the court can assess compliance with minimum staffing mandates.

Similarly, the court does not need to decide how many stars a SNF may be entitled to; rather, the claim is merely that Defendants submitted inaccurate information to CMS, which can be decided without infringing upon CMS's decisionmaking authority. The same is true for discharge requirements. The People allege that Defendants would discharge patients when their insurance coverage stopped paying in order to open beds for new patients with paying coverage. (Complaint, ¶ 4.) This does not require the court to decide if specific notice requirements were followed depending on whether the discharges were patient-initiated or facility-initiated. Ultimately, none of the foregoing decisions have "been placed within the special competence of an administrative body." (Bradley v. CVS Pharmacy, Inc. (2021) 64 Cal.App.5th 902, 919-20, quoting Jonathan Neil & Assoc., Inc. v. Jones (2004) 33 Cal.4th 917, 931.)

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## Rene C. Davidson Courthouse

The SNF Defendants argue that expert guidance from CMS and CDPH "is not difficult to obtain" and generally concludes in no less than 120 days. Therefore, Defendants request the action stayed. (MPA, at p. 17.) The SNF Defendants filed their demurrer in October of 2021, and, now almost two years later, it does not appear that they have taken any steps to obtain the guidance they claim is necessary. Even if the court were to find the doctrine applicable, it would not be inclined to exercise its discretion where the parties had more than enough time to seek the CMS and CDPH's input but failed to do so.

Moreover, the People allege that the CDPH has found "at least 1,588 violations of regulations at [Defendants'] facilities." (Complaint, ¶ 73.) The SNF Defendants argue in reply that the People's allegation regarding "violations" is relatively vague insofar as it does not identify relevant information concerning the basis for the "violation" or any subsequent remedial actions. However, at this stage, the court takes the allegation as true. Thus, it would appear that the CDPH has already spoken on the matter and determined that there were at least some violations at Defendants' facilities.

Therefore, as to the doctrine of primary jurisdiction, the demurrer is OVERRULED.

C. False Advertising Claim

The SNF Defendants argue that the People's false advertising law fails to state a claim because (1) the statements were not advertising; (2) the statements are privileged; and (3) the statements were true.

The Complaint alleges that Defendants obtained and advertised a "Five Star" rating from the CMS by providing "falsified information." (Complaint, ¶ 4.) Specifically, the People allege that Defendants considered vacation and other leave time as "worked" hours in order to boost the number of staff working in a facility "to obtain a higher rating than warranted." (Ibid.)

Thus, as to the SNF Defendants' first argument, the statements made to CMS are not the alleged advertising that the People contend violate the FAL; rather, it was the advertising of the "Five Star" rating that the People challenge. (Complaint, ¶ 106 ["The published 'Five Star Rating' is obtained by false reporting; thus Defendants are causing false and/or misleading information to be published in their advertising…"].)

Regarding the second argument, the court is not inclined to find the statements privileged and, even if they were, the claim is predicated upon statements to the public. (Complaint, ¶ 106.) The SNF Defendants argue that the statements to CMS are absolutely privileged under Civil Code § 47, subd. (b), which defines a privileged publication as one made in a legislative, judicial, or other official proceeding authorized by law. (Civ. Code, § 47, subd. (b).)

The privilege in Civil Code § 47, subd. (b) "does not apply unless the statements were made in an anticipation of an official proceeding or during an official proceeding." (Bikkina v. Mahadevan (2015) 241 Cal.App.4th 70, 90, citing Hagberg v. California Federal Bank (2004) 32 Cal.4th 350, 368.) This privilege extents to communications with an official agency that are designed to induce action. (Ghafur v. Bernstein (2005) 131 Cal.App.4th 1230, 1235; see also

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

Fontani v. Wells Fargo LLC (2005) 129 Cal.App.4th 719, 734 ["Its protection is not limited to statements made in a courtroom or administrative hearing, but also includes communications that are part of an investigatory process that may lead to a later proceeding."].)

The phrase "in any other official proceeding" encompasses "those proceedings which resemble judicial and legislative proceedings…" (Picton v. Anderson Union High School Dist. (1996) 50 Cal.App.4th 726, 737.) Thus, courts consider the following factors in deciding whether an administrative body possesses quasi-judicial powers to investigate and remedy wrongdoings such that privilege attaches: "(1) whether the administrative body is vested with discretion based upon investigation and consideration of evidentiary facts, (2) whether it is entitled to hold hearings and decide the issue by the application of rules of law to the ascertained facts, and (3) whether its power affects the personal or property rights of private persons." (Ibid.)

The SNF Defendants offer no argument whether the CMS star rating system meets any of the above criteria. Although the SNF Defendants cite Fontani, neither party argues that the submissions to CMS were intended to prompt investigation or remedy wrongdoings. Nor does it appear that the rating system awards stars by the application of law to facts or otherwise affects personal or property rights of private persons. Thus, the court declines to find that the submissions to CMS are absolutely privileged based upon the current record.

Finally, the SNF Defendants argue that republication of information from the CMS website is not deceptive because "CMS did, in fact, rate the subject SNFs that way." (MPA, at p. 20.) The FAL (and UCL) "prohibit 'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" (Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 951, quoting Leoni v. State Bar (1985) 39 Cal.3d 609, 626.) Therefore, while the SNF Defendants may have merely reposted information from the CMS website, such "truth" does not necessarily preclude deception or confusion of the public.

D. Unfair Competition Claim

The SNF Defendants argue that the People's allegations regarding discharge of patients are conclusory and lack material facts. They argue that the "bald allegations that Defendants violated a range of Federal and State laws without supporting factual allegations cannot suffice to state a UCL claim." (MPA, at p. 21.)

While the form of discharge notice may depend on the circumstances, neither the Complaint nor the UCL is limited solely to the alleged violation of notice requirements. The Complaint alleges that Defendants discharged patients whose Medicare coverage expired in order to free beds for patients with coverage and maximize profits. Further, the Complaint alleges that Defendants discharged patients without ensuring the patents were safe, could care for themselves, or had a place to go. (Complaint, ¶ 4.) Assuming the truth of these allegations, they would be sufficient to withstand a demurrer under the "unfair" prong of the UCL. (Kasky, supra, at p. 949 ["By defining unfair competition to include also any 'unfair or fraudulent business act or practice' (§ 17200 [italics omitted]), the UCL sweeps within its scope acts and practices not specifically proscribed by any other law."].)

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## Rene C. Davidson Courthouse

In any event, as the SNF Defendants acknowledge, "a determination of these threshold issues [i.e., whether notice is required] is a fact-intensive inquiry," which the court declines to engage in on a pleading challenge. (MPA, at p. 20, fn. 4)

E. Public Nuisance Claim

The SNF Defendants argue that the public nuisance claim fails for several reasons—(1) failure to allege sufficient facts; (2) failure to establish the challenged conduct poses a harm to the general public; (3) the claim is barred by Civil Code § 3482; and (4) failure to establish the interference was substantial and unreasonable.

Taking the third argument first, the court does not find that the People's claim is barred by Civil Code § 3482. The California Supreme Court "has 'consistently applied a narrow construction to [Civil Code] section 3482…'" (Chase v. Wizmann (2021) 71 Cal.App.5th 244, 254.) To be barred by section 3482, the challenged conduct must be "authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury." (Ibid., quoting Friends of H Street v. City of Sacramento (1993) 20 Cal.App.4th 152, 160.)

In Chase, the court rejected the argument that non-violation of an applicable statute brought the conduct within the scope of section 3482. (Id., at p. 254.) There, the plaintiff alleged private nuisance based upon excessive construction noise. The defendant argued that liability was precluded under section 3482 because the noise levels did not exceed the limits proscribed by Los Angeles Municipal Code. The court rejected the argument, reasoning that "no 'immunity from traditional nuisance liability' is conferred by statutes or regulations unless they specifically authorize the exact act complained of." (Id., at p. 255, quoting Greater Westchester Homeowners Assn. v. City of Los Angeles (1979) 26 Cal.3d 86, 101-102.)

Here, the SNF Defendants do not cite any specific law or regulation; rather, they argue immunity should be based upon compliance (or non-noncompliance) with general licensing regulations. However, where the conduct at issue is not specifically authorized, compliance with a set of regulations is insufficient to confer immunity in the same way that compliance with a single regulation was insufficient in Chase. Moreover, as the SNF Defendants acknowledge, "although an activity authorized by statute cannot be a nuisance, the Manner in which the activity is performed may constitute a nuisance." (Greater Westchester Homeowners Assn., supra, at p. 101, quoting Venuto v. Owens-Corning Fiberglas Corp. (1971) 22 Cal.App.3d 116, 129.) The SNF Defendants' argument that licensure by the State of California precludes liability for public nuisance is unavailing.

The court finds the factual allegations are sufficient at this stage of the action.

"A public nuisance claim under California law requires a plaintiff to prove: (1) the existence of a duty; (2) causation; and that the alleged interference with the use or enjoyment of property is both (3) substantial; and (4) unreasonable." (Schaeffer v. Gregory Village Partners, LP (N.D. Cal. 2015) 105 F.Supp.3d 951, 966; see also In re Firearm Cases (2005) 126 Cal.App.4th 959, 988 ["The conduct necessary to make the actor liable for either a public or a private nuisance

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## Rene C. Davidson Courthouse

may consist of (a) an act; or (b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest."].)

The court is not persuaded by SNF Defendants' second argument regarding the "general public." It may be true that the origins of public nuisance concerned a "public right," which "is one common to all members of the general public." (Monks v. City of Rancho Palos Verdes (2008) 167 Cal.App.4th 263, 300.) As codified, however, a public nuisance extends to "any considerable number of persons." (Civ. Code, § 3480.)

Here, the Complaint alleges that the complained-of conditions were present at various SNF across the State of California, each of which contained anywhere between 70 and 250 beds. (Complaint, ¶¶ 12-30.) This is sufficient to allege a considerable number of persons. (Birke v. Oakwood Worldwide (2009) 169 Cal.App.4th 1540, 1548-49 [finding allegations that secondhand tobacco smoke adversely impacted an entire apartment complex sufficient].)

The People conclusively allege that the nuisance created a substantial and unreasonable threat. (Complaint, ¶ 112.) An interference "is substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted." (County of Santa Clara v. Atlantic Richfield Co. (2006) 137 Cal.App.4th 292, 305, citing People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1105.) Were this the only allegation, the court would agree it is a legal conclusion and insufficient to defeat a demurrer, but the complaint also alleges extensive harm to residents which required calls to law enforcement (Complaint, ¶76), residents wandering off because of a failure to monitor them (¶ 75), residents not protected from violence and sexual predation (¶74) and defendants failure to control infections. (¶77.) These allegations are sufficient to demonstrate "an adverse impact upon the public and surrounding community…" (Opposition, at p. 19.) .

Therefore, the Demurrer is OVERRULED as to the People's public nuisance claim.


The Court orders counsel to obtain a copy of this order from the eCourt portal.

Dated: 07/19/2022

**Brad Seligman / Judge**

---